**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| GWG HOLDINGS, INC., *et al.*[1] | Case No. 22-90032 (MI) (Jointly Administered) |
| Debtors. | |
| MICHAEL I. GOLDBERG, as Trustee of the GWG LITIGATION TRUST, | |
| Plaintiff, | |
| v. | Adv. Pro. No. _____ |
| BRADLEY K. HEPPNER, individually and in his capacity as Trustee of THE BRADLEY K. HEPPNER FAMILY TRUST, THE HEPPNER FAMILY HOME TRUST, THE HIGHLAND BUSINESS HOLDINGS TRUST, and THE HIGHLAND INVESTMENT HOLDINGS TRUST; BENEFICIENT CAPITAL COMPANY, L.L.C.; BENEFICIENT CAPITAL COMPANY II, L.L.C.; BENEFICIENT COMPANY HOLDINGS, L.P.; BENEFICIENT HOLDINGS, INC.; BENEFICIENT MANAGEMENT, L.L.C.; BRADLEY CAPITAL COMPANY, L.L.C.; PETER T. CANGANY, JR.; DAVID F. CHAVENSON; CT RISK MANAGEMENT, L.L.C.; ELMWOOD BRADLEY OAKS, L.P.; TIMOTHY L. EVANS; FUNDING TRUST MANAGEMENT, L.L.C.; TIMOTHY B. HARMON, in his capacity as Trustee of THE HIGHLAND INVESTMENT | |

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: GWG Holdings, Inc. (2607); GWG Life, LLC (6955); GWG Life USA, LLC (5538); GWG DLP Funding IV, LLC (2589); GWG DLP Funding VI, LLC (6955); and GWG DLP Funding Holdings VI, LLC (6955). The location of Debtor GWG Holdings, Inc.'s principal place of business and the Debtors' service address is 325 N. St. Paul Street, Suite 2650 Dallas, TX 75201. Further information regarding the Debtors and these chapter 11 cases is available at the website of the Debtors' claims and noticing agent: https://donlinrecano.com/gwg.

HOLDINGS TRUST; HCLP CREDIT
COMPANY, L.L.C.; HCLP NOMINEES,
L.L.C.; THOMAS O. HICKS; HIGHLAND
CONSOLIDATED, L.P.; MURRAY T.
HOLLAND; LIQUIDTRUST
MANAGEMENT, L.L.C.; RESEARCH
RANCH OPERATING COMPANY, L.L.C.;
BRUCE W. SCHNITZER; THE
BENEFICIENT COMPANY GROUP, L.P.;
THE BENEFICIENT COMPANY GROUP
(USA), L.L.C.; and JOHN STAHL, in his
capacity as Trustee of THE LT-1
COLLECTIVE COLLATERAL TRUST,
THE LT-2 COLLECTIVE COLLATERAL
TRUST, THE LT-3 COLLECTIVE
COLLATERAL TRUST, THE LT-4
COLLECTIVE COLLATERAL TRUST,
THE LT-5 COLLECTIVE COLLATERAL
TRUST, THE LT-6 COLLECTIVE
COLLATERAL TRUST, THE LT-7
COLLECTIVE COLLATERAL TRUST,
THE LT-8 COLLECTIVE COLLATERAL
TRUST, THE LT-9 COLLECTIVE
COLLATERAL TRUST, THE LT-1 LIQUID
TRUST, THE LT-2 LIQUID TRUST, THE
LT-5 LIQUID TRUST, THE LT-7 LIQUID
TRUST, THE LT-8 LIQUID TRUST, and
THE LT-9 LIQUID TRUST,

    Defendants.

## **COMPLAINT**

## <u>TABLE OF CONTENTS</u>

NATURE OF ACTION ............................................................................................................... 1

JURISDICTION AND VENUE .............................................................................................. 14

PARTIES AND OTHER RELEVANT PERSONS AND ENTITIES ........................................ 15

   A.   Plaintiff Litigation Trust .............................................................................................. 15

   B.   Defendants .................................................................................................................. 15

        1.   Defendants Heppner, HCLP, and HCLP-Affiliated and Heppner-Affiliated Trusts and Entities .......................................................... 15

        2.   Defendant BEN Entities ................................................................................. 19

        3.   Defendant GWG Officers (and Later Directors), Holland and Evans....................... 20

        4.   Other Defendant GWG Directors .................................................................. 21

        5.   Other Defendants ........................................................................................... 23

   C.   Relevant Non-Parties ................................................................................................. 24

        1.   Non-Party Former GWG Directors ................................................................ 24

        2.   Other Relevant Non-Parties........................................................................... 26

Factual Background ................................................................................................................. 27

   A.   GWG's Historical Secondary Life Insurance Policy Business and Public Capital-Raising Machinery. ...................................................................................... 27

   B.   BEN's Origins and Formative Transactions, Including HCLP's Purported Refinancing of Debt Involving Heppner Affiliates. ..................................................... 28

        1.   BEN's Initial "Liquidity Transactions" on September 1, 2017. ............................... 28

        2.   BEN and Heppner's Shuffling of Assets and "Refinancing" Under a Purported $141 Million Debt to HCLP. ......................................... 31

        3.   BEN's Second Debt with HCLP. ................................................................... 35

        4.   Highland Consolidated Procures Over $▮ Million from GWG and BEN, then Advances Large Sums to Heppner's Affiliates......................... 36

        5.   Heppner's Efforts to Disguise His Influence Over and Distance Himself From HCLP. ................................................................................ 40

   C.   BEN, Holland, and Heppner Take Control of GWG in April 2019. ................................. 47

        1.   The Seller Trusts, Effectively Controlled by Holland and BEN (and, In Turn, Heppner), Obtain Majority Voting Control of GWG in April 2019. ......................... 47

        2.   BEN, Heppner, and Holland Install BEN's Presently Serving Directors as New GWG Directors on April 26, 2019, and Holland and Evans Become GWG Officers. ..................................................................... 49

i

3.   Thereafter, Heppner, Holland, and BEN Form a Control Group of Controlling Stockholders. ..................................................................................... 50

D.   BEN, Heppner, and Holland Initiate $154 Million in GWG Transfers Approved by an Ineffective GWG Special Committee (Mason and Chavenson) During 2019. ............... 52

   1.   A Special Committee with an Ineffective Mandate and Prearranged Counsel is Put in Place to Rubber Stamp Investments in BEN. ........................................ 52

   2.   In May 2019, the Chavenson/Mason Special Committee Hurriedly Approves a $10 Million Transfer for BEN Equity and a $65 Million Loan to BEN. .................. 57

   3.   The Chavenson/Mason Special Committee Is Presented with Numerous "Red Flags" Regarding BEN from June 2019 through December 2019. ......................... 70

   4.   Despite Numerous "Red Flags," the Ineffective Special Committee Approves a $79 Million Transfer to BEN in Exchange for BEN Equity on December 31, 2019. ................................................................................. 86

   5.   Summary of the Unfairness Surrounding the 2019 Transactions. .......................... 142

E.   Mason and the Special Committee's Advisors Resign, as Heppner Stacks the Special Committee with a BEN-loyal Plant, Defendant Cangany. ................................................ 147

F.   A Tainted and Ineffective Special Committee (Cangany, Chavenson, and Bailey) Approves the UPA, Clearing the Way for $130.2 Million in Transfers from GWG to BEN During 2020. ......................................................................................... 152

   1.   The Corrupt Cangany/Chavenson/Bailey Special Committee Immediately Recognizes Valuation Discrepancies Create a Challenge to Get Money to BEN. .. 153

   2.   Despite the Absence of Valuation Support, the Cangany/Chavenson/Bailey Special Committee Approve the UPA on July 15, 2020, and a $61 Million Transfer to BEN. ..................................................................................... 157

   3.   The Cangany/Chavenson/Bailey Special Committee Approves the Conversion of the $69.2 Million Liquid Trust Loans into Preferred C Units of BCH. .................... 168

   4.   The Cangany/Chavenson/Bailey Special Committee Approves Other Items on Heppner's and BEN's Wish List. .............................................................. 170

   5.   Chavenson and Special Committee Counsel Belatedly Express Concerns, Resulting in Heppner Side-Lining the Special Committee. .................................... 171

   6.   Heppner, Holland, and BEN (with Evans's Assistance) Cause GWG to Transfer an Additional $69.2 Million to BEN, With Minimal Special Committee Involvement. ....................................................................................... 173

   7.   Summary of Unfairness in 2020 Transactions. ......................................................... 175

G.   GWG Funding of $14.8 Million to BEN in March 2021, Over Objections of New Special Committee (Fine, Bailey, MacDowell). ........................................................... 180

H.   With the Special Committee Out of the Way, BEN Subordinates GWG's Preferred C Account. .......................................................................................................... 188

I.   Defendants' Unfair Treatment of GWG in Trying to Insulate Themselves from Liability and Distance BEN from GWG During 2021. ......................................... 192

    1.   GWG's Disloyal Fiduciaries' Dishonest and Misguided Initial Attempts to Paper the Record for the Patently Unfair Planned Decoupling. ......................................... 194

    2.   GWG's Board Becomes Aware of Significant Regulatory and Financial Risks for GWG Before Approving the Decoupling. ................................................................ 206

    3.   The Decoupling Transaction Was Unfair to GWG and Did Not Yield any of the Benefits Defendants Used to Try to Justify the Transaction. .................................. 208

J.   While Heppner and His Affiliates Made Out Like Bandits, GWG Obtained Equity in a Speculative, Distressed Business—BEN—that Has Predictably Since Gone Down in Flames, Resulting in a Near-Total Loss for GWG. .......................................................... 215

    1.   BEN Equity Had Minimal Fair Market Value When GWG Acquired it at Prices Implying BEN Was Worth Billions of Dollars. ....................................................... 215

    2.   BEN's Disastrous Stint as a Public Company. ....................................................... 228

CAUSES OF ACTION ............................................................................................................. 232

COUNT 1:  BREACH OF FIDUCIARY DUTY AGAINST CONTROL GROUP OF CONTROLLING STOCKHOLDERS (Against BEN Management, BEN LP, BCH, BCC, Heppner, and Holland)............................................................................... 232

COUNT 2:  BREACH OF FIDUCIARY DUTY AGAINST DEFENDANT DIRECTORS (Against Heppner, Hicks, Schnitzer, Chavenson, Cangany, Holland, and Evans) ......... 235

COUNT 3: BREACH OF FIDUCIARY DUTY AGAINST DEFENDANT OFFICERS (Against Holland and Evans)............................................................................. 241

COUNT 4:  AIDING AND ABETTING AND/OR KNOWING PARTICIPATION IN BREACHES OF FIDUCIARY DUTY (Against BEN Management, BEN LP, BCH, and BCC) ...................................................................................................... 243

COUNT 5:  AIDING AND ABETTING AND/OR KNOWING PARTICIPATION IN BREACHES OF FIDUCIARY DUTY (Against HCLP and Highland Consolidated) ... 245

COUNT 6:  UNJUST ENRICHMENT (Against HCLP, Highland Consolidated, and Other Defendants to the Extent that They Were Direct or Indirect Subsequent Transferees of Highland Consolidated) ............................................................................... 248

COUNT 7:  UNJUST ENRICHMENT (Against Bradley Capital)........................................ 250

COUNT 8:  UNJUST ENRICHMENT (Against Heppner)..................................................... 251

COUNT 9:  CIVIL CONSPIRACY (Against Heppner, HCLP, and Highland Consolidated)............................................................................................... 253

COUNT 10:  AVOIDANCE AND RECOVERY OF THE $&#9608;&#9608;&#9608;&#9608;&#9608; FRAUDULENT
TRANSFER MADE TO PURCHASE &#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;
PURSUANT TO TEXAS BUSINESS & COMMERCE CODE ("TUFTA") §§
24.005(a)(1), 24.008 & 24.009 (Against HCLP, HCLP Credit, Highland
Consolidated, Heppner Family Home Trust, and Harmon Trust)................................... 255

COUNT 11: AVOIDANCE AND RECOVERY OF FRAUDULENT TRANSFERS MADE
BY HCLP COMMENCING IN JUNE 2019 AND CONTINUING THEREAFTER
PURSUANT TO TUFTA §§ 24.005(a)(1), 24.008 & 24.009 (Against HCLP Credit,
Highland Consolidated, and Subsequent Transferees of Highland Consolidated
(including, but not limited to, Bradley Capital, Elmwood Bradley Oaks, Brad
Heppner Family Trust, and HBH Trust)) ....................................................................... 261

COUNT 12:  AVOIDANCE AND RECOVERY OF FRAUDULENT TRANSFERS MADE
BY BEN IN JUNE 2019 AND CONTINUING THEREAFTER PURSUANT TO
TUFTA §§ 24.005(A)(1), 24.008 & 24.009 (Against HCLP, HCLP Credit, Highland
Consolidated, and Subsequent Transferees of Highland Consolidated (including, but
not limited to, Bradley Capital, Elmwood Bradley Oaks, Brad Heppner Family Trust,
and HBH Trust)............................................................................................................... 265

COUNT 13:  AVOIDANCE OF THE BEN-HCLP FIRST DEBT AND BEN-HCLP
SECOND DEBT AS OBLIGATIONS INCURRED WITH ACTUAL INTENT TO
HINDER, DELAY, OR DEFRAUD CREDITORS (INCLUDING GWG) PURSUANT
TO TUFTA §§ 24.005(A)(1), 24.008, & 24.009 (Against BEN LP, BCC, BCH, BHI,
and HCLP) ...................................................................................................................... 270

COUNT 14:  AVOIDANCE AND RECOVERY OF FRAUDULENT TRANSFERS MADE
BY GWG (FROM JULY 2020 – DECEMBER 2020) PURSUANT TO 11 U.S.C. §§
548(a)(1)(A) & 550 (Against BCH, BCC, BCG (USA), HCLP, HCLP  Credit,
Highland Consolidated, CT Risk Management, L.L.C., and Other Subsequent
Transferees (including, but not limited to, Bradley Capital, Elmwood Bradley Oaks,
Brad Heppner Family Trust, and HBH Trust)) ............................................................... 276

COUNT 15:  AVOIDANCE AND RECOVERY OF THE $65 MILLION LOAN
PURSUANT TO APPLICABLE STATE LAW AND 11 U.S.C. §§ 544(b) & 550
(Against LiquidTrust Management, L.L.C., the Liquid Trusts, the Collective
Collateral Trusts, Funding Trust Management, L.L.C., BCC, HCLP, HCLP Credit,
Highland Consolidated, Bradley Capital, and Research Ranch Operating Company)... 281

COUNT 16:  AVOIDANCE OF TERMINATION OF THE 2019 NOTE AS A
FRAUDULENT TRANSFER AND RECOVERY OF THE VALUE THEREOF
PURSUANT TO 11 U.S.C. §§ 548(a)(1)(A) & 550 (Against the Liquid Trusts) .......... 286

COUNT 17:  AVOIDANCE OF FRAUDULENT TRANSFERS MADE IN THE
NOVEMBER 2021 DECOUPLING TRANSACTION AND RECOVERY OF THE
VALUE THEREOF PURSUANT TO 11 U.S.C. §§ 548(a)(1)(A) & 550 (Against BEN
LP, BEN Management, BCC, BCH, Heppner, Hicks, Schnitzer, Cangany, Holland,
Evans, and Chavenson)................................................................................................... 288

COUNT 18:  AVOIDANCE OF ANY PURPORTED RELEASES GIVEN TO
DEFENDANTS AS FRAUDULENT TRANSFERS PURSUANT TO 11 U.S.C. §§
544(b), 548 & 550 (Against all Defendants) ................................................................. 292

COUNT 19:  RESCISSORY, DECLARATORY, OR OTHER RELIEF ESTABLISHING
THAT ANY PURPORTED RELEASES ARE VOID IN EQUITY OR AT COMMON
LAW....................................................................................................................................... 293

COUNT 20:  DISALLOWANCE OF CLAIMS PURSUANT TO 11 U.S.C. § 502(d) .......... 297

PRAYER FOR RELIEF............................................................................................................................ 298

Michael I. Goldberg, in his capacity as trustee of the GWG Litigation Trust, the successor-in-interest to the claims of GWG Holdings, Inc. and its affiliated debtors and debtors-in-possession (collectively, the "Debtors"), by and through his undersigned counsel, respectfully alleges the following:

## NATURE OF ACTION

1.      This action arises out of egregious duty of loyalty breaches—including, by some defendants, misconduct amounting to corporate looting—by Defendant Brad Heppner and other disloyal former directors, officers, and controlling shareholders of GWG Holdings, Inc. ("GWG Holdings," and together with its wholly owned subsidiaries, "GWG").

2.      As alleged in more detail below, Heppner and his allies seized control of GWG in April 2019 and then funneled nearly $300 million in cash from GWG to (or at the request of) a group of Heppner-dominated companies doing business as Beneficient, which during the relevant time period, fell under the umbrella of The Beneficient Company Group, L.P. (together with its general partner and wholly subsidiaries, "BEN").  Once GWG's funds were transferred to BEN and other entities that Heppner ultimately controlled, Heppner siphoned much of those funds—at least $140 million—into his vast network of affiliated trusts and entities.  This self-enrichment scheme would not have been possible if not for the disloyal actions of several GWG fiduciaries—and the negligence and/or knowing complicity of several non-party professional firms—who helped Heppner funnel money from GWG to BEN as an initial step.

3.      Notably, between April 2019 and March 2021—the period during which GWG transferred hundreds of millions of dollars to BEN or at BEN's request—a number of directors joined and left GWG's board.  Many of those directors undoubtedly would have stopped Heppner's self-enrichment scheme in its tracks had they actually known what was happening,

*e.g.,* ██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████.

4.      But those directors never got the chance.  Instead, certain of GWG's fiduciaries—named as defendants in this action—acted disloyally, favoring BEN's interests over GWG's interests at every turn and throwing vast sums of cash into the financial black hole that was BEN. That disloyal misconduct effectively enabled Heppner to procure cash for BEN, which he could then funnel upstream for himself and his affiliates.  During the same time frame, four different iterations of board special committees were formed, reconstituted, and disbanded, as Heppner and his allies (including some special committee members) tried to undermine those committees' efforts and quash dissent; three law firms representing those committees resigned; and multiple valuation firms provided draft valuations that did not support the transactions between GWG and BEN—and that all valuation firms were unwilling to stand behind.

5.      While Heppner's affiliates walked away with more than a hundred million dollars, that same misconduct cost GWG in $300 million in cash outlays, loss of a $200 million note from BEN (in exchange for equity of minimal value), and well over $100 million in legal costs and professional fees resulting from the unfair transactions themselves, extensive SEC investigations, and a contentious bankruptcy proceeding, as Heppner and BEN tried to insulate themselves from liability for their misconduct.  This action seeks to recover the hundreds of millions of dollars that GWG lost as a result of Heppner's scheme and the disloyal acts of GWG fiduciaries who enabled that misconduct.

6.      Heppner is the founder, chairman, and CEO of BEN. Heppner, after selling businesses in the early 2000's, had spent over a decade running a mostly unsuccessful "family office" and several other ventures.  In the 2015 to 2017 timeframe, Heppner developed a new business idea that eventually became BEN.  BEN's business plan was to earn fees and interest by operating a "fund of funds" type investment business—through a complex network of related trusts—that would obtain illiquid alternative assets from mid-to-high net worth individuals and smaller institutions holding alternative assets (*e.g.,* limited partnership interests in private equity funds), for which there is not an established secondary market.  But BEN's business plan was inherently capital intensive, as capital was necessary to procure alternative assets to put in the trusts (from which BEN would earn fee and interest revenue).  BEN had minimal capital, however, even at the time of its formative transactions in September 2017, and was consistently losing money.

7.      BEN's outlook appeared to improve when GWG entered the picture in January 2018 and agreed to provide an ongoing stream of debt financing, cash, and stock as part of a convoluted series of transactions that closed throughout 2018.  Although GWG was independent from BEN at the time, this was nevertheless a game-changer for Heppner.  As Heppner ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████  But after more than a decade of unprofitability, Heppner was unwilling to wait for BEN to turn a profit that would generate a return.  Rather, Heppner crafted a plan to extract cash from BEN ahead of all other equity holders through a bespoke network of affiliated entities and trusts.

8.     The key to Heppner's self-enrichment scheme rested in the creation of senior debt purportedly owed to third parties. In connection with BEN's re-formative transactions on September 1, 2017, Heppner re-shuffled assets, liabilities, and limited partnership ownership interests as part of a $141 million new senior debt facility purportedly owed by BEN to HCLP Nominees, LLC ("HCLP").  HCLP, however, was nothing more than a front for various Heppner-affiliated entities and trusts.  In fact, BEN's adoption of this purported $141 million obligation to HCLP was a non-cash transaction—*i.e.,* HCLP did not advance funds to BEN—and primarily involved "refinancing" purported related-party "loans" associated with Heppner's affiliates that dated back over a decade and had non-commercial terms.

9.     In essence, BEN's purported $141 million senior debt to HCLP (the "BEN-HCLP First Debt") was the product of Heppner's elaborate shell game.  Nevertheless, it effectively sat at the top of BEN's capital stack.  In December 2018, Heppner layered another $72 million purported debt into BEN's capital stack (the "BEN-HCLP Second Debt").  Again, this was a non-cash transaction; despite having no contractual right to convert equity into debt, Heppner leveraged his control over BEN to obtain an early exercise of preferred equity to common equity conversion rights, taking the debt in lieu of common equity.  (The purported debt owed by BEN was initially owed to a different Heppner-affiliated entity but was later assigned to HCLP during 2019.)

10.     Layering the $141 million BEN-HCLP First Debt and $72 million BEN-HCLP Second Debt onto BEN's capital stack—without contributing cash to BEN in exchange—provided Heppner with a means of extracting cash for his affiliated network of trusts and entities even *before* BEN fully launched its business or turned profitable.  HCLP was indirectly owned by Highland Consolidated, L.P. ("Highland Consolidated"), which Heppner ▮▮▮▮▮▮

4

█████████████████. And for over two decades, Highland Consolidated had served as a piggy bank for Heppner, having advanced most of its capital to Heppner's network of trusts and entities as purported "investments" or "loans."  In turn, by getting BEN to repay its purported debts to HCLP and then upstreaming the cash from HCLP to Highland Consolidated, Heppner could extract cash out of BEN's business, regardless of whether BEN or its investors ever made a penny.

11.    Heppner's ability to use BEN's repayments of its purported debts to HCLP to enrich himself and his affiliates was limited, however, by one major hurdle: BEN's ability to repay its "debt" to HCLP.  That was a major problem because BEN had no hope of repaying the purported debt on its own.  Indeed, BEN's speculative business model was unproven, and BEN suffered losses and rapidly burned through cash.  Moreover, BEN's cash flows depended on fees and interest collected from various trusts that owned the alternative assets obtained in BEN's formative transactions, yet those underlying assets were illiquid (by definition), mostly old and stale, and/or distressed.

12.    By the spring of 2019, BEN's business was in dire straits.  Not only was it unable to timely repay HCLP (even interest payments), ████████████████████ ████████████████████. Because BEN was unable to generate cash on its own to even fund operations, let alone repay HCLP, Heppner needed to find a consistent outside source of cash for BEN, *i.e.,* he needed to find a third party willing to "invest" in BEN by pouring cash into the business, despite its many problems.

13.    Heppner found the perfect mark in GWG.  GWG was a publicly traded company that, historically, had been involved in the secondary life insurance business.  GWG's investments in life insurance policies were largely financed through public debt markets (and "L

Bonds" sold to investors).  Accordingly, GWG had an established and experienced capital-raising network in place.  At the same time, GWG was considering an exit from the secondary life insurance business into other alternative investments (the reason for its initial transactions with BEN).

14.      By buying out GWG's founders and taking over GWG, Heppner and BEN could effectively hijack GWG's capital-raising machinery and use it to funnel cash into BEN (and, from Heppner's perspective, from BEN to HCLP and into Highland Consolidated, his piggy bank).   And to that end, in April 2019, Heppner and BEN effectively took control of GWG.  GWG's entire pre-existing board resigned and was replaced by Heppner and other directors designated by BEN.  Each of the members of GWG's new board was also a BEN director, and these BEN-loyal, dual-directors promptly voted for Heppner to serve as GWG's chairman at their first GWG board meeting.  At the same time, they installed a former BEN director, Defendant Murray Holland, as GWG's new President and CEO.  And as part of the same change in control in April 2019, Holland and a BEN designee gained effective majority voting control over GWG stock.

15.      Thereafter, Holland, Heppner, and BEN functioned as a control group of controlling stockholders over GWG, both generally and with respect to the specific transactions at issue.  Holland, Heppner, and BEN did so through a combination of: (a) indirect majority voting control over GWG; (b) their positions (Holland as President and CEO and Heppner as Chairman); (c) their pervasive influence in a GWG board room dominated by dual-directors also serving on BEN's board; (d) collusion with BEN-loyalist directors on GWG's executive committee (Defendants Tom Hicks and Bruce Schnitzer); (e) through their installation of

Defendant Tim Evans, a former BEN officer, as GWG's CFO; and (f) pervasive misconduct in orchestrating approximately $300 million in transfers from GWG for their benefit.

16.     Immediately upon seizing control of GWG, Holland, Heppner, and BEN initiated numerous cash transactions from GWG to BEN (or at BEN's request).  These transactions included:

- GWG's transfer of $10 million to a third party for BEN common equity at grossly excessive prices (approved in May 2019), at the urging of Holland, Heppner, and BEN;

- A $65 million unsecured loan in May 2019 from a GWG subsidiary to trusts related to BEN's business, made with the understanding that the proceeds would flow to BEN;

- A $79 million transfer made by GWG in December 2019 in exchange for equity interests in BEN (the "December 2019 Transaction");

- $61 million of transfers made by GWG to BEN (and directly to HCLP for BEN's benefit) in exchange for subordinated BEN equity in July 2020;

- $69.2 million in additional transfers from GWG to BEN in September 2020, October 2020, and December 2020; and

- An additional $14.8 million from GWG to BEN in March 2021.

Most of those transfers served no real purpose in advancing BEN's business or the value of GWG's "investment" in BEN.  A significant portion of the substantial sums transferred by GWG merely lined the bank accounts of Heppner's affiliated trusts and entities; at least $140 million of the funds GWG transferred, directly or indirectly, flowed to Highland Consolidated and/or other Heppner affiliates, mostly on account of BEN's purported debts to HCLP.

17.     Because the transactions between GWG and BEN involved obvious conflicts of interest, Heppner, Holland, and the BEN directors dominating GWG's board elected nominally independent directors to serve on a Special Committee to approve the transactions.  But not all of the transactions were approved by Special Committees.  And those transactions that did receive

the approval of some iteration of GWG's Special Committee—which changed over time as directors resigned—were the product of grossly unfair dealing in numerous respects, as detailed at length below.

18.     <u>First</u> and foremost, the various Special Committees' approvals of transfers of GWG funds—to the extent such approvals were obtained—were procured by egregious duty of candor and disclosure breaches—if not outright fraud—by Holland, Evans, and Heppner (and, on occasion, by Defendant Pete Cangany, a dual-director who was chairman of BEN's Audit Committee).  The various iterations of GWG's Special Committee were told several outright lies or half-truths regarding BEN's current financial condition, the planned use of funds advanced by GWG, BEN's regulatory needs, and the status of BEN's application for a trust charter (which was always right around the corner).

19.     But worst of all, GWG's independent directors were deceived regarding HCLP's relationship with Heppner and Heppner's affiliated trusts and entities.  Repeatedly, GWG's Special Committees were led to believe that if GWG did not advance funds to BEN so that BEN could repay HCLP, then HCLP would foreclose on its collateral (substantially all of BEN's assets), thereby ruining BEN and, in turn, resulting in GWG taking a substantial loss on its debt and equity exposure in BEN.

20.     Moreover, HCLP was falsely portrayed as a hard bargaining third party lender. BEN's and HCLP's counsel—unwittingly or, in some instances, knowingly—made numerous false statements claiming that Heppner had no control over HCLP, that he could not replace its managers, and that at most he had a contingent indirect interest.  In reality, however, Heppner changed HCLP's manager to install friends and colleagues to serve as fronts (while directing them behind the scenes), and even backdated documents to make it appear as though he did not

control HCLP.  Yet, all along, Heppner's affiliates and trusts held substantial indirect equity interests in HCLP, and HCLP funneled the money it received to Highland Consolidated (Heppner's slush fund).

21.     Second, the Special Committees were irredeemably tainted by inclusion of two disloyal directors—Defendant David Chavenson and Defendant Cangany—who actively colluded with Holland, Evans, Heppner, and BEN and/or otherwise approved transactions to benefit BEN, even though they knew that those transactions were against GWG's best interests and were grossly unfair to GWG.  Chavenson chaired the two-person 2019 iteration of the Special Committee.  Later, at Heppner's urging, Cangany—chair of BEN's Audit Committee with long ties to BEN—was installed in a 2020 iteration of the Special Committee consisting of Chavenson, Cangany, and an independent third director.

22.     Notably, *all five* of the *other* GWG directors who served on one or more of the four different iterations of the Special Committee resigned as GWG directors within one year, and some within less than two months, of becoming GWG directors.  They did so due to significant concerns regarding the unfairness of the transactions between GWG and BEN (although many never received accurate information that would have allowed them to act), and lack of proper corporate governance, more broadly.

23.     One independent director and Special Committee member, for instance, observed that Heppner had created "a *rubber stamp environment* that may not be readily apparent to the existing board.  *Dangerous*.  Certainly not in sync with governance or transparency."  Another observed that Heppner, with the aid of Holland and Evans, was engaged in a "game of lies and mischaracterizations" that "is *unethical and in bad faith* at the least, *coercion and intimidation trying to make us ignore and/or rationalize our fiduciary responsibility* to the minority

9

shareholders in the middle, and *potentially illegal under securities laws* at worst." And another expressed total agreement with that sentiment, chiming in that "[t]hose guys will run right over us and not look back." Heppner responded to such dissident voices by trying to pressure individuals to resign, and—with the support of other Defendants—dissolving the Special Committee altogether in March 2021.

24.   <u>Third</u>, none of the Special Committees' efforts were adequately supported by legal advisors. Three different law firms represented the various iterations of the Special Committee, and all raised significant concerns before resigning. The first two of those law firms, due to negligence or complicity, nevertheless helped push through unfair transactions and "paper the record" before resigning. The third firm, which competently did its job and refused to be bullied into papering over unfair transactions, figured out that BEN and HCLP "are not at arms length," raising the question of "whether this currently is an 'inside job.'" But Heppner and the other Defendants dissolved that iteration of the Special Committee and approved additional funding to BEN over its objection.

25.   Likewise, none of the Special Committees' approvals of transactions were adequately supported by financial advisors. Many of the transactions were approved at times when the relevant Special Committee did not even have a financial advisor in place. And even when a financial advisor was involved (such as in December 2019 and July 2020), the Special Committee did *not* obtain formal fairness opinions or valuation opinions from its advisors because they were unable or unwilling to provide analysis that justified the transactions and/or the Special Committee did not wait on an advisor to complete its work because BEN was desperate for cash.

26.     Indeed, the Special Committee's financial advisor in December 2019 flatly refused to provide a formal fairness opinion and valuation opinion due to "major concerns about Ben," including "significant issues in Ben's financials," and because the advisor was "extremely uncomfortable with BEN's financial and valuation policies and BEN's overall financial condition."   Upon later resigning, the principal on the engagement further explained—to Chavenson and Cangany—that it was "one of few times in my 15 years" at his firm "where I have actually resigned from an engagement which is an indication of my level of concern." (Despite such strong warnings, Chavenson and Cangany later approved GWG sending $61 million more to BEN and HCLP in July 2020.)

27.     Accordingly, for those and many other reasons, as alleged below, all of the $300 million in transfers were the result of grossly unfair dealing.   Unsurprisingly, that pervasive unfairness resulted in an unfair price, as the consideration that GWG received in connection with these transactions was grossly inadequate.   Given BEN's financially distressed condition, no third party in an arm's-length marketplace transaction would have given cash in exchange for BEN equity at anything close to the prices paid or terms agreed to by GWG at the time of those transactions, especially considering that Heppner, and to a lesser extent Hicks and Schnitzer, had preferential positions in BEN's capital stack and waterfall.   And BEN would have needed to be worth many billions of dollars to make the prices paid even remotely defensible.

28.     But BEN was not worth billions.   BEN was a . It did not yet have a state-issued charter to exempt it from the Investment Company Act of 1940 (a key plank of its business plan).

████████████████████████████████████████████████ that had required issuance of restated financial statements; it was ████████████████████████ ████████████████████████████████████. Its entire business plan was speculative, and █████████████████████████████. And the initial portfolio of alternative assets—which BEN indirectly depended on for revenue—was ████████ ██████████████████████.

29.     BEN's many problems were not lost on those with any business sense (or sense of self-preservation).  On top of the revolving door of *five* independent GWG directors who resigned over BEN-related concerns (mentioned above), *four* other GWG directors—who were dual-directors of both GWG and BEN—also resigned from GWG's board after less than six months on the job.  Those directors had raised questions about BEN's related-party payments (including to HCLP) and BEN's lack of coherent financial projections and myriad accounting problems.  Those concerns prompted one director, upon resigning, to proclaim: "Free at last, free at last, thank God almighty, we're free at last."  A third chimed in, referring to those remaining on GWG's and BEN's boards of directors: "I think the rest of them have lost their marbles."

30.     Moreover, the aforementioned *nine* GWG director resignations were not the only ones fleeing the sinking ship.  Two additional dual-directors of GWG and BEN resigned during the first half of 2020.[2]  GWG's general counsel, BEN's general counsel, BEN's chief administrative officer, BEN's CFO, and other high level legal and accounting personnel all resigned in the second half of 2019.  And last, but not least, GWG and BEN also suffered four separate auditor resignations from 2019 to 2021.  Healthy companies worth—or on the verge of

---

[2] From October 2019 through March 2021, eleven directors in total resigned from GWG's board.

becoming worth—billions of dollars do not suffer such mass exoduses of directors, officers, legal and accounting personnel, and auditors.

31.     Ultimately, BEN's parasitic exploitation of GWG gradually came to an end in 2021 as it became increasingly clear that BEN would no longer be able to bleed cash from GWG for several reasons (including pending investigations by the U.S. Securities and Exchange Commission into GWG, which mostly focused on GWG's entanglement with BEN).  Defendants Heppner, Hicks, and Schnitzer resigned as GWG directors in June 2021, at which time GWG's board was reduced to five directors (that then included Defendants Holland, Evans, Cangany, and Chavenson).  In November 2021, those directors approved a "decoupling" transaction to try to disintegrate GWG from BEN.  But even that transaction harmed GWG, as it involved conversion of outstanding debt BEN owed to GWG into worthless equity.  GWG filed for bankruptcy shortly thereafter in April 2022.

32.     BEN eventually obtained a state-issued license in Kansas, formally launched its business, and went public through a de-SPACing transaction in 2023.  The de-SPACing related merger closed on June 7, 2023.  Unsurprisingly, BEN's business has since crashed and burned. Its stock price plummeted nearly 50% in the first week following the merger's closing, fell below $1 in October 2023, and was subject to a notice of delisting from NASDAQ in November 2023. The stock traded well below $1 until an 80-to-1 reverse stock split was executed in mid-April 2024 to avoid delisting.  BEN recognized and reported nearly $2.3 billion in impairment charges to goodwill—that never should have been recorded in the first place—in the nine months ended December 31, 2023.  BEN has minimal revenue, and it burned through $49.6 million in negative operating cash flow during the same period.

33.     GWG's equity interests in BEN were never worth anything close to what GWG paid, but now they represent a near-total loss given BEN's (predictable) collapse.  While GWG went bankrupt, spent over $100 million on legal fees and other professional fees dealing with the fallout, and has suffered a massive loss on its exposure to BEN—which is now on the verge of collapse—Heppner made out like a bandit; his personal slush fund, Highland Consolidated, obtained over $140 million originating from GWG, plus additional large sums from BEN.

34.     The Litigation Trust, as successor-in-interest to GWG with respect to its litigation claims following GWG's bankruptcy filing, now seeks to hold Heppner accountable, along with the others who engaged in the egregious misconduct alleged in detail below.

## JURISDICTION AND VENUE

35.     This Court has jurisdiction over this adversary proceeding under 28 U.S.C. §§ 157(a) and 1334(b) because it asserts causes of action arising in, arising under, and/or relating to the above-captioned bankruptcy case, and causes of action arising under the Bankruptcy Code.

36.     This adversary proceeding constitutes a "core" proceeding as defined in 28 U.S.C. § 157.

37.     Venue is proper in the Southern District of Texas pursuant to 28 U.S.C. § 1409 because GWG's bankruptcy case is pending in this District.

38.     This Court has personal jurisdiction over Defendants in this proceeding because each Defendant has sufficient contacts with the United States of America to be subject to nationwide service of process under Federal Rule of Bankruptcy Procedure 7004.

39.     Plaintiff consents to the entry of final orders or judgments pursuant to Federal Rule of Bankruptcy Procedure 7008.  Pursuant to Bankruptcy Local Rule 7008-1, Plaintiff

further consents to the entry of final orders or judgments by the Court if it is determined that the Court, absent consent of the parties, cannot enter final orders or judgment consistent with Article III of the United States Constitution.

## PARTIES AND OTHER RELEVANT PERSONS AND ENTITIES

### A.    Plaintiff Litigation Trust

40.    On April 20, 2022, GWG and its subsidiaries GWG Life, LLC, GWG Life USA, LLC, GWG DLP Funding IV, LLC, GWG DLP Funding VI, LLC, and GWG DLP Funding Holdings VI, LLC filed for bankruptcy in the United States Bankruptcy Court for the Southern District of Texas (the "Court"), Case No. 22-90032 (MI).  On June 20, 2023, the Court confirmed Debtors' Chapter 11 plan of liquidation (the "Plan") (ECF No. 1678).

41.    Plaintiff Michael I. Goldberg is the Litigation Trustee of the GWG Litigation Trust, which was created pursuant to the Plan (Goldberg, in his capacity as the Litigation Trustee, defined herein as the "Litigation Trust").  Under the Plan and the Litigation Trust Agreement (ECF No. 1910), certain claims and causes of action belonging to Debtors, including the claims asserted in this action, were assigned to the Litigation Trust as a representative of the bankruptcy estate pursuant to 11 U.S.C. § 1123(a)(5), (a)(7), and (b)(3)(B).  The Litigation Trust is the successor-in-interest of Debtors for the purpose of pursuing the assigned claims and therefore has standing to pursue the claims asserted in this action.

### B.    Defendants

#### 1.    *Defendants Heppner, HCLP, and HCLP-Affiliated and Heppner-Affiliated Trusts and Entities*

42.    Defendant Bradley K. Heppner ("Heppner") is BEN's founder, chairman, and CEO.  Heppner became a GWG director on April 26, 2019, and GWG's chairman on April 29, 2019.  Heppner remained in those roles until he resigned from GWG's board on June 14, 2021.

Heppner, along with BEN and Holland, was part of a control group of GWG controlling stockholders from April 26, 2019 onward.  Heppner is also being sued in his capacity as the trustee of The Highland Business Holdings Trust, The Highland Investment Holdings Trust, The Bradley K. Heppner Family Trust, and The Heppner Family Home Trust.

43.    Defendant Beneficient Holdings, Inc. ("BHI") is a Delaware corporation.  BHI is the principal entity through which Heppner (indirectly) holds his interest in BEN's business. BHI is solely owned and controlled by The Highland Business Holdings Trust.

44.    Defendant Heppner, in his capacity as trustee of The Highland Business Holdings Trust (the "HBH Trust").  The HBH Trust is a trust organized under the laws of the state of Delaware and is the sole owner and controller of BHI.  Heppner is the "Family Trustee" of the HBH Trust and, in that role or otherwise, effectively wields control over HBH Trust and, in turn, BHI.  Specifically, BEN's securities filings, signed by Heppner, attribute voting power for BEN shares held by BHI to Heppner because "BHI is an entity held by The Highland Business Holdings Trust of which Mr. Heppner is a beneficiary and a trustee and, in such capacity, has the sole power to vote and direct the disposition of such shares. Therefore, such shares are deemed to be beneficially owned by Mr. Heppner and The Highland Business Holdings Trust."  During the relevant period, the HBH Trust was also a limited partner of Highland Consolidated Business Holdings, L.P.  The HBH Trust was the initial or subsequent transferee of one or more fraudulent transfers described herein.

45.    Defendants Heppner and Tim Harmon, in their capacities as trustees of The Highland Investment Holdings Trust (the "Harmon Trust").  The Harmon Trust is a trust organized under the laws of the state of Delaware.  The Harmon Trust was the initial or

subsequent transferee of one or more fraudulent transfers described herein, and either Heppner or Harmon (or both) was the trustee of the Harmon Trust at all relevant times.

46.     Defendant Bradley Capital Company, L.L.C. ("Bradley Capital") is a Delaware limited liability company whose manager during the relevant period was Highland Counselors, L.L.C.  Bradley Capital entered into a "Services Agreement" with certain BEN entities, effective June 1, 2017, pursuant to which Heppner received compensation.  Bradley Capital was the initial or subsequent transferee of one or more fraudulent transfers described herein.

47.     Defendant HCLP Nominees, L.L.C. ("HCLP") is a Delaware limited liability company formed on July 21, 2017.  The sole member of HCLP during the time period described herein was HCLP Credit (defined below).  Highland Counselors (defined below) was the manager of HCLP at its formation, as well as at various points in time thereafter.  On or around October 3, 2019, Heppner purported to remove Highland Counselors as manager of HCLP and appoint CMH (defined below) as successor manager, effective as of April 1, 2019.  HCLP was the initial or subsequent transferee of one or more fraudulent transfers described herein.

48.     Defendant HCLP Credit Company, L.L.C. ("HCLP Credit") is a Delaware limited liability company formed on July 21, 2017.  The initial and sole member of HCLP Credit was and remains, on information and belief, Highland Consolidated (defined below).  Highland Counselors was the manager of HCLP Credit at its formation, as well as at various points in time thereafter.  On or around October 3, 2019, Heppner purported to remove Highland Counselors as manager of HCLP Credit and appoint CMH as successor manager, effective as of April 1, 2019.  HCLP Credit was the initial or subsequent transferee of one or more fraudulent transfers described herein.

17

49.     Defendant Highland Consolidated, L.P. ("Highland Consolidated") is a Texas limited partnership.  Highland Consolidated was formed in December 1996 by ███████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████ ; and (b) ███████████████████████████████████████████ ██████ .  According to section 2.06 of its Limited Partnership Agreement, some of the stated purposes of Highland Consolidated were: ████████████████████████████████████ ██████████████████████████████ " and " ████████████████████████████████████ █████████████████████████████████████ "  Highland Consolidated was the initial or subsequent transferee of one or more fraudulent transfers described herein.

50.     Defendant Heppner, in his capacity as trustee of The Bradley K. Heppner Family Trust ("Brad Heppner Family Trust").  The Brad Heppner Family Trust is a trust organized under the laws of the state of Texas. Heppner was the trustee of the Brad Heppner Family Trust at all relevant times. The Brad Heppner Family Trust was the initial or subsequent transferee of one or more fraudulent transfers described herein.

51.     Defendant Heppner, in his capacity as trustee of The Heppner Family Home Trust ("Heppner Family Home Trust").  The Heppner Family Home Trust is a trust organized under the laws of the state of Delaware. Heppner was the trustee of the Heppner Family Home Trust at all relevant times. The Heppner Family Home Trust was the initial or subsequent transferee of one or more fraudulent transfers described herein.

52.     Defendant Elmwood Bradley Oaks, L.P. ("Elmwood Bradley Oaks") is a limited partnership organized under the laws of the state of Delaware whose general partner during the

relevant period was Elmwood Bradley Oaks GP, L.L.C.  Elmwood Bradley Oaks was the initial or subsequent transferee of one or more fraudulent transfers described herein.

53.     Defendant Research Ranch Operating Company, L.L.C. ("Research Ranch Operating Company") is a Delaware limited liability company.  Research Ranch Operating Company was the initial or subsequent transferee of one or more fraudulent transfers described herein.

### 2.     *Defendant BEN Entities*

54.     Defendant Beneficient Management, L.L.C. ("BEN Management" or "BMLLC") is a Delaware limited liability company.  During the relevant period, BEN Management served as the top control entity in BEN's organizational structure, as the general partner of BEN LP.  BEN LP was controlled by, and the exclusive and complete authority to manage the operations and affairs of BEN LP was granted to, BEN Management's board of directors. Because BEN Management was the top organizational entity within BEN's business, BEN Management's directors were the ultimate human controllers of BEN, referred to in contemporaneous documents as BEN's directors, and are described herein as BEN's directors.

55.     Defendant Beneficient, f/k/a The Beneficient Company Group, L.P. ("BEN LP"), is a Nevada corporation.  During the relevant time period, BEN LP was a Delaware limited partnership, and its general partner was BEN Management.  BEN LP was the initial or subsequent transferee of one or more fraudulent transfers described herein.

56.     Defendant Beneficient Company Holdings, L.P. ("BCH") is a Delaware limited partnership.  BCH was the primary holding company of BEN's operating subsidiaries during the relevant time period.  During the relevant time period, BEN LP was the general partner of BCH

19

and held all of the limited partnership interests in BCH.  BCH was the initial or subsequent transferee of one or more fraudulent transfers described herein.

57.    Defendant Beneficient Capital Company II, L.L.C., f/k/a Beneficient Capital Company, L.L.C. (together with New BCC, defined below, "BCC") is a Delaware limited liability company formed in 2017 (its name was amended on December 30, 2020).  BCC's sole member and manager during the relevant time period was BCH.  BCC was the original borrower on two credit facilities related to HCLP.  BCC also obtained approximately 2.5 million shares of GWG stock, representing approximately 7.6% voting control, following an April 2019 transaction.  BCC was the initial or subsequent transferee of one or more fraudulent transfers described herein.

58.    Defendant Beneficient Capital Company, L.L.C. ("New BCC"), is a Delaware limited liability company formed on December 30, 2020.  New BCC submitted claims against the Debtors in the Bankruptcy Case. On information and belief, New BCC submitted these claims by mistake. But to the extent that New BCC and BCC have operated as the same company and/or lack corporate separateness, all references to BCC used herein shall refer to both BCC and, in the alternative, New BCC as well.

59.    Defendant The Beneficient Company Group (USA), L.L.C. ("BCG (USA)") is a Delaware limited liability company and is a subsidiary of BEN LP.  BCG (USA) was the initial or subsequent transferee of one or more fraudulent transfers described herein.

### 3.    *Defendant GWG Officers (and Later Directors), Holland and Evans*

60.    Defendant Murray T. Holland ("Holland") served as GWG's President and CEO from April 26, 2019, until GWG's bankruptcy filing in April 2022.  Holland was also appointed to GWG's board of directors and appointed as chairman of the board on June 14, 2021, and

served in that role until GWG's bankruptcy filing. Throughout the relevant period, Holland—along with a BEN designee—possessed effective voting control over GWG as a decision-maker for several "Seller Trusts," as described below. Through the influence he wielded as GWG's President and CEO and as Trust Advisor to the Seller Trusts that controlled GWG voting rights, Holland exercised control over GWG as part of a control group—that included BEN and Heppner—of controlling stockholders of GWG.

61.    Defendant Timothy L. Evans ("<u>Evans</u>") joined GWG as its "Chief Integration Officer" on May 6, 2019. He was appointed as GWG's Chief Financial Officer and Treasurer, effective August 15, 2019. He remained in those officer roles through GWG's bankruptcy filing. Evans also served as a GWG director from June 14, 2021, through GWG's bankruptcy filing. Prior to joining GWG as an officer (and later director), Evans was "Chief of Staff" for BEN, where he had also served as Vice President and Deputy General Counsel since February 2018. Throughout his tenure as a GWG officer, Evans acted disloyally to GWG and worked in concert with Defendants Heppner and Holland to favor BEN's interests over GWG's.

### 4.    Other Defendant GWG Directors

62.    Defendant Peter T. Cangany, Jr. ("<u>Cangany</u>") was a dual-director of GWG and BEN and served as chairman of BEN's Audit Committee. Cangany also "worked closely with Beneficient during its early formation on various accounting and consolidation matters." Cangany served as a GWG director from April 26, 2019, to June 20, 2022. As a result of Heppner's orchestration, Cangany served on a three-person special committee consisting of Cangany, Defendant Chavenson and non-party former GWG director Roy W. Bailey from March 3, 2020, until that special committee was disbanded, despite his blatant conflict of interest as a director of BEN and chairman of BEN's Audit Committee. Cangany consistently made

21

misrepresentations to GWG's Special Committee to persuade it to allow GWG to funnel more cash into BEN to GWG's detriment.

63.     Defendant Thomas O. Hicks ("Hicks") was a dual-director of GWG and BEN and served on BEN's Executive Committee.  He served on GWG's board from April 26, 2019, to June 14, 2021, and was a member of GWG's Executive Committee.  During this time, Hicks owned substantial preferred equity in BEN, either directly or through Hicks Holdings, LLC ("Hicks Holdings"), which Hicks founded and for which he served as chairman during the relevant period.  BEN and Hicks Holdings entered into a consulting agreement on September 1, 2017, pursuant to which Hicks Holdings, in connection with providing advisory and consulting services to BEN leading up to the Paul Capital transaction (as described below), received consulting fees through the termination on June 30, 2018.  As part of its transaction success fee, Hicks Holdings received equity-based compensation of $57.4 million in NPC-A and $2.9 million in Class S Ordinary Units, which vested upon the consummation of the co-sellers transaction in the five-months ended May 31, 2018.

64.     Defendant Bruce W. Schnitzer ("Schnitzer") was a dual-director of GWG and BEN and served on BEN's Executive Committee.  He served on GWG's board from April 26, 2019, to June 14, 2021, and was a member of GWG's Executive Committee.  During this time, Schnitzer owned substantial preferred equity in BEN.

65.     Defendant David F. Chavenson ("Chavenson") served as a GWG director from May 13, 2019, through the date of GWG's bankruptcy filing.  Mr. Chavenson served on two iterations of Special Committees of GWG's board of directors.  Chavenson served as chairman of the two-person committee consisting of himself and Kathleen Mason that existed from May 13, 2019, through the date of Ms. Mason's resignation on March 2, 2020.  Chavenson

subsequently served on a three-person special committee consisting of himself, Defendant Cangany, and non-party former GWG director Roy W. Bailey.

### 5.    *Other Defendants*

66.    Defendant LiquidTrust Management, L.L.C. is a Delaware limited liability company that was the initial transferee of the $65 million transferred by the Debtors for the benefit of the Liquid Trusts (as defined below).

67.    Defendant John Stahl, in his capacity as trustee of The LT-1 Liquid Trust, The LT-2 Liquid Trust, The LT-5 Liquid Trust, The LT-7 Liquid Trust, The LT-8 Liquid Trust, and The LT-9 Liquid Trust (collectively, the "Liquid Trusts").  The Liquid Trusts are trusts organized under the laws of the state of Texas.  The Liquid Trusts were the entities for whose benefit $65 million in transfers associated with the $65 Million Loan were made.

68.    Defendant John Stahl, in his capacity as trustee of The LT-1 Collective Collateral Trust, The LT-2 Collective Collateral Trust, The LT-3 Collective Collateral Trust, The LT-4 Collective Collateral Trust, The LT-5 Collective Collateral Trust, The LT-6 Collective Collateral Trust, The LT-7 Collective Collateral Trust, The LT-8 Collective Collateral Trust, and The LT-9 Collective Collateral Trust (collectively, the "Collective Collateral Trusts").  The Collective Collateral Trusts are trusts organized under the laws of the state of Texas.  The Collective Collateral Trusts were subsequent transferees of transfers made in connection with the $65 Million Loan, as defined below.

69.    Defendant Funding Trust Management, L.L.C. is a Delaware limited liability company that was a subsequent transferee of transfers made in connection with the $65 Million Loan, as defined below.

70.     Defendant CT Risk Management, L.L.C. is a Delaware limited liability company and a consolidated subsidiary of BEN.  CT Risk Management, L.L.C. was the initial or subsequent transferee of one or more fraudulent transfers described herein.

## C.     Relevant Non-Parties

### 1.     *Non-Party Former GWG Directors*

71.     Twenty different individuals served on GWG's board during the period between BEN's takeover of GWG's board on April 26, 2019, through GWG's bankruptcy filing in April 2022.  (Seven of those former directors are named Defendants in this action, namely, Defendants Heppner (April 2019 to June 2021), Hicks (April 2019 to June 2021), Schnitzer (April 2019 to June 2021), Cangany (April 2019 through GWG's bankruptcy), Chavenson (May 2019 through GWG's bankruptcy), Holland (June 2021 through GWG's bankruptcy), and Evans (June 2021 through GWG's bankruptcy)).

72.     All independent directors, other than Defendant Chavenson, resigned during that period.  GWG's independent directors each served on some iteration of the Special Committee. Such independent GWG directors included the following individuals: (1) Kathleen Mason (May 13, 2019 to March 2, 2020); (2) Roy Bailey (March 16, 2020 to March 6, 2021); (3) Daniel Fine (September 3, 2020 to March 6, 2021); (4) David Gruber (September 3, 2020 to October 27, 2020); (5) Jeffrey MacDowell (January 6, 2021 to March 6, 2021) (collectively, the "Non-Defendant Independent Directors").  Each of those independent directors resigned, in part, due to lack of clarity related to the circumstances surrounding GWG's advances of funds to BEN and Heppner's and other Defendants' actions, more broadly.

73.     Other non-party GWG directors during the relevant period, each of whom was a dual director of both GWG and BEN, included the following individuals: (1) Sheldon ("Shelly")

Stein (April 26, 2019 to October 15, 2019[*]); (2) David Glaser (April 26, 2019 to October 15, 2019[*]); (3) Bruce Zimmerman (April 26, 2019 to October 15, 2019[*]); (4) Richard Fisher (April 26, 2019 to October 15, 2019); (5) Michelle Caruso-Cabrera (April 26, 2019 to February 21, 2020); (6) Roger T. Staubach (April 26, 2019 to June 15, 2020); (7) Dennis P. Lockhart (May 13, 2019 to June 14, 2021); and (8) David H. de Weese (April 26, 2019 through GWG's bankruptcy filing) (collectively, the "Non-Defendant Dual Directors").  As described below, before resigning, several of those directors (Glaser, Stein, Zimmerman, and Fisher) expressed concerns regarding the lack of clarity into the circumstances surrounding GWG's transfers to BEN and BEN's payments to related parties, amongst other issues.

74.   GWG's board was controlled by BEN and dominated by BEN dual-directors and/or BEN-loyal directors who acted disloyally in favoring BEN's interests over GWG's interests at all times from April 26, 2019, onward.  Nevertheless, disloyally favoring BEN's interests in transactions with GWG (to benefit BEN at GWG's expense) is very different from supporting or permitting wrongful transfers of cash—procured from GWG—out of BEN that served no purpose other than to enrich Heppner and his affiliated trusts and entities.  The Non-Defendant Dual Directors, along with the Non-Defendant Independent Directors, would have put a stop to outflows from GWG to BEN had they been presented with the full picture regarding HCLP, Highland Consolidated, and the nine-figure sums—advanced by GWG—that Heppner effectively extracted from the combined companies for his affiliated trusts and other entities.

---

[*] Having submitted their resignations during or shortly after the October 10, 2019 meeting of BEN and GWG directors, Zimmerman and Stein were convinced by Defendant Holland (as part of a damage control orchestrated by Heppner, Hicks, and Schnitzer, along with Holland) to pause those resignations so that GWG could vote to reduce the size of its board instead.  Following the board vote, Zimmerman, Stein, and Glaser resigned officially on October 15, 2019.  *See* section D.3.c, *infra*.

### 2.    *Other Relevant Non-Parties*

75.    Non-party Highland Consolidated Investments, L.L.C. ("<u>HCI</u>") is a Texas limited liability company.  HCI was formed in ███████████████████████████████████ ██████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ███████████████████████████████████    At the time, HCI managed Highland Consolidated.  In later years, HCI served as general partner of Highland Consolidated.

76.    Non-party Highland Consolidated Investment Counselors, L.L.C. ("<u>HCIC</u>") is a Delaware limited liability company.  According to reports filed with the Texas Comptroller of Public Accounts, HCIC managed: (i) HCI in 2017, 2018, 2019, 2020, and 2021; (ii) HCLP in 2018; (iii) HCLP Credit in 2018 and 2021; and (iv) CMH in 2020 and 2021.  These reports also list HCIC as a subsidiary of Highland Counselors in 2018 and 2019.  On or around October 3, 2019, Heppner purported to remove Jeff Hinkle as manager of HCIC and appoint himself as successor manager, effective as of April 1, 2019.

77.    Non-party Crossmark Master Holdings, L.L.C. ("<u>CMH</u>") is a Delaware limited liability company formed on December 30, 1999.  On or around October 3, 2019, Heppner purported to remove HCIC as manager of CMH and appoint David Wickline as successor manager, effective as of October 3, 2019.   On or around October 3, 2019, Heppner also purported to remove Highland Counselors as manager of HCLP and HCLP Credit and appoint CMH as successor manager of those entities, effective as of April 1, 2019.

78.    Non-party Highland Counselors, L.L.C. ("<u>Highland Counselors</u>") is a Delaware limited liability company formed on September 16, 2003.  Highland Counselors was manager to Beneficient Holdings GP, L.L.C. (the general partner of Beneficient Company Holdings, L.P., the

sole member of Beneficient Capital Company, L.L.C.) in 2017. Highland Counselors was also manager to HCLP and HCLP Credit at the formation of those entities in 2017, as well as at various points in time thereafter. On or around October 3, 2019, Heppner purported to remove Highland Counselors as manager of HCLP and HCLP Credit and appoint CMH as successor manager, effective as of April 1, 2019. On or around October 3, 2019, Heppner also purported to remove Jeff Hinkle as manager of Highland Counselors and appoint himself as successor manager, effective as of April 1, 2019. According to reports filed with the Texas Comptroller of Public Accounts, Highland Counselors had a controlling ownership interest in HCIC in 2018 and 2019.

79.     Non-party Keith R. Martens ("Martens") is a long-time acquaintance of Heppner's from Hesston, Kansas. Heppner installed Martens as trustee of The Highland Great Plains Trust and as manager of HCI in February 2019.

80.     Non-party David L. Wickline ("Wickline") is an investment banking and real estate development professional who held the role of Vice President at Goldman Sachs from 1982 to 1988. While at Goldman Sachs, Wickline reported to Charles M. Harmon, Jr., who was also Heppner's mentor. ███████████████████████████████████ ███████████████████████████████████ Heppner installed David Wickline as the indirect manager of HCLP in October 2019.

## **FACTUAL BACKGROUND**

### A.     **GWG's Historical Secondary Life Insurance Policy Business and Public Capital-Raising Machinery.**

81.     Prior to its entanglement with BEN, GWG had been in the secondary life insurance business. It raised capital to purchase life insurance policies on the secondary market through debt financing in the form of L Bonds sold to investors through a network of brokers.

GWG's established capital-raising machinery and infrastructure (raising over $100 million from L Bond sales per year) made it an attractive target for BEN and Heppner (and Holland) because BEN—then mostly a conceptual stage start-up—needed capital to get its new business idea fully launched.

**B.      BEN's Origins and Formative Transactions, Including HCLP's Purported Refinancing of Debt Involving Heppner Affiliates.**

> *1.      BEN's Initial "Liquidity Transactions" on September 1, 2017.*

82.      BEN's business plan was to serve as a "liquidity provider" to mid-to-high net worth individuals and smaller institutions holding alternative assets (*e.g.*, limited partnership interests in private equity funds), effectively functioning as a buyer to allow those investors to sell their otherwise illiquid alternative assets.  BEN would then earn revenue—from various fees and interest on intercompany loans via a complicated network of related trusts that would hold the alternative assets—as the alternative assets were gradually monetized or otherwise liquidated over time.  BEN's business idea was inherently capital intensive; it could only generate revenue to the extent its related trusts could acquire an underlying portfolio of alternative assets that, in turn, generated cash with which to pay those fees and interest.

83.      Complicating BEN's capital needs further, and key to its new business plan, BEN wanted to invest in private-equity secondaries not as a private equity firm but as a non-depository bank.  The idea was that by obtaining a state-issued charter and falling within a state regulatory regime, BEN would be exempt from the Investment Company Act of 1940.  To receive such a bank charter, however, BEN needed to demonstrate substantial assets under management and a strong and proven track record. This required a large initial outlay of capital, which BEN did not have.  In turn, BEN concocted a convoluted scheme to obtain capital from

third parties—*i.e.*, GWG—to effectively finance its initial acquisition of illiquid, alternative assets through so-called "liquidity transactions."

84.     BEN's initial liquidity transactions occurred on or about September 1, 2017, when BEN and MHT Financial, L.L.C. ("MHT Financial") entered into agreements to provide liquidity in exchange for the economic rights to several portfolios of alternative assets from various third-party sellers.  MHT Financial, led by Murray Holland, served as middleman to facilitate the transfer of these secondary assets in exchange for what the sellers expected would be cash that they could then distribute to investors before winding down their funds.  The parties structured the transaction so that MHT Financial, as buyer, could purchase assets from a seller and immediately settle them in an "Exchange Trust" (aka "Seller Trust") whose first act would be to exchange the economic interests in those assets for BEN common units (the "BEN Units").

85.     The parties planned to offer the BEN Units for sale in a private auction, which was originally expected to close before April 30, 2018. The BEN Units, along with any consideration received for those Units, would be held in trust at Delaware Trust Company until such time that those Units or other consideration could be sold and the resulting cash distributed to the sellers.

86.     The largest of these third-party sellers was Paul Capital Advisors, L.L.C. ("Paul Capital"), which contributed alternative assets from its liquidating funds to Seller Trusts formed specifically to facilitate the exchange.  Thus, pursuant to a Purchase and Sale Agreement between MHT Financial and Paul Capital (and other co-sellers) and a Transaction Agreement among Paul Capital and its affiliated funds, MHT Financial, BEN LP, and certain BEN affiliates, MHT Financial acquired alternative assets from Paul Capital at a cost of ███████████████ ████████████████████████████████, representing the Net Asset Value ("NAV") as of the

closing dates, and settled the Seller Trusts with those assets. The Seller Trusts assigned the economic interests in those secondary assets to BEN in exchange for BEN Units, which were to be "auctioned off" to pay Paul Capital (and later, the co-sellers) up to 110% the NAV of their assets in cash.

87.     BEN completely ignored the realities of the market when it agreed to pay 100% of NAV for illiquid, alternative assets. In response to questions from a potential investor, BEN explained that ███████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ████████████████

88.     In Section 5.5.1 of the Transaction Agreement, MHT and the BEN parties agreed to "conduct an auction [of the] BEN Common Units as contemplated under and consistent with Section 5 of the Purchase and Sale Agreement" and to "take any reasonable actions reasonably necessary in order to consummate the Auction on or prior to April 30, 2018." The Purchase and Sale Agreement contemplated MHT Financial would commence an auction of the BEN Units within 60 days, and that it would use its "best commercial efforts" to complete the Auction for net cash proceeds of at least $500 million.

89.     On December 23, 2017, Holland informed Paul Capital that GWG was the ultimate winner of the "auction" of BEN Units. Immediately thereafter, a Master Exchange Agreement was drafted to capture the terms of GWG's winning bid, which consisted of $150 million cash, $250 million in L Bonds, and $150 million GWG common stock. On or around January 12, 2018, GWG executed the Master Exchange Agreement among GWG Holdings, GWG Life, LLC ("GWG Life"), BEN LP, MHT Financial SPV, L.L.C., and the Seller Trusts.

The Master Exchange Agreement anticipated, among other things, that BEN would incur a substantial debt to GWG.

90.     Thereafter, a series of "Exchange Transactions" took place in multiple steps throughout 2018 (the "2018 Exchange Transactions").   Despite the relevant agreements indicating the transaction would close by April 30, 2018, the closing date was pushed several times.  Eventually, the closing was bifurcated into two stages—the first stage occurring in August 2018 and the second in December 2018.

91.     The net effect of these transactions, by year end, was that: (a) GWG loaned $192.5 million to BEN as a commercial loan (the "CLA") and received approximately 30 million common units of BEN LP; (b) certain "Seller Trusts," effectively controlled by two Trust Advisors (Defendant Holland and a BEN designee, first Jeff Hinkle, and later, James Turvey), obtained majority ownership of GWG stock and also obtained L Bonds representing $366.9 million in debt owed by GWG to the Seller Trusts; and (c) BEN obtained equity interests in GWG, and trusts affiliated with BEN ended up with secondary private equity investments (originally belonging to third parties, like Paul Capital).

### 2.     BEN and Heppner's Shuffling of Assets and "Refinancing" Under a Purported $141 Million Debt to HCLP.

92.     As part of BEN's initial transactions that occurred on or about September 1, 2017, BEN assigned certain limited partnership entities to Heppner effective as of that date.  As BEN explained during an audit committee meeting, prior to BEN beginning commercial operations as a "liquidity lender," its ██████████████ had focused on ████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████     But with BEN's transition to liquidity lending came a spinoff of ██ ██████████████ and a distribution ████████████████████████████████.  As part of this

31

spinoff, BEN distributed to Heppner certain interests associated with net assets of ████████

████████████████████████████████████████████████████

████████████████ that would not be involved in the continuing operations of BEN.

93.     The spinoff also involved what BEN has characterized in its audited financial statements and SEC filings as a "refinancing" of approximately $121 million of existing debt (plus an additional $20.2 million for the purchase of certain technology assets) into a loan agreement with related party HCLP, for a total of $141 million (*i.e.*, the BEN-HCLP First Debt). Those "existing debts"—according to the notes to BEN's fiscal year ended December 31, 2018 audited financial statements—arose from "a series of six loan agreements issued by entities associated with BEN's founder between 2005 and 2007." These "Old Loan Agreements" reportedly were payable upon demand and did not require any periodic payments.

94.     BEN's audited financial statements further stated that:

- "The aggregate principal amount refinanced by [BEN], including $20.2 million related to the purchase of certain assets, totaled $141.0 million;"

- The refinanced "Old Loan Agreements include a series of six loan agreements issued by entities associated with *BEN's founder* between 2005 and 2007;" and

- "The balance of the Old Loan Agreements and other payables to the *founder* were refinanced into the New Loan Agreement on September 1, 2017."

The related party disclosure contained in those same BEN audited financial statements likewise reflected that HCLP is "an indirect subsidiary of Highland Consolidated, L.P., the limited partners of which includes trusts for which BEN's CEO and founder serves as investment trustee or which he or his family are in the class of possible beneficiaries" and that the BEN-HCLP First Debt "refinanced the Old Loan Agreements which included a series of six loan agreements issued by other entities related to BEN's founder between 2005-2007."

95.     The notes to BEN's March 31, 2022 audited financial statements tell a slightly different story.  They state that when BEN first issued common equity units on September 1, 2017, as part of its initial liquidity transaction, it "used a portion of the proceeds from the issuance of these common equity units to *retire* a series of six loan agreements with our founder or entities related to our founder, *in addition to other payables with our founder or related entities*."

96.     Regardless, the supposed "loans" that were supposedly refinanced or retired were not legitimate third-party loans, but purported debts owed to Heppner and affiliated entities that largely predated BEN's new business as a liquidity provider by at least a decade. Jeff Hinkle, BEN's former Chief Administrative Officer and Treasurer, confirmed that the BEN-HCLP First Debt was executed to "create a credit agreement for *past moneys that had been spent by Highland Consolidated* and [to] memorializ[e] that into this loan agreement or refinancing, . . . or whatever you want to call it," and he could not recall any cash being advanced under the BEN-HCLP First Debt once it was put in place.

97.     Moreover, HCLP was not a legitimate third-party lender but was indirectly controlled by Heppner by virtue of his role as trustee higher up HCLP's organizational chain.  To help disguise his influence over entities related to HCLP, Heppner enlisted the aid of two long-time allies.  Hinkle, who had worked in Heppner's "family office" investment firm for many years and served as trustee of certain of Heppner's family trusts, served as HCLP's indirect manager.  At the time, Hinkle was BEN's Chief Administrative Officer and Treasurer (answering to Heppner, BEN's CEO and Chairman).  Hinkle testified that:

- Heppner "ultimately … had the power of appointment" with respect to Highland Counselors and thus HCLP;

- Hinkle "serv[ed] at the pleasure of Brad" and "ultimately [his]

ABC

administrative task was to take that direction" from Heppner; and

- Heppner had access to HCLP's bank accounts, had the power to extend the BEN-HCLP First Debt's maturity, and had discretion to waive reporting requirements under that loan.

98.     Heppner also enlisted the aid of Keith Martens to serve as trustee or manager of several trusts and entities related to HCLP.  Martens had been a close friend of Heppner's since they were in high school together and, being a medical equipment salesperson with little business experience, was a curious choice for manager of entities with nine-figures of loans outstanding. Martens did not operate HCLP and its predecessors as a third-party lender at arm's-length.   In essence, Martens was not an autonomous manager acting on behalf of a legitimate, third-party lender, but functioned as Heppner's stand-in.

99.     For example, on September 1, 2017, when BEN's formative transactions occurred (and the date of the BEN-HCLP First Debt), Martens wrote to congratulate Heppner, asking him to "[l]et me know if there were any changes I should know about" and expressing that Martens was "relieved that HCLP's note is finally earning a more commercial rate of interest."

100.    A few months later, shortly before BEN made a $25 million transfer to HCLP in February 2018, Heppner wrote Martens to inform him that: "For the first time in over a decade, a principal payment will be made on the note tomorrow.  Just wanted to give you a heads up.  It will be $25 million note pay down of principal to $116 million."  (Emphasis added).  Martens responded: "Now when does the remaining $116[mm] get paid?  *Just kidding*."  (Emphasis added).

101.    As described further below, during 2019, Martens signed several back-dated organizational documents to help disguise Heppner's role and influence at HCLP before Heppner ultimately replaced Martens with David Wickline as HCLP's indirect manager in October 2019.

### 3.   BEN's Second Debt with HCLP.

102.     In 2018, Heppner once again self-servingly layered debt into BEN's capital stack. In August 2018, Heppner grumbled to Martens about "major headaches" in closing the transactions with GWG, complaining that GWG was "taking a pound of flesh" in cutting into his share of equity.   In turn, Heppner indicated that his entity would "negotiate for an early conversion of $72 million it has a right to convert, but instead of conversion into common [stock], it will want conversion into a note much like the HCLP note."[3]

103.     Thereafter, according to BEN's audited financial statements, on December 28, 2018, BEN and BHI—Heppner's primary holding vehicle for his interest in BEN[4]—"entered into a promissory note for $72 million in return for the relinquishment by BHI of $72 million of NPC Series A Subclass 1 Units of BCH."   In other words, BHI exchanged $72 million in preferred units in BCH for secured debt in BEN without advancing any funds to BEN or BCH, and even though Heppner had no contractual right to convert his preferred equity into debt (at the top of BEN's capital stack) instead of common stock (at the bottom of BEN's capital stack).   The note, dated December 28, 2018, was originally due on March 31, 2019.

104.     In May 2019 (on or after May 17, 2019), that promissory note was replaced when BEN and BHI executed a credit agreement (backdated to December 28, 2018) with an initial principal balance of $72 million (*i.e.*, the BEN-HCLP Second Debt).   Hinkle, a BEN officer,

---

[3] Heppner further wrote that he would call Martens to "discuss priority of payment or possibly an intercreditor [agreement] with HCLP."  Martens, manifesting a lack of commercial sophistication, replied: "Someone will need to educate me on an intercreditor agreement."

[4] BEN's Form 10-K for the fiscal year ended March 31, 2023, signed by Heppner, admits that "Heppner is a beneficiary of the trust that is the sole shareholder of BHI," that Heppner indirectly holds interests in BEN through BHI (including various forms of BCH preferred units), that those equity interests "represent [Heppner]'s interests originally received by BHI in connection with the formation" of BEN, and that "Heppner receives financial benefits from our business" through "equity interests  of BCH held by BHI."  *See* BEN's Form 10-K for the fiscal year ended March 31, 2023 (https://www.sec.gov/Archives/edgar/data/1775734/000177573423000008/ben-20230331.htm), at pgs. 151, 152, 156.

signed this agreement as Secretary of BHI, and BHI's notice address in the agreement was the same as BEN's address (and HCLP's notice address for the BEN-HCLP First Debt).

105.    Heppner subsequently caused BHI to "assign" the BEN-HCLP Second Debt to HCLP in August 2019 via an amended operating agreement for HCLP that was back-dated and made retroactively effective as of April 1, 2019.  BHI received a 34% membership interest in HCLP in exchange for assigning the BEN-HCLP Second Debt to HCLP.   In other words, the entity that Heppner utilizes as his primary (indirect) holding vehicle for his interest in BEN's business (BHI) holds a 34% membership interest in HCLP.

106.    Moreover, from June 2019 through January 2020, BEN made interest payments on the BEN-HCLP Second Debt to another Heppner-controlled entity, Bradley Capital, not to BHI (the supposed original lender) or to HCLP.   And BEN continued to make such interest payments to Bradley Capital even after BHI assigned the Second Debt to HCLP in 2019.

**4.    *Highland Consolidated Procures Over $▇ Million from GWG and BEN, then Advances Large Sums to Heppner's Affiliates.***

107.    From February 2018 through June 2022, over $▇ million was paid to HCLP (or to Highland Consolidated) as purported payments of principal, interest, and fees on the BEN First Debt and BEN Second Debt to HCLP, as set forth below:

| Date | Transferor | Transferee | Amount |
|------|-----------|-----------|--------|
| ▇ | ▇ | ▇ | ▇ |
| ▇ | ▇ | ▇ | ▇ |
| ▇ | ▇ | ▇ | ▇ |
| ▇ | ▇ | ▇ | ▇ |
| ▇ | ▇ | ▇ | ▇ |
| ▇ | ▇ | ▇ | ▇ |
| ▇ | ▇ | ▇ | ▇ |
| ▇ | ▇ | ▇ | ▇ |
| ▇ | ▇ | ▇ | ▇ |

| Date | Transferor | Transferee | Amount |
|------|-----------|-----------|--------|
| █████████ | ████ | ████████ | |
| ████████ | ████ | ████████ | |
| ████████ | ████ | ████████ | |
| ████████ | ████ | ████████ | |
| ████████ | ████ | ████████ | |
| ████████ | ████ | ████████ | |
| ████████ | ████ | ████████ | |
| ████████ | ████ | ████████ | |
| ████████ | ████ | ████████ | |
| ████████ | ████ | ████████ | |
| ████████ | ████ | ████████ | |
| ████████ | ████ | ████████ | |
| ████████ | ███████████ | ████████ | |
| ████████ | ████ | ████████ | |
| ████████ | ████ | ████████ | |
| ███████ | ████ | ████████ | |
| ███████ | ████ | ████████ | |
| ███████ | ████ | ████████ | |
| ████████ | ████ | ████████ | |
| ████████ | ████ | ████████ | |
| ████████ | ████ | ████████ | |
| ████████ | ████ | ████████ | |
| ████████ | ████ | ████████ | |
| ████████ | ████ | ████████ | |
| ████████ | ████ | ████████ | |
| ████████ | ████ | ████████ | |
| ████████ | ████ | ████████ | |
| ████████ | ████ | ████████ | |
| ████████ | ████ | ████████ | |
| ████████ | ████ | ████████ | |
| ████████ | ████ | ████████ | |

| Date | Transferor | Transferee | Amount |
|------|-----------|-----------|--------|
| ████ | ██ | | ████ |
| ████ | ██ | | ████ |
| ████ | ██ | | ████ |
| ████ | ██ | | ████ |
| ████ | ██ | | ███ |
| ████ | ██ | | ████ |
| ████ | ██ | | ████ |
| ████ | ██ | | ███ |
| ████ | | ██ | ███ |
| ████ | ██ | | ████ |
| █ | | ██ | ████ |

108.   The majority of the funds transferred by BEN entities—BCC, BCH, and BEN LP—during that time period originated from GWG.

109.   From May 2019 through March 2021—the time period during which GWG transferred $██ million to BEN and HCLP (directly or indirectly through BEN)—the GWG board members on various iterations of GWG's Special Committee were not told that HCLP would immediately transfer all funds it received through HCLP Credit to Highland Consolidated, and from there, to Heppner affiliated entities and trusts.  Those facts were only disclosed *after the fact*, and later admitted by both GWG and BEN in securities filings (presumably due to a heightened sense of the need to make more fulsome disclosures in the face of pending SEC investigations).

110.   In its audited financial statements and Form 10-K for the fiscal year ended December 31, 2020, filed with the SEC on November 5, 2011, GWG disclosed:

> During the years ended December 31, 2020 and 2019, *GWG Holdings invested $130.2 million and $79.0 million, respectively, of cash into equity investments in Beneficient. During this same period, Beneficient made payments to HCLP, its Senior Lender, totaling $144.6 million* in principal and interest on the First and Second Lien Credit Agreements. The First Credit Agreement was issued in 2017,

while the Second Lien Credit Agreement was issued in 2018. HCLP is an indirect subsidiary of Highland Consolidated, L.L.C. ("Highland").

*A long-standing lending and investment relationship of 25 years exists between Highland (and its affiliates or related parties), on the one hand, and certain trusts and entities held by such trusts that are controlled by Ben Founder[5] ("Ben Founder Affiliates"), on the other.* From time to time, *Highland or its affiliates have advanced funds under various lending and investing arrangements to the Ben Founder Affiliates*, and such Ben Founder Affiliates have made repayments to Highland or its affiliates, as applicable, both in cash and in kind.

*Such loans to and investments with or in the Ben Founder Affiliates have been* and may be *made by Highland, or its affiliates, as applicable, using proceeds from loan repayments made by Beneficient to HCLP* in its capacity as Senior Lender to Beneficient, *with such loan repayments made potentially using cash from GWG Holdings' and GWG Life's investments in Beneficient*. Such loans and investments have ranged between no outstanding balance and *$104.0 million*.

(Emphasis added). Those audited financial statements further provide that: "HCLP is indirectly associated with Ben Founder."

111. Similarly, BEN's most recent audited financial statements (for the fiscal year ended March 31, 2023), incorporated in BEN's Form 10-K annual report (signed by Heppner on July 13, 2023), admit that:

HCLP is an indirect subsidiary of Highland Consolidated, L.L.C. ("Highland"). *Ben's Chairman and CEO* [*i.e.*, Heppner] *is a beneficiary and trust investment advisor of the trusts that control, and are the partners of, Highland. Loans to and investments* with or in the Related Entities *have been and may be made by Highland, or its affiliates, as applicable, using proceeds from loan repayments made by Ben to HCLP* in its capacity as Lender to Ben.

*A long-standing lending and investment relationship of 25 years exists between Highland (and its affiliates or related parties), on the one hand, and Related Entities, on the other.* From time to time, Highland or its affiliates have advanced funds under various lending and investing arrangements to Related Entities, and such Related Entities have made repayments to Highland or its affiliates, as applicable, both in cash and in kind.

(Emphasis added). Substantially similar admissions are included in BEN's most recent Form

---

[5] The audited financial statements define "Ben Founder" as Brad K. Heppner. https://www.sec.gov/ixviewer/ix.html?doc=/Archives/edgar/data/0001522690/000152269021000008/gwgh-20201231.htm#if6544f550d1c410abc94e23f11851cd6_94 at F-12.

10-Q quarterly report, dated February 14, 2024 and signed by Heppner.  And BEN's internal accounting memoranda reflect that Highland Consolidated has a "long-standing lending relationship" with "entities affiliated with Mr. Heppner [that] has existed for *over 25 years*" and "in amounts representing *substantially all of [its] capital*."

112.    And indeed, much of the funds (over $▮▮▮▮▮▮) that BEN and/or GWG transferred to HCLP made their way to entities and trusts affiliated with Heppner, ▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

113.    BEN later claimed—and BEN and GWG reported in securities filings—that Heppner's affiliated trusts and entities supposedly "repaid" (in kind) the "loans" they had received from Highland Consolidated in June 2021.  But Holland cautioned that GWG's 10-K disclosure should ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮ Holland understood that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮ Holland further stated his understanding that ▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮



### 5.    *Heppner's Efforts to Disguise His Influence Over and Distance Himself From HCLP.*

114.    While the aforementioned securities filings later disclosed (or admitted) that funds advanced from GWG to BEN to HCLP were subsequently transferred to Highland Consolidated and then on to Heppner-affiliated trusts and entities, neither the ultimate destination of the funds nor the full extent of Heppner's relationship with and influence over HCLP or Highland Consolidated was disclosed to GWG, GWG's full board, or various iterations of the special committee of GWG's board at the time the advances were made by GWG to BEN.  Nor was it

disclosed in BEN's audited financial statements for fiscal year December 31, 2018, or in GWG's and BEN's combined consolidated financial statements for fiscal year ended December 31, 2019. Rather, Heppner and others acting in concert with him misleadingly portrayed HCLP as if it were a legitimate, hard bargaining third-party lender.

115.    On February 21, 2019, in response to questions from BEN's auditor, Heppner drafted a letter for Martens to send to William "Bill" Banowsky, HCLP's counsel (who routinely sought input and direction from Heppner regarding HCLP). The letter explained Martens's purported role at HCLP (and was subsequently provided to BEN's auditor). In this letter, Martens (as dictated by Heppner) represented that:

> Highland Counselors, L.L.C. ("Highland") is Nominees' manager, and Nominees' sole member is HCLP Credit Company, L.L.C. ("Credit Company"). Credit Company's sole member is Highland Consolidated, L.P. ("HCLP") and Credit Company's manager is Highland. Highland Consolidated Investments, L.L.C. ("HCI") is HCLP's general partner, and I am HCI's manager. The sole member of HCI is a trust for which I serve as trustee ("Trust"). No party has the ability to remove and replace me as trustee of the Trust or as manager of HCI.
>
> I have served as the Trust's trustee, and as HCI's manager, since July 7, 2017. *See* Exhibit A. As manager of HCI, I have the authority to remove and replace the manager of both Credit Company and Nominees ("Manager").

116.    Upon information and belief, the "Trust" referred to as "the sole member of HCI" in Martens's letter was ███████████████████████. At the time the letter was written,

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████

117.    ███████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

118. ██████████████████████████████████████████

119. ██████████████████████████████████████████

120. ██████████████████████████████████████████

[REDACTED]

121.    Furthermore, the statement in the February 21 letter that "no party has the ability to remove and replace [Martens] as . . . manager of HCI" was materially misleading, if not blatantly false. [REDACTED]

122.    But [REDACTED] did not stop there.  Upon their formation in July 2017, the manager of both HCLP and HCLP Credit was Highland Counselors.  Highland Counselors was, at that time, managed by Hinkle, Heppner's long-time employee and BEN's Chief Administrative Officer and Treasurer.  Hinkle, however, resigned from BEN and his various roles with HCLP and related entities on or around August 23, 2019.  Heppner thus needed to replace the vacancies left by Hinkle's departure.

123.    [REDACTED] to revise HCLP's governance documents and sign an Amended and Restated Limited Liability Company Agreement of HCLP "entered into as

of April 1, 2019." Martens signed this document as manager of CMH, which in turn was listed as HCLP's manager. Through this agreement, BHI assigned the $72 million BEN-HCLP Second Debt to HCLP as a capital contribution, and received a 34% interest in HCLP, as described above.

124.    The Amended and Restated LLC Agreement of HCLP and the organizational changes reflected therein were backdated.  CMH was not HCLP's manager in April 2019. Rather, on or about October 3, 2019, Heppner signed a unanimous written consent (back-dated to August 23, 2019)—as Trustee of The Highland Partners Holdings Trust—to change HCLP's manager from Highland Counselors (for which BEN officer Hinkle had been manager) to a new manager entity, CMH, retroactively effective as of April 1, 2019.  The signature block on this written consent was as follows:

```
MEMBER:

BY: HCLP CREDIT COMPANY, L.L.C.
Its sole member

By: HIGHLAND CONSOLIDATED, L.P.
Its sole member

By: HIGHLAND CONSOLIDETED INVESTMENTS, LLC
Its general partner

By: THE HIGHLAND PARTNERS HOLDINGS TRUST
Its sole member

By:   Bradley K. Heppner
Name: Bradley K. Heppner
Title:   Trustee
```

Thus, through his role as Trustee of The Highland Partners Holdings Trust, Heppner was able to effectively change HCLP's manager. ████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

44

███████████████████████████████████████████████████

███

125.    These back-dated organizational changes, initiated by Heppner, made it appear that: (a) CMH, an entity not managed by Hinkle, had been HCLP's manager since April 2019 (the date after which the related party payments began); and (b) the BEN Second Debt—previously owed to BHI, which Heppner controlled—had been owed to HCLP since April 2019.

126.    To further distance himself from HCLP and make HCLP appear like a hard bargaining third-party (rather than a subsidiary of Highland Consolidated, which had a two-decade history of transferring all of its capital to Heppner-affiliates as "investments" or "loans"), Heppner took two additional steps in early October 2019 to mask his control.

127.    First, because Martens (who worked in medical equipment sales) was unsophisticated and was not a credible manager of a senior secured lender with nine-figure loans outstanding, Heppner installed David Wickline—who had also worked at Goldman Sachs and reported to Hepper's mentor, Charles Harmon—as manager of CMH (and thus indirect manager of HCLP) on or about October 3, 2019.  To do so, Heppner signed—as Trustee of The Highland Partners Holdings Trust and The Highland Management Trust, respectively—unanimous written consents  that: ████████████████████████████████████

████████████████████████████████

128.    The same day (October 3, 2019), ████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

45

██████████████████████████████████████████████████████████

████████████████████████████████

129.    Second, in addition to replacing Martens with Wickline, ████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████

130.    The letter that ██████████████████████████████████████

████████████████████████████ was materially misleading.  It stated that ██████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████ But those assertions misleadingly

omitted that Heppner had just two days before: (i) installed Wickline in place of Martens as

manager of HCI; (ii) installed Wickline in place of HCIC as manager of CMH; and (iii) changed

HCLP's manager from Highland Counselors to CMH.

131.    ████████████████████████████████████████████████████

██████████████████████████████████████ while misleadingly omitting the

25-year history of HCLP's ultimate parent entity, Highland Consolidated, transferring all its

capital as purported "loans" or "investments" to Heppner-affiliated entities.

**C.      BEN, Holland, and Heppner Take Control of GWG in April 2019.**

*1.      The Seller Trusts, Effectively Controlled by Holland and BEN (and, In Turn, Heppner), Obtain Majority Voting Control of GWG in April 2019.*

132.      In connection with the earlier 2018 Exchange Transactions, the Seller Trusts under the effective control of Defendant Holland and Jeff Hinkle (a BEN designee) obtained majority ownership of GWG stock.   GWG's founders nevertheless maintained voting control because in connection with the 2018 Exchange Transactions, the Seller Trusts entered into a Stockholders Agreement (the "2018 GWG Stockholders Agreement") generally requiring that the Seller Trusts vote all voting GWG shares solely in proportion with the votes cast on the matter by all other holders of GWG voting securities.

133.      As part of the April 2019 transaction in which Heppner and BEN effectively took control of GWG and replaced its entire pre-existing board (the "April 2019 Transaction"), however, voting control over GWG changed and the Seller Trusts obtained majority voting control.   Specifically, in connection with the April 2019 Transaction, the 2018 GWG Stockholders Agreement was terminated.   And, in turn, the Seller Trusts became entitled to full voting rights with respect to the shares of GWG common stock they owned, amounting to approximately 79% of outstanding GWG voting securities at the time.

134.      Following the April 2019 Transaction, BEN also held approximately a 7.6% voting interest in GWG as a result of shares held by BCC.   BCC was a wholly owned and controlled subsidiary of BCH, which in turn was controlled by its general partner, BEN LP.   BEN LP was controlled by its general partner, BEN Management.   BEN Management's ultimate human controllers included Heppner.

135.      More specifically, from April 2019 through September 2020, certain Seller Trusts (for which Holland and BEN designees served as decision-makers) held 78.4% of GWG voting

power and BEN held 7.6% of GWG voting power (which Heppner controlled, according to GWG's securities filings). From September 30, 2020, through November 3, 2020, the Seller Trusts enjoyed 48.6% voting power and BEN retained its 7.6% voting power (meaning that, collectively, they still held majority voting control over GWG). And from November 3, 2020 onward, the Seller Trusts enjoyed what effectively amounted to 63.0% voting control by agreement, with BEN continuing to retain 7.6% voting control.

136.    As a practical matter, the Seller Trusts' majority voting control gave Holland and Heppner/BEN control because the Seller Trusts were controlled by their two "Trust Advisors," Holland and a BEN employee-designee (initially, Hinkle). GWG's securities filings acknowledged that the two Trust Advisors "*have sole decision-making authority with respect to each Seller Trust.*" (Emphasis added). ████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████

137.    Unsurprisingly, Holland and Hinkle routinely worked together with, and at the direction of, BEN, Heppner, and others at BEN. ████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████    In essence,

Holland worked in concert with BEN, fellow Trust Advisors designated by BEN (first Jeff

Hinkle and later James Turvey), and Heppner with no disagreement between them, especially insofar as it relates to the transactions at issue.

> ### 2. BEN, Heppner, and Holland Install BEN's Presently Serving Directors as New GWG Directors on April 26, 2019, and Holland and Evans Become GWG Officers.

138.    In connection with the same series of transactions in April 2019, BEN effectively bought out GWG's founding stockholders (Jon and Steve Sabes and their affiliated entities), and GWG's then-current directors resigned as part of that transaction.  BEN designated all GWG-director replacements and filled those positions with individuals who were already BEN board members, effective April 26, 2019.  The eleven BEN directors appointed to GWG's board, effective April 26, 2019, included: (1) Defendants Heppner, Cangany, Hicks, and Schnitzer; and (2) non-party former dual BEN/GWG directors Stein, Zimmerman, de Weese, Glaser, Caruso-Cabrera, Fisher, and Staubach.  Lockhart was appointed to both GWG's and BEN's boards effective May 13, 2019.

139.    At the same time that BEN effectively took over GWG's board, Defendant Holland was installed as GWG's new President and CEO on April 26, 2019.  Not long thereafter, on May 6, 2019, Defendant Evans (who had served as BEN's Chief of Staff and a Vice President and Deputy Counsel) was installed as GWG's "Chief Integration Officer" responsible for integrating GWG and BEN.  Evans was subsequently appointed as GWG's CFO on August 15, 2019.

140.    Thus, by early May 2019, the entirety of GWG's board (including its chairman, Heppner) and key officer positions were filled by individuals who were loyal to BEN.  And those individuals followed Heppner's lead.

### 3. Thereafter, Heppner, Holland, and BEN Form a Control Group of Controlling Stockholders.

141. At all times from April 26, 2019, through GWG's bankruptcy filing in April 2022, Heppner, Holland, and BEN formed a control group of controlling stockholders. They wielded control over GWG through several different levers of control at their disposal.

142. First, Heppner, Holland, and BEN collectively wielded de facto majority voting control over GWG. The Seller Trusts owned the majority of GWG stock. The Seller Trust's sole decisionmakers in voting were two Trust Advisors, Holland and a BEN designee. BEN and Heppner—directly and indirectly through BEN—controlled the actions of BEN's designated Trust Advisors (Hinkle and later Turvey), and Holland actively collaborated with them all.

143. Second, Holland and Heppner wielded influence and control due to their positions and influence over Evans. Holland served as GWG's President and CEO from April 2019 through GWG's bankruptcy filing, and as chairman of GWG's board of directors from June 2021 until the bankruptcy. Heppner served as GWG's chairman from April 29, 2019, until he resigned as a GWG director on June 14, 2021. Evans, who previously worked at BEN, served as GWG's CFO and Treasurer from August 15, 2019, until GWG's bankruptcy.

144. Third, Holland, Heppner, and BEN collectively wielded control as a result of their influence over dual-fiduciary BEN directors who also dominated GWG's board of directors, as well as GWG's Executive Committee of directors. GWG's board of directors was dominated by individuals concurrently serving as directors of BEN or who were otherwise loyal to BEN throughout the relevant time period.

145. Heppner and BEN exerted considerable influence over GWG through GWG's Executive Committee because of the considerable powers delegated to that Committee. Just two weeks after Holland, BEN, and Heppner took over GWG's board, the dual-serving BEN

directors then making up the entirety of GWG's board signed a unanimous written consent dated May 10, 2019, that established the Executive Committee. This written consent delegated to the Executive Committee "*all of the powers and authority of the Board* in the management of the business and affairs of the Corporation," at all times in between full board meetings. (Emphasis added). Heppner chaired GWG's Executive Committee, and Defendants Hicks and Schnitzer—both loyal BEN directors with substantial preferred equity in BEN—served on the Committee as well (until June 2021).

146. While other directors came and went (due to resignations), every director who served on GWG's Executive Committee was also a director of BEN. And through their influence and control over the GWG Executive Committee, Heppner, Holland, and BEN were able to set the agenda for GWG, including initiating the so-called "Strategic Initiative Transactions," or "SITA," with BEN, as described below. Indeed, Heppner and Holland collaborated on and dictated the terms for the written consent of the GWG Executive Committee that ultimately approved the SITA agenda (and was also signed by Hicks and Schnitzer).

147. In sum, the combination of majority voting control (through the Seller Trusts), senior positions at GWG (via Heppner as Chairman, Holland as President and CEO, and Evans as CFO), designation and appointment of BEN directors as GWG directors, and the significant powers delegated to the BEN-loyal Executive Committee all establish that Holland, BEN, and Heppner (via BEN) were a control group of controlling stockholders over GWG's business and affairs, in general. And as alleged and detailed below, Holland, Heppner, and BEN also exercised de facto actual control over GWG in connection with the transactions giving rise to the Litigation Trust's claims, which occurred from May 2019 through December 2021. They did so through their own actions, and by utilizing Defendant Evans as a pawn and intermediary.

**D.      BEN, Heppner, and Holland Initiate $154 Million in GWG Transfers Approved by an Ineffective GWG Special Committee (Mason and Chavenson) During 2019.**

   *1.      A Special Committee with an Ineffective Mandate and Prearranged Counsel is Put in Place to Rubber Stamp Investments in BEN.*

148.    Upon seizing control of GWG in April 2019, Heppner, Holland, and BEN immediately began plotting to funnel cash from GWG to BEN.  Within days of BEN board members taking their place on GWG's board, the new GWG board held its first board meeting on April 29, 2019 (at which Heppner was unanimously elected GWG's new chairman of the board).  At the meeting, Heppner led a discussion of GWG's "financial objectives" and "the timeline for implementing a number of strategic initiatives" with BEN during 2019, including GWG funding of BEN in May 2019 and a proposed "commitment to de-lever BEN."  (Of course, Hepper contemplated that "de-levering" BEN would entail money being sent to HCLP, BEN's senior lender.  Thus, from the very first GWG board meeting he chaired, Heppner started laying the groundwork for money to be funneled to HCLP, and from there to Highland Consolidated and his affiliates).

149.    Thereafter, the board "discussed the need to form a special committee comprised of independent and disinterested directors to review and approve the terms and conditions of the strategic transactions contemplated" between GWG and BEN.  From the start, however, the to-be-formed Special Committee was never intended to approximate arm's-length bargaining on GWG's behalf in transactions with BEN, with the ability to say "no" to all proposed transactions and otherwise explore alternatives.  Rather, Heppner, Holland, and BEN envisioned that the Special Committee would serve as a mere rubber stamp for transactions between GWG and BEN that they—as controllers—would put before the Special Committee.

150.    To maximize the odds that the Special Committee would bend to their will, Heppner, BEN, and Holland: (a) carefully vetted Special Committee members to find individuals who they could pass off as "independent" directors in a superficial sense at first appearance, yet were likely to be malleable; (b) defined the Special Committee's mission as if it were a foregone conclusion that money needed to go from GWG to BEN; and (c) pre-selected the Special Committee's counsel for it (while putting an extreme rush on the transactions that dissuaded the committee from considering alternative counsel or conducting an interview process).

151.    The two new directors appointed to the GWG board to serve as Special Committee members, Mason and Defendant Chavenson, both came recommended (to Heppner) from Stein, who was then a dual-director of both BEN and GWG.

152.    Holland and Heppner personally vetted Chavenson, meeting him for drinks on May 2, 2019.  The next day (May 3, 2019), Holland followed up with Chavenson in an email with the subject "Business Plan of BEN," attaching BEN's business plan and various BEN valuations, among other materials.  In response, Chavenson wrote: "I am more convinced than ever that *BEN* is on the cusp of an outstanding business opportunity, and I look forward to assisting you and contributing in whatever way that I can."  (Emphasis added).  Thus, even though Chavenson was being asked to join *GWG's* board and serve on a *GWG Special Committee*, Chavenson was immediately receptive to Heppner's and Holland's plan to use GWG as a tool to further *BEN's* interests.

153.    Heppner was pleased with Chavenson and instructed GWG's counsel to designate Chavenson as chair of the Special Committee in the written consent of GWG's board that created the Special Committee.  (Subsequently, Chavenson was appointed chair by a vote of Chavenson and Mason at the Special Committee's first meeting on May 15, 2019).

154.    The other prospective new director to serve on the Special Committee, Kathleen Mason, likewise came highly recommended (to Heppner) from Stein, who had known her for 20 years.  Heppner and Holland did not personally meet with Mason, as she lived on the East Coast (unlike Chavenson, who lived in Plano, Texas, close to BEN's headquarters in Dallas, Texas). Nevertheless, having an out-of-state director who lived on the East Coast (Mason) as one of only two members on a committee chaired by Chavenson, a Dallas-area local, created a dynamic that would help ensure that the agreeable and pliable Chavenson would lead the Special Committee's efforts.

155.    After settling upon Chavenson and Mason as prospective members of the Special Committee (but before they were formally appointed to GWG's board), Holland then focused Chavenson's and Mason's attention on getting money to BEN by providing them with additional background materials.  For example, in a May 8, 2019 email, Holland provided Chavenson and Mason with some "homework" to bring them up to speed, which included BEN's business plan and a presentation from the April 29, 2019 GWG board meeting that outlined "Strategic Initiatives with BEN" and the vision and goals of Heppner and the BEN-dominated GWG board going forward.

156.    The next day (May 9, 2019), Holland provided Chavenson and Mason with a valuation analysis that "contains a sensitivity analysis of the GWG cash flows," which he explained "is important in that *GWG is going to be a major cash source to Ben* from L Bond sales."  (Emphasis added).  He further explained that BEN was in the process of running risk analyses that "will help us fine tune the algorithm of *how much cash can be sent down*" to BEN. (Emphasis added).

157.     Thereafter, Chavenson and Mason were officially appointed to GWG's board through a unanimous written consent that formally created the Special Committee, which was dated May 10, 2019, and became effective on May 13, 2019.  Consistent with prior messaging from Holland and Heppner to Chavenson and Mason, recitals to the written consent made clear that the Special Committee was being *formed* because the BEN-dominated GWG board had "determined" that GWG should "explore an expansion of its business relationship with" BEN.

158.     Notably, the Chavenson/Mason Special Committee's mandate was narrowly defined.  Although the resolution *authorized* the Special Committee to evaluate potential transactions with BEN, it did not give the Special Committee the critical power to say "no" to such transactions or cut-off funding to BEN.  Rather, the Special Committee only had soft veto power, in that the full GWG board agreed that it would not authorize transactions with BEN "without a prior favorable recommendation . . . by the Special Committee."

159.     In addition to narrowly defining the Special Committee's mission, Holland, Heppner, and BEN also attempted to steer the Special Committee's efforts by pre-wiring engagement of counsel for the Special Committee that would not push back too hard—Evan Stone ("Stone") in the Dallas, Texas office of Foley & Lardner LLP ("Foley").  Holland reached out to Foley to secure Foley as Special Committee counsel no later than May 7, 2019, before the full GWG board had formed the Special Committee or appointed Mason and Chavenson to the board.  On May 9, 2019, Holland then informed prospective board members and committee members Mason and Chavenson that Foley was "prepared to be legal counsel to the special committee," and had come "recommended."

160.     Although Holland's May 9, 2019 email also indicated that the Special Committee could choose alternative counsel, both Chavenson and Mason deferred to Holland's

recommendation, thereby effectively allowing him to select Special Committee counsel for them. Chavenson asked *Holland* for his thoughts on Stone (the lead Foley partner on the engagement), then concluded that he was "fine with" Foley after Holland replied: "I am close friends with one of his partners" and that Stein "knows [Stone] and has used him before."  Mason was even more agreeable, indicating that she was fine with Foley, in part, because she: "d[id]n't see a need to complicate timing by engaging new counsel" and was sure Foley had already been brought "up to speed as much as is possible."

161.    In sum, by mid-May 2019, Heppner, Holland, and BEN had put in place a Special Committee consisting of two directors (Chavenson and Mason) and committee counsel that Heppner, Holland, and BEN fully expected—based on their vetting—to be accommodating and supportive of their plan to use GWG as a vehicle to prop up BEN.  Not only that, Holland and Heppner had already largely convinced the Special Committee and Foley that it was a foregone conclusion that GWG should continue to pour money into BEN and otherwise broadly support BEN's business.

162.    Thereafter, Holland, Heppner, and BEN exploited those dynamics and ran roughshod over the Special Committee in several transactions from May 2019 through December 2019, as alleged below.  The weak and mis-advised Special Committee's efforts fell far short of approximating arm's-length and vigorous negotiations, as required.   Instead, the Special Committee acted timidly and to appease Heppner, Holland, and BEN.  And in doing so, the Special Committee approved transactions without being fully informed and/or even though those transactions served BEN's interests, not GWG's interests.

2.      *In May 2019, the Chavenson/Mason Special Committee Hurriedly Approves a $10 Million Transfer for BEN Equity and a $65 Million Loan to BEN.*

163.    From the outset, the Chavenson/Mason Special Committee's efforts fell outside the norm.  Indeed, even before Chavenson and Mason were officially board members and before the Special Committee's first meeting, they were presented with an urgent request to approve large transfers of cash from GWG to BEN.

164.    Holland scheduled an initial call with Chavenson and Mason held on Saturday, May 11, 2019, at which Holland told them that it was critical that GWG move either $50 million to BEN—or $40 million to BEN, and $10 million to third-party Essex to acquire its BEN LP common units—by Friday of the upcoming week (May 17, 2019).   By the time the Chavenson/Mason Special Committee had its initial meeting on May 15, 2019, and initial substantive discussions on May 16, 2019, the request had increased to a $60 million loan (with $50 million funded immediately) plus an additional $10 million to Essex.  And by May 17, 2019, the request increased again to a $65 million loan (with $50 million funded immediately) plus an additional $10 million to Essex.

165.    The extreme urgency, size, and increasing amount of the funding request were all highly unusual, by themselves.  But the explanation given by GWG and BEN management was even more alarming, ███████████████████████████████████████ ████████████████████████████████.  The minutes for the Chavenson/Mason Special Committee's initial meeting, held May 15, 2019 (at BEN's offices) reflect that: "based on discussions with GWG and BEN management, ██████████████████████████████ ████████████████████████████████████████████████████."  The minutes for meetings held on May 16 and May 17, 2019, likewise reflect that issues over

whether ███████████████████████████ were the principal reason for the urgency of the funding request.

166.    The existence of substantial doubts over whether ████████████████████ ███████████████████████████████████ should have led the Chavenson/Mason Special Committee to question whether it was in GWG's best interests to send any money to BEN, let alone large sums on short notice.  At a minimum, ████████████ ██████ should have heightened scrutiny and flagged the need for vigorous negotiations to ensure that GWG was protected and not just throwing good money after bad.

167.    Instead, however, the Chavenson/Mason Special Committee tried to rationalize the funding request at their initial May 15, 2019 meeting.  The Special Committee discussed GWG's "strong interest in making the financing available to BEN, as communicated by [GWG] management."  The Special Committee then fell victim to a sunk-cost fallacy, rationalizing giving money to BEN because of GWG's prior substantial investments in BEN through the Exchange Transactions in 2018.  From the date of their first meeting, therefore, the Chavenson/Mason Special Committee adopted a "what's good for BEN is good for GWG" mindset that was fundamentally at odds with the Special Committee's duties.

168.    Their improper BEN-focused mindset permeated the Chavenson/Mason Special Committee's thinking in subsequent Special Committee meetings, both internally and with members of GWG and BEN management.  During several meetings held on May 16, 2019, and May 17, 2019, the Special Committee and Foley remained focused on whether the requested funding would enable ██████████████████████████████████.  They also focused on whether the proposed funding would enable ███████████████████████

███████████████████████████████████████████████████████, an additional rationale for the funding according to Holland and BEN (and, days later, Heppner).

169.   On May 20, 2019, just days on the job, the Special Committee approved the $10 million proposed GWG acquisition of BEN LP common units from Essex.  And on May 31, 2019, the Special Committee approved a $65 million loan from GWG[6] to trusts affiliated with BEN, with the understanding that the proceeds would ultimately flow through to benefit BEN.  Both transactions were unfair to GWG; the terms for GWG were far less than what a third party would have agreed to in an arm's-length transaction in the marketplace.

### a.   The $10 Million Essex Transaction

170.   Within a week of when Mason and Chavenson became board members (on May 13, 2019) and within just five days of their first Special Committee meeting (held May 15, 2019 at BEN's offices), the Special Committee approved sending $10 million to acquire BEN LP common units from Essex (the "Essex Transaction").  The condensed timeline for the Essex Transaction was a reflection of the Chavenson/Mason Special Committee's (and its counsel's): (1) (flawed) assumption that approving a transfer of $10 Million to Essex would satisfy an immediately due and payable BEN obligation (thereby helping BEN's immediate liquidity needs); and (2) attempts to appease Holland, Heppner, and BEN, rather than ensuring that the transaction was in GWG's best interests.

171.   Based on their initial meetings with Holland, Heppner, and BEN, the Chavenson/Mason Special Committee and its counsel were led to believe that BEN owed a cash obligation to Essex that needed to be paid immediately.

---

[6] The loan was made by GWG Holdings' wholly-owned subsidiary, GWG Life.

172.    The rationale for the Essex Transaction was first discussed at the Special Committee's second meeting, which commenced at 11:00 a.m. on May 16, 2019.  The minutes for that meeting show that the Chavenson/Mason Special Committee was informed that the $10 million acquisition of BEN LP units would "███████████████████████████████████ ████████████████████████████████████" (Emphasis added).

173.    The Chavenson/Mason Special Committee met later that day at approximately 2:15 pm.  Minutes from the meeting again reflect an understanding that the proposed $10 million acquisition of BEN LP common units "████████████████████████████████████ █████████████████████████████████████████████████████ ███████" (Emphasis added). The minutes further provide:

> It was discussed that such funding was requested to occur as a repurchase of the BEN limited partnership interests held by Essex ████████████████ ███████████████.  The Committee discussed that such funding would not have the same level of protection for [GWG] (i.e., an additional junior equity investment in BEN vs debt) but that certain considerations, ████████████ ██████████████████ as well as the relative size of the request, appeared reasonable.

(Emphases added).   In other words, the Special Committee rationalized the proposed equity investment in BEN—while knowing it was less desirable than debt financing—on the basis that it ████████████████████████████████████ and it was only $10 million (even though that was obviously a material sum, especially for GWG).

174.    By the end of the day on Thursday, May 16, 2019, less than 36 hours into their substantive efforts and with no meaningful substantive discussions or evaluation, the Special Committee was ready to sign off on the $10 million Essex Transaction.  But BEN, Holland, and Heppner had also requested simultaneous approval of a $60-65 million loan as part of an overall package, and the Special Committee and Foley were not quite ready to approve the loan.  To try to get the entire transaction across the finish line, the Special Committee met with Heppner and

members of GWG management on Friday, May 17 and met with BEN's Audit Committee chairman, Defendant Cangany, on Saturday, May 18.

175.    On May 20, 2019, the Special Committee held a Monday morning meeting to discuss the proposed $65 million loan to BEN and proposed $10 million Essex Transaction.  The Special Committee was still not ready to approve the loan due to issues with the loan documents, so decided to bifurcate the overall transaction and go forward with the Essex Transaction prior to approving the loan.  The meeting minutes reflect that Foley and the Special Committee discussed the "rationale for the bifurcation," including that because the Essex Transaction "required significantly less documentation and was not subject to additional approvals/waivers (e.g., documentation with BEN's senior lender)," it meant that "there was a possibility of proceeding with the [Essex Transaction] the same day."

176.    The Committee then "determined to move forward with its approval" of the Essex Transaction, and approved a resolution dated May 20, 2019 to authorize the transaction.  The Committee did so due to the "desirability of ███████████████████████████████ ████████████████████████████████████████" and "███████████████████ ████████████████████████████████████████████████████████████████ ██████████████████." (Emphases added).

177.    Yet, the Chavenson/Mason Special Committee's critical underlying assumptions in approving the transaction were erroneous.  ████████████████████████████████ ████████████████████████████████████████████████████████████████ ██████████████████████████" as the Special Committee erroneously believed.  Nor did GWG simply ████████████████████████████████████████████ Instead, later in the day on May 20, 2019 (after the Special Committee had already approved the Essex

Transaction), GWG's general counsel provided Foley with a draft agreement—originally prepared by BEN—for an assignment and transfer of Essex's units to GWG, which Foley then marked up to add purchase price terms.  This agreement made no mention of ██████████ ████████████████████████████████, and was not finalized until weeks later.

178.    Likewise, none of the other information BEN provided to the Special Committee and its counsel made any reference to ████████████████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████████.

179.    In addition to never verifying the existence of the obligation (despite information provided to its counsel indicating that no such obligation existed), the Chavenson/Mason Special Committee approved the Essex Transaction even though it had not yet hired a financial advisor, conducted any financial analysis whatsoever of the value of BEN equity as a whole, performed any analysis of BEN's complex capital stack to attribute value to BEN LP common units (a critical error given the billion dollar plus overhang of NPC-A preferred equity interests held by Heppner's main holding vehicle, BHI), or otherwise made any effort to value BEN LP common units before approving the Essex Transaction.

180.    The Special Committee's failure to obtain or conduct any independent financial analysis of the value of BEN LP common units before authorizing GWG to spend $10 million to

purchase BEN LP common units was particularly galling given the surrounding circumstances. Specifically:

- BEN had not yet obtained its required trust charter (one of the given reasons for the funding request was to help BEN meet regulatory requirements to obtain the charter);



- and

Given those many glaring red flags, there was ample reason to doubt whether *any* investment in BEN equity made sense.

181.    Moreover, paying $10 million for BEN LP common units at a $10/unit price made no rational business sense whatsoever.  A $10/unit price implied total BEN equity value of well over a billion dollars, wholly implausible for a distressed company that ███████████████ ███████████████████████████.  Yet the Special Committee made no effort whatsoever to try to: (a) negotiate a better, fairer price for GWG; (b) conduct any sort of market check for the value of BEN LP units; or (c) explore alternatives.

182.    The Chavenson/Mason Special Committee hastily approved the Essex Transaction—less than five days after it was first presented—not because they believed it was in GWG's interest, but rather to show progress of some kind to appease Heppner, Holland, and

BEN.  While Foley and the Special Committee thought they needed more time to examine the parallel request for a $65 million loan, "there was a possibility of proceeding with the [Essex Transaction] the same day or within a short period of time."

183.    The Special Committee sought to appease Heppner, Holland, and BEN to alleviate some of the pressure they were feeling.  Indeed, the same day that the Special Committee approved the Essex Transaction, its chairman, Chavenson, expressed concerns over the "pressure" he had felt and his hope to avoid another "fire drill."  Specifically, Chavenson wrote in a May 20, 2019, email to committee counsel:

> Despite all of our activities last week I don't think it was the intention of the GWG BOD to set up an ad-hoc Special Committee, although I will admit it felt like that.  Now that the dust has settled a bit on our first transaction (or will settle in the next hour), would either of you be interested in a lunch meeting . . . just to have a discussion on exactly what the Special Committee's responsibilities are and how it should go about executing those responsibility.  Myself, *I have felt some pressure from, shall we say, competing interests* and given that there is likely to be more work in the near term, I would just like to get your views on such issues.  Additionally, we can discuss how to go about hiring a financial advisor, since we are likely to need one soon and *I have little desire for another "fire drill."*

(Emphases added).

### b. The $65 Million Loan to BEN

184.    The Chavenson/Mason Special Committee's May 20, 2019 resolution approving the Essex Transaction expressly stated that the "Special Committee anticipates taking formal action on the Loan in a subsequent resolution following substantial finalization of certain outstanding documentation [items] relating thereto."   And on May 31, 2019, the Chavenson/Mason Special Committee approved a $65 million loan from GWG Life, GWG's wholly owned subsidiary, to liquid trust entities affiliated with BEN (the "$65 Million Loan"), with the understanding that the proceeds would flow back to BEN itself.

185.    In approving the $65 Million Loan, the Chavenson/Mason Special Committee never seriously considered the option of foregoing funding BEN altogether.   Instead, its narrow efforts were focused on ensuring that funds advanced by GWG would not be immediately swept by BEN's other lenders, seeking assurances that the funding would ███████████████████ ████████████████████████████████████████████, and trying to negotiate a loan from GWG to BEN under the assumption that BEN had no other options. Throughout, the Special Committee relied heavily on representations made by Defendants Heppner, Holland, Evans, and Cangany (who chaired BEN's Audit Committee), as illustrated in the following timeline.

186.    On May 17, 2019, the Special Committee met with Heppner and other members of GWG's executive committee.   Later that afternoon, the Special Committee reconvened to discuss the information that had been conveyed, including that "█████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████" Heppner also informed the Special Committee that ████████████████████████

███████████████████████████████████████████████████████████████████

█████████████████████.

187.    On May 18, 2019, the Special Committee met with Defendant Cangany, chair of BEN's Audit Committee, who reassured the Special Committee that the proposed transaction ████████████████████████████████████████████████████, which the Special Committee viewed as "a key rationale for the funding."

188.    Cangany also told the Special Committee that the $65 million requested loan amount "████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████  " Cangany further explained that BEN management's projections were ████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████  (Emphasis added).[7]

189.    On May 26, 2019, Defendants Heppner, Holland, and Evans joined a Special Committee meeting, by invitation, partway through.   Heppner "provided further analysis regarding BEN cash flows, including the assumptions underlying the Loan size in respect of operating cash needs ████████████████████████████████████."   The Special Committee questioned Heppner over whether the proposed $65 Million Loan was ████████████

---

[7] On May 20, 2019, the Special Committee met privately and further discussed that the ████████████████████████████████████████████████████████████████████████████████████████████████████████████████  The Special Committee also "discussed at length the disadvantages," including "the potential effect of reducing the current liquidity of [GWG] while [GWG] continued to generate losses."

████████████████████████████████████████████████████

███████████████████████████████████████████.

190.   Thereafter, Heppner also provided a summary of ████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████   (Emphasis added).  Again, Heppner misleadingly acted as if HCLP were

a legitimate third party, not a shell entity under his *de facto* control.

191.   On May 29, 2019, Holland emailed Chavenson and Mason regarding cash flow

projections for the liquid trust borrowers, asserting that the projections were "prepared by

[BEN]'s risk management team and signed off by the Risk Management Committee of the board

of directors of [BEN]," headed by Bruce Zimmerman, whom they "should consider . . . one of

the world's experts in risk analysis."   Holland further wrote that BEN's projections were risk

adjusted and prepared by a BEN "risk team that uses industry leading systems and assessment

tools."

192.   Finally, on May 30, 2019, Evans provided Special Committee counsel with a

document and organizational chart purporting to set out HCLP's "control structure."   This

document stated that ████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████

193.   But these representations and assurances made by Heppner, Cangany, Holland,

and Evans in their meetings with the Special Committee were materially misleading in several

respects.

194.  <u>First</u>, HCLP was not an arm's-length, third-party lender, as implied in Heppner's statements to the Special Committee, but rather a shell entity that funneled cash to Heppner's network of affiliated trusts and entities.  Heppner failed to disclose to the Special Committee that he enjoyed *de facto* control over HCLP.

195.  <u>Second</u>, and relatedly, the HCLP "control structure" that Evans provided to Special Committee counsel on May 30, 2019, ███████████████████████████████ ████████████████████████████████████████████████████████████████ ██████████████████████████████████████  But, as alleged above in section B.5, Heppner in fact signed documents that removed and replaced each of the managers referenced in the document—including Martens himself.

196.  <u>Third</u>, ██████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ███████

197.  <u>Fourth</u>, and relatedly, BEN's cash projections were not based on "industry leading systems and assessment tools," as Holland misleadingly represented in his May 29, 2019 email to Chavenson and Mason.  Rather, as Defendant Schnitzer—a member of BEN's Enterprise Risk Committee—admitted months later to a████████████████████████████████████ ███████████████████████████████████  (Emphasis added).

198.  <u>Fifth</u>, despite Cangany's, Heppner's and Holland's various representations and assurances regarding the use of proceeds, the proceeds were not ████████████████ █████████████████████████  Nor was the Special Committee informed that Heppner and

BEN—unbeknownst to Zimmerman and other members of BEN's risk committee—would use loan proceeds for ████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████.

199.    <u>Sixth</u>, and finally, the requested amount of the funding was not ████████ ████████████████████████████████████████████████████ ████████████████████████████ as Cangany had misleadingly suggested to the Special Committee.  In fact, Heppner and Holland intended to ask GWG for many millions of dollars more from GWG, almost immediately after the loan closed, including a sweep of unrestricted GWG cash to BEN, as alleged below.

200.    Nevertheless, because Heppner's, Cangany's, and Holland's representations and assurances created the impression that the $65 Million Loan would be a cure-all for BEN's needs over the next year, the Chavenson/Mason Special Committee approved the $65 Million Loan, despite some misgivings.

201.    The terms of the $65 Million Loan were materially unfavorable to GWG. Specifically, the loan: (a) was unsecured; (b) was subordinated to senior first debt (to HCLP) and second debt (to BHI); (c) was not due for over four years (on June 30, 2023); (d) bore interest at a rate of only 7.00%, which was not payable until the maturity date; and (e) was made to risky borrowers with no demonstrated track record of generating income sufficient to repay the loan. No third-party lender was willing to extend BEN credit on such below-market terms ████████ ████████.

202.    Moreover, it made no sense for GWG to make a loan with such unfavorable terms given that: (a) the loan's interest rate was lower than GWG's rate on its L Bond financing; and (b) the interest on the $65 Million Loan was not payable until maturity, yet GWG had to pay monthly interest on its L Bond borrowings.  In other words, GWG was losing money on the interest differential between the real money it sent out the door to pay its L Bond obligations and BEN's accrued interest obligations to be paid in the distant future.

203.    In short, the $65 Million Loan made little sense for GWG, and was made to benefit BEN.  Nevertheless, the Special Committee approved the below-market terms of the $65 Million Loan due to its warped, BEN-focused mission assignment and the misleading statements made by Heppner, Holland, and Cangany in coaxing the Special Committee to approve the loan (on unfair terms).

### 3.    The Chavenson/Mason Special Committee Is Presented with Numerous "Red Flags" Regarding BEN from June 2019 through December 2019.

204.    The Chavenson/Mason Special Committee approved the $65 Million Loan and the $10 million Loan Transaction in May 2019 without the benefit of a financial advisor or independent financial analysis, without fully understanding BEN's business and while knowing that BEN faced financial difficulties, and without fully informing themselves in other ways.  Instead, they acted hastily and were pressured into making a quick decision by Heppner, Holland, and BEN.  And they did so, in large part, due to misleading representations and assurances conveyed by Heppner, Holland, Evans, and Cangany.

205.    Accordingly, after what had just transpired in May 2019, the Chavenson/Mason Special Committee should have been particularly attuned to new information they learned about BEN in the following weeks and months.  To the extent such new information conflicted with what they had been previously been told, this should have raised significant concerns and doubts

about approving any more transfers from GWG to BEN, at a minimum. From June 2019 through December 2019, the Chavenson/Mason Special Committee and its advisors were presented with one glaring "red flag" about BEN after another, yet failed to act on them (instead approving an additional $79 million transfer to BEN on December 31, 2019, as alleged below in section D.4).

> a.   **Heppner and Holland Present Strategic Initiatives Requesting More Money for BEN to the Special Committee on June 1, 2019, Immediately After the $65 Million Loan was Approved.**

206.   Almost immediately, the Chavenson/Mason Special Committee learned that the $65 Million Loan was not a cure-all that would satisfy ████████████████████████, contrary to the assurances they received. Indeed, on June 1, 2019, the very next day after the loan was approved and funded, Heppner circulated a memorandum addressing proposed "Strategic Initiative Transactions" with BEN to be part of a Strategic Initiative Transactions Agreement, referred to as SITA. Heppner circulated this memorandum to the Special Committee and members of the executive committee of GWG's board (then consisting of Stein, Glaser, and Defendants Heppner, Hicks, and Schnitzer).

207.   Heppner's cover email and memorandum outlined a process through which the GWG executive committee would decide on the material terms for the various transactions with BEN's counsel drafting the terms for each agreement, then present them to the Special Committee for approval. In other words, Heppner's SITA memorandum envisioned that the Special Committee itself would not negotiate in the first instance, but instead largely play a rubber-stamping role.

208.   Consistent with that approach, on June 4, 2019, Holland provided the Special Committee with a table setting forth proposed terms for the proposed "Strategic Initiative Transactions" agreements to give them "a good roadmap of our plans," indicating that he would circulate the agreements to the Special Committee "[w]hen these are drafted."

71

209.    Among many other proposals oriented towards further ensnaring GWG and draining its cash, several of Heppner's proposals involved transferring vast additional sums of money into BEN on patently unreasonable terms.  For example, Heppner proposed amending the pre-existing commercial loan agreement (CLA) between GWG and BEN to increase BEN's borrowing capacity from $192.5 million to $3 billion, extend the maturity date by ten additional years, accrue all interest until maturity, and give BEN the option of repaying GWG in units of BEN's common equity (upon BEN obtaining a state trust bank charter).  Similarly, an additional proposed "strategic initiative" was an arrangement whereby GWG would provide to BEN "monthly funding of GWG's net available cash after necessary reserves," either though increased borrowing capacity of the CLA or by purchasing units in BEN, "in either case at BEN's sole discretion."

210.    These proposals were inconsistent with Cangany's and Heppner's reassurances to the Special Committee—made just days before—that the $65 Million Loan would satisfy ███ ███████████████████████████████████████████████.

211.    In addition, these proposals were inconsistent with Holland's reassurances regarding BEN's supposedly fully vetted and risk-adjusted cash flow projections, relayed in his May 29, 2019 email to the Special Committee.  Holland made those representations even though earlier that same day, he and Heppner were already working on collaborating on the forthcoming SITA memo, with Holland suggesting an additional immediate $110 million advance under the CLA "and a monthly funding of GWGH unrestricted cash thereafter."

   **b.**  **The Chavenson/Mason Special Committee and its Counsel Are Presented with Information Suggesting that BEN Had Previously Owed No Obligation to Essex.**

212.    As alleged above, the Chavenson/Mason Special Committee hastily approved the $10 million Essex Transaction—after just days on the job—based on the misunderstanding that

BEN owed an "███████████████████████████████████████████

███████████████████████████████.

213.    After it had already approved the Essex Transaction, however, the Special

Committee and its counsel were presented with additional information indicating that none of

that was true.  (Such information was in addition to the ███████████████████████ in

any of the materials provided by BEN to the Special Committee and its counsel during May

2019).

214.    After the Special Committee voted to approve the Essex Transaction, on June 11,

2019, the Special Committee's counsel was presented with documentation between Essex and

BEN, including an "Acknowledgement and Agreement Regarding Auction Consideration"

between BEN, Essex, and certain of the exchange trusts.  ███████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████.

215.    The next day (June 12, 2019), Evans emailed the Special Committee's counsel to

inform them that GWG's $10 million wire transfer was about to be sent to Essex, requesting

confirmation of the Special Committee's authorization to wire the funds and writing:

"[u]nfortunately, we're down to the wire (no pun intended) again." Foley responded: "Aren't we

always!"

216.    Accordingly, within weeks of the Special Committee's hasty approval of the

Essex Transaction, it should have been further obvious that ██████████████████████

████, and that the urgency initially conveyed by Holland and BEN was grossly exaggerated.

217.    That BEN ████████████████████ became further apparent to the Special

Committee and its counsel later in the year.  For example, when the Special Committee was

asked to approve a waiver of payment restrictions to the Sabes in order to enable BEN to pay its obligations to Paul Capital (section D.4.c, *infra*), Foley asked for an update of the "current status of all Paul Capital/bulk seller related obligations."   BEN's in-house counsel responded on October 2, 2019, explaining that bulk sellers, including Essex, were expecting cash payments from the buyer—*i.e.*, the relevant exchange trusts—under the relevant purchase and sale agreements.   She further explained that although BEN had entered into an Acknowledgement with Essex (on June 12, 2019), ███████████████████████████████████████ ███████████████████████████.

218.   In December 2019, the Chavenson/Mason Special Committee and its counsel finally started trying to locate and review documents related to ██████████████████████ ████████████████████████████████.   Unable to find any documents reflecting that ██████████████████████████, the Special Committee declined to send any more money to Essex at year-end (as BEN had requested as part of year-end funding).

219.   Nevertheless, even though the Chavenson/Mason Special Committee and its counsel knew or should have known by December 2019 that: (a) they had previously been duped; and (b) BEN was trying to achieve the same stunt again at year-end, the Special Committee still agreed to provide large sums to BEN for other dubious purposes, as alleged below (section D.4, *infra*).

   c.   **Defendants Holland, Heppner, Hicks, and Schnitzer Try to Cover Up Serious Concerns Raised by Three Directors Who Resigned from Both GWG's and BEN's Board**

220.   That the Special Committee and its counsel had apparently been misled, by itself, was reason for significant concern surrounding BEN and to heighten skepticism.   Throughout the remainder of summer and fall 2019, the Special Committee was presented with numerous

additional "red flags" that should have led to additional skepticism over sending any more money to BEN.

221.    One of the most glaring warning signs that something was amiss was a wave of resignations by three dual-directors, each of whom had raised significant questions regarding BEN and related-party payments to Heppner's affiliates.  While the Special Committee and its counsel should have investigated the circumstances surrounding that mass wave of departures (including attempting to interview those directors), they failed to do so in large part due to misleading statements conveyed by Holland as a damage control measure.

222.    By mid-July 2019,[8] Stein—who had prior relationships with the Special Committee and its counsel—and two other outside dual-directors with some visibility to both GWG and BEN, Zimmerman and Glaser, began asking questions about GWG's and BEN's cash flow projections and substantial related party payments that BEN made to Heppner affiliates, including HCLP.  Previously, within days of when GWG funded the first $50 million tranche[9] of the $65 Million Loan on June 3, 2019 to several liquid trusts affiliated with BEN, a substantial portion of the proceeds flowed to BEN, ███████████████████████████████████ ███████████████████████████████████████ and $401,056 to Bradley Capital, another Heppner entity, which provided private air travel to Heppner and his family.

223.    Upon learning of those payments in July 2019, Zimmerman, Stein, and Glaser were troubled, especially given the lack of reliable cash forecasts for either GWG or BEN, and significant questions over both companies' business models.

---

[8] Around the same time, Hinkle submitted resignation letters dated July 19, 2019, resigning from all BEN trust entities and all BEN business entities, to be effective on August 23, 2019.
[9] The second $15 million tranche on the $65 Million Loan was funded on November 22, 2019.

224.    Over the following weeks, Zimmerman, Stein, and Glaser grew increasingly concerned due to lack of forthcoming information and reliable projections from BEN.  And by late August, they thought that GWG should stop sending money to BEN and that BEN should cease all payments to related parties (including HCLP) for the time being.

225.    Specifically, on August 23, 2019, Zimmerman wrote to Defendants Heppner, Hicks, and Schnitzer: "I am not good with GWG sending anything more to BEN until at least January of 2020 . . . I am also not good with BEN making any more related party payments." Stein chimed in to express his "total agreement," stating that "Cash flow is a major problem and *it is unacceptable to make payments from GWG to BEN to related parties.  This is a major liability issue at the GWG level* and I am totally opposed to such payments."  (Emphasis added).

226.    Later that morning, Heppner/BEN loyalist Defendant Schnitzer tried to smooth things over, suggesting that ███████████████████████████████████████████ ██████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████

227.    Upon realizing that HCLP and related entities were about to be put under the microscope, Heppner then undertook several steps to cover his tracks.  As alleged in more detail above (section B.5, *supra*), Heppner: (a) coordinated with Martens, his hometown friend in Hesston, Kansas, to backdate HCLP governance documents to April 1, 2019; (b) installed Wickline as HCLP's indirect manager (replacing Martens) on October 3, 2019; ████████████ ██████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████

228.     Despite Heppner's efforts to cover his tracks and █████████████████████████

███████████████, however, Glaser, Stein, and Zimmerman, still had other concerns leading up to

October 10, 2019 board committee meetings.

229.     For example, in an October 5, 2019 email to Glaser, Stein wrote that he, Glaser,

and Zimmerman ████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

(Emphasis added).   Stein further observed that Heppner ████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████████

230.     For his part, Glaser ████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████.

231.     Heppner forwarded Glaser's October 7, 2019 email to Holland later that evening.

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████

232.     The testy exchanges between Glaser, a director looking out for GWG's interests,

and disloyal GWG fiduciaries favoring BEN's interests (*i.e.*, Holland, Heppner, Schnitzer, and

Hicks) continued the next day.  In an October 8, 2019 email exchange, ████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████ (Emphases added).  In response, Glaser wrote ██████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

██████████████████████ (Emphasis added).

233.    Shortly thereafter, at an October 10, 2019 BEN-and-GWG-combined committee meeting (attended by Stein, Glaser, and Zimmerman), Zimmerman resigned as a GWG and BEN director by handing out a resignation letter and then walking out of the room.  Stein submitted his resignation shortly after the meeting concluded.  But at the urging of Defendant Holland, they temporarily "withdrew" their resignations so that GWG could vote to reduce the size of the board.  Following the board vote, Stein, Glaser, and Zimmerman resigned officially on October 15, 2019.  When the GWG press release announcing their departures hit the wire, Zimmerman remarked: "*Free at last, free at last, thank God almighty, we're free at last*."  (Emphasis added). Stein replied: "*I think the rest of them have lost their marbles*."  (Emphasis added).

234.    On October 11, 2019, the day after the blow-up at the board meeting prompting Zimmerman, Stein, and Glaser to resign, Hicks recognized the need for damage control.  And thus, Hicks emailed Heppner, Holland, and Schnitzer to recommend that ██████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████ Schnitzer replied: ████████████

████████

235.     Holland then reached out to Chavenson as part of the agreed-upon approach to get ahead of that issue. Later that day, (October 11, 2019), the Special Committee discussed that Holland had informed them that Zimmerman, Glaser, and Stein "were planning on resigning from the board of directors of [GWG] and BEN," and "explained that the resignations stemmed from a variety of reasons, including outside obligations and commitments of the resigning directors and the general desirability for a smaller board of directors."   Neither Holland nor Heppner ever told the Special Committee of the many questions raised by Stein, Glaser, and Zimmerman regarding related-party payments from BEN to HCLP and the lack of reliable, long-term cash projections and business plans.

> **d.     Additional GWG (and BEN) Officers and Directors Resign During the Second Half of 2019**

236.     Numerous other GWG officers and directors and BEN officers likewise resigned during 2019.

237.     Richard Fisher, a pre-existing BEN director who became a GWG director on April 26, 2019, resigned from GWG's board on October 15, 2019 (but remained on BEN's board) as part of the mass-wave of resignations involving Stein, Glaser, and Zimmerman.   Fisher had

███████████████████████████████████████████████████████████████

███████████████████████████████████████████

238.     Fisher likewise shared many of Zimmerman's questions.  On September 21, 2019, Zimmerman and Fisher sent a joint email to Heppner addressing: ████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████

239.    Heppner promptly forwarded the joint Zimmerman/Fisher email to Defendants

Hicks and Schnitzer, ████████████████████████████████████████████

███████████████ and ███████████████████████████████████████

████████████████ Hicks responded that ████████████████████████████████

Not long thereafter, Fisher resigned from GWG's board on October 15, 2019, but remained on

BEN's board.

240.    The following GWG officers and BEN officers—who interfaced with the

Chavenson/Mason Special Committee—also resigned, or announced their resignations, in the

second half of 2019:

- GWG's William Acheson, who had served as GWG's CFO prior to installation of Evans into that role;

- GWG's in-house general counsel, Craig Opp (who abruptly announced his resignation on Christmas Eve 2019);

- BEN's long-standing Chief Administrative Officer and Treasurer, Jeff Hinkle;

- BEN's CFO, Tiffany Kice (who only learned of the purported debt to HCLP after joining the company and began contemplating resigning just two months in to her nine-month tenure, in part due to "not understand[ing] the future business purpose of why that debt would be on [BEN's] balance sheet.");

- BEN's in-house general counsel, Jessica Magee; and

- BEN's in-house counsel, Michael Andrews (who after Magee resigned had been "seconded" to GWG to work as the central point of contact for all Special Committee due diligence requests).

That mass exodus of high level legal and finance personnel from both GWG and BEN was a glaring red flag that something was amiss, or at the very least, that BEN was not on the cusp of becoming a flourishing business worth billions.

> **e.    BEN's and GWG's Auditors Resign in Late Summer 2019 (While Heppner, Holland, and Cangany Provide Misleading Reassurances)**

241.    On top of the mass exodus of four sophisticated GWG directors, three BEN directors, BEN's general counsel, BEN's CFO, BEN's Chief Administrative Officer, and other BEN legal and accounting/finance personnel throughout the summer and fall of 2019, two separate audit firms also left the scene.

242.    Baker Tilly, who had served as GWG's auditor for over five years, essentially fired GWG as an audit client in mid-2019.  When Baker Tilly indicated that it would resign, Holland and Heppner tried to gloss over issues surrounding BEN that were part of the reason it resigned, misleadingly scapegoating GWG.

243.    After Holland first informed GWG's full board that Baker Tilly intended to resign as GWG's auditor on June 20, 2019 and was pressed for details by the board, Holland responded that Baker Tilly "expressed concern over risks in the combined company."  Before Holland could answer follow-up board questions regarding those "risks," Heppner jumped in, instructing Holland to "not answer this until we speak."  Heppner then bought time, emailing the board that Holland would provide "a clearer response" later that evening, but that ███████████████

████████████████████████████████████████████████████████████████████████

████████████████

244.    Later that evening, after Holland and Heppner coordinated on damage control messaging, Holland sent a draft of his proposed email to the GWG board to Heppner.  Heppner responded: "This is good.  Send it to the board."  The Heppner-approved message that Holland

then relayed to GWG's board made it appear that the "risks" Baker Tilly identified were a function of concerns over GWG management and accounting personnel, combined with a failure to appreciate BEN's supposed capabilities. Holland claimed Baker Tilly was "concerned over GWG's [pre-existing] management capability to manage the complex business of Beneficient and in particular a combined company operating together," but they have "never met Brad or me" and "they do not understand that Ben has a fully developed management team."

245.    Holland further explained that Baker Tilly was concerned about "the ability of the finance team at GWG," but Baker Tilly had "not undertaken a review of Ben's financial accounting capabilities." Holland further explained: "they do not understand that Ben's capabilities far exceed GWG's."

246.    This Heppner-approved messaging and attempt at damage control created the impression that there was no real risk—only Baker Tilly's failure to appreciate the supposed "capabilities" that BEN brought to the table. But this was materially misleading in that BEN did not have robust accounting capabilities. Just days before (June 14, 2019) the Heppner-approved spin was relayed by Holland to GWG's board, ██████████████████████████████ ████████████████████████████████████████████████████████████████ ██████████████████████████████:



(Emphasis added). And several months later, BEN was still ███████████████████ ██████████████████████████ (in Defendant Schnitzer's words).

247.     Moreover, although Baker Tilly had determined that the complexity of BEN-related accounting questions had created challenges for GWG's accounting department, Holland and Heppner misleadingly omitted that the specific issues Baker Tilly raised largely related to questions relating to BEN's business and valuation, such as: ██████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████ .

248.     When Baker Tilly confronted GWG with questions related to BEN's valuation and financial statements, it was never able to get straight answers. Baker Tilly questioned the

████████████████████████████████████████████████████████

██████████████████████████████     Regarding  the May 31, 2018 valuation of BEN prepared by Ankura Capital Advisors, LLC ("Ankura"), Baker Tilly asked, ████████████

████████████████████████████████████████████████████████

████████████     Rather than answer any of these questions, GWG punted and told Baker Tilly to

██████████████████████████     And in responses to Baker Tilly's note that it ████

████████████████████████████████████████████████████████

████████████████████

249.     But Baker Tilly's questions about BEN continued to go unanswered, and its questions only mounted in the wake of the April 2019 Transaction.  It wasn't until mid-June 2019 that Baker Tilly finally received the BEN audited financial statements it had been promised for months (the delay caused by ██████████████████████████████████████

████████████████████████████████████████████████████).  BEN's audited

financial statements were ████████████████████████████████████████
████████████████████████████████████████████████████████

250.    GWG's inability to give Baker Tilly satisfactory answers to its questions about BEN and the audited financial statements that were finally handed over ████████████████ ████████████████████ very likely contributed to Baker Tilly's announcement on June 19, 2019 that it would not stand for reappointment as GWG's auditor.   Indeed, Baker Tilly only agreed to complete the Q1 2019 review on the condition that it receive written confirmation that ████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████

251.    Toward the end of Baker Tilly's engagement, the audit team's comments reflect that Baker Tilly ████████████████████████████████████████ ██████████████████████████████.   Thus, contrary to Heppner's and Holland's spin, Baker Tilly's resignation related to BEN-specific issues.

252.    Baker Tilly was also not the only audit firm that refused to audit GWG once it became entangled with BEN, due primarily to concerns relating to BEN—and Heppner.

253.    On August 6, 2019, Holland emailed Mason and Chavenson (copying Defendants Cangany and Heppner) to inform them that ████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████ Holland then attempted to put a positive spin on the situation:

████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

████████████████████████████████████████████████

Most of what Holland relayed to the Special Committee—and Cangany and Heppner failed to correct—was materially misleading.

      **f.**      **The Special Committee Learns that the Alternative Asset Portfolio Underpinning BEN's Business Was Littered with Stale and Distressed Investments.**

254.    During a meeting held on December 13, 2019, the Special Committee held a meeting "to discuss recent news reports regarding a ████████████████████ ████████████████" related to BEN and specifically ████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████

255.    Although certain aspects of the news report were disputed, BEN confirmed on December 11, 2019 through discussions with ████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████ The email recounting the details from BEN's conversation was forwarded to the Special Committee after its meeting on December 13, 2019.

256.    Notwithstanding  the  concerns  the  Special  Committee ████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████—long after the Special Committee agreed to

transfer $79 million to BEN, as discussed below, at valuations that utterly ignored the events

occurring at Proteus (which eventually filed for bankruptcy in June 2020).

### 4.    Despite Numerous "Red Flags," the Ineffective Special Committee Approves a $79 Million Transfer to BEN in Exchange for BEN Equity on December 31, 2019.

257.    Based  on  what  had  transpired  during  their  first  six  months  on  the  job,  the

Chavenson/Mason  Special  Committee  and  its  advisors  should  have  had,  and  did  have,

reservations  about  GWG  sending  any  more  money  to  BEN.    And  as  alleged  below,  the

Chavenson/Mason Special Committee were presented with many more glaring red flags during

the last few weeks of 2019.

258.    Nevertheless,  on  December 31, 2019,  the  Chavenson/Mason  Special  Committee

approved an additional $79.03 million transfer from GWG to BEN.  Approximately $69 million

of GWG's funds were for an NPC-A "unit account" in BCH with an assigned paper value of

$319 million, and the remaining $10 million was for 666,667 common units in BEN LP at a price

of $15.00 per unit.  The transaction was memorialized in a Preferred Series A Unit Account and

Common Unit Investment Agreement dated December 31, 2019 (the "$79 Million Investment

Agreement").

259.    Notably, the Chavenson/Mason Special Committee's financial advisor, Valuation

Research Corporation ("VRC"), refused to provide a fairness opinion—or other formal valuation

opinion—for  the  transaction.    As  Chad  Rucker,  VRC's  principal  on  the  engagement,  later

86

admitted (to Chavenson) that he had "major concerns about BEN," he was "extremely uncomfortable with BEN's financial and valuation policies and BEN's overall financial condition," and he did not want to expose his firm to risk "when I believe there are serious fundamental issues." Nevertheless, the Chavenson/Mason Special Committee approved the transaction despite VRC's refusal to provide a fairness opinion (and VRC's many concerns). And the committee did so at an agreed-upon valuation for BEN that was several times higher than all indications of value available to them.

260.   The unjustifiable—and patently unfair—$79 million cash price GWG paid in exchange for speculative BEN equity interests was even more indefensible given the surrounding circumstances. The $79 million GWG advanced to BEN was intended to be used for purposes directly related to driving BEN's value or launching BEN's business, such as funding "liquidity transactions" in BEN's supposed pipeline, making capital improvements, etc. Instead, GWG's funds were used by BEN to pay pre-existing obligations that BEN could not pay on its own due to its operating losses and cash burn, undercapitalization and likely insolvency, and liquidity challenges.

261.   That BEN needed large sums from GWG to remain afloat was reason in and of itself to seriously doubt why GWG should take BEN equity in exchange for real cash. BEN's poor financial condition and highly speculative business plan presented a significant risk that BEN equity might ultimately prove worthless. Yet the Special Committee inexplicably agreed to exchange cash for BEN equity at prices that valued BEN at a whopping $3.5 billion, even though the Special Committee knew that BEN was worth far less.

262.   Moreover, the two largest BEN purported obligations that were repaid with GWG funds related to transactions that primarily benefitted Heppner, not BEN's core business.

263.   <u>First</u>, $49.8 million of funds advanced by GWG to BEN were sent to HCLP to pay principal (and fees, including an approximately $960,000 pre-payment penalty), purportedly on the basis that HCLP demanded that payment to consent to a purported change of control of BEN that otherwise would have constituted an event of default under the BEN-HCLP First Debt and/or BEN-HCLP Second Debt.  This supposed change of control payment was not a legitimate demand from a legitimate third-party lender, but rather a pretext orchestrated by Heppner—with the aid of Holland and Evans—to get more money for HCLP and, in turn, Heppner's network of affiliates.

264.   Moreover, the purported change of control was completely illusory, as alleged in more detail below.  Although GWG obtained a theoretical right to appoint a slim majority of BEN's board, in reality that designation right would be wielded by those already in control of GWG—namely, Holland, Heppner, and BEN.  Predictably, Holland, Heppner, and BEN ensured that BEN's same preexisting directors were promptly re-appointed to their BEN board seats following the purported change in control.  And the agreement that gave GWG its theoretical right to designate BEN directors was further illusory in that ██████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████

265.   <u>Second</u>, in addition to the $49.8 million sent to HCLP ████████████████ ████████████████████████████, over $25 million of the funds advanced by GWG on December 31, 2019, were used to repay BEN's obligations to an entity associated with GWG's founders and prior controlling stockholders, Jon Sabes and Steve Sabes.  This too was an

obligation that had little to do with BEN's core business, but rather served Heppner's ends. The underlying obligation was incurred to finance BEN's purchase of GWG stock in buying out the Sabes brothers in April 2019. By advancing funds in December 2019 so that BEN could pay $25 million to the Sabes brothers' entity, therefore, GWG effectively funded Heppner and BEN's takeover of GWG, after the fact. The Chavenson/Mason Special Committee agreed to do so despite concerns over the propriety of advancing funds to BEN for that purpose, and even though a prior special committee of GWG's old board in April 2019 had insisted that GWG funds not be used by BEN for such purposes (a restriction which the Chavenson/Mason Special Committee waived).

266.    Due to these and other surrounding circumstances, as described in more detail below, the unfair price that GWG paid—in transferring $79 million in exchange for the BEN equity it received—was the product of a grossly unfair process and unfair dealing. Its various component pieces, and the $79 million transaction as a whole, involved: (a) material disclosure and candor failures (especially concerning HCLP); (b) disloyal, active collusion between Heppner and BEN and Holland (GWG's CEO) and/or Evans (GWG's CFO); (c) back-channeling of Special Committee deliberations from its disloyal chair, Chavenson, to Holland (so that Heppner, Holland, and BEN could more effectively get what they wanted from the Special Committee); (d) breaches of the Chavenson/Mason Special Committee's and its advisors duty of care and (e) numerous other inadequacies of the Special Committee's process and approach, as alleged below.

      **a.**    **Heppner and Other Corrupt GWG Fiduciaries Manipulate the GWG Special Committee into Approving Advances of GWG Funds so BEN Can Send $49.8 Million to HCLP.**

267.    The Chavenson/Mason Special Committee approved the $79 million transfer to BEN on December 31, 2019, fully aware that BEN would immediately transfer $49.8 million of

the proceeds to HCLP. The Special Committee's approval was the product of an unfair and defective process with several fundamental defects. First, Heppner and others acting on BEN's or HCLP's behalf made false and misleading representations to the Special Committee and its advisors regarding Heppner's ties to HCLP. Second, the Special Committee and its advisors breached their duty of care by failing to adequately inform themselves regarding HCLP and, in Chavenson's case, colluding with Holland to paper the record. Finally, the Special Committee and its advisors acted grossly negligently in agreeing to a purely illusory "change of control" over BEN that accomplished nothing to limit Heppner's influence, yet provided Hepper and HCLP with a bargaining chip to extract a payment from BEN using GWG funds.

268.   In mid-November 2019, the Special Committee and BEN began ramping up efforts and negotiations towards proposed "SITA" transactions and related year-end funding requests from BEN. On November 14, 2019, BEN circulated a "working draft" of a term sheet for interim SITA funding to be used "as the 'strawman' for" a planned meeting a few days later involving Heppner, Evans, Holland, and the Chavenson/Mason Special Committee that Heppner had initiated. The contemplated funding included "$41 million to pay down enough of Ben's senior debt ███████████████████████████████████████ In requesting $41 million to pay down HCLP, no other explanation was given.

269.   Around the same time, Foley reached out to Evans to request a memo regarding HCLP that Evans had "referenced on the BEN debt (trust relationships, Brad's powers etc.)." Evans replied that he did not have a copy of the memo, but suggested that Foley instead speak with Banowsky, and provided his contact information.

270.    The next day (Friday, November 15, 2019), Foley connected with Banowsky. Foley relayed the substance of that call to the Special Committee during a meeting the following Monday, as follows:

> Foley discussed that, as part of its due diligence efforts, it had initiated a call the prior Friday with Bill Banowsky of the Thompson Knight firm who represents BEN's senior lender, HCLP….Foley explained that the purpose was to gain comfort that the senior lender was unaffiliated with BEN (i.e., not controlled by Mr. Heppner or other affiliates) – *such lack of affiliation had been previously represented to the Committee by BEN management*—and that *Mr. Heppner otherwise would not have an economic interest in proceeds received by the lender, which was an important issue to confirm for the Committee*. Foley explained that Mr. Banowsky explained *the control structure of the lender (which did not include rights for Mr. Heppner or other affiliates)* and represented that Mr. Heppner retained solely a limited contingent interest in distributions from the ultimate equity holder in the lender and *that unequivocally no debt repayment would be received by Mr. Heppner or his affiliates*.

(Emphases added).  Banowsky's representations were untrue.  Heppner had exercised de facto control over HCLP, twice swapping out its managers in 2019. .

271.    A few weeks later, Foley held a diligence call with Glenn West of Weil Gotshal, who had been the recipient of the materially misleading October 5, 2019 memorandum that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ During a December 17, 2019 Chavenson/Mason Special Committee meeting, Foley relayed that:

> [Foley] had a follow up call with Glenn West of Weil Gotshal for the purpose of confirming Mr. West's understanding of the third party status of HCLP Nominees, the BEN senior lender which BEN was proposing to repay in part in connection with the Year End Items.  This call was a follow up to an earlier confirmatory diligence call with the Thompson Knight firm.  Foley reported that Mr. West had conducted a careful analysis of the debt on behalf of [a] committee of the BEN GP board and *concluded the lender was not affiliated with Mr. Heppner*.  Foley explained that Mr. West represented that, among other things, *the manager of its ultimate control party was not Heppner or an affiliate and Mr. Heppner's*

*relationship to the key trust equity holder in the lender was as a limited contingent beneficiary…*

(Emphases added).  West's substantive representations were also untrue; he merely parroted misleading information set forth in the October 5, 2019 letter that ▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇, as alleged above.  And beyond reading ▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇, West apparently had not conducted meaningful independent analysis of HCLP.

272.    The next morning, on December 18, 2019, Holland emailed Chavenson and Mason to request a meeting later that day to address various issues, including funding requests for BEN outlined in an attached memo.  The memo relayed by Holland to the Special Committee—which Heppner had previously provided to Holland—contemplated that GWG would purchase BEN LP common units, with BEN using "$41 million to pay down enough of Ben's senior debt ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇"  In referring to the contemplated $41 million payment to HCLP, again no mention was made of any change of control payment demanded by HCLP.

273.    Later that day, however, the narrative began to shift.  When the Chavenson/Mason Special Committee held a meeting to discuss BEN's funding requests, the discussion included the request for "a payment of approximately $40-45 million to HCLP, the senior lender to BEN, which BEN indicated" ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ and "*was being demanded by the lender to waive a covenant breach that would occur as a result of the change of control of BEN* contemplated" in the year-end transactions.  (Emphasis added).

274.    Moreover, later that day (December 18, 2019), Chavenson, Mason, and Foley met with Heppner and BEN representatives in a meeting that the Special Committee minutes characterized as "constructive but somewhat contentious."  The Special Committee meeting

minutes reflect that "*Heppner discussed at some length BEN's negotiations with the manager (David Wickline)* of the control party of HCLP Nominees and represented that, *while such negotiations were on-going*, he was not optimistic…*that a change of control early repayment of the magnitude requested could be avoided.*"  (Emphases added).  In other words, Heppner had created the misleading impression that Wickline was a hard bargaining third party, and that there was little that Heppner or BEN could do to reduce the amount of the $40-45 million payment requested.

275.    Contrary to Heppner's misleading statements and insinuations, Wickline was not a hard bargaining, independent manager of HCLP, but rather someone who collaborated with Heppner.  Moreover, Heppner did not disclose that he had only recently installed Wickline as HCLP's indirect manager in early October 2019 (via Heppner signing written consents as trustee of various trusts, as alleged above), Heppner's prior connections to Wickline, and that Heppner himself personally ensured that Wickline's quarterly management fee was paid by HCLP (by BEN personnel acting under Heppner's direction who had control of HCLP's bank account).  And worst of all, Heppner lied about the supposed ongoing negotiations with Wickline; as of December 18, 2019, Wickline had not yet demanded any change of control payment (and neither had Banowsky).

276.    Heppner's shift to this new, false narrative—that HCLP was demanding $40-45 million to consent to the contemplated change of control—was no coincidence but rather stemmed from Heppner's efforts to exploit the situation.  By the time he met with the Special Committee on December 18, 2019, Heppner and BEN realized that GWG obtaining board designation rights for BEN was something that the Chavenson/Mason Special Committee and its counsel were fixated on.  Indeed, just a few days before (on December 14, 2019), Foley emailed

BEN's counsel to stridently complain that BEN's initial draft of the revised operating agreement for BMLLC was "inconsistent with our discussions as to GWG control" which "was a core premise of the Special Committee's entire approach and our discussions (with view to putting the GWG board in a position to make funding decisions in a traditional parent-sub framework)."

277.    The Special Committee's and its counsel's desire for GWG board designation rights presented Heppner with the perfect angle.  Giving GWG board designation rights over BEN's board would constitute a technical event of default under BEN's credit agreement with HCLP.[10]  In turn, HCLP could use the threat of default—over something the Special Committee and its counsel wanted—as a cudgel to extract a massive payment from GWG for BEN to then give to HCLP in exchange for consenting to the transaction and waiving the default.

278.    Of course, one potential pitfall to this gambit was that HCLP could easily waive any technical event of default associated with changes to BEN board designation rights without demanding any significant fee, let alone a $40-45 million payment.  Indeed, HCLP had a ██████ ████████████████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████████.[11]

279.    For instance, HCLP had previously agreed to:

- ████████████████████████████████████████████████████████████████ ████████████████

---

[10] Specifically, the credit agreement for the BEN-HCLP First Debt provides that a "Change of Control" would "be deemed to have occurred if" a majority of the seats on BEN's board were occupied by persons "who were not named or nominated in the manner set forth" in BEN Management's operating agreement as of the closing date of the loan. And section 8.01(k) thereof provided that such a "Change in Control" would constitute an event of default.

[11] ███████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████



In none of these instances did HCLP

280.    Given HCLP's prior track record of helping BEN and the sheer magnitude of the $40-45 million payment supposedly requested, Heppner, Holland, and BEN should have faced serious questions over the legitimacy of the supposed demand from HCLP.  But fortunately for Heppner, he had the benefit of: (a) disloyal GWG officers Holland and Evans willing to act in BEN's interests; (b) an eager-to-please Special Committee chair (Chavenson) who would go along to get along; and (c) negligent and/or complicit Special Committee counsel.

281.    Early in the morning (on December 19, 2019) after Heppner had made misleading statements regarding supposed negotiations with Wickline, Holland emailed Chavenson and

---



Mason to request a meeting that morning.  Mason was traveling, but Chavenson responded (in mere minutes): "You know me—always willing to help. . . . BTW I will come down but I was to meet with Foley and try to update our positions, etc. so we can move forward. Your thoughts?" Holland instructed Chavenson: "Please come here first. . . . I have some further thoughts," and Chavenson obliged, delaying his meeting with committee counsel to meet with Holland instead.

282.    After meeting with Chavenson, Holland relayed to Heppner later that morning (December 19, 2019) that: ██████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████ When Heppner responded that ████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████

283.    Later that same day (December 19, 2019), ██████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████

284.    Meanwhile, Holland also relayed the message to BEN's outside counsel.  On December 19, 2019, BEN's outside counsel ███████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████ In disregard for the fiduciary duties he owed to GWG, Holland ███████████████████████████████

██████████████████████████████    ████████████████████████████████

█████████████████████████████████

285.    ███████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████    ████████████████████████████████████████

████████████████████████████████████



██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████

286.     Holland responded later that evening: "Ok by me."  Evans likewise responded: "this approach makes sense."  In other words, both GWG's CEO and CFO fully ███████

███████████████████████████████████████████████████████████████████████

███████████████████████

287.     The next day (December 21, 2019), the Special Committee met and discussed that it "understood that a change of control payment to HCLP Nominees might be required to facilitate the lender's consent."  Nevertheless, the Special Committee also "discussed ensuring that management was doing everything possible to minimize such current cost."  And, in turn, one of the "outstanding key items and issues" discussed by the Special Committee was the "need for BEN to provide clear written documentation as to any demand from HCLP Nominees regarding a payment in connection with the change of control of BEN effected by the Consolidation and a confirmation that efforts were exhausted to minimize such payment."  At the conclusion of the meeting, "[i]t was agreed that [Chavenson] would call [Holland] to express the importance and urgency" of that issue (amongst other outstanding issues).

288.     Just hours after the Special Committee meeting concluded on December 21, 2019, and presumably after Chavenson and Holland connected, ███████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████

289.    Based on prior discussions and representations made to the Special Committee, the increase in the demand to $50 million troubled Holland, who cautioned in a December 23, 2019 email response (copying Heppner and Evans):

> We have been telling the special committee for some time now that the number is $40 million.  In the memo prepared for the[m] this last week the number was $41 [million].  I've had a number of calls with them over the weekend and they have $40-41 [million] in their heads.  *Dave [Chavenson] is onboard but Kathleen [Mason] is not.  Dave thinks we can get her there.  If we increase to $50 [million], we run the risk that they throw up on it.*

(Emphasis added).

290.    Before Heppner and BEN, along with GWG's disloyal officers Holland and Evans, decided amongst themselves how to proceed, however, the Special Committee and Foley provided an update on the Special Committee's current thinking on overall willingness to fund. Specifically, later that same day (December 23, 2019), Foley communicated to BEN that the Special Committee was contemplating approving $65 million in cash funding prior to year-end, with the funding "in the form of NPC-A" with a double conversion feature.  Heppner forwarded the email chain to Holland, exclaiming: "Ugh!"

291.    Early the next day (December 24, 2019), Holland emailed Heppner to seek instructions on how to proceed, writing: "I need your list of cash needs by year end.  The SC wants $65 [million] . . . you say $93 [million].  Please give details."  In response, Heppner submitted a bullet point wish list of items that included "$50.2 million for loan paydown for consent of change of control" (to be paid to HCLP), and $25 million for a payment to the Sabes brothers.  Thus, due to his disappointment—"Ugh!"—with the amount of money the Special Committee was willing to approve for GWG to advance to BEN, Heppner once again turned to HCLP as a means of getting more money out of GWG, this time by increasing the amount of HCLP's purported demand.

292.    Shortly thereafter, Holland delivered a Christmas Eve surprise to the Special Committee by—consistent with Heppner's guidance—increasing the funding request related to HCLP's supposed change of control demand for payment to $50.2 million.  Holland's email to Chavenson transmitting the funding request copied Heppner's wish list, verbatim.

293.    Chavenson, despite his general eagerness to please Holland (and Heppner and BEN), was taken aback by the significant increase, responding to Holland minutes later: "Why did the [HCLP loan] repayment increase by 10 mill?  *I am hoping it was just a typo!!!!*" (Emphasis added).  But it was no typo; Holland responded: "Brad [Heppner] had said to everyone that the $40 million was the regulatory requirement *but that no one had negotiated with the senior lender yet.  This was their requirement to consent to all this*."  (Emphasis added).

294.    Chavenson then forwarded Holland's response to Mason and Foley, writing: "Help!  This is not what [BEN's counsel] said on last Friday," asking for confirmation that his recollection was correct.  Foley responded: "You are 100% right – they have repeated multiple times to us that the approx. $40mm was the amount requested to approve the change of control."  Foley further observed that "Brad [Heppner] was in fact clear they were talking with the lender and the lender had made its demands (putting aside the issue of the coziness of that relationship)."  Even then, despite the glaring inconsistencies in what they were told, however, Chavenson remained focused on appeasement; he responded: "how do we handle this without creating unnecessary ruckus?"

295.    Foley then innocuously emailed BEN's counsel to "see if we get a consistent story," intentionally not including specific figures in the email, but rather writing: "Dave Chavenson passed on that he heard from Murray [Holland] this afternoon that there was an increase in the HCLP loan payment demand affecting BEN cash requirements.  Any color?"

296.    Later that day (during the evening hours of Christmas Eve), BEN's counsel responded that "[t]he senior lender is now asking for something closer to $45-50 million instead of $41 million.  But there has been push back on our side."  Foley and the Special Committee took this explanation at face value, responding to BEN's counsel to encourage BEN to "push its hardest and get the number to $41 mm—or extremely close—that would significantly facilitate things on our end."  Foley also encouraged BEN's counsel to "keep the support documentation on the front burner as well, as we will need that."

297.    Two days later, during the morning after Christmas Day (December 26, 2019), Holland coordinated with Evans (and BEN's legal team, GWG's outside counsel, and Heppner) to compile a memo to "come from Brad" setting forth "the amounts requested from the Special Committee, along with supporting documentation," as described in an email Evans sent that morning.  Evans relayed that Holland had already "shared the request for $50 million with the SC," but that a "[f]inal letter from Wickline," HCLP's purported manager, was among the "support materials" that was still needed. ████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
██████████████████████████

298.    Then late in the evening of December 26, 2019, BEN's counsel sent an email to the Chavenson/Mason Special Committee, sharing BEN's funding request memo—which Evans helped draft—and supporting documentation.  The BEN funding memo changed the request to "$49.8 million to obtain change-of-control consent from Senior Lender," *i.e.*, HCLP, and attached a draft letter purportedly from Wickline as support.  The attached draft letter had a large

"draft" watermark, was unsigned, and left a blank for the specific amount of the payment demanded.

299.     Following receipt of the draft Wickline letter (with amounts left blank), the Chavenson/Mason Special Committee conducted almost no additional diligence into the legitimacy of the purported demand from HCLP and did not even verify if the $49.8 million figure included in BEN's funding request memo was the precise figure.   The minutes for a Special Committee meeting held on December 27, 2019, reflect that a discussion occurred regarding "communications between Mr. Chavenson and Mr. Murray T. Holland regarding the BEN Group senior lender's (HCLP Nominees) letter regarding its demand for a change-of-control early principal payment to permit the change of control," but no details regarding the substance of that discussion were provided.  No further due diligence efforts were undertaken by the Special Committee or its counsel regarding the letter or HCLP's demand (and supposed lack of movement), and a final version of the Wickline letter—that included the specific amount of payment—was never obtained.

300.     In sum, the Chavenson/Mason Special Committee's approval of the $49.8 million component of the total $79 million GWG funding to BEN was the result of a corrupt and defective process.  Heppner, ███████████████████████ made false statements to the Special Committee and its counsel regarding Heppner's relationship with HCLP.  Chavenson colluded with Holland to obtain documentation from HCLP to paper the file, ███████████████ ████████████████████████████████████████████████████████████████ ███████  And the Special Committee, due in large part to its counsel's negligence, ultimately accepted a draft letter with a blank number as proof of HCLP's supposed $49.8 million demand, even though: (a) the explanations given for the payment changed over time; (b) they were given

conflicting information regarding status of discussions with HCLP; (c) the amount of the request increased by approximately $10 million on Christmas Eve to $50 million (with minimal subsequent movement); and (e) the sheer size of HCLP's demand was highly unusual, especially when juxtaposed against HCLP's track record of accommodating BEN without demanding similar payments.

        **b.**      **The Chavenson/Mason Special Committee Fails to Obtain Substantive Control Rights for GWG.**

301.    At the same time it approved advancing GWG funds so that BEN could send $49.8 million to HCLP to obtain HCLP's consent to a change in control, the Chavenson/Mason Special Committee and its counsel failed to ensure that the control rights obtained by GWG that triggered the payment were substantive and meaningful.  Ultimately, the board designation rights that GWG obtained were illusory, meaning that, in effect, the $49.8 million payment to obtain HCLP's consent accomplished nothing.

302.    Giving GWG theoretical—but ineffective—rights to designate a bare majority of BEN's board had been one of Heppner's and Holland's long-planned objectives.   Indeed, amending the limited liability company agreement of Beneficient Management, L.L.C. (also referred to as BMLLC or BEN Management), the general partner in control of BEN, was the very first item on Heppner's original SITA memorandum transmitted to the Chavenson/Mason Special Committee on June 1, 2019.  As indicated in that original SITA memorandum, Heppner wanted to give GWG board rights because, among other reasons, it would result in financial statement consolidation and "remove limits imposed by the 40 Act on the amount of BEN Common Units that GWG can hold on its balance sheet."  Heppner and BEN viewed giving GWG board designation rights as the means to the end of obtaining more money for BEN through GWG.

303.    At the same time, however, Heppner had no intention of giving up substantive control over BEN itself.  While he wanted to give GWG rights to designate a bare majority of BMLLC's board to exploit accounting rules and facilitate financial statement consolidation (and, in turn, get more money from GWG for BEN), Heppner was not willing to give GWG substantive control over BEN's business, Heppner's brainchild.

304.    Heppner had two means of ensuring that giving GWG theoretical board designation rights for BMLLC's board would not interfere with his control over BEN.  First, GWG was already firmly under his and Holland's control, given that: (a) GWG's entire board had been designated by pre-existing BEN directors or selected by them; and (b) Heppner, Holland, and BEN exercised effective voting control over GWG (through Holland's and BEN's designee roles as Trust Advisors of the Seller Trusts that controlled GWG's majority voting interest).  This meant that, in practice, GWG would exercise its designation rights in a way that benefitted BEN, *i.e.*, by re-appointing BEN directors right back to BEN's board.

305.    Second, Heppner ensured that the amended version of BMLLC's operating agreement included sweeping consent rights that all but guaranteed the new BEN board could not take any substantive action without Heppner's blessing.  These provisions functioned as a safeguard to make sure GWG's board designation rights over BMLLC's board never stripped Heppner of his ability to control BEN, just in case Heppner ever lost control—through his, Holland's, and BEN's collective ability—of dictating how GWG would exercise its board designation rights in BEN.  In effect, these provisions made GWG's board rights ineffective in changing or exercising substantive control over BEN.

306.    Consistent with Heppner's ends, BEN's initial draft of the amended and restated limited liability company agreement of BMLLC included all sorts of provisions that ensured that

GWG would not effectively gain control over BEN, notwithstanding the proposed right for GWG to appoint a bare majority of BEN's board.  This draft was provided to the Chavenson/Foley Special Committee on December 13, 2019, along with drafts of several SITA-related transaction documents.

307.   Problems with the agreement—and Heppner's ends—were immediately obvious to the Special Committee and its counsel.  In an email to Chavenson and Mason sent the next day (December 14, 2019), Foley noted:

> They ostensibly grant GWG ("Principal LP") a majority of the board, but they reserve all real rights in the Executive Committee and the Nominating Committee, each for which Brad's affiliate gets 50% of the seats. Brad's affiliate also expressly names the chairman of the board, all committees and meetings, which have meaningful control (agendas, who can attend, notice etc). *The bottom line is that Brad's consent is needed for anything meaningful and he continues to control all process.*  I suspect they asked the accountants what is the minimum needed to consolidate BEN (who said a simple majority of the larger BEN GP board) *but substantively they maintain Brad's control of BEN.*  The doc even provides that the board isn't permitted to "debate or discuss" anything without the affirmative approval of the Executive Committee (would need Brad to OK it).

(Emphases added).  In addition, Foley cautioned, "it appears BEN is veering materially away from what we thought we were discussing with them (*turning our 'process' into more optics*)." (Emphasis added).

308.   Chavenson acknowledged the problems, but in yet another instance of going along to get along, tried to downplay the absurd terms proposed by BEN, wondering aloud "whether they were just the product of an overzealous associate" within BEN's legal team. Mason strongly disagreed, however, writing to set the record straight:

> *I'm sure Brad [Heppner] steers the response on any documents released to [Foley] or the Special Committee.*  I would suspect there is little or no independent latitude with respect to an overzealous employee.  *This assures a rubber stamp environment that may not be readily apparent to the existing board. Dangerous. Certainly not in sync with governance or transparency.*

(Emphases added).

309.   Later that day (December 14, 2019), the Special Committee held a meeting to further discuss the problems with BEN's proposed draft amended BMLLC operating agreement. At the meeting, "two key issues" discussed were that: (1) "many key actions would continue to require the consent of an affiliate of Mr. Brad K. Heppner," and (2) "it appeared that the BEN Nominating Committee (if it was stalemated and did not affirmatively approve the Company nominees to the BMLLC Board) could ultimately cause [GWG] to lose its rights to appoint a majority of the BMLLC directors."

310.   Foley then relayed the Special Committee's concerns regarding the proposed operational changes to BEN's counsel, writing in a December 14, 2019 email: "We read through the BEN Management agreement and it's inconsistent with our discussions as to GWG control. As you know this was a core premise of the Special Committee's entire approach and our discussions (with view to putting the GWG board in a position to make funding decisions in a traditional parent-sub framework)."   Foley wrote in a follow-up email later that day that the proposed "composition and powers/consents of committees, chair appointments, chair rights, director related trigger for loss of parent rights, et al, are different than traditional majority parent rights."

311.   Following discussions with BEN's counsel, Foley reported back to the Special Committee during a December 17, 2019 meeting to provide an update.  Foley noted:

> Previously, the Committee expressed concern that [GWG's] majority control of the board of BMLLC would be supplanted by various provisions in the *BMLLC operating agreement that provided for substantial control/veto rights for Beneficient Counselors (for which the ultimate control party is Mr. Brad K. Heppner).*  Foley noted provisions of the proposed operating agreement would in effect give Beneficient Counselors (and ultimately Mr. Heppner) the rights to equal representation on all committees, appointment of chairmen, agenda and attendance control.  Foley provided an update that it had meaningful discussions

with BEN lawyers regarding potential changes with respect to the BMLLC operating agreement….

(Emphasis added).

312.    During a subsequent Special Committee meeting held December 21, 2019, Foley again noted that the terms of "the BMLLC operating agreement…required additional changes" and "reasonable other adjustments to the items that were perceived as heavy handed and off market." And the Special Committee further "discussed," as one of the "outstanding key items and issues," "the importance of implementing proper protections for [GWG] with respect to its majority governance rights in BMLLC."

313.    Over the following days, Foley continued to negotiate with BEN's counsel over the terms of the amended BMLLC operating agreement. But most of Foley's and the Special Committee's efforts became preoccupied with the increase in HCLP's supposed demand to $50 million, BEN's other specific funding requests, myriad valuation issues and problems (section D.4.d, *infra*), and negotiations over the equity that GWG would receive in exchange for funding BEN. In effect, while the changes to the BMLLC operating agreement remained important, it was put on the backburner as the Special Committee and its advisors dealt with other crises.

314.    A week later, during a Special Committee meeting held on December 28, 2019, the Committee once turned its attention back to control issues, discussing a forthcoming draft of the BMLLC operating agreement from BEN. As part of the discussion, the Special Committee again "emphasized the importance of the BMLLC operating agreement and the fact that such agreement was critical to [GWG's] control of the board of directors of BMLLC to help mitigate conflicts of interest and streamline decision-making between [GWG] and BEN."

315.    Thereafter, Foley and BEN (along with GWG's outside counsel) continued to negotiate over the BMLLC operating agreement up until the eleventh hour, including on closing

day, December 31, 2019, amidst a flurry of other ongoing negotiations and activity. Foley finally signed off on the final version of the amended BMLLC operating agreement shortly before 2 pm on December 31, 2019, just hours before GWG's $79 million were transferred to BEN. But the final version of this agreement failed to address many of the Special Committee's significant concerns; it did nothing to change control dynamics, let alone "mitigate conflict of interests" involving Heppner.

316.   Even before the transaction closed, it was obvious that GWG's soon-to-be-acquired board designation rights would accomplish nothing in substance, *i.e.*, there would be no practical change in control over BEN. On December 30, 2019, Evans emailed Heppner and Holland—and them alone—to ask about which BEN directors should become the GWG-designee directors to BEN's board. Evans proposed designating current BEN directors Hicks, de Weese, Cangany, Caruso-Cabrera, and Lockhart, but sought further input on whether the sixth director should be Defendant Schnitzer or Roger Staubach. Heppner replied with a one-word answer: "Schnitzer," and GWG's list of designees was thus unceremoniously set—exclusively by Heppner, Holland, and Evans.

317.   The next day (December 31, 2019), Holland signed a letter on GWG's behalf that listed GWG's six designees to serve on BEN's board pursuant to the amended and restated BMLLC operating agreement. The six individuals listed were all current BEN directors and had all been picked by Holland, Heppner, and Evans the day before: Cangany, Caruso-Cabrera, de Weese, Hicks, Lockhart, and Schnitzer. Three of those six BEN directors—Defendants Hicks, Schnitzer, and Cangany—were part of Heppner's inner circle. Thus, nothing changed. No new directors were appointed to BEN's board to counterbalance Heppner and those loyal to him.

318.    The Special Committee and its counsel knew or should have known that no changes would be made to BEN's board, even prior to the closing and finalization of the transactions on December 31, 2019.  Earlier that morning (December 31, 2019), GWG's outside counsel had circulated a draft of the letter (with GWG's picks for BEN's board) to the Special Committee and its counsel.  But the Chavenson/Mason Special Committee and its counsel raised no objection and expressed no concerns over the fact that GWG's soon-to-be-acquired board designation rights would change nothing, as current BEN's directors would simply remain as BEN directors.

319.    Nor did the Chavenson/Mason Special Committee or its counsel take any steps previously to ensure that GWG's board designation rights would be enjoyed by GWG, rather than usurped by Heppner and BEN.  The Chavenson/Mason Special Committee and its counsel never bargained for any protections to safeguard against the obvious risk that Heppner, Holland, and BEN would wield their control over GWG to use GWG's designation rights to simply reappoint existing BEN directors.  Nor did the Special Committee and its counsel otherwise ensure that board designation rights would be exercised independently by GWG, such as insisting that GWG's nominees be selected by an independent committee of GWG directors or otherwise.  In short, the Chavenson/Mason Special Committee and its counsel did nothing to prevent GWG's disloyal fiduciaries from simply reappointing BEN directors—including Heppner loyalists—to their current BEN board seats.

320.    In effect, therefore, GWG did not obtain any real control, practically speaking, as a result of the amendments to BMLLC operating agreement as part of the December 2019 Transactions.  The hypothetical control right that GWG obtained was completely illusory because it would be wielded by Heppner and Holland (with assistance from Evans), not

independently for GWG. And, in turn, the board designation rights that GWG obtained provided no real value to GWG.

321.    Moreover, although some minor improvements were made, the final version of the amended BMLLC Operating Agreement failed to address the Special Committee's and its counsel's significant concerns regarding control that Heppner could wield over BEN via consent rights. Specifically, section 3.4 of Third Amended and Restated Limited Liability Company Agreement dated December 31, 2019, set forth an extensive list of matters that required prior approval of BEN's executive committee, enumerated in sections 3.4(a) to 3.4(s). GWG's filing with the SEC that described the December 2019 Transaction described those sweeping rights as follows:

> The Beneficient Management executive committee has the right to approve certain transactions on behalf of Beneficient Management and Beneficient LP and its subsidiaries, including: (i) the incurrence of debt; (ii) the issuance of equity interests of Beneficient LP or any subsidiary equal to 5% or more of the fully diluted equity of such entity or that have preferred terms to the common equity of Beneficient LP, except in connection with any trust instrument or product offered by Beneficient LP or its affiliates; (iii) the adoption of a shareholder or unitholder rights plan by Beneficient LP or any subsidiary thereof; (iv) the amendment, supplement, waiver, or modification of Beneficient LP's limited partnership agreement, the BCH limited partnership agreement or the organizational documents of any subsidiary of the foregoing other than any common law or statutory trusts created to facilitate the financing, acquisition, contribution, assignment or holding of alternative assets; (v) the exchange or disposition of a majority or more of the assets, taken as a whole, of Beneficient LP or any subsidiary thereof in a single transaction or a series of related transactions; (vi) the exchange or disposition of a majority or more of the assets, taken as a whole, of Beneficient Management or any subsidiary thereof in a single transaction or a series of related transactions; (vii) the execution by Beneficient LP, Beneficient Management or any subsidiary thereof of any contracts or of any amendment, supplement, waiver or modification of any existing contract, which would materially change the nature of the business of Beneficient Management and its affiliates; (viii) materially or commercially substantive changes to or creation of an employee incentive or benefit plan of Beneficient Management, Beneficient LP or any subsidiary thereof; (ix) the merger, sale or other combination of Beneficient LP, Beneficient Management or any subsidiary thereof with or into any other person or entity; (x) the transfer, mortgage, pledge, hypothecation or

grant of a security interest in all or substantially all of the assets of Beneficient LP or any subsidiary thereof; (xi) the transfer, mortgage, pledge, hypothecation or grant of a security interest in all or substantially all of the assets of Beneficient Management or any subsidiary thereof; (xii) the removal without cause of a chief executive officer or any other executive officer of Beneficient Management, Beneficient LP or any operating subsidiary thereof; (xiii) the termination of employment of any other officer of Beneficient Management, Beneficient LP or any operating subsidiary thereof or the termination of the association of a partner, member, manager or director of any subsidiary of Beneficient LP, in each case, without cause; (xiv) the liquidation or dissolution of Beneficient Management, Beneficient LP or any operating subsidiary thereof; (xv) the withdrawal or removal of Beneficient Management as the general partner of Beneficient LP or the direct or indirect transfer of beneficial ownership of all or any part of a general partner interest in Beneficient LP; (xvi) any determination by Beneficient Management, acting as general partner of Beneficient LP, related to the removal or replacement of the general partner under Beneficient LP's limited partnership agreement; (xvii) the entry into any material or commercially substantive agreement with a related party; (xviii) the creation of any new and materially or commercially substantively different trust instrument or product, or any materially or commercially substantive change, amendment, supplement, waiver or modification to the terms or provision of any existing trust product, offered by Beneficient LP or any of its affiliates to the extent regulated by the Texas Finance Commission or other state, federal or non-U.S. regulator with direct or indirect jurisdiction over Beneficient LP or such affiliate or such product, other than any change or modification to any exhibit or schedule to any trust instrument or product; or (xix) the bankruptcy of Beneficient LP.

Those extensive consent rights meant that Heppner, who chaired and dominated BEN's executive committee, would continue to call the shots for BEN, and that neither GWG nor its board designees could do almost anything substantive without Heppner's blessing and approval.

322.    As such, the final version of BMLLC's operating agreement did not meaningfully address the Special Committee's and its counsel's specific concerns, such as the reservation of "all real rights in the Executive Committee," "that Brad [Heppner's] consent is needed for anything meaningful and he continues to control all process," and that "substantively they maintain Brad's control of BEN." Yet the Chavenson/Mason Special Committee and its counsel approved it anyway.

323.     Accordingly, the purported board designation rights that GWG obtained on December 31, 2019, did not support the Chavenson/Mason Special Committee's approval of the transactions as a whole.  The right that GWG obtained was illusory, in practical effect.  Yet that same illusory right—which provided no real benefit to GWG—formed the basis for HCLP's demand for a $49.8 million payment from BEN, which GWG funded, and the Special Committee also approved.  More broadly, the surrounding circumstances are further illustration of the Special Committee's ineffectiveness in that the Special Committee failed to ensure that any control rights GWG obtained were meaningful, to otherwise guard against known risks regarding misapplication of those rights, and to meaningfully address concerns over Heppner's retention of de facto control via consent rights.

> **c.     The Chavenson/Mason Special Committee Effectively Allow BEN and Heppner to Pay for their April 2019 Takeover GWG by Using GWG Funds to Satisfy BEN's Payment Obligations Incurred in the Takeover.**

324.     BEN's other primary use of the $79 million advanced by GWG on December 31, 2019, was to repay obligations that BEN owed to an affiliate of Jon Sabes and Steven Sabes, GWG's founders and controlling stockholders prior to April 26, 2019.  The circumstances surrounding the Chavenson/Mason Special Committee's approval of funding for that purpose manifest an unfair, corrupt, and woefully inadequate process.

325.     Approximately $25.1 million of the total funding package approved on December 31, 2019, was used by BEN to repay an obligation it incurred in April 2019 to GWG's founders and former controlling stockholders when BEN effectively seized control of GWG. Specifically, pursuant to an April 15, 2019 Purchase and Contribution Agreement (the "Sabes PCA"), BCH owed $25 million to Sabes AV Holdings, LLC ("Sabes AV") in exchange for 2,500 GWG shares that BCH had obtained from Sabes AV.

326.     Under the terms of the original Sabes PCA, BEN's $25 million payment was originally due six months after the closing date, in October 2019.   In an amendment to the agreement dated October 25, 2019 (but executed thereafter), the due date for BCH's obligation to make a $25 million payment to Sabes AV was extended to January 3, 2020 (with interest accruing from October 26, 2019. until the date of payment).

327.     Notably, the Sabes PCA specifically provided that BCH could not use funds originating, directly or indirectly, from GWG or its subsidiaries to pay its $25 million obligation to Sabes AV.   The GWG special committee tasked with reviewing the Sabes PCA (and its provisions affecting GWG, such as appointing new GWG directors nominated by BEN) insisted on this restriction on the use of GWG funds to pay Sabes AV throughout negotiations over the Sabes PCA's terms.

328.     For example, the minutes from one of the prior special committee's first meetings after its formation noted that its chairman had spoken with Jon Sabes and requested assurances that "payment was coming from BEN and not [GWG]."   Three days later, the special committee's chairman relayed to other committee members notes from a call he had with Heppner, noting that Heppner "confirmed they were not going to use GWG cash to fund the deal."   And later, when BEN's counsel stated that the "transaction agreements do not contemplate any restrictions on funding source," the special committee chair immediately emailed Heppner, noting that "[t]his seems to directly contradict our discussion and your assurance this morning that no GWG funds will be used to finance the transaction with the Sabes."   Heppner responded, "It is being cleared up as we speak.   You will receive an email from me further confirming that no GWG funds will be used to finance the purchase of the Sabes

stock." Thus, at the time the parties entered the Sabes PCA, both the Sabes and Heppner knew full well that BCH could not use GWG funds to pay BCH's obligation to Sabes AV.

329. Notwithstanding that restriction—and Heppner's promises to the special committee that "no GWG funds will be used to finance the purchase of the Sabes stock"—BEN, Holland, and Heppner collaborated and then subsequently reached out to the Chavenson/Mason Special Committee to obtain a waiver or modification of the restriction, thereby allowing BEN to satisfy its $25 million obligation to Sabes AV using funds that BEN planned to obtain from GWG.

330. Specifically, on September 24, 2019, Holland asked Heppner for "a memo describing that we need to make a $25 million payment to Paul Capital out of funds from distributions and later a $25 million payment to Jon [Sabes] from GWG loans." Shortly thereafter, Holland emailed Chavenson and Mason with a "memo at the request from Ben" for their approval, noting that he didn't "see any GWG issue with it but we will need your approval."

331. The memo forwarded by Holland to the Special Committee explained:

> We would like the Special Committee to consent to an amendment of the Purchase and Contribution Agreement ("PCA") dated April 15, 2019 to allow for Beneficient to use $25 million of cash provided by GWG to Ben, either from a loan or equity contribution, sometime in the future to pay the Sabes' for the purchase of their stock under the PCA. *The PCA restricted the use of these funds so that Ben could not use them to pay for the Sabes' stock-Ben is required to use cash from distributions from underlying alternative asset investments*. Ben currently has $25 million in such cash but is required to use this cash first to pay Paul Capital. Ben is requesting that GWG allow it to use the existing cash to pay Paul Capital and later as it receives cash from GWG use that cash to pay the Sabes'.

(Emphasis added).

332. To obtain further clarity on the specific request to the Special Committee, Foley reached out to BEN's counsel. After conferring with BEN's counsel, Foley reported back to

Chavenson and Mason in a September 25, 2019 email that the restriction in the Sabes PCA "was put in place at the specific request of the former special committee for the benefit of GWG."

333.    On September 30, 2019, Holland reached out to Chavenson, providing him with proposed language for the Chavenson/Mason Special Committee to adopt in waiving the restriction.  Chavenson then emailed Mason and Foley for their thoughts, informing them that Holland had called him "at noon today and said [that] BEN needs a consent from the Special Comm today (I am not kidding).  So I asked him to send me some language to provide some guidance."

334.    In laying out potential options on how to respond, the Special Committee and its counsel discussed various pros and cons.  One option, granting the waiver, was problematic because it would require "be[ing] able to articulate how this benefits the public shareholders and why the waiver of this right is appropriate."

335.    Another option was to "explain our precise concerns," such as "we're not sure why we should waive a right before the transfer is requested," "*we're not sure the benefit to [GWG]* of this payment," and "*the issue that the whole Board has had about needing transparency to permit funding*."  (Emphases added).  But the downside was explaining those concerns "will not make Murray [Holland] happy," and it could lead to delay.

336.    Ultimately, the Chavenson/Mason Special Committee did not address those issues or its concerns head-on, instead acting to appease Holland, Heppner, and BEN while attempting to rationalize its actions.  To that end, Special Committee's counsel, Foley, reached out to BEN's in-house counsel for generic due diligence items to help paper the record and provide some rationalization for approving the waiver, primarily relating to BEN's obligations to Paul Capital

(and other "bulk sellers"), BEN's financial projections, status of BEN's trust charter application, and conversations to date with the Sabes.

337.    At the same time, Chavenson privately reached out to Holland to explain the Special Committee's thinking, and Holland conferred with BEN's in-house counsel on upcoming calls between her and Foley.   Based on the back-channel communications he had with Chavenson, Holland recognized that the Special Committee and its counsel were "ok" with the request, but "just need[ed] to paper the file."

338.    Less than two weeks later, Holland and Chavenson coordinated privately on the text of an email to be sent by Chavenson, announcing the waiver, exchanging drafts as Holland word-smithed the email and Chavenson dutifully took instruction (over a weekend).   Once Holland gave the green light on the final language, Chavenson then emailed Heppner and Holland (copying Mason) on a Sunday morning (October 13, 2019), to announce that the Special Committee had "unanimously agreed to waive any and all of its rights associated with the contractual provision in BEN's purchase and sale agreement with the Sabes brothers" regarding "BEN's source of funds for the contractually required payment to the Sabes brothers."

339.    Two days later (October 15, 2019), in order to paper the record and create the illusion of process, the Chavenson/Mason Special Committee held an after-the-fact committee meeting to discuss and approve a formal resolution approving the waiver of the restriction on BEN's source of funds to repay Sabes AV.   Notably, the Chavenson/Mason Special Committee resolution approving the waiver included a recital that specifically referenced that a previously established special committee had imposed "a restriction on the use of funding or financing provided by [GWG]… to pay the Sabes Party remaining amounts owed to them" under the Sabes PCA.

340.   Accordingly, based on conversations with BEN and reflected in its own resolution, the Chavenson/Mason Special Committee—and its counsel, Foley—were fully aware that a predecessor special committee of GWG's pre-BEN board of directors had insisted that BEN not use any funds originating from GWG to satisfy its $25 million obligation to Sabes AV. Moreover, the Special Committee had deduced—as discussed at an October 11, 2019 meeting— that the restriction had a "constructive rationale from the perspective of [GWG]," such as "limiting [GWG] funds being ultimately paid to the Sabes in connection with a transaction in which all other [GWG stockholders] did not participate."

341.   Nevertheless, the Chavenson/Mason Special Committee approved the waiver without reaching out to their predecessor special committee (or predecessor committee counsel), without directly addressing their own concerns, and without negotiating for GWG to receive any consideration in exchange for agreeing to waive the restriction (which it knew would inevitably lead to future funding requests from BEN to GWG).

342.   The Chavenson/Mason Special Committee did so due to the same flawed process and improper analytical framework that permeated its earlier approval of transactions in May 2019.  First, the committee justified the waiver primarily on the flawed and improper, "what's good for BEN is good for GWG" way of thinking that permeated its analysis of other transactions.  Second, the Chavenson/Mason Special Committee accepted—at face value—that BEN paying down its obligations would put BEN on the path to satisfying restricted capital requirements "to satisfy Texas State Banking Commission regulations in order to receive trust company charters necessary to launch its business."  And finally, just as it rationalized the hasty approval of the Essex Transaction in May 2019, the Special Committee rationalized that the waiver "required less documentation" and GWG could proceed "within a short period of time,"

albeit with the understanding that the "Committee was not approving and had not approved any additional capital infusion and reserved the right to further diligence, review and approve any such capital infusion."

343.    The Chavenson/Mason Special Committee's attempt at can-kicking accomplished little, as BEN sought funding from GWG for the $25 million payment to Sabes AV just two months later when BEN's due date to make the payment neared.   Specifically, a funding request—drafted by Heppner—and relayed by Holland to the Special Committee on December 18, 2019, requested "$25.5 million to Ben to pay obligations owing to the Sabes Parties."   And Holland's December 24, 2019 email to Chavenson—that copied and pasted Heppner's funding wish list and increased the amount of the payment to HCLP—likewise earmarked "$25 million for Sabes payment."

344.    The proposed $25 million funding of BEN's obligations to Sabes continued to trouble the Special Committee's advisors, however.   Internally, the Special Committee's advisors discussed having BEN transfer the GWG shares (that BEN had obtained from Sabes) back to GWG, essentially "a buyback," as that "probably looks better as an essentially at-the-market acquisition of shares and [GWG shareholders] more immediately benefit from this…rather than extending more funds to BEN."   But that preferable alternative to paying off BEN's debts in exchange for additional (dubious) equity in BEN was never seriously pursued.

345.    Instead, a few days later, ████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████



Evans then circulated the revised BEN funding memo (with supporting documentation, "including the draft Wickline letter") to Heppner, Holland, and BEN counsel, amongst others, later that afternoon.

346.    The BEN funding request memo—that Evans had primarily drafted—was circulated to the Chavenson/Mason Special Committee later that evening (December 26, 2019). ▮▮▮▮▮▮▮▮▮▮▮▮▮▮, the memo requested "[a]pproximately $30 million for operating capital," including "$27 million *to build Ben's capital reserves* pending payment of certain obligations."  (Emphasis added).   The memo made no specific mention of the Sabes—presumably due to the Special Committee's previously expressed "reservations about referencing the specific pay down of the Sabes," although the memo did refer to the supporting exhibit binder that included the underlying contract.

347.    Ultimately, the semantic messaging employed by Evans—▮▮▮▮▮▮▮▮ ▮—did the trick.   During a Special Committee meeting held on December 30, 2019, the Special Committee discussed that one of two main "components" of the proposed total funding was "*an amount to bolster BEN reserves following a payment* in satisfaction of a payment obligation to the Sabes."  (Emphasis added).  And a recital set forth in the December 31, 2019

Special Committee resolution approving the overall $79 million transfer from GWG to BEN likewise indicated that the money would be used (in addition to a $49.8 million payment to HCLP) to accommodate BEN's "need for approximately $30 million for *additional operating capital*, including approximately $27 million *to build BEN's capital reserves* pending payment of certain obligations." (Emphases added).

348.    In reality, however, the purported justification of building BEN's "capital reserves" *after* it made the payment to Sabes was a smokescreen because ███████████████ ██████████████████████ BCH was the obligor on the required $25 million payment to Sabes AV under the terms of the October 25, 2019 amendment to the purchase and contribution agreement, ██████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████████████████████████████████

349.    Accordingly, ██████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ Specifically, GWG wire transferred $██████████ into BEN LP's JPMorgan bank account on December 31, 2019 ████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████

350.   ███████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████

351.   ███████████████████████████████████████████

should have been a major red flag to the Chavenson/Mason Special Committee and its advisors. Moreover, BEN's liquidity problems and cash burn were a recurring problem.  Indeed, the Chavenson/Mason Special Committee had previously approved the $65 Million Loan in May 2019 due to ███████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████ The Chavenson/Mason Special Committee previously (in October 2019) approved a waiver of the restriction on BEN's source of repayment of Sabes AV to enable BEN to pay its (past due) obligations to Paul Capital.  And the Chavenson/Mason Special Committee had spent the last several weeks hearing one funding request after another from BEN related to numerous BEN cash needs, all while BEN continued to hemorrhage cash.

352.   In short, the Chavenson/Mason Special Committee's and its counsel's rationalization of the funding "to build BEN's capital reserves" was a farce.  They knew or should have known that the funds were to be used to pay BEN's obligation to Sabes AV.  The Special Committee and its advisors likewise had several concerns—that were never resolved—about GWG giving money to BEN to fund BEN's buyout of GWG equity from GWG's founders

(which was only possible in the first place because the Chavenson/Mason Special Committee's waiver of a restriction put in place by a predecessor special committee). And yet the Chavenson/Mason Special Committee approved the Sabes-related component of the $79 million overall funding anyway because it (and its counsel): (a) failed to fully inform themselves of BEN's financial condition before agreeing to fund the advance, thereby breaching its fiduciary duty of care; (b) knew that the stated reason for the funding was pretextual, or (c) some combination of the two.

      **d.**    **The Chavenson/Mason Special Committee Accept BEN Equity in Exchange for $79 Million, Despite its Financial Advisor's Refusal to Provide a Fairness Opinion and Many Known Questions Surrounding BEN's Business and Valuation.**

353. Like the rest of the circumstances surrounding GWG's $79 million transfer to BEN on December 31, 2019, the Chavenson/Mason Special Committee's process regarding the consideration that GWG would receive in exchange was inadequate, ineffective, and grossly unfair to GWG.

354. One major contributing factor was that VRC, the Special Committee's valuation advisor, did not conduct significant valuation analysis until the last week of December 2019. That was not VRC's fault, however, but a result of: (a) BEN's delays in providing usable financial projections to the Special Committee and to VRC; and (b) BEN materially shifting the priority of the year-end transactions over the last two weeks of December 2019.

355. ████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

█████ After several months, ████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████████████████████

356.     At the same time, "BEN also introduced – through its modeling - the concept of a proposed recapitalization of BEN and [GWG], whereby the existing NPC-A holder would exchange L Bonds for the purpose of eliminating the preferred unit 'overhang' at BEN (which the Committee had expressed was an impediment to realizing returns for [GWG] stockholders through BEN)."  The Special Committee took the proposal as "a clear effort to respond to the Committee's expressed concern that the BEN level NPC-A preferred potentially frustrated the ability of [GWG] to achieve meaningful returns from any additional investments into the BEN business through the 'SITA' transactions."  In addition, a "significant benefit of the contemplated exchange was the possibility of mitigating potential conflicts of interest between [GWG] and BEN, since affiliates of Mr. Heppner and certain other directors would no longer be holders of BEN equity."

357.     Accordingly, the Special Committee and its advisors spent the next several weeks primarily focusing on the potential recapitalization transaction.  Ascertaining the fair value of NPC-A was a critical issue for the proposed recapitalization.  The Special Committee and its advisors, from their review of BEN's audited financial statements for the year ended December 31, 2018, knew that BEN's recorded value of NPC-A on its balance sheet (over $1 billion) was the result of a purchase price accounting analysis that had been performed as of May 31, 2018 as

a result of a purported change in control over BEN.[13]   Because that accounting exercise purported to allocate fair value to NPC-A equity, the underlying valuation report, prepared by Ankura, was of critical importance to the Special Committee and its advisors, especially VRC.

358.    For nearly three weeks, the Special Committee and its advisors repeatedly tried to obtain a copy of Ankura's May 31, 2018 report from BEN, but BEN made various excuses and Ankura dragged its feet, demanding non-reliance letters with non-standard indemnification terms before sharing its report.

359.    As the delay mounted, the Special Committee and its advisors grew increasingly desperate.  For example, on December 10, 2019, VRC followed-up with BEN on the status of the non-reliance letters and emphasized that "to meet our deadlines, we need to get this information as soon as possible," while Foley encouraged Chavenson to remind Holland "again that the whole process will be affected if they don't get the report across to us asap" (while also noting that BEN's counsel had informed Foley that "they are now making changes to the Ankura report, which is a bit disconcerting").  Similarly, VRC again followed up with BEN on December 17, 2019, on the status of getting Ankura's reports, noting that the "delay is seriously impeding our progress."

360.    Finally, BEN transmitted Ankura's prior May 31, 2018 valuation report to the Special Committee on December 19, 2019.   This report immediately confirmed VRC's skepticism and pre-existing concern that something was broken in Ankura's analysis.   VRC immediately wrote to Foley: "exactly what I thought.  *They did not take into account the equity that had to be issued to produce those values.  I see why they did not want to send*."  (Emphasis added).

---

[13] The Special Committee and its advisors had sought information to better understand the "write-up" of the NPC-A to over $1.0 billion since August 2019.

361.    Later that afternoon (December 19, 2019), BEN provided a different version of the Ankura report, also dated May 31, 2018, writing in the cover email that the subsequently provided version was the "final version" and that "[t]he values are the same in both reports, the only difference is the wording."  This second, final version contained the same fundamental error that VRC had identified; failure to account for dilutive equity issuances and related costs that would be necessary for the growth modeled in BEN's dubious projections.

362.    In addition to that fundamental error, however, there were other glaring flaws and shortcomings with Ankura's valuation analysis.  The version of Ankura's report as of May 31, 2018 first provided to the Special Committee (dated October 10, 2018) incorrectly stated that "BEN has obtained the regulatory charters and approvals required," and that BEN "owns a charter in Texas."  The revised version of Ankura's report as of May 31, 2018 (dated November 12, 2018), however, provided that "BEN expects to obtain certain regulatory charters and approvals required."  The later version, despite claiming a slight probability discount by assuming a 95% probability that BEN would obtain the charters, then inexplicably assigned a slightly higher value ($883 million) to "charters" than the prior version ($882 million), even though the total enterprise value was unchanged.

363.    Moreover, Ankura's analysis was so non-sensical that BEN's auditor (Deloitte) forced BEN to restate its previously issued financial statements as of June 1, 2018, making: (a) an $882 million adjustment to reduce the non-existent intangible asset of charters and "trust platform" to $0; and (b) a $60.5 million reduction to technology related intangibles.  Thus, whereas Ankura—in both versions of its May 31, 2018 report—had attributed over $950 million of value to intangible assets associated with (non-existent) charters and technology, BEN later

restated its financial statements to record only $5 million in intangible assets. (The $942.5 million total adjustments resulted in an increase in goodwill.)

364.    In short, Ankura's valuation reports were utterly unreliable on their face, even setting aside that Ankura had merely taken BEN's projections at face value with no independent verification whatsoever.

365.    On the same day that BEN finally handed over Ankura's deeply flawed analysis, which Heppner and BEN knew would inform the Special Committee's analysis of the proposed recapitalization, the proposed recapitalization suddenly was taken off the table. Specifically, Holland informed Chavenson on December 19, 2019, that the Texas Department of Banking had indicated that "they are not prepared at present to approve the NPCA exchange," as it would involve a change in the capital structure of BEN.

366.    The next day (December 20, 2019), an updated schedule of proposed year-end transactions was provided to the Special Committee. BEN had increased the amount of funding required, while at the same time moving away from giving GWG any NPC-A in exchange for funding. The Special Committee and its advisors were dismayed, with Foley observing to Chavenson (and Mason):

- "They just made life a lot harder…Brad is essentially saying to us…. 'you want changes to BEN Management, LLC, you are going to pay for it';"

- "[T]he change to GWG now funding as common (vs NPC-A, whether now or upon reversion) is" a "big tactical move;"

- "This is indeed a big change and particularly not appropriate where we have even less certainty that the recap may occur (since the banking commission can/may stop [it]) and *they have admitted to the GWG common investment largely being worthless without the recap*."

(Emphasis added).

367.     With those troubling developments, the Special Committee's advisors shifted away from the now-postponed recapitalization, and towards transferring funds to BEN before year-end in exchange for equity.  They concluded the December 21, 2019 board meeting by noting that one of the "outstanding key items and issues" remained "the evaluation and financial analysis of the consideration to be received by [GWG] from the Committee's financial advisor," VRC.

368.     Over the following week, the Special Committee's advisors interfaced with BEN regarding the fundamental flaws with Ankura's approach and BEN's projections, while VRC went to work, quickly crunching some numbers.

369.     VRC provided a "very rough draft" of a discounted cash flow model "for illustrative purposes to primarily show you… approach," late in the evening of December 26, 2019.

370.     The next day (December 27, 2019), the Special Committee discussed valuation issues with VRC, with particular focus on the problems with Ankura's analysis.  VRC also tried to arrange a call with Ankura, but BEN informed VRC that "[d]ue to the nature of the relationships and *a professional liability issue*, any questions need to come through BEN and BEN will work with Ankura."  Forced to use BEN as an intermediary, VRC then asked BEN to "ask" Ankura "how they factor in the preferred and common equity issuances needed to acquire new assets in their valuation, particularly the DCF."

371.     When BEN passed on that question to Ankura, Ankura responded by prefacing the email: "Reminder – no comment sent to VRC or GWG should be attributed to us."  Ankura then wrote to BEN:

- "With regard to VRC's specific question below, this is a question for Beneficient, not Ankura, as the projections were prepared by Beneficient.

BEN has always represented to Ankura…that the model reflects fully funded assumptions….”

- “Further, BEN's representation to us has always been that no additional equity is contemplated in the projections, and that if additional equity was raised, there would be upside in the projections.”

- “Beyond that, VRC should be aware that the enterprise value for both our 2018 and 2019 reports was determined by Ankura using the $10 per share transaction price for the Class A common, backsolving to other securities based on that price. The BEN calculations shown were purely corroborating…”

BEN never conveyed that information, all of which cast further doubt on the reliability of Ankura's analysis, to VRC. (Ankura later reiterated to BEN that it refused to speak with VRC based on instruction of counsel, and that Ankura was "willing to answer your questions, not theirs.")

372. Nor did the Special Committee and its advisors otherwise get acceptable answers from BEN. Rather, the discussion that the Special Committee and its advisors had with BEN and its legal team on Saturday, December 28, 2019, prompted VRC to write to Mason: "complete craziness." Mason responded: "I'm speechless." Following the call, the Special Committee held a meeting, at which (amongst other topics), the Committee and its advisors "discussed the Ankura Report at length and determined that the Ankura approach did not appear to take into account the additional funds or equity necessary to support BEN's business."

373. Nevertheless, the Special Committee determined at the same meeting that it was still willing to value the existing founders' NPC-A in the $1 billion range. Shockingly, it did so even though Ankura's fundamentally flawed analysis as of May 31, 2018—which VRC had repeatedly noted was unreliable—was the primary basis for the $1 billion value attributed to the NPC-A in the first place (which had been recorded at *negative* $300 million prior to the purchase price accounting exercise). And the Special Committee did so even though the committee and its

negligent counsel knew or should have known ████████████████████████████ ██████████████████████ and that BEN had faced repeated delays in obtaining its charter.

374.    After the Special Committee determined that it would propose a valuation of around $1 billion for the NPC-A, despite those and many other problems, the Special Committee's thinking was conveyed by Chavenson to Holland, and by Foley to BEN's counsel.

375.    The next afternoon (Sunday, December 29, 2019), BEN's counsel emailed Heppner, Evans, Holland, and BEN officers to update them on a call he had just had with Foley, writing: "there's still a meaningful gap with the SC between the numbers in the Ankura report and the numbers that they are coming up with."  BEN's counsel further indicated that, based on the call, "we'll be able to get to a number with the SC that's north of $1 billion but I'm not confident the SC will get comfortable with the $1.5B or so reflected in the Ankura report. Chavenson may ultimately agree, but it sounds like Mason may not get there."  Holland replied: "Dave's last 'offer' to me was we use the last $1.1 billion agreement.  I told him Brad said no."

376.    Evans then proposed a potential solution to bridge the gap, suggesting a "relative percentage" approach that would result in a write-up of both the assigned paper value attributed to the NPC-A held by BEN's founders (including Heppner via his affiliates) and an assigned paper value GWG would obtain in an amount beyond the actual amount contributed.  Heppner approved: "This is the right way to look at the math."  BEN's counsel then chimed in:

> I get the sense that *the SC will work with some creative solutions* so long as they can pin the number back to the valuation report they need to rely on.   So I believe Tim [Evans]'s approach of first getting to a percentage based on one (lower) valuation then issuing what we need to get them to that percentage based on a higher valuation would work.

(Emphasis added).  Thereafter, Evans, Heppner, and Holland worked with BEN's team to crunch the numbers and figure out a proposal that was acceptable to Heppner, yet still might pass muster with the Special Committee.

377.   Once Heppner, Evans, Holland, and BEN had all settled on the approach and analysis, Evans asked Holland to "call Dave [Chavenson] with this."  Holland called Chavenson, who dutifully responded late in the evening at 10:21 p.m. on a Sunday (December 29, 2019) by email setting forth his understanding of the terms dictated by Holland, with the subject line "*Is this what you wanted me to write up?*"  (Emphasis added).

378.   Holland forwarded this email to Evans, who indicated that what Chavenson wrote was "close" but should be "restate[d]" as GWG advancing $79 million to BEN, with $69 million being contributed in exchange for a $319 million NPC-A unit account, and $10 million purchasing BEN LP common units at a price of $15.00 (based on a valuation provided by BEN's valuation firm).  Following the transaction, Evans suggested that the BEN founders' NPC-A would be at $1.25 billion and GWG's NPC-A account would be at $319 million.

379.   At the Special Committee meeting on December 30, 2019, the basic terms as articulated by Evans were presented and discussed as a "compromise proposal pursuant to which the Committee would agree to a valuation of the NPC-A ($1.25 billion) substantially half way between the valuation sought by the Committee and BEN's desired valuation ($1.5 billion or higher), provided that [GWG] would receive a capital account credit in an amount equal to approximately $320 million."  The Committee determined that this "compromise approach" was acceptable.

380.   Notably, the Chavenson/Mason Special Committee approved this transaction even though its financial advisor, VRC, would not expressly support it.  Although VRC had been

engaged to provide a fairness opinion, VRC *refused to provide a fairness opinion* for that component of the transaction or the $79 million transfer as a whole.  VRC refused to do so because, as VRC principal Chad Rucker later explained, he had "*major concerns about BEN*," he was "*extremely uncomfortable with BEN's financial and valuation policies and BEN's overall financial condition*," and he did not want to expose his firm to risk "when I believe there are *serious fundamental issues*." (Emphases added).

381.    Indeed, Rucker was so troubled by the circumstances surrounding GWG's $79 million transfer to BEN on December 31, 2019, that he wrote a cautionary email to his fellow VRC principals just two days later.  Specifically, Rucker wrote in a January 2, 2020 email:

> Ankura had performed several valuations that also been through an audit where Ankura had performed a valuation that was used for a purchase price allocation valuation exercise for a transaction with an affiliated party….*I had not seen the valuation report but for months had told the Special Committee that there was no way that the current value of the Company was anywhere near $2.6 billion and that had something had to be wrong.*  The Special Committee members told me that Ankura was a very large and reputable firm, and that their valuation reports had to be reliable.  *After signing the non-reliance letter, I got the reports and the underlying data that was provided to Ankura.  There were significant issues. Essentially they had forgot[ten to] add in all of the working capital needs in their DCF and they did not take into account the billions of equity that would need to be issued to fund the business.  Therefore, [their] value was at least $500 million to $1.0 billion too high.*  The bad thing is that the company had booked all this goodwill, valued the intangible assets with the math errors and issued preferred securities to the affiliated party based on these valuations.  And this was the second and third report in this valuation series and no one caught these errors. Basically, *the people that outsourced the work never dug into the outsourced work, and more importantly took a step back and asked does this make sense given the Company's business and stage of development.*  It will be interesting to see how they solve this problem.  *The CFO acknowledged that there [are] problems, but I think the CFO will try to bury it and hope that the auditors don't raise questions in the future.*

(Emphases added).  Rucker previously expressed similar—and additional—concerns to the Chavenson/Mason Special Committee and its counsel and was particularly adamant about

Ankura's and BEN's failure to adequately account for equity issuances and related costs, which Rucker viewed as a "very very large logic/math mistake."

382.    Although Rucker and VRC refused to offer a formal opinion, Rucker nevertheless agreed to provide some PowerPoint presentations with "discussion materials" with various estimates.  Those presentations were provided in the 24 hours before the transaction closed and were primarily designed to provide cover for the Special Committee to help paper the record for a transaction that they had, in effect, already agreed to.  The PowerPoint presentations that VRC provided were never intended to be, nor purported to be, a formal valuation opinion or analysis, however, as VRC was only willing to go so far in providing cover.

383.    VRC circulated the initial "rough draft" of its PowerPoint to the Chavenson/Mason Special Committee late in the day on December 30, 2019.  This draft offered no express opinions of any kind, let alone a specific opinion regarding the market value of the NPC-A unit account in BCH that GWG would receive in exchange for $69 million (of the total $79 million funding).  VRC was only willing to a "estimate a range" of values, while carefully noting that in "estimating a range of values," VRC had "used financial forecast and data provided by GWG and Beneficient without any independent verification." The initial estimate for the aggregate amount value of all holders' NPC-A was $608.6 million to $1,015.4 million, a figure far below the aggregate $1.57 billion paper value effectively attributed to the NPC-A by the Special Committee in the transaction.

384.    When Chavenson received the draft, the lack of any opinion and direct discussion of the transaction made it unclear to him whether it would provide adequate cover for him.  Thus, he asked: "will it support the valuation we in effect agreed to?"  VRC replied "[y]es, we are putting together a page that will show that."

385.    VRC then circulated an updated draft at 11:13 pm (on December 30, 2019).  This draft contained an additional page that made a comparison between: (a) the amount of cash provided by GWG in exchange for the NPC-A account and the (b) the "estimated value" of GWG's NPC-A unit account, which was based on multiplying GWG's proportionate share of the total NPC-A account (approximately 20.4%) times the total NPC-A liquidation value, assumed by VRC to be $1.015 million as relayed by BEN earlier that day.

386.    VRC circulated the final version of its PowerPoint presentation mid-afternoon on December 31, 2019, *after* the Special Committee had already formally voted to approve the transaction and after GWG had already wire transferred the $79 million to BEN.

387.    The after-the-fact final version of VRC's presentation, dubbed "Discussion Materials," again contained broad disclaimers of the reliability of the BEN-provided projections utilized, indicating that VRC used that data "without any independent verification."  The final "Discussion Materials" presentation, once again, did not contain an opinion or purport to opine on fairness or valuation.  Rather, it provided "estimates" of BEN's aggregate equity value, then "used a waterfall analysis to allocate that value to the NPC-A" in aggregate.

388.    In the final presentation, the estimated range of total BEN equity value was $477.6 million to $1.302 billion.  VRC then "estimated waterfall allocated value" to NPC-A using an assumed NPC-A liquidation preference of $1.015 billion.  And then VRC multiplied the waterfall estimates by GWG's proportionate share of the total NPC-A to arrive an "estimated value" of $97.3 million to $206.9 million for GWG's NPC-A unit account, comparing it to GWG's $70 million cash transfer in exchange.[14]

---

[14] VRC's calculation utilized $70 million, although the cash component exchanged for the NPC-A unit account was slightly over $69 million.

389.    This crude comparison—provided after the Special Committee had already decided to approve the transaction—was merely intended to paper the file, creating the illusion of process for a transaction that was already *fait accompli*.   It was provided in response to Chavenson's question of whether VRC's presentation would "support the valuation we in effect agreed to?"   And VRC's "discussion materials" were provided after Rucker had previously informed Chavenson on December 28, 2019, that VRC would get him: "the backup you need to approve transactions."   The Chavenson/Mason Special Committee did not actually rely upon the discussion materials VRC provided.

390.    Moreover, even if VRC's discussion materials had been provided before—rather than after—it approved GWG's transfer of $79 million to BEN, the Chavenson/Mason Special Committee could not have reasonably relied on those materials in approving the transaction for several reasons.

391.    <u>First</u>, VRC refused to provide a formal fairness opinion or valuation opinion due to serious concerns regarding BEN and BEN's valuation.   And the discussion materials VRC provided did not purport to offer an opinion either, just rough "estimates" taking BEN's unreasonable projections at face value, with no independent verification.

392.    <u>Second</u>, VRC's "estimated waterfall allocated value" did not purport to estimate what a third party in an arms-length transaction would have paid for GWG's NPC-A account. The market for such an unusual, non-unitized security in a financially distressed, speculative business like BEN was highly uncertain.   Moreover, the $1.25 billion paper value assigned to the NPC-A account associated with the founders' NPC-A accounts was not based on actual value they provided, but rather: (a) resulted from Ankura's flawed purchase price accounting report in May 2018, which attributed over $1 billion to the NPC-A; and (b) the Special Committee's own

agreement to increase the assigned value by approximately $235 million as part of the December 2019 Transaction.  Under such circumstances, no third party in the marketplace would have paid anywhere close to $69 million for GWG's non-unitized NPC-A account in BCH.

393.   <u>Third</u>, although the VRC discussion materials did some number crunching for a comparable companies analysis, VRC expressly cautioned: "In reviewing the implied PE multiples, it is important to note that substantial equity issuances will be needed by either Beneficient or GWG to acquire assets that would generate the projected 2021 and 2022 net income.  Therefore, *the 2021 and 2022 implied P/E ratios might not be meaningful*."  (Emphasis added).  And while VRC also provided an estimate based on 2020 estimated net income, the earnings estimate BEN provided (of $86.9 million) was unvetted by VRC, inconsistent with BEN's history of losses, and based on the flawed assumption that BEN had its trust charter and was ready to launch in early 2020.

394.   <u>Fourth</u>, VRC's discounted cash flow ("<u>DCF</u>") calculation was unreasonable for several reasons.  Due to VRC's recognition that BEN's financial projections failed to adequately build in the costs of rapidly growing the business, through dilutive equity issuances or otherwise, VRC made adjustments to build in those costs.  The result was that BEN had negative cash flow in years 1 through 5 of the projections, with a present value of *negative* $2.4 billion.

| Adjusted Free Cash Flow to the Equity | (5,420,362) | (111,360,635) | (1,336,464,386) | (1,172,102,319) | (1,174,723,660) | (1,833,620,012) |
|---|---|---|---|---|---|---|
| Partial Period Adjustment ' | 1.00 | | | | | |
| Adjusted Free Cash Flow | (5,420,362) | | | | | |
| Period | 0.500 | 1.500 | 2.500 | 3.500 | 4.500 | 5.500 |
| 25.00% PV Factor | 0.8944 | 0.7155 | 0.5724 | 0.4579 | 0.3664 | 0.2931 |
| Present Value of Net Cash Flows | $ (4,848,120) $ | (79,683,184) $ | (765,036,856) $ | (536,760,415) $ | (430,368,679) $ | (537,408,175) |
| Present Value Sum of Net Cash Flows | $ (2,354,105,428) | | | | | |

VRC then assumed an exit multiple of $12.2 billion in 2024 (10x times 2024E net income of $1.22 billion), applied a present value factor, and then subtracted the negative cash flows in the interim to arrive at an estimated overall DCF valuation:



Setting aside the unreasonableness of BEN's projected growth and future earnings, it was unreasonable and unrealistic to assume that a financial services company like BEN that had five straight years of *negative* cash flow, burning over $5.5 billion in cash, would somehow sell for $12 billion at the end of that period.

395.   Moreover, VRC utilized a 22.0% to 28.0% discount rate in this analysis, based on studies for "mezzanine / bridge / IPO companies."   But much higher discount rates would be appropriate for companies at an earlier stage, which VRC's presentation expressly acknowledged:

| Stage of Development | Stage Description | QED Research[1] | Fin. Entrep. Ventures[2] | Scherilis & Sahlman[3] |
|---|---|---|---|---|
| Start-up or Seed | Early product development. Incomplete management team. Limited expense history. | 50-70% | 50-100% | 50-70% |
| First | Product development continues. Business challenges understood. Cash burn rate history. | 40-60% | 40-60% | 40-60% |
| Second | Product development complete, management team is likely in place. Have shipped initial products and getting feedback from market. | 35-50% | 30-40% | 30-50% |
| Third | Sales growth is rapid, may have achieved profitability. Lenders may finance fixed assets and receivables. | 30-50% | na | na |
| Fourth | Sales growth and profit margins have reduced much of the investment risk. May seek to use debt financing to reduce equity dilution. | 30-40% | 20-30% | na |
| Bridge / Mezzanine / IPO | Exit, via IPO or sale, and timing are likely known. Need capital to sustain rapid growth. | 25-35% | 20-30% | 20-35% |

The Chavenson/Mason Special Committee and its counsel knew or should have known that BEN was more fairly classified as a "First" stage company (at best), warranting a 40-60% discount rate, because BEN faced challenges in obtaining its trust charter, had failed to conduct any meaningful liquidity transactions during 2019, was still developing its systems, and had sustained significant cash burn.

396.  <u>Fifth</u>, and finally, VRC's calculations depended on information provided by BEN and BEN's projections.  But BEN's projections erroneously assumed that the trust charter had already been obtained and the business was immediately ready to launch into the first year of the projections, *i.e.,* that there was no risk of delay or in failing to obtain the charter altogether. BEN's projections were wildly unrealistic for the reasons alleged below.  And VRC's allocation analysis was based on a liquidation preference for the NPC-A of $1.015 billion supplied by BEN, whereas Heppner apparently believed that the liquidation preference for the NPC-A was only around $200 million at the time.

397.  Accordingly, VRC's PowerPoint "discussion materials," circulated at the eleventh hour, in no way justified GWG sending $69 million to BEN in exchange for a NPC-A account. While the NPC-A non-unitized account that GWG received was assigned a paper value of $319

million, that paper value bore no relation to what a third-party would have paid for that interest in an arm's-length transaction in the marketplace.

398.   The Chavenson/Mason Special Committee and its counsel undertook no effort whatsoever to market check the value of the NPC-A account.  The sum total of their market analysis consisted of discussions with VRC, which consistently sounded the alarm and raised concerns about BEN, and procuring the after-the-fact VRC discussion materials that addressed the NPC-A unit account.

399.   Even more egregious, the Chavenson/Mason Special Committee and counsel performed and obtained no independent analysis whatsoever, from VRC or otherwise, regarding the market value of the 666,667 BEN LP common units that GWG agreed to purchase for $10 million at a price of $15.0 per unit.  Shockingly, the Special Committee and its counsel agreed to that price and an agreed upon overall equity of BEN of *$3.5 billion* during and after the closing call held on December 31, 2019, even though the Special Committee had previously recognized that common units were potentially worthless given the NPC-A overhang in BEN's capital structure.

400.   The $15.00 per unit price paid for BEN LP common units was grossly unfair to GWG.  It implied a total BEN equity value at least 3-4 times higher than what VRC's discussion materials supported, even setting aside the VRC's presentation itself was wildly optimistic for the reasons alleged above.  Moreover, almost no value could be expected out of BEN LP common units given that: (a) BEN LP was merely a holding company for BCH: (b) NPC-A holders at BCH had preferential distribution rights and claims on profits of its operating subsidiaries; and (c) the NPC-A account at BCH held a substantial liquidation preference (which BEN told the Special Committee and its advisors was $1.015 billion).

401.    That BEN LP common units occupied an inferior position in BEN's capital stack was well known to the Chavenson/Mason Special Committee and its advisors.  For weeks, they had discussed the challenges posed by the NPC-A "overhang" in BEN's capital stack and had tried to negotiate a recapitalization transaction with BEN that would eliminate it.  Indeed, eliminating known problems posed by the NPC-A "overhang" was a frequent discussion at Special Committee meetings discussing the proposed recapitalization.  For example:

- The "elimination of the NPC-A 'overhang'" was discussed as a benefit of capital structure improvement at a December 4, 2019 Special Committee meeting.

- During a December 10, 2019 meeting, the Special Committee discussed potential benefits, "in particular the elimination of the NPC-A 'overhang' which" would "significantly improve the chance that common stockholders of [GWG] will achieve value from the initial deal between [GWG] and the BEN Group" and "eliminate or mitigate conflicts of interest arising from [GWG] and BEN which was hampering governance;" and

- During a December 17, 2019 meeting, the Special Committee discussed "the desirability of pursuing consideration in the form of preferred equity or debt of BCH rather than common units of BEN" for any year-end funding.

402.    And even after learning that the proposed recapitalization had been delayed indefinitely, the Special Committee determined that it "*would remain firm that any funding would need to occur as a senior BEN security*, e.g., in the form of NPC-A preferred, to avoid any subordination to the current NPC-A holders [and] to avoid value from such funding accruing [to] the current NPC-A preferred holders."  (Emphasis added).  The Committee likewise discussed on December 21, 2019, that "any cash funding would occur in the form of a security that would be preferred in the BEN Group capital structure for protection and to enhance returns."  And during a subsequent meeting held on December 23, 2019, the Special Committee again "re-emphasized the need for any funding to be effected in the form of NPC-A preferred (*pari passu* with the

existing preferred holders, including affiliates of Mr. Heppner)," and discussed that it would be "problematic" if GWG were to "receive common units as consideration to provide" funding.

403.    Nevertheless, once BEN eventually indicated that it would exchange NPC-A for the majority of the funding, the Special Committee changed its tune beginning on December 28, 2019, and expressed a willingness to accept a "small amount of consideration in the form of common units."  Thus, much like the Essex Transaction in May 2019, the Special Committee was willing to provide $10 million to BEN in exchange for common units—at a grossly inflated price—largely because $10 million was merely a "small amount," in its warped view.

404.    Even worse, the final price of $15.00 per unit was not the subject of rigorous or meaningful negotiations, but rather raised and agreed upon on closing call between counsel on December 31, 2019.  Moreover, it was based on expectations—as relayed by BEN—of where Ankura's final valuation would land.  Given the many known problems with Ankura's analysis, there was no legitimate reason for the Special Committee and its counsel to agree to a unit price based on Ankura's forthcoming valuation of total BEN equity, thereby casting aside VRC's analysis and significant concerns.

405.    On top of that, the $15.00 price and agreed-upon $3.5 billion valuation for BEN was based on materially misleading information that had been conveyed by BEN's counsel (due to information he was fed by Evans and BEN's CFO) and that Heppner, who was copied, did not correct.  Specifically, in an email sent on December 31, 2019, BEN's counsel wrote to confirm the final price of $15 per unit equating to an agreed-upon "overall equity value of $3.5B," noting that it was "likely that the final Ankura report will show a higher overall equity valuation (the current draft Ankura report…shows a higher overall equity valuation)."  (The understanding being that GWG would obtain more units later on if Ankura's valuation came in higher).

406.    But Ankura was not willing to support a total BEN equity value of $3.5 billion.

Indeed, ████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████ And

Heppner and Evans knew it, as Ankura's email to that effect was forwarded to them. Yet

Heppner and Evans failed to correct the materially misleading information relayed by BEN's

counsel to the Special Committee.

407.    In a follow up email on December 31, 2019, BEN's counsel forwarded an Ankura

schedule, mischaracterizing it as the current draft of Ankura's valuation report referenced in his

last email, to the Special Committee's counsel. The  document was not the current draft of

Ankura's valuation report, however, but merely one iteration of a "sensitivity analysis" that

Ankura had "executed extremely quickly," at the direction of BEN's CFO (in consultation with

Heppner and Evans). Even though they knew that the document BEN's counsel forwarded—

which showed a $4 billion total equity value for BEN—did not fairly reflect Ankura's current

thinking on BEN's total value, Heppner and Evans failed to correct the misleading impression

created by BEN's counsels' emails.

408.    In sum, the Chavenson/Mason Special Committee's process regarding the

consideration that GWG would receive in exchange for transferring $79 million to BEN was

woefully ineffective and unfair to GWG. Like much of the committee's other efforts, it was

marred and irredeemably tainted by: (a) GWG's disloyal CEO (Holland) and CFO (Evans)

actively colluding with Heppner and BEN against GWG's interests; (b) Chavenson disloyally

engaging in back-channel communications with Holland; (c) Heppner (and Evans) feeding

materially misleading information to the Special Committee (through BEN's counsel); and (d)

the Special Committee and its counsel hastily papering over significant problems, while ignoring many known concerns over BEN's valuation and prospects.

### 5.    Summary of the Unfairness Surrounding the 2019 Transactions.

409.    The Essex Transaction, $65 Million Loan, and the $79 million transfer from BEN to GWG in December 2019 were not entirely fair to GWG.

410.    The consideration GWG received in exchange for its $154 million was grossly unfair because no third-party in an arm's-length transaction in the marketplace would have advanced funds on the terms that GWG received for the reasons alleged more fully herein.

411.    BEN was ███████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████. It suffered high legal and finance personnel turnover, and ████████████████████████. BEN's business plan was entirely speculative, and BEN did not have its charter.  Its financial projections—which BEN refused to stand behind—███████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ ████████████████████████████████████

412.    Under such circumstances, no third-party lender would have extended credit to a distressed, unproven business under the terms extended by GWG in connection with the $65 Million Loan.  It is uncertain whether BEN could have otherwise obtained any third-party financing at that time given its distressed and unproven nature.  But at a minimum, BEN was unable to find a third-party lender willing to extent credit on terms anywhere near as favorable

for BEN in connection with the $65 Million Loan (i.e., unsecured, doubly subordinated to nine-figure senior debt, four-year maturity with no interest due until maturity, and only 7% interest charged).

413.     Likewise, given the many problems and question marks surrounding BEN, no third party would have paid cash to BEN in exchange for equity that valued BEN's total equity in the billions, as GWG did.  That is especially true for BEN LP common units at the bottom of BEN's capital stack, units that were practically worthless in light of the NPC-A "overhang" (but that GWG agreed to pay $10.00 and $15.00 for in May 2019 and December 2019, respectively).  Notably, no third party (*i.e.,* anyone other than GWG) paid—or was willing to pay—cash for BEN equity at prices anywhere near what GWG paid.

414.     The unfair consideration that GWG received in exchange for the $154 million it transferred during 2019 was the result of unfair dealing and a grossly unfair process.  The Chavenson/Mason Special Committee's process was fundamentally unfair in numerous respects.

415.     First, the Chavenson/Mason Special Committee's process was tainted through myriad disclosure violations and breaches of the duty of candor owed by Heppner, Holland, BEN, Evans, and Cangany as GWG fiduciaries.  Holland, Evans, Heppner, and BEN conveyed—or failed to correct—materially misleading statements and omissions whether BEN itself owed a due and payable $10 million obligation to Essex, when in fact BEN owed no such obligation.  Holland, Heppner, and Cangany gave misleading statements and assurances regarding the $65 Million Loan, portraying it as a cure-all for BEN's needs over the next year that would set BEN on the path to regulatory approval, when the opposite was true.  Finally, Heppner, directly and indirectly through BEN's and HCLP's agents, duped the Special Committee into approving the transfer of $49.8 million for BEN to send to HCLP.

416.  <u>Second</u>, Chavenson actively colluded with Holland behind the scenes and: (a) back-channeled the Special Committee's thought process, failing to maintain the confidentiality of its deliberations and the analysis of its advisors; (b) took marching orders from Holland; and (c) coordinated with Holland to "paper the file" to provide himself with cover.  More broadly, Chavenson's general approach to his role on the Special Committee was to go along to get along, trying to appease Holland, Heppner, and BEN.

417.  <u>Third</u>, and relatedly, the Chavenson/Mason Special Committee lacked adequate independence because its chair, Chavenson, did not act independently of Holland, Heppner, and BEN.  The 2019 iteration of the Special Committee only had two members, Chavenson and Mason.  And Chavenson did not judge matters on the merits and to further GWG's best interests, but instead was influenced by and acted beholden to Holland, Heppner, and BEN in taking actions that adhered with their wishes, despite substantial concerns surrounding the transactions from GWG's perspective.

418.  <u>Fourth</u>, the Chavenson/Mason Special Committee's process was not adequately supported by legal advice from competent, independent counsel.  The Special Committee's counsel, Foley, was pre-selected for it by Holland.  Due to the urgent need for action conveyed by Holland in initial discussions with Chavenson and Mason, they accepted Foley as their counsel without an interview process.

419.  Foley, for its part, was negligent in several respects, including basic due diligence failures, such as failing to verify the existence of the purported obligation underlying the Essex Obligation, and accepting the draft letter from Wickline with a blank number as adequate evidence of HCLP's purported demand.  More broadly, Foley acted primarily to "paper the

record" and rationalize grossly unfair transactions, rather than zealously representing GWG's bests interests.

420.   <u>Fifth</u>, the Chavenson/Mason Special Committee's process was not adequately supported by analysis from financial advisors either.  The Special Committee approved the Essex Transaction and $65 Million Loan in May 2019, before it had even hired VRC.  And the Special Committee approved the $79 million transfer in December 2019, even though VRC refused to provide a fairness opinion or formal valuation opinion on the transaction.  Although VRC provided "discussion materials," those materials did not purport to offer a formal opinion, and the materials were provided after the Special Committee had already agreed to the terms of the $69 million NPC-A component of the transaction.

421.   Moreover, VRC's "discussion materials" did not specifically address the $10 million BEN LP common unit component of the transaction.  And the generally applicable analysis VRC provided of BEN's overall equity indicated that those units were worth a small fraction of the price the Special Committee agreed to pay.

422.   <u>Sixth</u>, the Chavenson/Mason Special Committee (and its counsel) failed to negotiate vigorously and in a spirited, arm's-length manner.  The Special Committee failed to use GWG's position of bargaining strength—due to BEN's financial desperation—to drive a hard bargain.  The Special Committee did not vigorously pursue alternative transaction structures, let alone seriously consider foregoing funding to BEN altogether.  And it did not conduct any sort of market check.  Instead of attempting to approximate arm's-length marketplace bargaining, the Special Committee was mostly deferential and accommodating.  The Special Committee's main focus was on trying just enough to rationalize the transactions and paper the record, not on bargaining for the best possible deal for GWG.

423.    <u>Seventh</u>, the Chavenson/Mason Special Committee's negotiating efforts were also not conducted in an arm's-length manner because of: (a) collusion of GWG's officers with BEN; and (b) the grossly unequal informational advantage that BEN and Heppner had in negotiating with the Special Committee.  Both GWG's CEO (Holland) and CFO (Evans) actively shared GWG information and the Special Committee's thinking with Heppner, BEN, and BEN's counsel.  And Holland and especially Evans even helped BEN develop terms to deliver to the Special Committee.  In other words, GWG's principal officers effectively played for BEN's team in negotiations between BEN and the GWG Special Committee.

424.    Heppner, despite his role as GWG's chairman, did not try to wall himself off from the negotiations, instead actively seeking GWG information.  He requested and arranged meetings with Holland and Evans to specifically discuss the Chavenson/Mason Special Committee's process.  And when he didn't like what he was hearing, Heppner barked orders to Holland to relay to Chavenson.  For instance, when Heppner was displeased with the pace of Foley's progress on a corporate opportunity doctrine waiver he and BEN had demanded, he told Holland what to relay to Chavenson, writing: "I want to hold these clowns accountable for being accurate and stop their d[***] crying."

425.    Meanwhile, while having full access to GWG's information via his role as GWG's chairman and through collusion with Holland and Evans, Heppner closely controlled information flow from BEN to the Chavenson/Special Committee and its advisors.  Indeed, when Holland pressed BEN to try to get information to the Special Committee more quickly, he was told that BEN's team was "pushing hard," but "need[ed] to run all materials by Brad [Heppner] before they go out."

426.  <u>Eighth</u>, the Essex Transaction, $65 Million Loan, and December 2019 Transaction were all initiated and timed by Heppner, Holland, and BEN.  Heppner, Holland, and BEN timed those transactions to BEN's advantage, ensuring that BEN ███████████████████ ███████████████████.  Moreover, Heppner, Holland, and BEN: (a) delivered the initial proposals for the transactions; and (b) controlled the transaction timelines.

427.  <u>Ninth</u>, Heppner and Holland tried to pressure the Chavenson/Mason Special Committee.  Chavenson and Mason felt pressured in the "fire drill" surrounding their approval of the initial Essex Transaction, and their communications amongst themselves and counsel often focused on keeping Holland happy and/or avoiding getting blamed by Heppner.

428.  <u>Tenth</u>, and finally, the Chavenson/Mason Special Committee was not put in place and empowered before the start of the substantive negotiations with respect to the Essex Transaction and the $65 Million Loan approved in May 2019.  Heppner started planning for those transactions, and the SITA transactions more broadly, by late 2019.  And Holland held weekend discussions with Mason and Chavenson, requesting funding within a week, before Mason and Chavenson were even officially appointed to GWG's board.

**E.  Mason and the Special Committee's Advisors Resign, as Heppner Stacks the Special Committee with a BEN-loyal Plant, Defendant Cangany.**

429.  Although the Chavenson/Mason Special Committee was grossly ineffective and approved transactions that were patently unfair to GWG to benefit BEN, it had not blindly approved all of Heppner's plans for BEN on a timeline that was satisfactory to Heppner.

430.  In his December 31, 2019 "Year-End Update" email to Hicks and Schnitzer, Heppner informed them that: "we finished what we could with the Special Committee," and noted that although "[w]e didn't get as far as we had planned back in mid-June, … we did as much as the SC was willing to do."  Heppner listed positive highlights (from his and BEN's

147

perspective) and various items and goals that were not accomplished by year-end.  For the latter, Heppner blamed then-Special Committee member Kathleen Mason for asking questions and not totally yielding to his and BEN's demands.

431.   Because Heppner and BEN did not get their way entirely, Heppner then suggested that he and his cohorts eliminate all future dissent from Mason and the Special Committee, writing:

---

Moving into January, I propose the following:

- GWG presses Kathleen to resign from the Board.
- We dissolve the SC.
- GWG forms a new Finance Committee including Dave Chavenson, Pete Cangany and the 3 of us. Pete to serve as Chair. Pete and Dave would make up a sub-committee of the Finance Committee responsible for decisions in which the 3 of us are conflicted. A specific sub-committee format is recommended by Delaware Counsel.
- The Finance Committee is going to need its own independent counsel. We could engage Foley since they advised SC and know everything that SC completed, or we could consider replacing Foley - since Foley was Stein's plant. I might be fine with Foley staying on. They did get us this far. We need to think about this over the next few days and make a decision.  I subscribe to the advice that times the devil we know is better than bringing in a new counsel we don't know. On the other hand, we may want to remove all of Stein's plants and cut out that cancer. It hasn't worked well for us thus far. The new Finance Committee will also need to hire a valuation agent that's smart with strong technical skills.
- The new Finance Committee should immediately take up the items that were not completed as planned and which I listed above. Would be great to have these items done by mid January.
- The new Finance Committee needs to immediately move forward with the GWG restructuring plan. This plan will spin out un-levered Ben, LLC and exchange list it's Ben Common units on the NYSE and the former NPC-A units on the NYSE. Then our master plan is in motion and we can just focus on selling products.

---

In effect, Chavenson had proven sufficiently compliant to remain involved, and Heppner wanted to stack future committee efforts with Cangany—ideally, serving as chair—due to Cangany's extensive prior history with and loyalty to BEN.

432.   Cangany had a demonstrated track record in serving BEN's interest.  Cangany worked closely with BEN during its early formation on various accounting and consolidation matters.  Cangany served as BEN's Audit Committee chair and had previously helped coax Chavenson and Mason into approving the $65 Million Loan in May 2019, as alleged above.  Thus, Cangany could be expected to continue to put BEN's interests first, above GWG's.

433.     Heppner and BEN had begun preparatory steps to deploy Cangany as Heppner's plant even before year-end.  Because Cangany was a BEN director who served as chair of BEN's Audit Committee, appointing him as a member of a GWG Special Committee tasked with evaluating transactions between BEN and GWG created an obvious independence problem. Cangany was a dual-fiduciary of both BEN and GWG.  In a misguided attempt to help create a better record if Cangany were to serve on a committee that approved transactions between GWG and BEN, Heppner and BEN made changes to the amended BMLLC operating agreement— dated December 31, 2019—to *temporarily* eliminate fiduciary duties that Cangany would owe to BEN during the period he served as a GWG director.  While it was clear that Cangany would still act in BEN's interests (based on his history and continued role as chair of BEN's Audit Committee), this maneuvering created the basis for a theoretical—but unproven and unsupported by any case law—legal theory that Cangany was fit for committee service.

434.     During January and February 2020, Evans worked with GWG's outside counsel towards implementing Heppner's plan to install Cangany as a tool to approve conflicted transactions between GWG and BEN and eliminate any Special Committee opposition.  As relayed by BEN's counsel to Foley in a January 17, 2020 email, the "plan remain[ed] to create a Finance Committee with a similar mandate to the Special Committee but with … revised/expanded membership," with Cangany to "chair that committee."  The plan "would include the dissolution of the Special Committee" consisting of Mason and Chavenson.  After Evans involved GWG's outside Delaware counsel, however, the plan changed over the following weeks to instead expand the Special Committee to add Cangany.

435.     On February 4, 2020, Holland emailed a memorandum and draft resolutions "relating to a potential expansion of both the Special Committee's mandate and membership."

The attached memorandum explained that in addition to "items remaining from 2019, a series of additional transactions, designed to simplify the governance of GWG and Ben, structure the flow of funds between the companies, and prepare Ben for its own public listing, will be proposed in the coming weeks." After reviewing the memorandum and proposed resolutions, Chavenson emailed Holland to confirm his support: "I am fine with everything and will certainly be supportive on the call."

436.    Consistent with Heppner's initial plan, Cangany volunteered to fill the new position on the Special Committee, and the full board held a conference call on February 7, 2020, to discuss expanding the Special Committee. Although a unanimous written consent to expand the Special Committee was posted to the "Diligent Boards" platform on February 11, 2020, the unanimous written consent was recirculated on February 25, 2020, because Mason had not signed the unanimous written consent before BEN/GWG dual-director Michelle Caruso-Cabrera resigned from GWG's board on February 24, 2020.

437.    On February 26, 2020, Evans emailed Foley (copying Holland) to request that Mason cast her vote on the expansion of the Special Committee. (Evans then forwarded his email to Foley to BEN's in-house counsel, to keep BEN abreast of the situation.)

438.    The next day (February 27, 2020), Evans and BEN's in-house counsel held a call with Foley to discuss. Following the call, Evans shared the memorandum with Foley (and BEN's in-house counsel) and proposed resolutions that had been transmitted to GWG's board. The memorandum indicated that elimination of BEN fiduciary duties owed by certain dual-directors would arguably permit certain BEN directors to serve on GWG's Special Committee.

439.    Due to Foley's apparent skepticism, Evans emailed GWG's outside counsel the next day (February 28, 2020) to set up a call for them to discuss with Foley. Evans explained

that Mason was "withholding" her "vote from the written consent to expand the Special Committee with Pete Cangany," and Evans further indicated that he wanted them to explain—to Foley—the "analysis" that changes to BEN Management's governing documents would support an argument that Cangany was sufficiently independent to serve on the Special Committee. That afternoon (February 28, 2020), Foley held the call with GWG's outside counsel and Evans.

440. But Foley remained skeptical. And the next day, Saturday, February 29, 2020, Foley relayed the substance of what transpired on the call to Chavenson and Mason and its overall assessment of the situation, noting that:

- "[W]e strongly encouraged the appointment of additional 'clean' (no BEN ties) directors to achieve what they want and achieve the goals we espoused," such as "not having all liability/onus on [Chavenson] and [Mason]" and, amongst other reasons, to "*improve the negotiating dynamic/leverage vis a vis BEN, which is problematic here as we have seen*."

- GWG's Delaware counsel "was not aware of the long relationship that [Cangany] and [Heppner] have and acknowledged that this is a risk factor and could be an issue for [Chavenson] and [Mason]," although Evans tried to downplay the issue (inconsistent with what Cangany himself had said).

- "[F]rom a committee/approval structure perspective," the dynamic was unlikely to change and "as a practical matter *the pressure may get worse now with [Cangany] in the mix, as he is now present in the 'room' (with the posture/back channeling he brings -the initial previous from him isn't constructive as we have seen)*."

- "[T]he likelihood of the pressure on the committee to take action for BEN on an expected basis ramping up as time elapses, based on experience from last year," remained a concern.

- "These process dynamics/qualifications also matter a lot in light of the substantive matters the Committee is likely to take up," including "downstreaming large sums," including to HCLP that "we collectively have new questions about – as to control/interest/affiliated with [Heppner]."

(Emphases added).  Foley's "overall" conclusion was that Foley "continued to believe that this is a high risk situation for the current Special Committee directors going forward."

441.    On the ensuing Monday (March 2, 2020), Mason resigned as a GWG director. The following day (March 3, 2020), the GWG board met without Mason and passed resolutions expanding the Special Committee to include Cangany and a new board member, Roy Bailey (who had previously served as the Executive Vice President of Hicks Holdings, LLC, which: (a) was—and Bailey's resume described as—the family office of Defendant Hicks in Dallas, Texas; and (b) held preferred and common interest in BCH).  Foley resigned that evening; Cangany's official appointment to the Special Committee was the final straw.

442.    Despite all that had transpired in 2019 and the glaring red flags raised by Foley, Chavenson opted to remain on the Special Committee, going so far as to tell Holland that he "was fine with everything and will certainly be supportive" in discussions surrounding the expansion of the Special Committee.  Moreover, as alleged below, Chavenson stayed on the Special Committee even after the Special Committee's financial advisor, VRC, also resigned the next month (April 2020) while ringing major alarm bells over BEN on its way out the door when asked by Chavenson and Cangany to perform additional valuation services.

**F.    A Tainted and Ineffective Special Committee (Cangany, Chavenson, and Bailey) Approves the UPA, Clearing the Way for $130.2 Million in Transfers from GWG to BEN During 2020.**

443.    Delayed by the COVID-19 pandemic and its search for new counsel, the newly constituted Cangany/Chavenson/Bailey Special Committee began its work in earnest in April 2020.  Over the next four months, the Cangany/Chavenson/Bailey Special Committee approved, among other things, a Preferred Series C Unit Purchase Agreement ("UPA"), under which GWG transferred $130.2 million to BEN (or directly to HCLP for BEN's benefit) during the second

half of 2020, approximately $78.2 million of which was earmarked for HCLP. Although the UPA was one of Heppner's "strategic initiatives" outlined in his May 31, 2019, memorandum, Heppner's January plan to remove Mason and plant Cangany on the Special Committee was a key step in making the UPA a reality.

> ### 1. The Corrupt Cangany/Chavenson/Bailey Special Committee Immediately Recognizes Valuation Discrepancies Create a Challenge to Get Money to BEN.

444. In mid-April 2020, Evans and Holland began sending requests for funding to the Cangany/Chavenson/Bailey Special Committee. And in his new role as a plant on the Special Committee, Cangany quickly went to work with Heppner, Evans, and Holland on finding a structure that would allow GWG to funnel more money to BEN in a manner that was advantageous to BEN.

445. On April 15, 2020, Evans notified the Special Committee that BEN was requesting $15 million to fund a "hedge program" to "be accomplished through the purchase of additional Ben Common Units" at "a price to be agreed on by the parties." After the Special Committee initially discussed funding the "hedge program" through a loan from GWG (either under the CLA or a separate, short-term note), on April 20, 2020, Evans and Heppner had a call with Cangany "to discuss the method by which GWG would send cash to Ben[.]" Art Damoulakis, BEN's inside counsel, described the call in an email, explaining that " ███ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ███████████████████████████ " Always on board with Heppner's plans to funnel cash to BEN, Holland responded, "Yes. We need to move cash ASAP." The only urgency was Heppner's and BEN's—not GWG's.

446.    Cangany and Chavenson immediately recognized, however, that VRC's draft valuation analysis conveyed to the prior Chavenson/Mason Special Committee—which BEN misinterpreted as implying a value of "just" $7/unit, when VRC's analysis supported far less[15]— could be problematic.  The very next morning (after Cangany's call with Heppner and Evans), Chavenson and Cangany both reached out to VRC in an effort to convince VRC, who had already refused once, to continue working with the Special Committee to evaluate "a per common unit price mechanism that Ben has come back to the Special Committee with."

447.    Specifically, on Friday, April 17, 2020, Chavenson reached out to VRC's principal on the prior engagement, Chad Rucker, to check on whether VRC was willing to "continu[e] to perform valuation work for the Special Committee," in relation to an additional $15 million proposed equity "investment" by GWG in BEN.  Rucker replied that "VRC is unwilling to advise the Special Committee on this transaction," indicating that he would "be happy to have further conversations regarding VRC's decisions, rationale, and inability to provide financial advisory services on this proposed transaction."

448.    On April 20, 2020, Chavenson asked Rucker again, writing: "Just to be clear, I am not asking you to do additional work.  I am just asking you to update (i.e. do a bring down) the work VRC has already done."  Rucker again replied "no," indicating that he would call Chavenson to "provide" him "with some additional insight."

---

[15] VRC did not deliver a formal opinion or analysis, but merely provided draft "discussion materials."  The preliminary analysis it provided estimated total BEN equity value of $608.6 million to $1.095 billion (assuming BEN had launched and based on BEN's projections, with no corroboration or verification).  Then VRC used a "waterfall analysis to allocate that value to the NPC-A," attributing $608.6 million to $1.0154 billion to NPC-A (based on the NPC-A liquidation preference).  Thus, VRC's analysis implies $0 for lower priority equity interests for most of its range, and at most $80 million to spread across all other layers of equity even at the very top of the range.  VRC's analysis did not purport to assign a share price, and it cannot be fairly read as implying a $7 share price for junior BEN equity interests either.

449.     Chavenson and Cangany still refused to take "no" for an answer, however, and later that evening (April 20, 2020), Cangany emailed Rucker again asking if VRC would stay on for at least one additional transaction.  Rucker replied (copying Chavenson):

> As you know, I am extremely uncomfortable with BEN's financial and valuation policies and BEN's overall financial condition.  Additionally, *I am uncomfortable with the number of directors that have resigned in 2019 and 2020 in addition to Fol[]ey Lardner.  Hopefully you understand, there is simply too much risk for my firm to provide current or future valuation advisory services to GWG given these concerns… I have to respectfully decline to provide any current or future valuation services related to GWG acquiring any new BEN units.*

(Emphasis added).  (Chavenson promptly forwarded this email to Holland.)

450.     Even then, Cangany and Chavenson begged VRC to stay on, with Cangany writing in an April 21, 2020 email that he hoped VRC "still might be able to provide us some advi[c]e on the mechanics of the plan appreciating that you are not in agreement with the [BEN] common unit price being used."   Cangany followed up with "[o]ne other thought for consideration," namely, whether it would "change your decision if the Special Committee would indemnify VRC on legal costs?"  Yet again, Rucker responded "no," indicating that he would call Cangany later that day.

451.     Later that afternoon (April 21, 2020), Rucker responded more fully to Cangany (copying Chavenson), as follows:



> *I had calls with both you and Dave [Chavenson] to address what I thought were some significant issues* ███████████ *that should be addressed.  I have expressed to both you and Dave, my major concerns* ███████ *on each of my calls*…I told Dave and Kathleen [Mason] when I was hired that I would not be involved in transactions where I was not comfortable.  *I am not comfortable with providing advice on the transfer* ██████████████████ *.  I cannot expose my firm to the risk of addition capital transfers when* ███████████████ ….*This is one of the few times in my 15 years at VRC, where I have actually resigned from an engagement which is an indication of my level of concern.*

(Emphases added).

452.     Apparently undeterred by VRC's refusal and serious concerns, Chavenson remarked, "So we need a new valuation firm (there are certainly lots of them)." Cangany, for his part, looked for other ways to circumvent the hurdle caused by VRC's significantly lower draft valuation "discussion materials" delivered to the prior Special Committee.

453.     On April 21, 2020, Evans emailed Cangany "a high-level overview of the mechanics of the agreement we discussed," under which GWG would "purchase BEN common units in support of Ben's cash requirements as approved by the Special Committee" at an initial purchase price of $12.50 per unit subject to adjustment upon BEN's public listing or, if there was no listing, a future valuation.

454.     Copying Heppner and Holland (but no other members of the Special Committee), Cangany responded on April 22, 2020, asking Evans to "get the lawyers to draft a document incorporating the above terms," which he advised Evans to "send to the Special Committee along with the April 2019 Duff & Phelps report (under the assumption that the SC will engage them as our financial adviser)." Cangany added, "I think it would be important to highlight the page number in the D&P report that indicates a per common unit value."

455.     On April 23, 2020, following Cangany's instruction, Evans emailed GWG's and BEN's in-house counsel, explaining that "Pete [Cangany] would like to get a draft document for a Unit Purchase Agreement as soon as we can turn it. He believes that with a UPA and an existing Duff and Phelps valuation, they might be on a short path to a resolution for approving funds."

456.     Although Chavenson also supported hiring Duff & Phelps (which had been Holland's recommendation to Cangany in February), that plan ultimately fell apart when Duff & Phelps' prior work for and collection of over $██████ in fees from BEN came to light. Faced

with VRC's refusal and Duff & Phelps' "independence issues," the Cangany/Chavenson/Bailey Special Committee agreed to hire Murray Devine on May 14, 2020, to serve as its financial advisor.

**2.    *Despite the Absence of Valuation Support, the Cangany/Chavenson/Bailey Special Committee Approve the UPA on July 15, 2020, and a $61 Million Transfer to BEN.***

457.    With Chavenson's and Cangany's efforts to work around VRC's resignation temporarily delayed, the Cangany/Chavenson/Bailey Special Committee turned its attention to, among other things, approving a term sheet amending BEN's loan with HCLP, which extended the maturity date for a fee, established a payment schedule (with the first $███████ payment due June 1, 2020, and a total of $███████ due by the end of 2020), and provided for GWG's assumption of the debt if the Texas Department of Banking approved BEN's trust charter application.

458.    As with Foley's warnings and VRC's refusal to continue working for the Special Committee, the messaging around the HCLP Loan amendment should have raised a red flag for the Cangany/Chavenson/Bailey Special Committee.  In passing along HCLP's terms for an extension to the Special Committee, Evans explained, "[p]art of the reason the senior lender has pushed so hard for repayment *is that the value of the collateral has been decreasing at Ben*." Evans' explanation should have raised serious questions about assuming BEN's debt in exchange for common units and, more generally, the state of BEN's business.  The Cangany/Chavenson/Bailey Special Committee nonetheless approved the HCLP loan amendment term sheet on May 14, 2020.

459.    Unsurprisingly, ██████████████████████████████████████  ██████████████████████████████████ as contemplated in the term sheet.  ████████████████████████████

███████████████████████, the UPA again became a priority for Heppner and Cangany because of their continued desire to use GWG to bankroll BEN and funnel money to HCLP.  BEN and its outside counsel prepared drafts of the UPA, which they circulated to Evans, and by June 12, 2020, Heppner had approved BEN's drafts of the UPA to send to the Special Committee.  BEN's in-house counsel emailed Evans that evening: "Brad [Heppner] is good with the UPA so that is ready to go to the SC.  The UPA and [amended Certificate of Incorporation] really need to go to the SC today as soon as possible.  Please update when they go over so I can update Brad."

460.    The very next day, Evans sent BEN's draft UPA and a memorandum from "GWG Management" recommending that the Special Committee adopt the UPA.  Evans's memorandum explained that "GWG management expects that [BEN] will require capital infusions *prior to the completion of work by the Special Committee's valuation advisor*," including "regulatory capital required by the Texas Department of Banking" and "required extension payments" to HCLP "under the binding term sheet to amend Ben's senior note."

461.    Unlike the April version that Heppner and Cangany discussed, Evans's memorandum explained that under the June version of the UPA, GWG would purchase preferred equity at BCH that would "convert into Ben common equity at a price set by the market or by a valuation on or before December 31, 2020."  Evans then emailed Heppner, "[c]onfirming that the Amended COI, UPA, and Beast [*i.e.*, BEN's financial model] are all now with the SC."

462.    The Special Committee's new counsel, Gibson Dunn, immediately questioned the UPA and the conversion prices in the proposed draft.  And for good reason: notwithstanding VRC's prior draft valuation that implied BEN common units were worth far less (if anything), the lowest price at which GWG would be able to convert its preferred shares under the proposed

UPA draft (and the price recommended by management) was $10/unit. Cangany immediately forwarded Gibson Dunn's negative response to Evans, asking whether it would be possible to remove the conversion feature to alleviate any impediment to getting the UPA approved. As Cangany explained, he was ███████████████████████████████████████ (Emphasis added).

463. A few days later, on June 17, 2020, Cangany reported to his follow special committee members that, based on his discussions with Evans, "the priority of our work product will be to a) understand Keystone; b) get agreement on the [UPA]; and, shortly thereafter, c) approve the COI amendment." The Cangany/Chavenson/Bailey Special Committee then held calls with Evans and BEN employees on June 23, 2020, to discuss "Project Keystone," which was BEN's plan to transform BEN into a publicly traded company (with GWG as a subsidiary) after receiving its charter from the Texas Department of Banking, and the UPA. (A key goal of Project Keystone, as BEN's counsel later admitted to GWG's outside counsel, was to "waive[] all the necessary fiduciary duties from a DE perspective so that there is no concern about money moving between GWG and BEN.")

464. Evans circulated a revised UPA—prepared by BEN's counsel and approved by Heppner—to the Special Committee on July 6, 2020. The new draft proposed that GWG would purchase preferred equity junior to the more than $1.25 billion in NPC-A held by Heppner affiliates, Hicks, and others. The revised UPA, Evans explained, had no floor or ceiling price, "which reduces risk related to the conversion price and any market signaling about unit prices." The newly named "Preferred Series C" could be converted by GWG into BEN common units using a valuation process designed by BEN and would be required to convert into common units once BEN became a publicly listed company.

465.    That afternoon, Chavenson emailed Cangany (and Bailey) to express that he had "some strong feelings and concerns" and suggested a call with the Committee's counsel, Gibson Dunn, to discuss the UPA.  As Cangany had done with Gibson Dunn's initial criticisms, Cangany immediately reached out to Evans. The next day, Cangany relayed his conversation with Evans to Chavenson.  Chavenson summarized the conversation in an email: "Yesterday Pete [Cangany] had a lengthy conference call with Tim Evans, CFO of GWGH.  One of the things he learned is that the [UPA] was drafted by BEN's outside attorneys.  Pete also learned that BEN will need a cash advance by the end of the month.  That being the case, it appears to the Special Committee that the UPA will need to be negotiated quite soon."

466.    The following day, July 8, 2020, the Special Committee held a call where they agreed to ask for NPC-A units or units that ranked *pari passu* with BEN founders' holdings. Cangany took the Special Committee's request to Evans, who purportedly reported back that "a condition of getting the NPC-A is that the founders who put up the $███ of hard money that went into B[EN] to secure the Paul Capital assets in 2017 would only agree to allow GWG [to] be in that position if they were able to move up to the BHI preferred that will be issued with the senior note reassignment."  In other words, although BEN lacked the revenue or cash to support its own operations and pay debts owed to Heppner affiliates, Heppner would only allow GWG to acquire additional NPC-A if his affiliates' holdings were senior to those of GWG (including the NPC-A that GWG already held).

467.    When pressed to provide evidence for his baseless assertion that BEN's "founders" had invested "$███ of hard money," Cangany conceded that BEN's founders (including Heppner) had not in fact put in "all hard cash," but were relying on "an accumulation of value since inception." But that "accumulation of value" was based on ████████████

███████. The founders' NPC-A account ████████████████████████████████████

████████████████████████████████████████████████████████████████

And that accounting exercise depended entirely on Ankura's fundamentally flawed May 31, 2018 analysis—the same report that VRC had identified had "████████████████████████████████." Accordingly, Cangany, as chair of BEN's Audit Committee must have known that the NPC-A account balances were not based on any real "accumulation of value," yet advanced that misleading narrative anyway to try to get money to BEN.

468.    The following day, July 9, 2020, Cangany reported that "Tim Evans and Murray Holland called me late last night" to inform him that Heppner had rejected the Special Committee's request for NPC-A because "he doesn't understand why we would take a hard stand on the issue and ruin our own business model." And as had happened each time the Special Committee failed to cave to Heppner's demands, HCLP appeared on scene as a cudgel to pressure the non-compliant Special Committee members.

469.    ████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████    As a result, according to Cangany, HCLP "is expecting some kind of resolution before they will extend [BEN's] note." Cangany concluded: "I have told Dave [Chavenson] over the past several days that I am okay with the junior preferred option, but was willing to push the envelope to see if we could get more NPC-A; however, given that our request for a higher security doesn't look promising, I am not willing to have our entire investment in B[EN] go sideways as both sides flex their muscles." Once again,

HCLP was simply acting to further Heppner's and his affiliates interests; its purported "flexing" of its "muscles" was a farce.

470.    Fulfilling his role as Heppner's plant on the Special Committee, Cangany separately emailed the other Special Committee members (excluding the Committee's counsel) on Saturday July 11, 2020:

> It looks like we need to make a decision no later than Monday regarding the funding of B[EN] expenditures that total approximately $61 million. . . . Suffice it to say that missing the senior loan extension payment, tax payments, or funding [BEN's] payroll is really a non-starter.  I know we'd all like to have more perfect information from which to make these decisions (e.g., are we going to get bank charters, having the most recent up-to-date detailed cash flows, and can we successfully complete Project Keystone), but only time is going to give us those answers.

Cangany then explained that, in his estimation, caving to Heppner's demands satisfied the Special Committee's fiduciary duties because "B[EN]'s success is the best path forward for GWG's shareholders."  Cangany went on to argue that because, in his view, "B[EN] is majority-owned by GWG . . . what i[s] good for the majority shareholder here (GWG) is also good for the minority shareholders."

471.    This "what is good for BEN must be good for GWG" mentality reflected Cangany's fundamental misunderstanding of his fiduciary obligations as a member of GWG's Special Committee and GWG's predominantly subordinated position in BEN's capital stack—notwithstanding that GWG had invested "hard money" unlike BEN's founders.  Nonetheless, Cangany recommended that the Special Committee "accept the UPA terms as presented and work to finalize the agreement as soon as possible[.]" Bailey responded, "Your position makes good sense to me."  But this view made no sense at all from GWG's vantage point, and the directors' fiduciary duties required them to act exclusively in GWG's best interests, not BEN's.

472.     The Special Committee met with its counsel on Monday, July 13, 2020, to discuss the UPA again.  Notwithstanding Cangany's willingness to blindly accept Heppner's demands, the Committee resolved to "reach out to its financial advisor, [Murray Devine], to discuss Murray Devine's ongoing evaluation of BCH," request a discussion with "James Silk and Derek Fletcher of Beneficient," and ask for additional information from Evans.

473.     But Murray Devine's response proved nearly as problematic as VRC's draft valuation.  Murray Devine forwarded a "draft presentation" to the Special Committee that morning that estimated BEN's value at between $1.018 billion and $1.153 billion, assuming— without any vetting or independent analysis—that BEN's wildly unrealistic projections were achievable and that BEN had obtained its charter and was ready for launch.

474.     Notably, Murray Devine's rough, draft estimate was less than half of Ankura's valuation and ███████████████████████████████████████ ████████ that Chavenson had agreed to as a member of the prior Special Committee in December 2019.   (Chavenson later forwarded Murray Devine's presentation to Holland, who in turn forwarded the presentation to Evans and Heppner.)  That now a second firm—in addition to VRC—had arrived on a valuation less than half on Ankura's valuation of BEN should have been a major red flag on BEN's valuation, and cast serious doubts over further advances from GWG to BEN.

475.     Nevertheless, upon realizing that the Murray Devine draft valuation would not support the transaction, Evans responded to the Special Committee's information request later that day (July 13) by leaning into HCLP as a pressure point upon GWG.  Evans told the Special Committee that "the Senior Lender's counsel has had phone calls with the companies over the last week regarding its extreme displeasure with the current status of B[EN]'s ability to make the

extension payment due on July 15 (and future payments)[.]"  In a transparent attempt to further pressure the Special Committee, Evans claimed that HCLP was also displeased with "the fact that the agreement for the transfer of funds to B[EN] (i.e., the UPA) was not already in place, as it had understood."  Evans offered no explanation as to why HCLP "understood" that the UPA was "already in place" when there was no basis for an entity ultimately under Heppner's control to have such an understanding, nor did the Special Committee question it.

476.    The Special Committee also met that afternoon (July 13) with BEN employees James Silk and Derek Fletcher to discuss the status of BEN's business and bank charter application, during which the Special Committee asked about "Beneficient's investment in Proteus Health"—which had filed for bankruptcy on or about June 16, 2020—and was "marked down."  While draft minutes from the meeting do not reveal what Messrs. Silk and Fletcher told the Special Committee, only a few weeks later on July 26, 2020, Mr. Fletcher reported to BEN's board (including Cangany) that the Texas Department of Banking had spent a "significant amount of time analyzing the co-seller transaction" and "[a]s we know, *these transactions have not performed well and have apparently created some concern at the Department regarding the profitability of our business plan*."

477.    With payments now due to HCLP on July 15, 2020, and HCLP supposedly "extremely" displeased, the Cangany/Chavenson/Bailey Special Committee met again on July 14, 2020.  However, rather than cave to Heppner's terms, as Cangany recommended, the Committee agreed to request: (a) that any Preferred Series C Units issued to GWG rank *pari passu* with the NPC-A "with respect to allocations of profit and loss and distributions until the Preferred Series C Units of BCH convert into Common Units of Beneficient[;]" and (b) "a ceiling of the conversion price for the conversion of the Preferred Series C Units of BCH into

Common Units of Beneficient[.]"  The Special Committee draft minutes did not specify what price it would ask for as a conversion ceiling.

478.    But before the Special Committee even made the request on July 15, Heppner, Evans, and others at BEN already had discussed and agreed on a $12.75/unit ceiling on the conversion price under the UPA, notwithstanding the fact that, in connection with GWG's planned assumption of the HCLP debt, Heppner's elevated NPC-A Subclass 0 units (held through his affiliate BHI) benefitted from a $10/unit ceiling on the conversion price.

479.    The Special Committee's decision to continue negotiating the UPA's terms— rather than cave as Cangany urged—apparently infuriated members of GWG's Executive Committee.  On the morning of July 15, 2020, hours before a scheduled Special Committee call, the GWG Audit Committee (comprised of the same members as the Special Committee) held a meeting attended by Defendants Heppner, Hicks, and Schnitzer (who comprised GWG's Executive Committee), as well as Holland and Evans.  Without the Special Committee's legal counsel present, the Audit Committee discussed "the upcoming $25mm loan payment on B[EN]'s senior debt" and the status of the UPA negotiations.  According to draft minutes of that meeting, the Special Committee and its counsel's attempts to seek even slightly better terms instigated a "[v]igorous discussion . . . regarding the [HCLP] loan, the Special Committee and its legal counsel[.]"

480.    Following the "vigorous discussion" at the Audit Committee meeting, the Special Committee met a few hours later.  Draft minutes from that meeting—which make no mention of the Audit Committee meeting attended by its members just hours before—indicated that BEN agreed to the Special Committee's requests on July 14 (using the $12.75/unit ceiling price that

Heppner/BEN had internally agreed on days earlier) and the Cangany/Chavenson/Bailey Special Committee voted to approve the UPA.

481.     But that was not the end:  Heppner and BEN continued to negotiate the UPA's terms.  First, BEN insisted that GWG would not benefit from any increase in BEN's value from the date GWG purchased units under the UPA and the date it converted its Preferred Series C Units into BEN common units.  The Special Committee, under the impression that it needed to transfer funds to pay HCLP that day, approved BEN's condition immediately.  In fact, Cangany emailed Evans to confirm that GWG could transfer $61 million to BEN—and/or HCLP for BEN's benefit—under the UPA *before* the Special Committee's counsel had approved revised drafts of the UPA and associated documents.

482.     Second, hours after Cangany had authorized Evans to transfer the funds from GWG to BEN, Heppner demanded another change to the UPA and related documents "to recoup the lost P&L to the Pref A1 class upon liquidation."  As BEN's general counsel explained in an email forwarded to Evans, the change was to ensure "that we get our money back."  Evans forwarded those changes to the Special Committee's counsel (which were approved), but left out BEN's stated reason for the changes.

483.     In the end, the Cangany/Chavenson/Bailey Special Committee hurriedly approved the transfer of $61 million from GWG to BEN under the UPA, which was wired out in two transfers on July 16, 2020, even though the UPA itself was not executed until several days later, on July 22, 2020.  One tranche totaling $28,196,915 was sent directly from GWG Holdings to HCLP's bank account at JPMorgan on July 16, 2020.  The remainder of the $61 million was sent from debtor GWG Life, GWG Holdings's wholly owned subsidiary, to BCH via a $32,803,085 wire transfer on July 16, 2020. ███████████████████████

166

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████ a fact that Evans did not disclose to the Special Committee when describing the uses of the funds that would be requested under the UPA.

484.    The terms of the UPA (and GWG's initial $61 million transfer to BEN under it) were terrible for GWG; it made no sense to invest real dollars in a speculative, non-unitized Preferred C account for at least three different reasons.

485.    First, the Preferred Series C Units obtained through making investments under the UPA were inferior to the NPC-A accounts held by Heppner and Hicks through their affiliates, which were convertible pre-IPO at a price set by BEN LP (*i.e.,* Heppner and his cronies) (other than the NPC-A Subclass 0 units, which were convertible at $10/unit).

486.    Second, Heppner and his allies obtained their billion-dollar plus NPC-A accounts while contributing very little, if any, capital.  Most of the balance was due to accounting gimmicks involving purchase price accounting at May 31, 2018, as alleged elsewhere herein.

487.    Third, there was substantial doubt that GWG could recover its Preferred C investment (much less earn a return) given that the existing NPC-A accounts' liquidation preference exceeded the total BEN equity value as estimated in draft valuations provided by VRC and Murray Devine.  Even worse, those draft valuations were unrealistically high because they utilized BEN's unrealistic projections and assumed BEN obtaining its charter and fully launching its business was imminent.  As a result, the $61 million that GWG invested through the UPA immediately was worth far less than $61 million, and even with a liquidation preference, was exposed to substantial downside.

### 3. The Cangany/Chavenson/Bailey Special Committee Approves the Conversion of the $69.2 Million Liquid Trust Loans into Preferred C Units of BCH.

488.    Days after the UPA was executed, the Special Committee was asked to approve yet another transaction that made little sense from GWG's perspective.  On July 19, 2020, Evans emailed the Special Committee a request to convert the $65 million promissory note between GWG and certain of the Liquid Trusts into an additional Preferred C equity account balance in BCH, which with unpaid interest, added up to approximately $70 million.

489.    As with nearly every other transaction, the express purpose of the transaction was to benefit BEN (or at a minimum, extract BEN from issues surrounding the complicated trust structures it created).  For example, the memorandum attached to Evans' email explained that the "Benefits to GWG" were that the conversion would "eliminate the examination burden to the Texas Department of Banking, thus easing the issuance of the charters" to BEN. But as the memorandum also explained, the Texas Department of Banking's concern rested with the complicated structure that BEN created by having the Liquid Trusts hold "senior beneficial interests" in "Collective Collateral Trusts," and it was far from assured that converting the note would guarantee BEN receiving a charter.  (In fact, as noted above, a week later, BEN noted in an email to its board, including Cangany, that the Texas Department of Banking had serious concerns about "the profitability of our business plan" due to the poor performance of the "co-seller transactions.")

490.    Demonstrating that BEN was the winner from any conversion, "GWG Management" described other "benefits" to GWG, such as "*GWG is not sacrificing any near term cash payments*" because "the payment of interest is deferred until the maturity" and "the relatively small income associated with the Promissory Note $4.5M, *is a reasonable sacrifice to ease the issuance of the charters*."  Simply put, the message was that GWG needed to sacrifice

its status as a creditor because BEN hoped that would help the Texas Department of Banking approve *BEN's* charter application (of course, with no assurance that it would).

491.    Not surprisingly, Cangany quickly supported approving the conversion, describing it as "low-hanging fruit" now that the Special Committee had a "mechanism to convert the debt" in the UPA, although he supported speaking to BEN's counsel "representing it in the charter process" to "get his insights as to how much of an issue this item is and if it was eliminated how much it would improve our chances of getting the charter."  Echoing Cangany's email, at a meeting on July 22, 2020, the Special Committee discussed the conversion request and agreed to request a discussion with BEN's outside counsel "for an update on the status of the bank charter and to understand the TXBC's concern with the LiquidTrust promissory note," although Chavenson noted in a separate email that that lawyer's "forecast for the receipt of a charter" in the fourth quarter of 2019 "was way off."

492.    But it does not appear the Special Committee in fact ever had that discussion with BEN's outside counsel.  Instead, on or about July 29, 2020—after Cangany had received the email laying out the Texas Department of Banking's other concerns and still without a final valuation opinion from its financial advisor—the Special Committee purportedly approved the exchange of the Liquid Trust Promissory Note for $75 million in Preferred C equity from BCH, and the right to receive an additional $5 million in Preferred C equity should BEN not receive its Texas charter within one year (or if no charter was pending or in the process of being refiled). Even then, the agreement itself was not executed until November 19, 2020 (after the Cangany/Chavenson/Bailey Special Committee was disbanded and a new special committee was in place, as discussed below), and made effective as of September 30, 2020.

### 4.    The Cangany/Chavenson/Bailey Special Committee Approves Other Items on Heppner's and BEN's Wish List.

493.    The Cangany/Chavenson/Bailey Special Committee approved a number of other measures on Heppner's and BEN's wish list during its short tenure, including a "Corporate Opportunity Renunciation" and an Amended and Restated Certificate of Incorporation of GWG that was described as the first step in Project Keystone.  Because a number of GWG employees were moved under the BEN umbrella, the Special Committee also approved a cost sharing arrangement, formalized in a "Shared Services Agreement," under which BEN agreed to provide various services to GWG and GWG agreed to reimburse BEN for certain expenses that GWG incurred on BEN's behalf and pay a "Service Fee."

494.    BEN invoiced GWG over $23.5 million under the Shared Services Agreement between June 2020 and May 2022, including the following amounts one year prior to GWG's bankruptcy filing: (a) $2,677,175.56 on April 22, 2021; (b) $91,913.97 on July 20, 2021; (c) $1,929,832.16 on August 27, 2021; (d) $3,150,000 on September 20, 2021; $1,168,255.87 on October 13, 2021; and (f) $2,991,411,97 on January 26, 2022.  BEN also invoiced an additional $5,440,128.34 on May 3, 2022.

495.    While these invoices reflected expenses associated with employees that performed work for GWG, BEN also used the Shared Services to "allocate costs" to GWG and, on occasion, as another avenue to funnel money to BEN (or claim that funds were due to BEN). For example, although BEN typically billed GWG on a quarterly basis, BEN submitted three requests for payment covering the third quarter of 2021, including one "funding request" for an additional $3.15 million on September 15, 2021.  Unlike other requests, however, BEN included a request that GWG pay $421,362 to BEN to cover interest payments that *were due to GWG*

*under the CLA* and a "payroll related" charge that appears to have covered more than just GWG employees.

496.     BEN apparently repaid the September advance in December 2021, but that was not the only time that BEN attempted to add charges unrelated to GWG operational expenses.  In BEN's invoice for the first quarter of 2022, BEN added a $1 million "redemption fee" for a "GWG/HCLP advance" that, as discussed *infra* at section I.3, GWG did not owe under the executed agreements.  Moreover, that final invoice was an outlier compared to every other invoice that BEN submitted:  the "employee costs" invoiced exceeded any other invoice by nearly $1.5 million.  While, on information and belief, GWG did not pay the first quarter 2022 invoice, BEN has filed a proof of claim for that full amount.

### 5.     Chavenson and Special Committee Counsel Belatedly Express Concerns, Resulting in Heppner Side-Lining the Special Committee.

497.     Shortly after the UPA's execution and the $61 million transfer from GWG to BEN, Chavenson—who knew of VRC's concerns and the issues with the NPC-A overhang in BEN's capital stack—grew increasingly uncomfortable with what had just happened, especially since the significant valuation issues raised by VRC had been echoed by Murray Devine.  On July 24, 2020, Evans tried to reassure Chavenson by setting up calls with GWG's outside Delaware counsel.  But Chavenson remained concerned, and on July 25, 2020, Chavenson emailed his fellow committee members with remarks he prepared for an upcoming full board meeting.  In his remarks, Chavenson noted that "the Special Committee has concentrated on advancing money from GWG to Beneficient," but that "the Special Committee is concerned about the ability of GWG to issue L Bond debt to adequately meet the combined needs of GWG and BEN and the potential risks associated with such an increase in leverage."

498.     Chavenson went on to explain that the present and former Special Committee's respective valuation advisors had both issued drafts valuing BEN at approximately $1 billion dollars, or less (even using BEN's untested projections and mistakenly assuming that BEN had already launched).  Those amounts were less than the amount of the agreed upon "value" of Heppner's and his cronies' affiliates NPC-A accounts.  In turn, as Chavenson explained, "[t]he problem that the Special Committee has is that at present most of the value inures to the holders of the [NPC-A], and the Special Committee of course represents the common shareholders of GWG."  Chavenson further observed that this has been "somewhat problematic" for the Special Committee, "but so far we have been able to work through this in terms of advancing money" to BEN.

499.     Chavenson also identified other "challenges" faced by the Special Committee in getting money to BEN.  For example, Chavenson noted that the requirement that the Special Committee "negotiate at arm's length . . . has from time to time created challenges," although the Committee "has been able to find common ground and move forward" in approving transfers to BEN.  Chavenson also noted that "the challenge in work efforts" to advance money to BEN "relates to the form of consideration to be received in exchange for the cash advance."

500.     At the same time, the Chavenson/Cangany/Bailey Special Committee's counsel at Gibson Dunn grew increasingly concerned too.  Gibson Dunn had already raised many concerns in the days before, but grew even more incensed upon learning on July 25, 2020, that Cangany had been conflicted as BEN's Audit Committee chair all along (making him unsuitable to serve on the Special Committee).  Following a testy exchange with GWG's outside Delaware counsel, Gibson Dunn indicated the next day: "We will be resigning if Pete [Cangany] stays on" the Special Committee.

501.    The concerns raised by Chavenson and the Special Committee's counsel apparently did not sit well with Heppner, who once again sought to neutralize the Special Committee.   According to a timeline that Evans prepared in early 2021, GWG's board "dissolve[d] the Special Committee" at a July 29, 2020 board meeting based on a determination that "the objectives of the May 2019 charter have been principally met."

502.    That pretextual excuse was hardly accurate.   For example, the GWG board expanded the Special Committee's mandate in March 2020 to include evaluating "Project Keystone."   Indeed, at the GWG board meeting in March 2020 establishing the Cangany/Chavenson/Bailey Special Committee, "Mr. Heppner discussed the role the Special Committee . . . would play in reviewing and considering the proposed transactions that are part of Project Keystone."   And the July 29, 2020 board minutes discussed "Project Keystone" as an ongoing endeavor (as did minutes from subsequent board meetings). Moreover, the Special Committee was actively considering other transactions involving BEN and related parties in August 2020, well after the Special Committee was supposedly disbanded.

503.    Nonetheless, on information and belief, the Cangany/Chavenson/Bailey Special Committee was unceremoniously disbanded at some point during August 2020.

**6.    *Heppner, Holland, and BEN (with Evans's Assistance) Cause GWG to Transfer an Additional $69.2 Million to BEN, With Minimal Special Committee Involvement.***

504.    Eventually, GWG formed a new Special Committee on September 8, 2020, with Bailey and two new board members (Daniel Fine and David Gruber).   The very next day, without seeking approval from the newly constituted Special Committee, GWG sent $25 million to BEN under the UPA to pay HCLP.   Specifically, on September 9, 2020, GWG wire transferred $25

million to BCH, ███████████████████████████████████████

███████████████████████████████████████████

505.    Later that month, on September 28, 2020, Evans sent an email to the Special Committee requesting approval to fund another $19.2 million under the UPA "before the end of the month later this week."  With little time to evaluate the request (and without having hired new counsel or a financial advisor), the new Bailey/Fine/Gruber Special Committee authorized the payment, but was "determined to request that any future requests of the Committee be made with further lead time."

506.    Following the hurried approval, GWG wire transferred $19.2 million to BCH on October 2, 2020. ███████████████████████████████████

███████████████████████████████████████████████

█████████████████

507.    Then in December 2020, again *without* seeking Special Committee approval, GWG transferred an additional $25 million to BEN under the UPA to pay HCLP.  Specifically, GWG transferred $25 million to BCH on December 9, 2020, ████████████████████

███████████████████████████████████████████████

████████

508.    Evans's misguided rationale for circumventing the Special Committee was that the prior Special Committee "approved the [HCLP] loan amendment, which included this payment schedule."

509.    None of these payments (totaling $69.2 million) were required under the UPA, which merely gave GWG the option to invest more in BEN under the UPA's terms—with no obligation that GWG do so (or without precluding GWG from advancing debt financing to BEN

or investing in BEN on more favorable terms).  Moreover, none of these payments made sense from GWG's vantage point.  It gave up cash for equity of uncertain value (unsupported by any formal valuation opinion), in an entirely speculative, unproven business.

### 7.  Summary of Unfairness in 2020 Transactions.

510.    The UPA (and $130.2 million that GWG transferred under the UPA) were not entirely fair to GWG.  Indeed, as with the series of transactions that occurred in 2019, the consideration GWG received in exchange for its $130.2 million was grossly unfair because no third-party in an arm's-length transaction in the marketplace would have advanced funds on the terms that GWG received.

511.    BEN remicode  BEN still did not have its charter, and as BEN reported to its board, the Texas Department of Banking had serious questions concerning the "profitability of our business plan." Proteus, one of the largest single positions (27%) held by BEN trusts had filed for bankruptcy.

512.    Under such circumstances, no third-party lender would have paid cash to BEN in exchange for Preferred C equity, which given the continuing NPC-A "overhang" that dominated BEN's capital structure, were immediately worth less than the cash invested.

513.     The unfair consideration that GWG received in exchange for the $130.2 million it transferred during 2020—and the termination of the $65 Million Loan—was the result of unfair dealing and a grossly unfair process.   The Cangany/Chavenson/Bailey Special Committee's process was fundamentally unfair in numerous respects.

514.     First, Cangany (in particular) and Chavenson did not maintain the confidentiality of the Special Committee's internal deliberations or the analysis it received from its advisors, instead leaking information to Heppner, Evans and Holland, and Cangany actively colluded to further BEN's interests in getting the UPA and other transactions approved.

515.     Indeed, in February 2020, even before Cangany was officially appointed to the Special Committee, Cangany began working with Heppner, Holland and Evans on identifying the various measures that the Special Committee would need to approve to accomplish Heppner's goals.   Cangany continued to serve as Heppner's plant throughout his time on the Special Committee, working behind the scenes with Heppner, Holland, and Evans to ███████████ ██████████ and even guiding Evans (copying Heppner and Holland) on how to craft messages to the Special Committee to accomplish that goal.   Cangany also repeatedly forwarded communications from Special Committee members and counsel that were critical of Heppner's pre-approved terms (that Evans and Holland "recommended") to Evans.   And in each case, Evans and Cangany worked together to craft a response.   Chavenson, for his part, forwarded Murray Devine's draft presentation that valued BEN at just ~$1 billion to Holland (who then forwarded it to Evans and Heppner) before the UPA was fully executed.

516.     Second, and relatedly, the Cangany/Chavenson/Bailey Special Committee lacked adequate independence because: (a) Cangany was BEN's Audit Committee chair and Heppner's chosen plant on the Special Committee (consistent with the plan Heppner relayed to Defendants

Hicks and Schnitzer on December 31, 2019, to kick Mason off the board and create a new process spearheaded by Cangany, with Chavenson too); and (b) Chavenson did not act independently of Holland, Heppner, and BEN. Cangany and Chavenson did not judge matters on the merits and in furtherance of GWG's best interests, but instead were influenced by and acted beholden to Heppner, BEN, Holland, and Evans in taking actions that adhered with their wishes, despite substantial concerns surrounding the transactions from GWG's perspective (and the strong concerns voiced by VRC).

517. <u>Third</u>, the Cangany/Chavenson/Bailey Special Committee's process was tainted through myriad disclosure violations and breaches of the duty of candor owed by Heppner, Holland, BEN, Evans, and Cangany as GWG fiduciaries. Among other things, as in 2019, Heppner, BEN and Evans again used HCLP as a cudgel to press the Special Committee to enter the UPA so that BEN could pay HCLP and avoid a default, without ever disclosing that tens of millions of dollars funded under the UPA would make their way to Heppner-affiliated entities. Heppner, Cangany, and BEN also failed to fully inform the full committee and their counsel as to the true state of BEN's charter application or the Texas Department of Banking's concerns about the "profitability of [BEN's] business plan."

518. <u>Fourth</u>, the Cangany/Chavenson/Bailey Special Committee's process was not adequately supported by analysis from financial advisors. Cangany and Chavenson were acutely aware of VRC's criticisms and concerns about BEN's valuations, which lead VRC to refuse to assist the Cangany/Chavenson/Bailey Special Committee. The financial advisor that the Cangany/Chavenson/Bailey Special Committee did hire, Muray Devine, delivered its draft analysis on July 13, 2020, just two days before the UPA was approved. The draft presentation,

providing an overview of a possible fairness opinion, was half-baked, leaving blank the amount of GWG's investment and "[transaction details]." It did not purport to be an opinion.

519.    Murray Devine's draft analysis contained many methodological errors. It assumed that BEN was ready for launch, taking the projections BEN provided at face value without independent analysis or corroboration (despite patent absurdity, such as BEN's wildly unrealistic 3-year projected compound annual growth rate of 252.5%). ███████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████ And it valued BEN assuming a multi-billion dollar exit at a 10x exit multiple of projected net income five years out, despite projections showing that BEN would consistently burn billions of dollars in the interim. Despite such conceptual errors and adopting BEN's wildly unrealistic projections at face value, Murray Devine's draft analysis estimated that BEN's total equity value was $1.018 billion to $1.143 billion (meaning that the actual value was far less).

520.    Despite those many fundamental flaws (all favorable to BEN), Murray Devine's analysis still did *not* support GWG's entry into the UPA. Murray Devine's draft analysis wholly failed to consider BEN's capital stack, and the implications that the pre-existing $1.6 billion NPC-A account would have on GWG's return for its proposed investment in Preferred C. Even assuming a liquidation analysis and equal treatment of NPC-A and Preferred C and that BEN was worth as much as Murray Devine's half-baked draft analysis indicated, any investment in Preferred C would deliver at most 60-70 cents on the dollar back to GWG because the total equity was far less than total NPC-A and Preferred C accounts.[16]  And in part because Murray

---

[16] Under a liquidation analysis, the value of GWG's investment under this sort of analysis would be:

Devine's analysis (and VRC's prior analysis) did not support a unit value for BEN remotely close to that desired by BEN, GWG's investment under the UPA was relegated to a "non-unitized" Preferred C account.

521.   Fifth, the Cangany/Chavenson/Bailey Special Committee failed to fully inform itself and otherwise satisfy its duty of care in negotiating fair terms for the UPA.  Notably, the Special Committee agreed to the UPA even though its own financial advisor, Murray Devine

522.   , could not arrive upon a reliable valuation for BEN.  The Special Committee and its advisors did nothing to vet the reasonableness of BEN's projections.  The Special Committee conducted no due diligence into HCLP, even though HCLP's supposed demands were the primary reason for the hasty process and decision-making knowingly made on incomplete information.  And the Special Committee did not conduct due diligence into BEN's future funding needs, nor undertake any steps—through negotiating the terms of the UPA or otherwise—to ensure that Heppner and BEN would not try to improperly utilize the UPA as a blank check for future BEN funding needs.

523.   Seventh, the Cangany/Chavenson/Bailey Special Committee's negotiating efforts were also not conducted in an arm's-length manner because of: (a) collusion of Chavenson and GWG's officers with BEN; and (b) the grossly unequal informational advantage that BEN and Heppner had in negotiating with the Special Committee.  Both Cangany and GWG's CFO (Evans) actively shared GWG information and the Special Committee's thinking with Heppner, BEN, and BEN's counsel.  And Cangany even worked with Heppner, BEN, and Evans to develop terms to deliver to the Special Committee.  In other words, one special committee

---

[Value] = [(Preferred C) / (Preferred C + NPC-A)] × [Total equity value].  If the total equity value was less than the sum of Preferred C and NPC-A, then GWG would be at a loss from day one.  For example, GWG's $61 million investment in July 2020 would be worth only $40.4 million, assuming NPC-A of $1.6 billion and total equity of $1.1 billion (because [$61 million/($61 million + $1.6 billion)] × [$1.1 billion] = $40.4 million).

member and GWG's principal officers effectively played for BEN's team in negotiations between BEN and the GWG Special Committee.

524.    Heppner, despite his role as GWG's chairman, did not try to wall himself off from the negotiations or seeking GWG information.  To the contrary, he communicated directly with Cangany, Holland and Evans about the Special Committee's negotiations, reviewed and approved the UPA's terms before sending any drafts to the Special Committee, and, when the Special Committee moved too slowly, pressured the Special Committee at other meetings at which the Special Committee's counsel was not present.

525.    <u>Eighth</u>, and finally, the Cangany/Chavenson/Bailey Special Committee was not put in place and empowered before the start of the substantive negotiations with respect to the UPA.  The UPA was part of the "Strategic Initiative Transactions" planned by Heppner and BEN upon seizing control of GWG, and negotiations over the UPA were in motion long before Bailey joined GWG's board in March 2020 and the Special Committee was expanded on March 3, 2020 to include three members: Bailey, Chavenson, and Cangany.

**G.    GWG Funding of $14.8 Million to BEN in March 2021, Over Objections of New Special Committee (Fine, Bailey, MacDowell).**

526.    GWG transferred an additional $14.8 million to BCH in March 2021, supposedly in connection with the UPA and with no Special Committee vote.  Initially, however, GWG management (*i.e.,* Defendants Holland, Heppner, and Evans) sought Special Committee approval for the transaction.  They only decided that the UPA would allow them to fund with no Special Committee vote *after* the Special Committee—then consisting of Daniel Fine, Roy Bailey, and Jeff MacDowell—pushed back and sought better terms for GWG, as indicated in the following sequence of events.

527.    On February 10, 2021, GWG management sent a memo to the Special Committee—Fine, Bailey, and MacDowell—to request funding for BEN in the form of a purchase of an additional Preferred C account in BEN.

528.    On February 21, 2021, the Fine/Bailey/MacDowell Special Committee previewed its negative initial reaction to the funding request to Defendant Evans, which prompted Evans to ask the Special Committee to delay its response.

529.    On February 23, 2021 in an email responding to Evans's request, the Fine/Bailey/MacDowell Special Committee agreed to "refrain from responding to" the February 10 funding "request for 24 hours."

530.    On February 24, 2021, during the ensuing standstill, Defendant Holland emailed the Special Committee to inform it that "in consultation with members of the Executive Committee," (*i.e.*, Defendants Heppner, Hicks, and Schnitzer), GWG was withdrawing its request to the Special Committee for funding.  (Earlier that same day, Banowsky emerged out of the blue to ask BEN's in-house counsel to confirm basic information about the current status of HCLP's loans to BEN.)

531.    Holland's email troubled the Fine/MacDowell/Bailey Special Committee, and the Special Committee transmitted a memorandum the next day (February 25, 2021) to Holland and Evans, writing: "On behalf of the Special Committee, and in accordance with its authority pursuant to duly adopted resolutions of the Board of Directors of GWGH, *no funds of GWGH . . . are to be invested in BEN without Special Committee approval* until further notice to you from the Special Committee."  (Emphasis added).

532.    On February 26, 2021, Evans provided Special Committee counsel with a letter from Banowsky/HCLP to BEN dated February 24, 2021, that Evans indicated he first received

on February 26th. The letter addressed BEN's purported failure to make January and February 2021 interest payments and its upcoming $25 million principal payment due to HCLP on May 10, 2021. (The initial February 10 funding request to the Special Committee made no mention of any payments due and owing to HCLP.)

533. Finally, on February 27, 2021, Defendant Evans then sent a gaslighting email to new Special Committee counsel (Winston & Strawn), attempting to blame the Special Committee's refusal to blindly rubber stamp the requested "funding consistent with the prior funding under the Preferred C" and the "current delay in funding" as the source of BEN's problems with HCLP. Evans further (falsely) wrote that negotiations with HCLP's manager, Wickline, "have always been hard fought," and that HCLP approval would be required prior to BEN incurring any additional debt (*i.e.*, if GWG were to provide debt financing instead).

534. That sequence of events, along with simultaneous efforts by Defendants Hicks and Cangany[17] to pressure individual Special Committee members, deeply troubled the Special Committee. Special Committee chair Fine immediately recognized Evans's February 27 email as "mis-information." MacDowell agreed: "I am shaking my head at all of the misinformation and mischaracterization in Tim's email, albeit the wording came in consultation with Murray [Holland] and Brad [Heppner]."

535. In the same email chain, MacDowell further wrote:

This game of *lies and mischaracterizations* they are playing does not sit well with me AT ALL. It is *unethical and in bad faith* at the least, *coercion and intimidation trying to make us ignore and/or rationalize our*

---

[17] For example, Cangany tried to pressure Bailey, copying Chavenson, in a February 27, 2021 email indicating that the Special Committee's insistence on better terms would "cash starve B[EN] just when it is beginning to show the ability to execute on its operating business plan," and there would be "no way [BEN] can pay its bills." When Bailey retorted that the Special Committee "has been willing to fund Ben reasonable amounts on reasonable terms," Cangany flatly responded "I still don't understand" and suggested that the Special Committee should just agree to fund BEN as a Preferred C investment.

*fiduciary responsibility* to the minority shareholders in the middle, and *potentially illegal under securities laws* at worst.

(Emphases added). Bailey chimed in to express his total agreement, further observing: "This does not feel good. Those guys will run right over us and not look back if we let them."

536. After sleeping on it, the Special Committee then decided to set the record straight through a lengthy email from Fine to Evans sent on February 28, 2021, which both challenged Evans's mischaracterizations and chronicled efforts by Defendant Hicks and "GWG Management" to pressure Fine and Bailey.

537. Thereafter, the Fine/Bailey/MacDowell Special Committee refused to bow to the pressure, and delivered a term sheet (on March 1, 2021), proposing that GWG provide debt-based financing to BEN instead of a Preferred C equity investment that it believed was unfair to GWG. Based on the prior sequence of events, however, the Special Committee was not optimistic. Bailey predicted to his fellow Special Committee members that evening: "Their strategy is that the senior lender HCLP will conveniently tell them that they won't approve the debt." MacDowell chimed in to "agree" with that assessment, predicting that Heppner, Evans, and Holland would try to scapegoat the Special Committee.

538. Sure enough, the next day, Banowsky sent a letter to Special Committee counsel articulating HCLP's position on the Special Committee's proposed term sheet, writing: "HCLP Nominees does ***not*** consent to this proposed credit facility and does ***not*** consent to the redeemable equity." (Emphases in original). Banowsky further indicated that "HCLP Nominees is unwilling to consider new funding facilities where there are existing HCLP Nominees approved funding facilities in place," "HCLP Nominees is frankly tired of going through this goat rodeo," and "HCLP Nominees will not consider any funding except through" GWG's prior commercial loan agreement or the UPA. To apply additional pressure, the letter repeated

Heppner's talking points (that GWG insisting on fair terms was bad for GWG because it would "jeopardize[] the ability of B[EN] to execute its business plan") and threatened to foreclose if the Special Committee did not agree to a term sheet acceptable to HCLP.

539.    In a second letter to Special Committee counsel, dated March 3, 2021, Banowsky again wielded HCLP's consent rights as a cudgel, insisting that HCLP "be fully aware of any transaction B[EN] and the Special Committee are negotiating" and reiterating that HCLP "will not consent to any transaction that gives GWG[] priority over HCLP Nominees in any of the substitute collateral, including the Preferred A."   Banowsky (again) concluded ominously, noting: "[i]n its SEC filings, GWG[] has made it clear that it succeeds only if Ben succeeds.  For Ben to succeed, it must timely pay its debt."

540.    Unlike the past iterations of the Special Committee, however, this time the new Special Committee of Fine, Bailey, and MacDowell, was not bullied into submission by HCLP's threats of dire consequences for BEN, and in turn, GWG.  The Fine/Bailey/MacDowell Special Committee was chaired and manned by three truly independent board members looking out for GWG's best interests, unlike previous iterations irredeemably tainted by disloyal directors like Chavenson (in 2019 and 2020) and Cangany (in 2020) who favored BEN's interests over GWG's.

541.    Moreover, the Fine/Bailey/MacDowell Special Committee's counsel (Winston & Strawn) did a commendable job, cutting through all the nonsense and correctly observing that:

- Banowsky "seems like a litigator playing debt counsel and just saying 'No' to anything and everything, but [Preferred C]," *i.e.*, is just "a lawyer programmed to say no."

- BEN and HCLP "are not at arms length," raising the question of "whether this currently is an 'inside job.'"

- GWG management and BEN management "may just be setting up an impasse argument" because they "have many other options" but "are just unwilling to try."

- There was no reason that Heppner's, Hicks', and Schnitzer's affiliated NPC-A accounts in BEN could not serve as collateral for a loan from GWG to BEN based on past precedent, including how GWG itself was treated: "Looks like in August of last year when there was no Special Committee, GWG turned over some or all of [its] Pref A as collateral to [HCLP] as substitute collateral! That benefitted BEN and the Pref A insiders and harmed GWG and its public stockholders!"

- The draft valuation work provided by the prior Special Committee's financial advisor, Murray Devine, made a Preferred C investment appear untenable.

In other words, the 2021 Special Committee of Fine, MacDowell, and Bailey and its counsel—unlike their predecessors—attempted to do the job properly.

542.    As it became increasingly clear to Heppner, Evans, Holland, and the BEN-loyalist directors that the Special Committee was well-functioning and would not yield to the pressure, Heppner sent an email on March 3, 2021, calling for a special GWG board meeting.  While his email indicated that the Board needed to address "certain urgent matters" concerning "GWG's funding of B[EN] to meet various capital requirements," no formal agenda was provided.  Rather, it was a planned ambush—Heppner would quash any dissent to GWG funding BEN by disbanding the Special Committee altogether and ensuring that only BEN loyalists remained on GWG's board.

543.    Heppner attempted to closely choreograph the March 2021 board meeting, setting up a GWG board vote to disband the Special Committee in accordance with Heppner's wishes under the guise that the Special Committee was no longer required because the funding could proceed under the UPA without any input required.  The meeting did not go entirely smoothly, however, as Bailey spoke up to make his displeasure known.

544.     Specifically, Bailey spoke up because he "wanted the entire Board to know that we felt they were moving in the wrong direction, and that if they….[were] to transfer money without our approval, that we are going to resign from the Board."  Bailey further testified in his deposition that Heppner "tried to talk all over me, tried to change the subject, tried to move the agenda along, and I wouldn't let him.  I was hellbent on being on the record and letting every Board member know how we felt."  Fine likewise spoke up at the meeting to tell the full board: "I stand with Roy Bailey on that matter."

545.     Heppner's attempts to lean on Chavenson and Cangany, two of the three members of the iteration of the Special Committee that initially approved the UPA in 2020, to support his plan at the March 4 meeting also did not go entirely smoothly.  According to the meeting minutes, Cangany and Chavenson indicated that "the UPA was intended to be an ongoing source of funding and did not require further Special Committee approval," and Chavenson "noted the extensive negotiations that led to the execution of the UPA."  Bailey, the third member of that 2020 iteration of the Special Committee, had a different view, however, and testified in his deposition that: "[w]ith the UPA, there was never going to be a carte [blanche] funding without Special Committee approval," and thus Special Committee approval was still required for any advances even under the UPA.  And at the March 2021 board meeting, Bailey got into a contentious argument with Chavenson because "what he said was not the truth," and "I just remember calling him out and saying, 'You're not telling the truth, Dave.'"

546.     Despite the fireworks and the Fine/Bailey/MacDowell Special Committee's efforts, the GWG board nevertheless went along with Heppner's wishes, concluding that future funding to BEN would proceed under the UPA and voting to disband the Special Committee altogether.  And despite determining that the UPA was a continuous source of funding to BEN,

GWG's board resolved to "fund $14,800,000 to Beneficent Company Holdings, L.P. in exchange for a capital account in newly issued, higher priority Preferred Series C Subclass 0 Units."

547.   Just two days later, on March 6, 2021, the Special Committee members (MacDowell, Fine, and Bailey) resigned in protest from GWG's board (although GWG would file a Form 8-K, signed by Holland, falsely claiming that "[t]hese resignations were not due to any disagreement with the Company known to an executive officer of the Company or on any matter relating to the operations, policies, or practices of the Company").   And with the Special Committee out of the way and all dissent removed from GWG's board, Heppner and his cadre of BEN-loyalist GWG directors proceeded to approve an additional funding round to BEN in exchange for Preferred Series C equity, pretending that the UPA pre-authorized such payments all along, with no Special Committee approval required.   (As discussed below, BCH had not yet even created Preferred Series C Subclass 0 Units ("Preferred C-0") and so could not issue any units to GWG.)

548.   On March 9, 2021, GWG wire transferred $14.8 million to BEN based on information provided to Evans and Holland, just five days after the Special Committee was disbanded and just three days after its members resigned. ████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████ (further

indicating that the letters sent by Banowsky on HCLP's behalf from February 24 to March 3, 2021 were a ruse).

549.    Most of the funds GWG transferred to BEN were instead used for other purposes. ███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████ From there, ████████████████████████

████████████████████████████. Moreover, ██████████████████████████████

███████████████████████████████████████████████████████

████████████████████████

## H.    With the Special Committee Out of the Way, BEN Subordinates GWG's Preferred C Account.

550.    While GWG's board ultimately agreed to invest $14.8 million into BEN for Preferred C-0, neither BCH's then-operative LPA nor the credit agreements with HCLP allowed for the issuance of such units. Always looking to advance their own interests, BEN executives, dual BEN/GWG directors, and BEN-loyal GWG executives used the amendments required to create a new, super-senior class of equity to simultaneously subordinate more than $200 million of GWG's other Preferred Series C investments in BCH.

551.    In negotiating the UPA, GWG's previous special committee insisted that Preferred Series C equity purchased under the UPA be *pari passu* with the NPC-A held by BEN's founders, including Heppner.    And indeed, under the Fifth Amended and Restated BCH Limited Partnership Agreement (the "Fifth BCH LPA"), effective as of July 15, 2020, GWG's Preferred Series C interest was equal to the NPC-A in liquidation priority.

552.    In early May 2021, approximately two months after GWG sent $14.8 million to BEN, BEN executives sent GWG's outside counsel a draft Sixth Amended and Restated BCH

Limited Partnership Agreement (the "Sixth BCH LPA"), which had been prepared by or with BEN's outside counsel, and a term sheet for amendment of the HCLP credit agreements. Among other things, the term sheet allowed BCH to issue Preferred C-0. The draft Sixth BCH LPA likewise allowed BCH to issue Preferred C-0, but also subordinated more than $200 million of GWG's other Preferred Series C interests—which would be dubbed Preferred Series C Subclass 1—to the NPC-A (predominantly held by Heppner, Hicks, and Schnitzer) with which GWG's Preferred Series C interests had previously been *pari passu*. There was no apparent reason for this subordination (the term sheet said nothing about subordinating GWG's Preferred Series C interests or any other interests)[18] other than to benefit holders of NPC-A at GWG's expense.

553.    After receiving the term sheet and draft Sixth BCH LPA, GWG's outside counsel advised that amending the credit agreements would require an 8-K and proposed draft language for such a filing (which also did not discuss the subordination of Preferred C-1). Counsel cautioned that the proposed language "needs to be supplemented to explain more clearly Ben's capitalization and the practical economic impact of the changes, so investors understand the significance of the changes and what the economic and other rights are of the various preferred unit accounts" and requested that someone "send [GWG's counsel] a summary of the various equity interests in the Ben entities and their relative ranking." However, GWG never filed a Form 8-K concerning the proposed amendment.

554.    BEN did not execute the Sixth BCH LPA (nor did GWG's board request that BEN actually authorize and issue the class of equity that its March 2021 investment was premised on) until fall 2021, after BEN and Heppner sought to distance themselves from GWG (as described

---

[18] The Term sheet provided that "neither the Borrower, [BCG] nor [BCC] shall issue, or permit any of their subsidiaries to issue, any securities that are senior to the Preferred Series A Subclass 1," but the Preferred C-1 was only *pari passu* with Preferred A-1, not senior to it.

below).  In November 2021, GWG's outside counsel began circulating new drafts of the Sixth BCH LPA along with a Seventh Amended and Restated BCH Limited Partnership Agreement ("Seventh BCH LPA"), which made further changes to BCH's equity classes.  As compared to the May draft, the November draft of the Sixth BCH LPA subordinated GWG's interest even further: Preferred C-0 was now subordinated to Preferred Series B in liquidation, whereas Preferred C-0 ranked senior to Preferred Series B in liquidation preference in the May draft.[19]

555.    The Sixth BCH LPA made other changes to priority among the various equity classes that further harmed GWG: the Sixth BCH LPA subordinated any distribution of profits to Preferred Series C interests from a sale to preferred returns for all Preferred Series A classes; whereas under the Fifth BCH LPA, profits were allocated to the Preferred Series C interests to recoup any loss previously allocated that class *before* being applied towards Preferred Series A returns.

556.    The Sixth BCH LPA was signed in late October or early November 2021 by Silk on behalf of BCG's GP, BEN Management, and was backdated to be effective as of March 31, 2021.  On November 11, 2021, GWG stated in its 10-Q for the quarter ended March 31, 2021 that "Effective March 31, 2021, BCH amended its limited partnership agreement by executing that certain 6th Amended and Restated LPA of BCH to allow for the issuance of Preferred Series C Subclass 0 Unit Accounts" and further disclosed that "The Preferred Series C Subclass 0 Unit Accounts are senior to all other classes of preferred equity other than the Preferred Series A Subclass 0 Unit Accounts in terms of allocations of profits, distributions, and liquidation." However, GWG failed to disclose—either in that 10-Q or any other filing—that the Sixth LPA

---

[19] The November draft of the Sixth BCH LPA included other changes to priority of distribution not included in the May draft. These changes appear to have been made at the last minute. For example, there are obvious numbering errors in the portion of the waterfall addressing distribution of profits from a sale. *See* Section 5.04(f).

also subordinated GWG's more than $200 million worth of Preferred Series C equity to other equity interests held by Heppner and other BEN founders (through their affiliates).

557.    Also in late October, BEN created a memorandum explaining the changes to the LPAs made in connection with the Decoupling.  Redlined copies of new LP agreements were attached to the memo as exhibits.  However, the memo and attached redlines showed only changes to accomplish the planned separation of BEN and GWG (*i.e.*, from the Sixth to the Seventh BCH LPA) and did not capture the subordination of the Preferred Series C.  The memo and its exhibits were sent to Defendant Evans and later to the entire GWG board (which then included Holland, Evans, Cangany, and Chavenson) in preparation for its vote on the separation transaction at the November 12, 2021 board meeting.  Minutes from that meeting state that Defendant Evans "led a discussion of the proposed amendments to the limited partnership agreement of Beneficient Company Holdings, L.P.," but make no mention of the fact that GWG's nine-figure Preferred Series C investment had been subordinated to interests held by Heppner and other BEN founders in contravention of one of the terms of the prior Special Committee's agreement to the UPA.

558.    A few days later, on November 14, 2021, Evans (on behalf of GWG Life) and Holland (on behalf of GWG Holdings) signed consents to the conversion of $14.8 million of GWG's Preferred Series C equity investment to Preferred C-0 and to the changes in the Seventh BCH LPA, which further harmed GWG's interests as discussed in detail in section H.  Although GWG's consent should have been required for the Sixth BCH LPA, GWG does not appear to have signed a consent to the terms of that agreement.  Nor is there a record of GWG's board approving the subordination of the company's more than $200 million investment in Preferred Series C equity.

I.      **Defendants' Unfair Treatment of GWG in Trying to Insulate Themselves from Liability and Distance BEN from GWG During 2021.**

559.    Over a nearly two-year period from April 2019 through March 2021, Heppner, BEN, Holland, and the BEN-dominated GWG board effectively controlled GWG and its capital-raising infrastructure and transferred $290 million of GWG funds directly to BEN or HCLP (while causing GWG to expend tens of millions more on other BEN-related expenditures, such as for professional fees and the Essex Transaction).  GWG's two primary officers, Defendants Holland and Evans, were and remained loyal to Heppner and BEN—not GWG—first and foremost.  And the vast majority of GWG employees were either terminated or moved over to BEN as new BEN employees (with BEN then charging GWG fees under the Shared Services Agreement).

560.    In April 2021, however, BEN's parasitic abuse of GWG began encountering obstacles as BEN's and Heppner's prior misconduct began catching up with them, creating problems with the SEC on two fronts.

561.    First, GWG's new auditor refused to sign off on GWG's Form 10-K until the SEC's Office of Chief Accountant ("OCA") reviewed GWG's previous financial statement and blessed GWG's accounting treatment on two issues—███████████████████████████

████████████████████████████████████████████████████████████████████████

██████████████████████████████████  As a result, on April 1, 2021, GWG filed a Form 12b-25, indicating that it would not be able to timely file its Form 10-K annual report. For the same reason, on May 25, 2021, GWG filed a Form 12b-25, indicating that it would not be able to timely file its Form 10-Q quarterly report for the first quarter of 2021 either.

562.    Second, investigatory efforts underway by the SEC's Enforcement Division (dating back to October 2020 and involving approximately a dozen subpoenas) began to pick up

steam.  On April 30, 2021, the SEC sent a multi-page list of 26 questions for GWG, requesting responses in writing.  Several of the SEC's questions zeroed in on GWG's prior transactions with BEN, the circumstances surrounding BEN's retention of Ankura, transactions involving Bradley Capital, and payments made to Heppner in connection with his affiliation with BEN, GWG, and HCLP.

563.    Following those troubling developments, Heppner and BEN decided that BEN's financial statement consolidation with GWG (a public company subject to SEC oversight) was not such a great idea after all.  Beginning in May 2021, Heppner, BEN, and Holland (with the aid of Evans, GWG's disloyal CFO), devised a plan to distance BEN from GWG—and help insulate Heppner from exposure—by having GWG relinquish its technical (albeit illusory in substance) right to appoint the majority of the board of directors of BEN Management.

564.    This plan came to fruition in November 2021 in a series of transactions that also involved the re-classing of GWG and others' equity interests in BEN, repayment of the CLA with BEN common stock, and certain other changes to the LLC agreement of BEN Management (collectively, the "Decoupling").  When the dust settled, GWG was in a far worse position than prior to the Decoupling, with its equity interests in BEN even further subordinated.  Meanwhile, interests held by Heppner and his allies—including their interests in the exact same categories of BEN equity held by GWG—were elevated in the capital stack and given new, valuable rights.

565.    The Decoupling, like every other transaction foisted upon GWG by BEN, Heppner, Holland and GWG's disloyal fiduciaries, was grossly unfair to GWG, was not in GWG's best interest, and served to benefit Heppner and BEN.  Once again, GWG's disloyal fiduciaries approved the transaction even though advisors *refused* to opine that the transaction was fair, only this time without even bothering to create the illusion of process by involving a

Special Committee.  There was no legitimate process, only a misguided attempt to paper the record with flimsy rationalizations for a patently unfair transaction that GWG's disloyal fiduciaries intended to approve all along (to benefit BEN).  And once again, the economic terms were grossly unfair to GWG and far from what GWG would have achieved in an arm's-length transaction.

### 1. *GWG's Disloyal Fiduciaries' Dishonest and Misguided Initial Attempts to Paper the Record for the Patently Unfair Planned Decoupling.*

566.    GWG's disloyal fiduciaries intended all along to favor BEN's interests over GWG's through the Decoupling.  This time, however, BEN, Heppner, and Holland decided to proceed without even attempting to create the illusion of process by employing a Special Committee.  BEN, Heppner, and Holland (along with the other Defendant directors) had just dissolved the Fine/Bailey/MacDowell Special Committee.  And GWG had no truly independent directors left after Fine, Bailey, and MacDowell all resigned from GWG's board in March 2021, following the blowup.

567.    On May 10, 2021, BEN's associate general counsel emailed Holland and Evans, copying Heppner, with a proposed agenda and presentation for an upcoming GWG board meeting on May 12, 2021 that BEN and Heppner had developed.  The next day (May 11, 2021), she provided Holland and Evans with some "draft talking points" for the "Strategic Initiatives" discussion to use at a GWG board meeting the next day.   BEN's spoon-fed talking points indicating that GWG and BEN should be "deconsolidated such that GWG is considered an investor and will not be deemed to have control over Ben," and further proposing that Cangany and Chavenson be appointed as GWG "Board leaders to oversee the deconsolidation process." Cangany and Chavenson accepted, following up with Evans and Holland after the May 12, 2021 board meeting "to discuss a timeframe for moving forward on our new project."

568.   In advance of a follow-up board meeting on May 24, 2021, Evans emailed GWG's Delaware counsel (on May 23, 2021) to ask if he was available to join a board meeting and "talk about the entire fairness doctrine, and its application if the board were to undertake a transaction with Ben that did not include a special committee."   The next day, Evans forwarded the agenda for the board meeting, reminding counsel that he would be asked to explain that "if a board is not using a special committee, any transaction between GWG and Ben would be subject to entire fairness, what that means, and *the best way to build a good record for entire fairness*." (Emphasis added).   In other words, Evans and GWG's other disloyal fiduciaries already knew that they were going to approve the transaction; the only question was how to paper the record to provide themselves with cover in the process.   GWG's disloyal fiduciaries then sent about trying "to build a good record" in several ways.

### a. Heppner and BEN Re-Shuffle GWG's Board to Protect Themselves.

569.   One way of trying to improve the "record" for purposes of trying to limit liability exposure was to make the conflicts of interest on GWG's existing board seem less obvious.   In late May 2021, GWG's seven remaining board seats were held by six dual-directors of both GWG and BEN: Defendants Heppner, Hicks, Schnitzer, Cangany, and non-party dual-directors Lockhart and DeWeese.   Those optics were terrible.   And thus BEN, Heppner, Holland, and Evans hatched a plan to reshuffle the board.

570.   The three most egregiously conflicted dual-directors—Heppner, Hicks, and Schnitzer—would resign from the GWG board, along with a fourth dual-director.   Meanwhile, Evans and Holland would join GWG's board as directors.   On paper, this would improve the optics because GWG's reconstituted five-member board would facially have three directors with no technical BEN ties (Holland, Evans, and Chavenson) and only two remaining dual-directors of BEN's board (Cangany and de Weese).   (In reality, this board reshuffling changed nothing

195

because Holland and Evans were firmly in BEN's camp, and Chavenson had proven to be compliant and deferential to Heppner, Holland, and BEN.)

571.    The GWG board reshuffling occurred on June 14, 2021.  Heppner, Hicks, and Schnitzer (along with fellow dual-director Lockhart) all resigned from GWG's board.  And Evans and Holland became new GWG directors, with Holland named as GWG's chairman (succeeding Heppner in that role).  GWG's press release and securities filings described the change in GWG's board as follows:

> GWG Holdings, Inc. (the "Company") is pleased to announce that it has taken steps to prepare for the issuance of a conditional trust banking charter (the "Charter") to The Beneficient Company Group, L.P. ("Ben") by the Kansas Office of the State Bank Commissioner ("OSBC") under the recently enacted Kansas Technology-Enabled Fiduciary Financial Institutions Act ("TEFFI Act").  The Company expects that the TEFFI Act will be a significant benefit to the value of the Company's investment in Ben, as it will provide Ben the necessary regulatory framework to achieve its long-term objective of providing liquidity and other services to holders of alternative asset through a Kansas regulated technology-enabled fiduciary financial institution ("TEFFI") trust bank.

> The TEFFI Act directs the OSBC to issue the Charter to Ben on July 1, 2021, as part of the establishment of a fiduciary financial institution pilot program. Ben is in the process of creating a new subsidiary ("Ben TEFFI") to serve as the chartered TEFFI trust bank. Ben has also agreed to fund the pilot program and assist the OSBC in promulgating rules, regulations, and standards ahead of wider adoption. The Company expects that the directors of the Ben TEFFI trust bank will expend significant efforts assisting the OSBC with the promulgation of rules, regulations, and standards as part of the pilot program. *As a result, the directors of the Company who will serve on the new TEFFI trust bank Board of Directors have resigned their membership on the Company's Board of Directors to devote their time to serving as directors of the Ben TEFFI trust bank*, which the Company believes is the highest and best use of their available time and skills and will support the development of the Ben TEFFI trust bank and the successful execution of Ben's business plan.

(Emphasis added).  In other words, GWG chalked up the board reshuffling to the supposed need for Heppner, Hicks, and Schnitzer to focus on a new BEN-related entity with a soon-to-be issued

conditional TEFFI charter.  No mention was made, however, of the plan to separate BEN from GWG that was already in the works.

572.    Nor did GWG's press release mention another reason for Heppner's, Hicks', and Schnitzer's resignations and the board reshuffling; to insulate BEN and those conflicted directors from exposure, through a combination of: (a) making a better paper record for the planned separation of BEN and GWG, to be undertaken with no Special Committee; (b) relatedly, trying to limit Heppner's, Hicks', and Schnitzer's exposure because they would no longer be among the GWG directors who would approve the planned decoupling; and (c) in Heppner's case, trying to minimize additional SEC scrutiny into his prior misconduct.

573.    Notably, on June 14, 2021, the *same day* that Heppner resigned from GWG's board, GWG responded to the SEC's questions (from April 30, 2021) regarding certain payments made to Heppner and his entities.  For instance, GWG disclosed that on June 5, 2019, BEN had paid $401,056.05 to Bradley Capital—immediately after GWG funded the first tranche on the $65 Million Loan—to reimburse private air travel for Heppner and his family dating back to February 2018 (including a trip to Napa Valley and a Colorado ski trip).  Similarly, GWG disclosed to the SEC—for the first time—the existence of a "long-standing lending relationship of 25 years between" Highland Consolidated and "entities affiliated with Mr. Heppner," while claiming that Highland Consolidated would be repaid in full "on our around June 30, 2021, leaving no outstanding balance."

574.    ███████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████  This answer was highly evasive.

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████

575.     Heppner also had recently (in late May 2021) lined up personal securities counsel in response to the SEC's questions into payments made to his affiliates and other questions. BEN, meanwhile, was facing more scrutiny from the OCA over accounting issues, from the SEC Enforcement Division over Ankura's dubious valuation and several other issues, and from both Texas and Kansas regulators regarding BEN's bid to obtain the necessary state charter to exempt itself from the Investment Company Act of 1940.[20]  And those were reasons why BEN, Heppner, Schnitzer, and Hicks sought to distance themselves from GWG in June 2021 through board reshuffling and helping to make a better record for the planned Decoupling, already in the works.

>    **b.   GWG's Remaining Disloyal Fiduciaries Try, But Miserably Fail, to Procure a Fairness Opinion to Give them Cover.**

576.     Throughout the summer of 2021, Holland and Evans tried to line up a financial advisor to provide a solvency opinion or fairness opinion to support the planned Decoupling. Several firms flatly said no, unwilling to stick their necks out.

---

[20] By this time, BEN had begun to lobby for new legislation in Kanas that would create a new type of state trust bank charter, called a Technology-Enabled Fiduciary Financial Institution, or "TEFFI."  The legislation, referred to as the "TEFFI Act," was largely engineered by BEN and its team of lobbyists, who promised to bring billions of dollars and other benefits to Kansas.  In fact, Heppner, Martens,  and several BEN officers all testified before Kansas legislative committees, touting the supposed benefits of the TEFFI Act.

577.     In August 2021, Holland and Evans were finally able to convince Houlihan Lokey ("Houlihan") to provide financial consulting services in connection with the contemplated transactions.  Even then, however, Houlihan refused to provide a fairness opinion.

578.     At the outset of its engagement, Houlihan quickly realized that it would never be able to bless the proposed transaction.   In negotiating the terms of its engagement letter, Houlihan refused to offer to opine that the transaction was "fair from a financial point of view." In email correspondence sent to GWG's counsel on August 5, 2021, Holland wrote that Houlihan would not agree to "fairness 'from a financial point of view' because *they do not want to opine on fairness from any point of view*."  (Emphasis added).  When GWG's outside Delaware counsel expressed puzzlement over why Houlihan would not agree to the "normal opinion phraseology," Holland reiterated that Houlihan would "*not opine to that or to a legal, ethical, or any other point of view*."  (Emphasis added).  In other words, Houlihan wanted nothing to do with the concept of fairness *in any sense* when it came to the Decoupling.

579.     Nevertheless, just one week later, before Houlihan's engagement letter was finalized, and before Houlihan had conducted any meaningful analysis, Holland and GWG's other disloyal fiduciaries entered into a term sheet with BEN, agreeing to the basic framework for the Decoupling.

580.     A few weeks later, GWG procured a fully executed engagement letter with Houlihan.  Notably, however, the engagement letter explicitly stated that Houlihan's work would "*not* address….the fairness of any portion or aspect of the [Decoupling] to the holders of any class of securities, creditors or other constituencies of the Company, or to any other party," "the fairness of any portion or aspect of the [Decoupling] to any one class or group of the Company's or any other party's security holders or constituents vis-a-vis any other class or group," or

"solvency, creditworthiness, or fair value." (Emphasis added). In other words, Houlihan was so adamant in its unwillingness to bless the planned transaction that it incorporated express terms in its engagement letter over work and analysis it was *not* willing to do or provide.

581.   Houlihan's refusal to provide a fairness opinion did not concern GWG's board, more broadly, but especially did not concern Holland (then GWG Chairman and CEO). Over the course of several weeks, Holland was consistently non-responsive to Houlihan's many requests for basic information in order to conduct financial analysis. As long as he and GWG's board could at least paper the record by showing that they had retained a financial advisor, he apparently did not care whether that advisor ultimately performed any meaningful analysis, let alone about the views or concerns expressed by that advisor.

582.   Ultimately, Houlihan Lokey never provided a fairness opinion, GWG's board never specifically asked to review one, and GWG's board never even requested to see a summary of any work Houlihan supposedly did. Nevertheless, GWG's board voted to approve the Decoupling at a November 12, 2021 board meeting.

### c. Evans Coordinates with BEN's Counsel to Manipulate GWG Board Minutes to Present a More Favorable Narrative to Heppner and BEN.

583.   In late May 2021 and early June 2021 (largely after Heppner had hired personal securities counsel), Evans and BEN's in-house legal team exchanged several drafts of board minutes for GWG board meetings held on May 12, 2021, May 24, 2021, and June 2, 2021. These drafts were edited in ways, at BEN's counsel's suggestion, that would make it easier to defend the GWG board's process leading up to its approval of the Decoupling (which was a foregone conclusion).

584.   For instance, on June 1, 2021, Evans circulated his markups to the minutes for the May 24, 2021 board meeting. Evans's draft provided that Heppner had asked Schnitzer to lead a

discussion, in which Schnitzer had argued that the "better approach [for GWG] would be for BEN to be separate from, and independent of control of, [GWG]."  BEN's counsel responded that the minutes ███████████████████████████████████████████████ ████████████████████████  Under Delaware law, that BEN and Schnitzer had initiated and the proposed transaction and/or that the GWG had already decided to go that way when still dominated by dual-BEN directors would reflect unfair dealing, and the revision suggested by BEN's counsel—regardless of what actually happened—would make a better record to avoid liability down the road.

585.    Similarly, Evans's same draft of those May 24, 2021 GWG board minutes reflected the following:

> Next, Mr. Evans provided an update on the status of the Company's interactions with SEC enforcement.  He further noted that the Company's Form 10-K would include previously undisclosed information relating to past, present and future lending by [HCLP or Highland Consolidated] to entities related to or affiliated with Mr. Heppner, which, while previously known to members of certain committees of the Board, had not been known to management and thus had not been previously disclosed.

BEN's counsel responded that the GWG board minutes should be changed to ██████████████ ██████████████████████████████████████████████████████████████████ ████████████████████████████████

586.    Evans deferred to BEN counsel's suggestions on both points, thereby papering over that: (a) BEN, Heppner, and Schnitzer had already initiated decoupling discussions; and (b) there were non-disclosure issues regarding HCLP's relationship with Heppner that were finally coming to light in late May and early June 2021, the exact time that Heppner and BEN decided to distance themselves from GWG.

### d. Misleading Pretextual Demands from Third Parties.

587.     The disloyal GWG fiduciaries' final means of trying to create a record to support the Decoupling was to use regulatory requirements as a pretext.  Similar to how BEN, Heppner, and Holland had previously used the Texas Department of Banking's supposed restricted capital requirements to get money from GWG to BEN, they turned to Kansas regulators, suggesting that BEN needed to de-integrate with GWG in order to obtain its TEFFI charter.  In other words, BEN, Heppner, and Holland yet again resorted to the familiar playbook of using supposed third-party demands on BEN as a means to get what they wanted out of GWG.

588.     There were several obvious problems with this pretextual excuse for the Decoupling.  First, even if the Kansas Office of State Bank Commissioner ("OSBC") required that GWG give up its technical board designation rights in BEN as a condition to receiving a TEFFI charter, that was no reason for GWG's board to do so in a patently unfair transaction.  Even if GWG had to relinquish its board designation rights, GWG's board owed a fiduciary duty to act in GWG's best interests and ensure that GWG did so in a way that was fair to GWG.  But instead, GWG's disloyal board conferred all sorts of benefits to BEN and Heppner that had nothing to do with control issues (such as forgiving the CLA, elevating founder NPC-A units, and effectively swapping GWG's NPC-A account for inferior Preferred B interests).

589.     Second, the excuse was untrue.  OSBC was already set to issue BEN a conditional charter on July 1, 2021.  And the pretextual reason given for Heppner's, Hicks', and Schnitzer's resignation from GWG's board on June 14, 2021, was so that they could devote their time to a new BEN entity that would hold the charter.  That was inconsistent with any notion that GWG disentangling itself from BEN was some crucial gating issue for BEN to obtain a TEFFI charter.

590.     And OSBC had made no such requirement.  Rather, at *Heppner's* urging, BEN promised that GWG would voluntarily relinquish its purported control rights.  Indeed, on

202

May 31, 2021, Heppner initiated a call with Heppner, Evans, and BEN's counsel to discuss "the need for a resolution to show the state of Kansas the intent" to deconsolidate.  Months later, on November 2, 2021, OSBC sent BEN a second letter regarding deficiencies in its application, noting inconsistencies with what OSBC had been told: ███████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

████████   Like all of OSBC's other letters and communications to BEN, the November 2 letter referenced promises made by BEN, rather than any request or demand by OSBC or the Kansas legislature that GWG and BEN separate.

591.    In other words, the regulatory problem—to the extent legitimate at all—was one of Heppner's and BEN's own making.  And the same was true of many of OSBC's other concerns.  OSBC's November 2 letter outlined a number of other serious deficiencies with BEN's application, including ████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

OSBC stated that these issues ████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

█████████████████████████████████████████

592.    More broadly, the Decoupling was not a cure-all for BEN's regulatory woes, as OSBC maintained significant concerns even after the Decoupling occurred (and even after BEN received its non-conditional TEFFI charter on December 28, 2021).

593.    On January 12, 2022, Commissioner Herndon testified regarding the status of the TEFFI Act at another legislative committee meeting, noting that BEN still had not provided audited financial statements and fielded several questions from representatives about why the financials had not yet been provided.

594.    Then, on April 10, 2022, Commissioner Herndon wrote a letter to the Vice Chair of the Kansas House Financial Institutions and Rural Development Committee providing an update on BEN's TEFFI application.  Commissioner Herndon explained that, "While some of our original concerns from this time last year have been resolved, *new and more deeply concerning issues have arisen*."  (Emphasis added).  First, "Accounting concerns remain and have deepened" because BEN "ha[s] still not produced audited financial statements," the company's "accounting firm has declined to stand for reappointment, and [BEN] has only recently arranged a new firm to complete its financial audit."

595.    Commissioner Herndon further explained that the Decoupling did not resolve concerns regarding the relationship between BEN and GWG, which had written a letter to its investors in February 2022 stating that it was evaluating restructuring alternatives. Commissioner Herndon continued that "The exact relationship between GWG and Beneficient has never been made clear" but, despite the Decoupling, "the companies are financially intertwined."

596.    Commissioner Herndon also explained that the supposed benefits of the TEFFI Act had not yet borne out and OSBC could not even examine BEN because it had done so little business.  The letter also listed concerns with an SEC investigation concerning both GWG and BEN matters, a lawsuit filed against BEN by Paul Capital, and a class action filed against former

GWG directors who at that time served on the BEN TEFFI's board of directors, including Heppner.

597. And there were other problems and concerns too:

- BEN "has repeatedly asserted that it has contributed $15 million in qualified charitable distributions, including to the Kansas Department of Commerce . . . . [BEN] has told Commerce that the funds to Commerce are in escrow and will be transferred soon, but to date, Commerce has not received any funds or any evidence of assets or beneficial interests in its name."

- "The distributions contemplated in the TEFFI Act by BFF were meant for the benefit of Hesston, Kansas . . . .  It is unclear whether [BEN] has distributed funds to Hesston, but [BEN] has suggested that Hesston should provide $4 million of its own funds and request $12 million from the state."

- "Under the TEFFI Act, the pilot program cannot end without an examination" of BEN. "Unfortunately, this can only be accomplished with at least some book of business by [BEN] for OSBC to examine."

- "Despite assertions by [BEN] that it had substantial business lined up, so far, we have seen only one external transaction. We also have not received any inquiries or applications from any other companies interested in coming into the state as subsequent TEFFI's."

598. In a December 2022 annual report to the Kansas Joint Committee of Fiduciary Financial Institutions Oversight, Commissioner Herndon explained that OSBC was still not able to conclude the pilot program, did not receive audited BEN financials until late October of that year, and continued to have concerns about the relationship between GWG and BEN, particularly in light of GWG's bankruptcy filing and the ongoing SEC investigation.

599. Ultimately, OSBC's concerns about the relationship between GWG and BEN were never truly resolved, but with GWG in bankruptcy, the agency eventually shifted its focus to the many other problems with BEN and its business model, such as BEN "being able to fund itself in the future," "federal regulatory actions taken against Benefic[i]ent, the freefall of

Beneficient's publicly traded stock, [and] public statements by Beneficient as well as its accounting firm regarding the company as a going concern."

2.    *GWG's Board Becomes Aware of Significant Regulatory and Financial Risks for GWG Before Approving the Decoupling.*

600.    GWG's board (Holland, Evans, Cangany, Chavenson, and de Weese) initially approved a non-binding term sheet outlining the supposed terms for the Decoupling at an August 12, 2021 board meeting.  In the days that followed the August 12 board meeting, the board learned that the Decoupling presented another serious problem for GWG.  Specifically, following the transaction, GWG's enormous investment in BEN and lack of other significant operations or assets would likely cause it to be considered an unregistered Investment Company in violation of the Investment Advisers Act of 1940 (the "'40 Act").

601.    Thereafter, Cangany emphasized the need for an "exit strategy" involving finding new capital to cover L Bond obligations and changing GWG's organization and business to fit within an exception to the '40 Act—and a "compensation plan" that "rewards us for getting this accomplished and protecting the previous board members and officers who no longer serve GWG."  Cangany also acknowledged that he (and previous board members) faced significant risk if the company failed under the weight of its L Bonds, which would come due long before the company saw a return on its investment in BEN, even under the company's overly optimistic predictions for its success.

602.    To get around their '40 Act problem, GWG's board explored a "spin-out" of BEN shares pursuant to which GWG shareholders would receive a dividend of BEN common shares previously held by GWG.  However, after significant discussions with outside counsel, the board determined that although a spin-out could solve GWG's looming '40 Act issues, it would cause other, equally serious problems.  Specifically, a distribution of BEN shares—the largest "asset"

on GWG's balance sheet—would likely cause GWG to violate its debt coverage ratio obligations.  In addition, the spin-out would require ████████████████████████ ████████████████████████████████████ and invite scrutiny of Heppner and his affiliates' interests in BEN.

603.    On September 2, 2021, GWG held another board meeting to discuss its post-Decoupling plans, or lack thereof.  The board again observed that spinning out the BEN shares would solve the '40 Act issue but would cause GWG to violate its debt coverage ratio.  On management's recommendation, GWG would explore obtaining an insurance license to make use of an exception to the '40 Act for insurance companies.

604.    Notes from the meeting—taken by a BEN in-house attorney—indicate ████ ██████████████████████████████████████ ████████████████████████████. The notes emphasized that ████ ██████████████████████████████████████ ██████████████████████████████████████ ████████████████ (Emphases added).

605.    At the meeting, GWG's board met with insurance industry consultants, who discussed more bad news: the company might have to seek an insurance license in Bermuda because GWG would run afoul of US regulations regarding debt-to-equity ratios and asset concentration. ██████████████████████████████ ██████████████████████████████████████ ██████████████████████████████████████ ██████████████████████████████████████

██████████████████████████████████████████

████████████████████████

606.     The board eventually resolved that GWG would work with its insurance industry consultants to assess the viability of entering the insurance or reinsurance business.  In other words, GWG's best option to deal with the consequences of investing virtually all of its cash into and then decoupling from BEN was to contort itself and change its business model in a matter of months, all while the company's ability to raise capital was in serious doubt.

607.     Indeed, GWG's situation was becoming increasingly precarious.  The company was nearly out of cash, scrambling to find interim financing to cover looming payments, the subject of an SEC investigation, late to file its annual report and other documents with the SEC, and had only months to obtain an insurance license and come up with a bona fide business plan to avoid running afoul of the '40 Act post-Decoupling.

608.     And for those reasons, in the midst of discussing the Decoupling, Holland reached out to counsel to discuss a possible bankruptcy filing. Notes from that discussion—titled "Contingency Planning"—show that Holland and others were concerned GWG would default on its L Bond obligations.  If GWG defaulted, Holland and counsel outlined a plan to use a bankruptcy filing to prevent GWG's creditors from foreclosing on or otherwise liquidating assets until a public market developed for BEN.

### 3.     The Decoupling Transaction Was Unfair to GWG and Did Not Yield any of the Benefits Defendants Used to Try to Justify the Transaction.

609.     On November 12, 2021, BEN's and GWG's boards of directors met to vote on the Decoupling.  Despite the obvious financial and regulatory risks it posed, the unfairness of its terms, and the lack of any financial analysis or fairness opinion to support it, the remaining

GWG directors (Cangany, Chavenson, Holland, Evans, and de Weese) voted to approve the Decoupling.

610.    The minutes for the November 12, 2021 board meeting reflect that Holland "reviewed what the Company 'gives' and 'gets' in this transaction," to try to provide cover for himself and other disloyal GWG fiduciaries.  Among the "gives" were:

- GWG "no longer being able to appoint a majority of directors of Ben Management";

- "conversion of the existing [CLA] with Ben for equity," which the original term sheet did not contemplate;

- "an agreement to the issuance by Ben of A0, B1 and B2 units," the first two of which would be senior to GWG's interest in BEN (a portion of which would be converted to the newly-issued, subordinate B2 units);

- "mutual releases" between BEN and GWG, which, if enforceable, would waive GWG's valuable claims against its disloyal fiduciaries, BEN, and its founders and management.

These were all significant downsides for GWG.  Accordingly, the company should have insisted on substantial consideration for its agreement to the Decoupling.

611.    However, GWG's "gets" in the Decoupling were illusory and not true benefits to the company.  Rather, the "gets" represented benefits to BEN, reflecting the board's continued (incorrect) view that whatever benefitted BEN was in GWG's interest, no matter the cost.

612.    BEN's TEFFI Charter: The first supposed benefit, "clearing the [OSBC] requirement that the Company no longer control Ben for issuance of a TEFFI Charter," was not a "get" at all because OSBC had not required that GWG and BEN separate as a condition to issuing a TEFFI charter.  Instead, as discussed above, BEN had promised OSBC it would separate from GWG, and then used OSBC and its TEFFI application as justification for the

Decoupling.[21]  And just days earlier, OSBC informed BEN that it would likely allow it to continue operating with its provisional charter for an additional six months, despite the fact that it had not de-consolidated from GWG.

613.  <u>Additional Investment in BEN</u>: The next pretextual supposed benefit was that the Decoupling would "satisfy[] the additional Ben capital investors['] requirement that the Company no longer control Ben for contributions up to between \$2 - \$3B in cash and alternative asset financings."  But the GWG board had received no information establishing that BEN had committed capital investors of this magnitude or that those investors conditioned their investment on the Decoupling.  Moreover, if investors did contribute that much capital to BEN, GWG would automatically lose its technical right to appoint a majority of BEN Management directors anyway (meaning that the concern was a red herring).  Regardless, the dilution and subordination of GWG's interest in BEN was far from a benefit to GWG.

614.  <u>No Spinout</u>: Another supposed "get" was that GWG "will not be required to distribute any of its Ben units as part of a spinout."  The spinout, however, was never going to happen because it would cause GWG to violate its debt covenants and require detailed disclosure of the allocation and distribution provisions of BEN's organization documents, which strongly favored Heppner and his affiliates and allies, even before their rights were enhanced in the Decoupling, as described below.

615.  <u>GWG Realizing a Gain on Its BEN Investment</u>: The next purported "get" was GWG's ability to "realiz[e] a Q4 gain/loss for fair value of Ben equity to current carrying value." However, the "fair value" of BEN equity and whatever gain or loss GWG recognized were based

---

[21] This dynamic was similar to that among BEN, GWG, and HCLP.  Heppner and others would cause BEN to make gratuitous or bogus commitments, and then use those commitments (and the supposed dire consequences of breaching them) as a cudgel to get their way.

on fundamentally flawed valuations, as discussed below in section J.  The ability to recognize paper gains on illiquid stock in a still unproven and money-losing business was hardly a benefit.

616.   <u>Conversion of the CLA</u>: The next pretextual benefit of the Decoupling was GWG "receiving approximately 19.5 million units of Ben common equity for conversion of the [CLA], which should be valued at a premium to the carrying value of the [CLA]."  But GWG relinquishing its one remaining non-equity investment in BEN for more common units was not a benefit, particularly when those units were at the very bottom of BEN's top-heavy capital stack and almost worthless for the reasons alleged herein.  Repayment of the CLA in BEN common was also a material change from the term sheet and 8-K, which contemplated the CLA and collateral being assigned to a third party.  Perhaps most telling, unlike GWG, HCLP was to be repaid in cash, rather than BEN common units.

617.   <u>Mutual Releases</u>: Another supposed "get" was the "mutual release" between GWG and BEN as a benefit to GWG from the Decoupling, although that same item was also listed as a downside to the transaction.  The release purportedly covered all claims between and among GWGH, GWG Life, BCG, BCH, BCC, BEN Management, and BHI, and each of their current or former directors, officers, members, and managers.  The release also broadly included any claims GWG held against "any of its present or former" directors and officers that also served as "directors, members or managers of any Ben Party," regardless of whether their conduct was willful or intentional.  It is not clear how such a release could have benefitted GWG in any way, although it certainly was an attempt to benefit Heppner and other dual GWG/BEN directors, as well as then-GWG directors, who months earlier acknowledged the need for an "exit strategy" to mitigate their tremendous liability if the company failed.  More broadly, the inclusion of the release underscores that the Decoupling was motivated (at least in part) by

Heppner and BEN trying to keep a lid on further investigations or litigation surrounding payments made to HCLP (and up the chain to Highland Consolidated and to Heppner's many affiliates).

618.    <u>Conversion of GWG's BEN Equity</u>: Finally, the last supposed gain reflected in the GWG board minutes was the "conversion of $319M of GWG's [NPC-A account] with Preferred B2 units."  The term sheet provided that any conversion in connection with the Decoupling was supposed to give GWG an additional $250 million in value, but the conversion of GWG's NPC-A to Preferred B2 provided GWG with no additional value or other benefits.[22] Instead, Heppner and others used this conversion to effectively subordinate GWG and elevate their own interests in several ways.

619.    First, only GWG's NPC-A account was converted to BCG Preferred B2 in the Decoupling (because BCG Preferred B2 was inferior in virtually every way to NPC-A).  The other NPC-A accounts, largely held by BEN's founders and their affiliates, kept 80% of their NPC-A balance with the remaining 20% being converted to super-senior NPC-A0.

620.    Next, the BCG Preferred B2 GWG received in exchange for its NPC-A was subordinated to Preferred B1 that BCG would issue following the Decoupling.  SEC filings reveal that the proceeds of Preferred B1 sales would first be used to pay HCLP, which, unlike GWG, got paid cash for its loan to BEN.  ███████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

---

[22] Although GWG's $319 million BCH Preferred A1 account incorporated $250 million of additional value based on BEN's supposed enterprise value, converting that into an equivalent amount of BCG Preferred B2 (therefore rolling over that $250 million) did not provide GWG with the additional $250 million of value stated in the term sheet, or any value at all.  Indeed, GWG claimed in a letter to the SEC just four days after the Decoupling that "the 'original cost basis' of the Pref[erred] A[1] [wa]s $319.03 million."

███████████████████   Finally, the Preferred B2 received no guaranteed return, was allocated quarterly profits equal to only 0.125% of account balances, and could not be redeemed prior to December 31, 2025.

621.   Moreover, the Decoupling gave other benefits to Heppner and his allies, most notably Defendants Hicks and Schnitzer.  The mandatory return to holders of NPC-A—which was held almost entirely by Heppner and his allies following GWG's conversion to Preferred B2—would no longer be forborne, and BHI (controlled by Heppner) was given the unilateral right to cause payment of the preferred return.  The return to the super-preferred NPC-A0 was increased from approximately 2% to approximately 6% per year, was no longer subject to available cash restrictions, and NPC-A0 holders were able to force redemptions of up to 12.5% of their capital accounts per quarter and elevate an equal amount of NPC-A to NPC-A0.  The Decoupling also created a new class of BCH FLP unit account (to be held entirely by BHI), which was allocated certain profit and tax distributions not subject to the available cash restrictions.

622.   After summarizing the preceding supposed benefits to GWG at the November 12 board meeting, Holland claimed GWG "hired Houlihan Lokey as experts to review and advise on the transaction."  But, as discussed in section I.1.b, *supra*, Houlihan never received the materials necessary to even begin its work, never did any analysis of the transaction, produced no work product beyond a handful of basic slides shown at the August board meeting, and never provided an opinion on the Decoupling.

623.   Nevertheless, at the November 12, 2021 board meeting, the board resolved that, barring any material changes in terms, "management should execute and deliver on behalf of the

Company all documents necessary to consummate the decoupling transaction with an effective date not later than November 29, 2021."

624.    On November 29, 2021, the Decoupling transaction documents became effective, and GWG lost its illusory "control" rights to designate BEN directors.   Although GWG exchanged all of its NPC-A for inferior Preferred B2 in the Decoupling, the transaction did not directly affect GWG's $14.8 million of BCH Preferred C0[23] or approximately $205 million of Preferred Series C Units.

625.    Then, on December 1, 2021, BEN and GWG entered into a binding term sheet to redeem GWG's entire $14.8 million Preferred C0 account for cash.   In exchange, GWG would give BEN a warrant to acquire 24 million BEN common units held by GWG "such that Ben can use those Common Units in partial or full satisfaction of the warrant that Ben intends to issue to [a] strategic investor."   BEN and GWG executed a redemption agreement for the Preferred C0 account later that day.   Although the binding term sheet included a $1 million early redemption fee, the final redemption agreement did not.   The redemption agreement contained a merger clause stating that the agreement's terms superseded any prior written or oral understandings, but BEN has nevertheless made a claim for the $1 million early redemption fee in GWG's bankruptcy.

---

[23] Shortly before the Decoupling effective date, as discussed above, GWG and BEN entered into a term sheet allowing GWG to convert up to $14.8 million of its Preferred Series C Units to Preferred C0.

**J.**     **While Heppner and His Affiliates Made Out Like Bandits, GWG Obtained Equity in a Speculative, Distressed Business—BEN—that Has Predictably Since Gone Down in Flames, Resulting in a Near-Total Loss for GWG.**

**1.**     ***BEN Equity Had Minimal Fair Market Value When GWG Acquired it at Prices Implying BEN Was Worth Billions of Dollars.***

626.     GWG received BEN equity directly in exchange for $235 million of cash transfers out of GWG, and indirectly for another $65 million (because the $65 Million Loan was later "repaid" through the issuance of BEN equity to GWG). The BEN equity interests that GWG received however, were worth nowhere close to the amounts GWG paid at the time of the relevant transactions. And the BEN equity interests that GWG ended up with are now nearly worthless, as BEN's share price has crashed and burned, trading below $0.10 for weeks before an 80-for-1 reverse stock split on April 18, 2024. Accordingly, GWG has suffered close to a total loss on the approximately $300 million it sent to BEN.[24]

627.     While Heppner touted BEN as a business worth $2-3+ billion even before it obtained a trust charter, that was not remotely true from 2019 through 2021 in the marketplace. No arm's-length third party during that timeframe would, or did, pay cash for BEN equity implying a valuation anywhere near that high. BEN was undercapitalized from the start, burned cash, and was often unable to pay its debts as they came due (often requiring cash from GWG). And BEN's claimed value was a house of cards built on: (a) a fundamentally flawed business

---

[24] The $14.8 million that GWG transferred to BEN in March 2021—over the objection of, and following the dissolution of, the Fine/Bailey/MacDowell Special Committee—was subsequently "redeemed" by BEN in December 2021. Because of the egregious breaches of fiduciary duty involved in that transaction, however, certain Defendants should still be found liable for that transaction, albeit with an equitable remedy that may offset the $14.8 million redemption payment to GWG (*e.g.,* Defendants should be ordered to repay the benefit they received from having free use of $14.8 million of GWG's money for more than 8 months via imposition of interest at a reasonable interest rate, and/or to disgorge any profits received from that $14.8 million). In addition, BEN and several of its subsidiaries have made claims in GWG's bankruptcy for a $1 million early redemption penalty purportedly owed by GWG as a result of the $14.8 million redemption payment. However, neither the UPA (pursuant to which GWG initially invested the $14.8 million), the consent to conversion (which converted the $14.8 million from Preferred C-1 to Preferred C-0), nor the redemption agreement (pursuant to which the $14.8 million was returned to GWG) provided for an early redemption penalty. Any early redemption obligation should be declared unenforceable and any claims for such penalty should be avoided.

plan that defied economic reality; (b) wildly unrealistic projections, which BEN itself refused to stand behind; and (c) wholly unreliable, "garbage in, garbage out" analyses provided by Ankura that took BEN's unrealistic projections at face value and compounded the misstatements of BEN's value by making several fundamental conceptual errors in its analyses.

### a.    BEN's Business Was Undercapitalized.

628.    Although start-up companies sometimes burn cash at inception until achieving profitability after growth, BEN—which lacked the trust charter necessary to operate its business and was still developing and implementing systems—was in much worse shape than normal start-up companies for three reasons.

629.    First, BEN did not have valuable technology or intellectual property.  Rather, as of December 31, 2018, the fair value of all of its intangible assets was only approximately $5 million (and BEN was forced to make over $950 million in downward adjustments and restate its previously issued financial statements for that reason).  In other words, the value of the ideas or sweat equity contributed by Heppner was modest.

630.    Second, beyond not contributing ideas or sweat equity of meaningful value, BEN's founders had not contributed much—if any—cash into the business.  Rather, the founder NPC-A capital accounts held a debit balance of ($132.6 million), reflecting *negative equity*, prior to a purchase price accounting exercise conducted in 2018 (that stemmed from a sham change of control transaction on May 31, 2018).[25]  This accounting exercise resulted in a write-up of the NPC-A account of approximately $1.16 billion, leaving a balance of approximately $1.03 billion

---

[25] BEN Management's operating agreement was amended to give Paul Capital hypothetical BEN board designation rights, resulting in a technical change of control.  This change of control is what triggered the purchase price accounting exercise, requiring allocation of fair value across BEN's assets, liability, and equity.  Much like the sham change of control at December 31, 2019 described in section D.4.b, *supra*, however, Heppner remained firmly in control of BEN.

as of June 1, 2018.  In other words, the founders' NPC-A billion-dollar capital account was based on accounting smoke and mirrors, *not* on prior capital contributed to the business or allocation of earnings (for which there were none, as BEN only suffered losses).  Notably, this accounting mark-up was based on Ankura's May 31, 2018 valuation reports, the same reports that VRC recognized contained "very very, large math/logic errors," as alleged above.  And beyond the flaw that VRC recognized, Ankura's May 31, 2018 analysis was utterly unreliable for the many reasons alleged below.

631.  <u>Third</u>, unlike most start-ups, BEN owed significant debts (and purported debts) at inception.  Heppner had layered in massive additional purported debt into BEN's capital stack from the outset, via the $141 million BEN-HCLP First Debt and the $72 million BEN-HCLP Second Debt, to enrich himself and his affiliated trusts and entities via HCLP and Highland Consolidated.  And BEN owed nine-figure debt to GWG under the CLA.

632.  Under those circumstances, it is implausible that the total value of BEN's equity was anywhere close to the values attributed by Ankura and, in turn, Heppner and BEN, at that stage in BEN's development.  That was especially true given the speculative, unproven nature of BEN's business, and BEN's ongoing financial problems.

      **b.**    **BEN's Business Plan Had Fundamental Conceptual and Logical Flaws, Which Made its Projections Unrealistic**

633.  BEN's business plan largely depended on the wholly untested assumptions: (1) that customers in need of "liquidity transactions," *i.e.*, cash in exchange for illiquid and not readily saleable alternative assets, would be willing to accept (illiquid) equity in BEN—not cash—in exchange for their alternative assets; and (2) that BEN's equity price would increase over time.  But these assumptions defied logic and economic reality.

634.    It was doubtful whether BEN's prospective customers would have much appetite for BEN equity—instead of cash—in exchange for their alternative assets.  An investor willing to sell an alternative asset to BEN at an appropriate discount to fair value—for lack of liquidity of that asset—would only rationally sell that asset at a discount if that investor needed liquidity, *i.e.*, cash.  If the investor/BEN customer did not need cash now, then the investor would be better off holding the alternative investment and obtaining its full value over time.  Therefore, most prospective customers willing to sell their alternative assets to BEN at a discount could be expected to have immediate cash needs.

635.    Accordingly, even to the extent that customers were willing to accept BEN equity units in exchange for their alternative assets as a first step, there would be strong reason to believe that such customers would rapidly try to sell those BEN equity units—in exchange for cash—assuming BEN's equity units were liquid.  In other words, for the very reason that BEN's customers would come to BEN for a "liquidity transaction" in the first place (immediate cash needs), those customers could be expected to immediately sell any BEN equity they obtained from BEN (to obtain cash).

636.    The likelihood that a large portion of BEN customers would quickly sell any BEN equity they received in "liquidity transactions" directly undercut BEN's second key assumption, that BEN's stock price would increase over time.  The opposite was likely due to market forces.  BEN's stock price would face immediate selling pressure every time new acquirers of BEN shares sold them to acquire the "liquidity," *i.e.*, cash.  Making matters worse, such equity issuances could create additional downward selling pressure due to the dilutive effect of such new equity issuances on pre-existing BEN equity holders (at least with respect to short-term earnings per share).  And on top of that, if those sources of selling pressure became sufficiently

high, it could have a cascading effect as the market for BEN's stock grew increasingly imbalanced between buyers and sellers, causing additional holders to sell their BEN equity in order to cut their losses before it came worthless.

637.    Accordingly, BEN's assumptions that: (1) it could grow its business through issuing BEN equity in exchange for alternative assets in "liquidity transactions," and (2) BEN's stock price would somehow simultaneously grow over time were internally inconsistent.  The economic law of supply and demand apparently did not factor into BEN's financial model. BEN's financial projections were unreasonable and unrealistic for that reason.

### c.    BEN's Wildly Unrealistic Projections Were Untethered from Reality

638.    In addition to the foregoing conceptual, logical, and economic flaws, BEN's financial projections were wildly unrealistic and unreasonable because they were not based on historical results, but instead speculatively assumed—while making additional conceptual and economic errors—that: (a) BEN would achieve rapid growth; and (b) BEN would be able to acquire high quality assets at opportune times.

639.    <u>First</u>, BEN's financial projections assumed rapid growth, with annual revenue growth rate assumptions of ███████████████████████████████████ But BEN's projections did not provide a realistic path to achieve such growth, instead relying on two flawed assumptions regarding: (a) BEN's ability to fuel growth through cash flow generated from operations; and (b) BEN's ability to fuel growth through additional issuances of BEN equity to customers.

640.    BEN's projected growth rate assumed that it would generate significant cash flows in early years that would be reinvested in the business.  But this was a dubious assumption because most of the net alternative assets BEN obtained through so-called "liquidity transactions" would be unlikely to generate cash in the near-term because of the nature of the

assets that BEN acquired.  BEN's target market was customers who needed cash quick and were hence willing to sell their alternative assets to BEN at a steep discount to fair value.  But if the alternative assets BEN acquired were likely to generate a significant return in the short-term, then it is doubtful that the customer would need liquidity from BEN (as opposed to just waiting for the return from the investment itself), let alone sell that asset to BEN at a discount.  In other words, the assets that BEN would likely acquire were not the types of assets that would generate cash quickly.  Nevertheless, BEN's projections unrealistically assumed that a substantial portion of the *illiquid* assets would yield cash returns in the near term.

641.    BEN's other assumed path to growth, that investors would exchange alternative assets for BEN equity, was likewise problematic.  As discussed above, it was dubious that customers desiring "liquidity transactions" would be willing to take BEN equity—rather than cash—in exchange for alternative assets.  And BEN also ignored that any customers who did would likely try to sell the BEN equity they received almost immediately, thereby creating downward pressure on BEN's stock price, which would make future investors even less likely to accept BEN stock in exchange for their alternative assets.

642.    Moreover, BEN's assumption that it could rapidly grow by issuing BEN equity to acquire illiquid assets defied economic theory and practical market reality in other ways.  At a fundamental level, BEN's financial performance depended on the alternative assets it obtained through "liquidity transactions" generating a return.  Cutting through BEN's convoluted business structure, accounting gimmicks, and the myriad of intercompany fees and transactions, BEN's business model in substance was similar to a "fund of funds"-type hedge fund business model (although BEN's income depended on fees and interest, not carried interest like a typical fund).

643.    There is no reason why an economically rational holder of BEN equity would value BEN equity as worth more than a proportionate claim on net future cash flows associated with returns from the alternative asset portfolio. ████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████

644.    Second, ████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

645.    ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

646.

647.



648.

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████

649.   This meant that BEN's business faced an enormous moral hazard problem: the investors most willing to exchange their alternative assets to for BEN equity were those holding sub-par assets.  And because BEN was poised to serve as a dumping ground for those trying to unload junk assets, it was highly likely that the alternative assets BEN acquired in "liquidity transactions" would perform below industry average (as was the case for the portfolio dumped by Paul Capital and the initial bulk sellers).

650.   The inherent moral hazard problem BEN's business faced was exacerbated by timing dynamics surrounding private equity and venture capital investments.   Potential customers would be more likely to engage in "liquidity transactions" with BEN, and receive BEN equity, in exchange for older, stale investment assets because: (a) such investments were more likely to have little remaining upside; and/or (b) the odds of an investor having some other reason to sell would increase as time went by (*e.g.*, due to divorce, death, an institutional investor winding down a fund, etc.).  Predictably, this dynamic was pervasive in the alternative assets that the exchange trusts acquired in connection with BEN's initial transactions; the vast majority of fund investments were 10-15+ years old when acquired.

651.   ████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████████████



652.

> **d.      Contemporaneous Valuation Analyses of BEN Were Utterly Unreliable, and BEN Equity Had Minimal Value.**

653.    Although several different financial services firms evaluated BEN from 2018 to 2021, *none* of those firms undertook any independent testing or analyses of BEN's projections. While some (such as VRC) made adjustments by reclassifying certain items, all

contemporaneous valuations or financial analyses of BEN during the relevant time period relied upon BEN's projections of revenue and income growth in their analyses. Because all contemporaneous valuations relied on BEN projections—without verification or analysis—and those projections were unrealistic and unreliable, the valuations were all "garbage in, garbage out" analyses.

654. Moreover, the problems with using unreliable projections were compounded and exacerbated by numerous conceptual problems with the assumptions underpinning the valuation methodologies employed.

655. First, every contemporaneous valuation analysis of BEN assumed for purposes of the analysis that: (a) BEN had already obtained its charter; and (b) BEN was fully ready to launch its business. But those assumptions were fundamentally flawed because *neither was true*. And both BEN's lack of operating history and regulatory challenges posed material risks.

656. Indeed, both were identified as "risk factors" in GWG's securities filings, as Defendants Heppner, Holland, Evans, Hicks, Schnitzer, Cangany, and Chavenson admitted in signing such filings. Specifically, GWG's securities filing expressly acknowledged that "[BEN] does not have operating history under its current business plan," "[BEN]'s proposed trust company subsidiaries have no operating history," and "companies that seek to implement these kinds of business plans present substantial business and financial risks and uncertainties." Those securities filings likewise admitted that "[BEN]'s proposed trust company subsidiaries may not commence trust company operations until those subsidiaries receive the necessary trust charters," "[t]here is no assurance that [BEN] will be able to satisfy" all regulatory conditions, impositions of regulatory "conditions could delay the anticipated time for commencement of trust operations," and failure to obtain the charters could "compromise" BEN's "ability to implement

its current business plan."  Yet those material risks were not adequately accounted for in the valuation analyses conducted by Ankura and others.

657.  <u>Second</u>, and relatedly, the discounted cash flow (DCF) analyses performed by Ankura and others made several methodological errors.  The DCF analysis conducted in those analyses all used discount rates in the 20-28% range, which would only have been appropriate if BEN had already obtained its charters, had at least some history of operating its new business plan, and was immediately ready to launch into the starting point in the projections.  Since none of those things were true, a discount rate in the 40-60% range should have been utilized (or some other risk adjustment applied if using a lower discount rate).

658.  Moreover, several valuation analyses—most notably Ankura's—failed to spot the mathematical errors and inconsistencies in the projections BEN provided.  For example, Ankura failed to apprehend the "very very, large math/logic" error identified by VRC in BEN's projections, namely, the failure to account for equity dilution and related costs in the projections.  Similarly, Ankura's DCF analysis assigned all value to the terminal year projections provided by BEN. ███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

659.  <u>Third</u>, the comparable companies analyses of BEN performed at different times were flawed for similar reasons.  Those analyses took BEN's projected income estimates at face value, ignoring execution risk, and then applied multiples based on established, publicly traded companies in the banking and finance industry.  ███████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████████████████  And the valuation multiples utilized in the comparable analyses were derived from established companies that were not fairly

comparable to BEN.   Because such comparable companies analyses used unrepresentative multiples and unrealistic BEN estimates, the valuations spit out were wildly inaccurate.

660.   <u>Fourth</u>, valuations of BEN that occurred in 2019 depended on BEN financial statements and financial reporting based on Ankura's flawed purchase price accounting analysis dated May 31, 2018 (and the subsequent reporting of $1 billion of NPC-A capital in BEN's capital stack).   And that $1 billion figure for NPC-A capital was not based on capital contributed or retained earnings, but instead a convoluted accounting exercise.

661.   Ankura's purported valuations of the NPC-A capital account were primarily based on an option pricing method ("OPM") backsolve approach.   In an OPM backsolve approach, the price paid for an equity security in a recent transaction is used to extrapolate a value for each class of equity and the total equity as a whole (utilizing various assumptions involving time to payment and volatility).   Such an analysis is necessarily a relative valuation, not an intrinsic valuation, because it depends entirely on the initial transaction that is used to "backsolve" from.

662.   Ankura's OPM backsolve approach was unreliable because its crucial inputs were prices of BEN equity in transactions with GWG (and Paul Capital), which Ankura assumed were simple arm's-length transactions in which BEN units were purchased for $10 cash per unit.   But that was not an accurate assumption given the convoluted nature of those transactions.   First, Paul Capital and the other "bulk sellers" did not pay cash for BEN units, but exchanged alternative assets at the NAV the seller reported to BEN—which significantly exceeded the fair value of those assets.   Second, the $10 price per unit was an assumed "book value" of the units, not an actual purchase price.

663.   The governing agreements assumed that the BEN units would be auctioned off to generate cash to pay the various participating sellers the NAV of the interests they were selling.

Because even the parties did not know what BEN units would fetch from third parties through the auction, BEN issued units that, using the assumed book value, equaled 120% of the NAV reported by the sellers—and BEN's founders even agreed to kick in another 30% as additional protection—in the event that the auction did not result in the sellers receiving cash equal to their reported NAV. As Heppner explained in one email, this structure was negotiated so that "the Sellers would receive cash Purchase Payments totaling 100% of NAV upon the block trade occurring at values of $5.00 per MLP Unit of Ben and above." In other words, the $10 per unit price used by Ankura was not an arms-length market price that a third party paid for BEN Units, and therefore not a proper input for its OPM backsolve analysis.

664.     In short, Ankura's valuations and other contemporaneous valuation analyses of BEN—which other than Ankura were not reduced to formal written opinions—during the relevant period were not reliable. There was a "garbage in, garbage out" problem due to the unreliability and unreasonableness of BEN's projections. And the many flawed methodologies applied to the inaccurate projections merely compounded the errors.

### 2.     BEN's Disastrous Stint as a Public Company.

665.     After its parasitic relationship with GWG came to an end and GWG filed for bankruptcy in April 2022, BEN found a new means to access the public capital markets: a de-SPACing transaction with Avalon Acquisition Inc. ("Avalon"). In Avalon, BEN and Heppner found another counterparty willing to agree to transactions that implied an inflated value for BEN, far above what any third party would have paid for BEN equity—especially in cash—in an arm's-length transaction.

666.     Avalon was led by Don Putnam, founder of Grail Partners LLC ("Grail Partners"), who had long-standing relationships with Heppner and BEN. Heppner respected Putnam "a lot,"

having done business with him since the 1990's. And the feeling was mutual. Putnam was the self-proclaimed "most enthusiastic booster of the BEN strategy there could ever be" and "want[ed] to still be part of Brad's 'business family' in ten years as [he had] been for the last twenty."

667.    Moreover, Putnam's fund, Grail Partners, had significant entanglements with BEN. It had been involved in exchange transactions with BEN in the 2017-2018 timeframe. And Grail Partners held a substantial amount of BEN LP common units and outstanding L Bonds. From 2019 to 2021, Putnam had engaged in various brainstorming sessions with Holland and Heppner regarding possible strategic transactions involving BEN and GWG, and Putnam had advocated for the Decoupling transaction in the fall of 2021.

668.    In February 2022, Putnam reached out to Heppner and BEN to propose a de-SPACing merger between BEN and Avalon, a SPAC entity Putnam led that was going nowhere. In March 2022, just a few weeks before GWG's bankruptcy filing, Putnam and Heppner signed an offer letter between Avalon and BEN, in which Avalon proposed allocating shares to holders of BEN equity "establishing an equity value well in excess of $3.0 billion at signing of definitive agreements." This transaction allowed Putnam's main entity, Grail Partners, to significantly increase the holding value of the BEN common equity on its books.

669.    Accordingly, the merger between BEN and Avalon was not a true arm's-length transaction. Rather, it was the product of Heppner's and Putnam's mutual admiration and willingness to help each other in a relationship dating back decades, and their mutual benefit in engaging in a transaction that would inflate the paper value of their pre-existing holdings.

670.    BEN's merger transaction with Avalon closed on June 7, 2023. The first few days of trading post-merger saw heavy trading volume and progressively lower closes. Moreover, the

closing price of BEN's stock went down every single day for over two weeks, losing two-thirds of its value almost immediately:

| Trading Day | Closing Price |
|---|---|
| 06/07/23 | $9.10 |
| 06/08/23 | $9.00 |
| 06/09/23 | $8.27 |
| 06/12/23 | $6.63 |
| 06/13/23 | $5.70 |
| 06/14/23 | $5.52 |
| 06/15/23 | $5.31 |
| 06/16/23 | $5.12 |
| 06/20/23 | $4.57 |
| 06/21/23 | $4.31 |
| 06/22/23 | $3.90 |
| 06/23/23 | $3.87 |
| 06/26/23 | $3.09 |
| 06/27/23 | $2.74 |

From there, BEN's stock price continued to decline. On October 16, 2023, it closed at $0.9580. BEN's stock price never traded above $1 thereafter, meaning that BEN effectively lost approximately 90% of its wildly over-inflated initial market cap within just four months of trading.

671. From there, matters got even worse for BEN and its unfortunate bag-holders, like GWG. BEN's stock price ended 2023 at $0.4860, and it did not close above $0.50 thereafter. After BEN's stock traded below $0.10 for at least ten consecutive trading days, on March 22, 2024, NASDAQ sent a letter to BEN under Listing Rule 5810(c)(3)(A)(iii) (the "Low Priced Stocks Rule") advising that NASDAQ staff had determined to delist BEN unless it timely requested a hearing before the NASDAQ hearings panel. (BEN announced that it plans to appeal the decision.)

672. Operationally, BEN has also crashed and burned. BEN's most recent financial reporting, its Form 10-Q for the quarter ended December 31, 2023, reflects that BEN has

recognized nearly $2.3 billion in total impairment charge to goodwill in the nine months ending on that date. Most of that goodwill impairment related to BEN's key operating units, its "Ben Liquidity" and "Ben Custody" segments. Indeed, BEN took a total write-off to goodwill of its bread-and-butter unit, "Ben Liquidity," writing it down from $1.73 billion at March 31, 2023 to *$0* by December 31, 2023.

673. Those impairment charges stemmed from BEN's lack of revenue and continued operational losses, among other reasons. BEN has continued to burn cash in operations, as it has since inception. BEN burned through $49.6 million in cash in operations (*i.e.*, had negative operating cash flow) during the nine months ended December 31, 2023.

674. Those and other problems raise substantial doubts over BEN's ability to continue as a going concern, which BEN itself has acknowledged in recent securities filing. Nevertheless, BEN maintains that "based on management's plan . . . such substantial doubt has been alleviated." That plan entails borrowing more money or refinancing existing obligations, dilutive equity financing efforts, and "workforce reductions." And to that end, BEN borrowed $25 million (from an entity affiliated with Defendant Hicks) in October 2023, furloughed 20% of its workforce on July 11, 2023 (just a month after the merger), and terminated the furloughed employees and laid of an additional 10% of its workforce on November 3, 2023. While such can-kicking measures may stave off total collapse for a bit longer, BEN's business remains a financial disaster (as it always has been, since inception).

675. All of this was entirely predictable—if not inevitable—due to the many fundamental problems with BEN's business described above. BEN effectively became a penny stock (prior to its 80-for-1 reverse stock split on April 18, 2024). BEN was never worth billions of dollars. And the BEN equity that GWG obtained was not worth anything close to the prices

GWG paid, meaning that GWG has suffered a near-total loss on the $300 million it transferred, directly or indirectly, for BEN equity.

## CAUSES OF ACTION

**COUNT 1:**          **BREACH OF FIDUCIARY DUTY AGAINST CONTROL GROUP OF CONTROLLING STOCKHOLDERS (Against BEN Management, BEN LP, BCH, BCC, Heppner, and Holland)**

676.    The Litigation Trust repeats and realleges each and every allegation contained above as if fully set forth herein.

677.    BEN (specifically, BEN Management, BEN LP, BCH, and BCC), Heppner, and Holland (collectively, the "BEN/Heppner/Holland Control Group") constituted a control group of controlling stockholders over GWG beginning on April 26, 2019, and continuing through the last of the challenged transactions, the November 2021 Decoupling.  Heppner, Holland, BEN Management, BEN LP, BCH, and BCC formed a control group because they wielded their sources of control over GWG to work together toward a shared goal, namely, funneling as much cash as possible from GWG to BEN (or for BEN's perceived benefit) on terms favorable to BEN.  Heppner was BEN's founder, chairman, and CEO and exercised pervasive influence over BEN.  Holland was a former director of BEN and was also involved via MHT and the Exchange Trusts in BEN's formative transactions and initial exchange transactions.  Thereafter, Holland was one of two Trust Advisors (along with a BEN designee ultimately answering to Heppner) that agreed and collaborated to exercise GWG's majority control to benefit BEN.  Collectively, Heppner, Holland, and BEN worked together to further BEN's interests, both generally and in connection with the specific transactions, as alleged at length herein.

678.    The BEN/Heppner/Holland Control Group exercised control over GWG's business and affairs in general during the relevant period.  As alleged in more detail in section C and elsewhere herein, the BEN/Heppner/Holland Control Group wielded pervasive control over

GWG's business through a combination of: (a) effective majority voting power over GWG stock through Holland and the other BEN-designee Trust Advisors of the Seller Trusts, and the 7.6% voting interest held by BCC (and controlled by, in turn, BEN LP, BCH, and BEN Management); (b) BEN Management's, BEN LP's, and BCH's collective appointment[26] of BEN's own directors as GWG directors in April 2019 (and maintaining a continuous majority of BEN dual-directors and/or BEN-loyal directors at GWG thereafter); (c) Heppner's influence over those BEN-appointed dual-directors, especially Hicks and Schnitzer (who, along with Heppner, made up a majority of GWG's Executive Committee throughout the relevant period); (d) Heppner's and BEN's influence over GWG's Executive Committee, which was delegated extensive powers, chaired by Heppner, and made up entirely of dual-BEN directors (from May 10, 2019 through June 14, 2021); (e) Heppner's position as GWG's chairman and Holland's position as GWG's President and CEO; and (f) influence they had over and exercised through Evans, who was GWG's Chief Integration Officer, GWG's CFO (beginning August 2019), and a GWG director (beginning June 2021), yet remained primarily loyal to Heppner and BEN.

679.    For the same reasons and also because of their activities and roles in connection with the relevant transactions as alleged at length above, the BEN/Heppner/Holland Control Group also exercised de facto control over GWG in connection with the specific transactions at issue: (1) the Essex Transaction; (2) the $65 Million Loan in 2019 (and the purported "repayment" thereof with BEN equity in 2020); and (3) the $79 million December 2019 Transaction; (4) the UPA and related transfer of $61 million in July 2020; (5) the additional $69.2 million in transfers GWG made in connection with the UPA from September 2020 –

---

[26] BEN Management was the general partner of BEN LP, which was the general partner of BCH.  BEN LP obtained the contractual right to designate GWG's board members in the April 2019 transaction with the Sabes.  That right was exercised by BCH, however.

December 2020; (6) the March 2021 transfer of $14.8 million; and (7) the November 2021 Decoupling (collectively, the "Transactions").

680. Because Defendants BEN Management, BEN LP, BCH, BCC, Heppner, and Holland collectively formed a control group of controlling stockholders over GWG, both in general and in the specific Transactions at issue, each of those Defendants owed a fiduciary duty of loyalty to GWG.

681. Each of the Transactions was a transaction between GWG and the BEN/Heppner/Holland Control Group, *i.e.*, a transaction with a controller, or "controller transaction." Specifically, each transaction involved: (a) transfers of money to BEN, at BEN's request and/or for BEN's perceived benefit; and/or (b) extinguishment of debt or obligations owed by BEN (or entities related to BEN) to GWG. Accordingly, entire fairness applies as the standard of review for each of the Transactions.

682. None of the Transactions was submitted to a majority of the minority stockholder vote. Nor were any of the Transactions approved by a well-functioning Special Committee (or by any Special Committee at all, in some instances). Accordingly, entire fairness is the applicable standard of review for each of the Transactions.

683. None of the Transactions were entirely fair to GWG for the reasons summarized in sections D.5 and F.7 and for all the other reasons alleged above. In each instance, the consideration GWG received was grossly inadequate and unfair. And each of the Transactions was the product of grossly unfair dealing.

684. Accordingly, Defendants BEN Management, BEN LP, BCH, BCC, Heppner, and Holland breached their fiduciary duty of loyalty in connection with each of the Transactions as controllers.

685.   GWG suffered substantial harm as a result of the Transactions and the BEN/Heppner/Holland Control Group's fiduciary duty breaches.  GWG transferred over $300 million in connection with the Transactions, extinguished pre-existing debt from BEN under the CLA, and was left with only BEN equity in the end.  That BEN equity was and currently is worth a small fraction of the prices GWG paid, and it may be completely worthless by the time of trial.  GWG also suffered harm in the form of other out-of-pocket costs incurred in connection with, or as a result of, the Transactions, including, but not limited to, legal costs in the Transactions and in connection with the SEC investigations they played a substantial factor in, as well as over $100 million in professional fees and expenses incurred as a result of and during GWG's contentious bankruptcy.

686.   Moreover, the BEN/Heppner/Holland Control Group received an unjust windfall because the funds received from GWG far exceeded the consideration given in exchange.  Accordingly, equitable remedies should be awarded to disgorge any profits received, to make restitution, and/or otherwise prevent the BEN/Heppner/Holland Control Group from benefitting from breaches of the fiduciary duty of loyalty.

**COUNT 2:       BREACH OF FIDUCIARY DUTY AGAINST DEFENDANT DIRECTORS (Against Heppner, Hicks, Schnitzer, Chavenson, Cangany, Holland, and Evans)**

687.   The Litigation Trust repeats and realleges each and every allegation contained above as if fully set forth herein.

688.   Heppner, Hicks, Schnitzer, Chavenson, Cangany, Holland, and Evans (collectively, the "Director Defendants") owed fiduciary duties of loyalty to GWG during the time periods that they individually served as GWG directors.  Heppner, Hicks, and Schnitzer served as GWG directors from April 26, 2019, to June 14, 2021.  Cangany served as a GWG

director from April 26, 2019, until after GWG filed for bankruptcy in April 2022, Chavenson served as a GWG director from May 13, 2019, until after GWG filed for bankruptcy in April 2022.  And Evans and Holland served as GWG directors from June 2021 until after GWG filed for bankruptcy.

689.    Entire fairness is the applicable standard of review for the Transactions because each of the Transactions was a controller transaction involving the BEN/Heppner/Holland Control Group, and none of the Transactions was: (a) submitted to a majority of the minority stockholder vote; and/or (b) approved by a well-functioning Special Committee (or by any Special Committee at all, in some instances).

690.    Entire fairness is also the applicable standard of review for the Transactions because at the time of each of the transactions, GWG did not have a board majority of independent, disinterested, sufficiently informed, individuals who acted in good faith and in GWG's best interests in connection with the Transactions.  At all times from April 26, 2019, to June 14, 2021, the majority of GWG's board was made up of dual-directors of both BEN and GWG.  The BEN directors serving on GWG's board were dual-fiduciaries who owed a duty of loyalty to BEN and/or otherwise acted disloyally to favor BEN's interests over GWG's interests. At the time of the Decoupling in November 2021, two of GWG's five board members (Cangany and de Weese) were dual-directors of both BEN and GWG, and the remaining three GWG directors (Holland, Evans, and Chavenson) were not independent of BEN and acted disloyally by favoring BEN's interests over GWG's interests throughout the Transactions at issue.   More broadly, throughout his tenure as a GWG director, Chavenson was not independent of the BEN/Heppner/Holland Control Group, was beholden to it, and acted to further its interests.

691.    None of the Transactions were entirely fair to GWG for the reasons summarized in sections D.5 and F.7 and for all the other reasons alleged above.   In each instance, the consideration GWG received was grossly inadequate and unfair.   And each of the Transactions was the product of grossly unfair dealing.

692.    Because the Transactions were not entirely fair to GWG, the GWG directors who were interested in those transactions breached their fiduciary duties of loyalty to GWG.   The interested GWG directors in the Transactions included Heppner, Hicks, and Schnitzer, each of whom held NPC-A accounts in BCH that were effectively at the top of BEN's capital stack due to liquidation preferences, BEN's waterfall, and other rights associated with the NPC-A units. Those NPC-A accounts meant that Heppner, Hicks, and Schnitzer received a non-ratable benefit from GWG investing in BEN that GWG's minority shareholders did not enjoy (as GWG obtained inferior capital interests in BEN worth far less).   Heppner was also interested in the Transactions because many of the proceeds of the funds advanced by GWG in connection with the Transactions were immediately transferred to HCLP and ultimately to Highland Consolidated (which then transferred funds to Heppner's affiliated trusts and other entities).

693.    Heppner further breached his fiduciary duty of loyalty to GWG in numerous other ways.   As alleged at length above, he repeatedly breached his duties of candor and disclosure in numerous respects (in particular related to HCLP), he consistently acted to further BEN's interests rather than GWG's and induced GWG's officers (Holland and Evans) to do the same, and he engaged in rampant self-dealing by siphoning funds, indirectly through BEN or directly, to HCLP, Highland Consolidated, and ultimately his affiliated trusts and entities.   Heppner also directly corrupted the Special Committee's process.   And through his role as chairman of GWG's

Executive Committee, Heppner—along with Schnitzer and Hicks—set GWG on a path of benefitting BEN.

694.     Defendants Schnitzer and Hicks likewise breached their fiduciary duties of loyalty in connection with their roles on GWG's Executive Committee.  In collaboration with Heppner, and as members of GWG's Executive Committee, they: (a) signed unanimous written consents pushing GWG to advance funds to BEN and otherwise favor BEN's interests, including in connection with the SITA committee; (b) tried to silence dissent when questions were raised by other GWG board members (Stein, Glaser, Zimmerman, and Fisher); and (c) at all times acted disloyally to push BEN's agenda as part of Heppner's inner circle, rather than look out for GWG's best interests.   In addition, Hicks affirmatively tried to pressure members of the Fine/MacDowell/Bailey Special Committee in March 2021 before, along with Schnitzer and Heppner, signing resolutions to dissolve the Special Committee altogether.

695.     Defendant Chavenson breached his fiduciary duty of loyalty by disloyally acting to favor BEN's interests over GWG's and by acting for purposes and reasons other than GWG's best interest.  As alleged at length above, during his tenure on Chavenson/Mason Special Committee in 2019 and subsequent Chavenson/Cangany/Bailey Special Committee in 2020, among other actions displaying that he was beholden to Holland, Heppner, and BEN, Chavenson repeatedly: (a) approved transactions despite the lack of supporting analysis from financial advisors, and in several instances despite significant concerns raised by the Special Committee's financial advisors; (b) approved transactions despite known problems with BEN's business; (c) acted to appease Heppner, Holland, and BEN instead of negotiating vigorously to defend GWG's interests; (d) shared the Special Committee's confidential information with Holland and Evans; and (e) coordinated with Holland to request information intended purely to "paper the

file" and give him cover for his planned rubber-stamping of transactions that favored BEN. Chavenson also spoke up at the March 3, 2021 board meeting to advocate for funding under the UPA, even though the UPA clearly did not obligate GWG—as opposed to merely giving GWG the choice—to make additional investments in BEN under its unfair terms.

696.    In 2021, Chavenson approved the Decoupling, again acting to favor BEN's interests over GWG's.  He approved that transaction despite the board's inability to find any fairness opinion provider who was willing to support it because it was so transparently unfair to GWG.  Moreover, in the Decoupling, GWG's interests in BEN were made subordinate to those held by Heppner and his affiliates. And the CLA—GWG's one remaining non-equity investment in BEN—was repaid in worthless BEN common stock.  GWG also purported to release valuable claims it had against then-current and former GWG and BEN directors and officers in the Decoupling.  GWG received essentially no consideration in the Decoupling for the subordination of its BEN equity, payoff of the CLA, and purportedly releasing claims against Heppner and others (although those releases were void or voidable as alleged herein).

697.    For the same reasons, Cangany, Evans, and Holland also breached their fiduciary duties of loyalty as directors to GWG for approving the BEN-friendly Decoupling.

698.    In addition to approving the Decoupling in 2021, Cangany also breached his fiduciary duty of loyalty in May 2019 in connection with: (1) the Essex Transaction; and (2) $65 Million Loan.  Cangany breached his duties of candor and disclosure by ██████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ███████████████████████████████████████████ Cangany made those misleading

statements because he favored BEN's interests over GWG's and was trying to help convince the Chavenson/Mason Special Committee to approve the Essex Transaction and $65 Million Loan.

699.    Cangany further breached his fiduciary duty of loyalty during his tenure as a member of the Chavenson/Cangany/Bailey Special Committee during 2020.   Cangany was Heppner's plant on that Special Committee, and he consistently pushed BEN's agenda.   He shared the Special Committee's deliberations and advice from its advisors with Evans, Heppner, Holland, and BEN, and actively colluded with them to push the Special Committee to approve transactions that favored BEN's interests and were against GWG's best interests.   And Cangany approved the UPA and related $61 million ███████████████████████████████

███████████████████████████████████████████████████████████████

█████████████████████████████████████████

700.    GWG suffered substantial harm as a result of the unfair Transactions and the Director Defendants' breaches of their fiduciary duties of loyalty.   GWG transferred over $300 million in connection with the Transactions, extinguished pre-existing debt from BEN under the CLA, and was left with only BEN equity in the end.   That BEN equity was and currently is worth a small fraction of the prices GWG paid, and it may be completely worthless by the time of trial.   GWG also suffered harm in the form of other out-of-pocket costs incurred in connection with, or as a result of the Transactions, including, but not limited to, legal costs in the Transactions and in connection with the SEC investigations they played a substantial factor in, as well as over $100 million in professional fees and expenses incurred as a result of GWG's contentious bankruptcy.

701.    Moreover, in connection with, and as a result of, Heppner's breaches of his fiduciary duty of loyalty to GWG, ███████████████████████████████ █

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

Heppner should be forced to account for all profits he received on account of such funds, disgorge all profits, and otherwise return all benefits he received as a result of his breaches of his fiduciary duty of loyalty to GWG.

**COUNT 3:**       **BREACH OF FIDUCIARY DUTY AGAINST DEFENDANT OFFICERS (Against Holland and Evans)**

702.    The Litigation Trust repeats and realleges each and every allegation contained above as if fully set forth herein.

703.    As GWG officers, Holland and Evans owed fiduciary duties of loyalty and care to GWG.  Holland served as GWG's President and CEO from April 2019 through GWG's bankruptcy filing in April 2019.  Evans served as GWG's Chief Integration Officer from May 6, 2019 to August 15, 2019, and then as GWG's CFO from August 15, 2019 through GWG's bankruptcy filing.

704.    As alleged at length above, Holland breached his fiduciary duty of loyalty by consistently favoring the interests of BEN over those of GWG.  Even though he was GWG's CEO and President, Holland actively collaborated with Heppner to advance BEN's interests and agenda.  Among many other instances of misconduct, Holland: (a) collaborated with Heppner and relayed requests from Heppner and BEN, often passing requests off as if they were coming from Holland and "GWG management" (without disclosing Heppner's and BEN's involvement);

(b) collaborated with Heppner and other BEN actors to actively negotiate against GWG's Special Committees in 2019 and 2020, and relayed information he learned from Chavenson and/or Cangany to Heppner and BEN (betraying the GWG Special Committee's confidences); and (c) pressured the GWG Special Committee in 2019 and 2020 to approve transactions that were lopsided in BEN's favor and against GWG's best interests.

705.    As GWG's President and CEO, Holland also breached the fiduciary duty of care that he owed to GWG.  Holland knew or reasonably should have known of many glaring risks and "red flags" surrounding BEN's business.  For instance, BEN's business was financially distressed, BEN had major accounting issues, BEN's business plan was entirely speculative and unproven (and its projections were based on a statistical simulation), BEN's business plan had several conceptual flaws, the alternative asset portfolio obtained in BEN's formative transaction was full of bad investments, and BEN had significant turnover.  Yet in conscious disregard for those known risks and/or failing to adequately inform himself of BEN's many problems, Holland continued to press BEN's agenda and to advocate for GWG to continue to pour money into BEN.

706.    Evans breached his fiduciary duty of loyalty to GWG as a GWG officer by acting in Heppner's, Holland's, and BEN's best interests throughout the relevant period.  In effect, Evans was a pawn for those controllers and, in particular, Heppner.  As alleged at length above, Evans consistently took marching orders from Heppner, and actively collaborated with BEN in negotiating against GWG Special Committees.  Evans also tried to sidestep GWG Special Committees in funneling money to BEN after the UPA was approved.

707.    Evans also breached the fiduciary duty of care that he owed to GWG.  Evans knew or reasonably should have known of many glaring risks and "red flags" surrounding BEN's business.  For instance, BEN's business was financially distressed, BEN had major accounting

issues, BEN's business plan was entirely speculative and unproven (and its projections were based on a statistical simulation), BEN's business plan had several conceptual flaws, the alternative asset portfolio obtained in BEN's formative transaction was full of bad investments, and BEN had significant turnover. Yet in conscious disregard for those known risks and/or failing to adequately inform himself of BEN's many problems, Evans continued to press BEN's agenda and to facilitate BEN's efforts to obtain cash from GWG.

708. GWG suffered substantial harm as a result of the unfair Transactions (facilitated by Evans's and Holland's respective breaches of their fiduciary duties of loyalty and care as GWG officers). GWG transferred over $300 million in connection with the Transactions, extinguished pre-existing debt from BEN under the CLA, and was left with only BEN equity in the end. That BEN equity was and currently is worth a small fraction of the prices GWG paid, and it may be completely worthless by the time of trial. GWG also suffered harm in the form of other out-of-pocket costs incurred in connection with, or as a result of the Transactions, including, but not limited to, legal costs in the Transactions and in connection with the SEC investigations they played a substantial factor in, as well as over $100 million in professional fees and expenses incurred as a result of GWG's bankruptcy.

**COUNT 4: AIDING AND ABETTING AND/OR KNOWING PARTICIPATION IN BREACHES OF FIDUCIARY DUTY (Against BEN Management, BEN LP, BCH, and BCC)**

709. The Litigation Trust repeats and realleges each and every allegation contained above as if fully set forth herein.

710. Pleading in the alternative, solely to the extent that one or more of BEN Management, BEN LP, BCH, or BCC (collectively, the "BEN Entity Defendants") is not deemed to have owed fiduciary duties to GWG as part of a control group of controlling stockholders,

such entities aided and abetted or knowingly participated in breaches of fiduciary duties to GWG.

711.   Heppner owed fiduciary duties to GWG as its chairman and as part of a control group of controlling stockholders.  Holland owed fiduciary duties to GWG as an officer, as part of a control group of controlling stockholders, and (after June 14, 2021) as a GWG director. Evans owed fiduciary duties to GWG as an officer and (after June 14, 2021) as a GWG director.

712.   As alleged and for the reasons set forth herein: (a) Heppner breached fiduciary duties of loyalty he owed to GWG a chairman of GWG's board and as part of a control group of controlling stockholders; (b) Holland breached his fiduciary duties of loyalty and care as GWG's CEO, as part of a control group of controlling stockholders, and as a GWG director; and (c) Evans breached his fiduciary duties of loyalty and care as a GWG officer and GWG director.

713.   The BEN Entity Defendants had actual knowledge of Heppner's, Holland's, and Evans's misconduct through BEN's agents.  BEN's in-house and outside counsel and BEN finance and accounting personnel (including BEN's CFO) actively collaborated with Evans and Holland in negotiating against GWG, and those BEN agents also knew that Heppner had not walled himself off from GWG or its officers in participating in negotiations to advance BEN's interests.

714.   The BEN Entity Defendants knowingly participated in, substantially assisted, and/or induced Heppner's, Holland's, and Evans's breaches of their respective fiduciary duties. BEN's agents actively sought confidential GWG information from Holland and Evans— including information Holland and Evans knew regarding the GWG Special Committee's deliberations and analysis.  BEN, through Heppner, also specifically gave instructions to Holland and Evans and otherwise colluded with them in turning GWG's own officers against it.

Moreover, the BEN Entity Defendants—along with Heppner—drove the timing of the Transactions and all material terms of those transactions.

715.    GWG suffered substantial harm as a result of the unfair Transactions that were facilitated by the BEN Entity Defendants' aiding and abetting of, and knowing participation in, Heppner's, Holland's, and Evans's breaches of their fiduciary duties.  GWG transferred over $300 million in connection with the Transactions, extinguished pre-existing debt from BEN under the CLA, and was left with only BEN equity in the end.  That BEN equity was and currently is worth a small fraction of the prices GWG paid, and it may be completely worthless by the time of trial.  GWG also suffered harm in the form of other out-of-pocket costs incurred in connection with, or as a result of the Transactions and the BEN Entity Defendants' misconduct, including, but not limited to, legal costs in the Transactions and in connection with the SEC investigations they played a substantial factor in, as well as over $100 million in professional fees and expenses incurred as a result of GWG's bankruptcy.

**COUNT 5:**        **AIDING AND ABETTING AND/OR KNOWING PARTICIPATION IN BREACHES OF FIDUCIARY DUTY (Against HCLP and Highland Consolidated)**

716.    The Litigation Trust repeats and realleges each and every allegation contained above as if fully set forth herein.

717.    Heppner owed fiduciary duties to GWG as its chairman and as part of a control group of controlling stockholders.  The BEN Entity Defendants owed fiduciary duties to GWG as part of a control group of controlling stockholders.

718.    As alleged and for the reasons set forth herein: (a) Heppner breached fiduciary duties of loyalty he owed to GWG as chairman of GWG's board and as part of a control group of controlling stockholders; and (b) the BEN Entity Defendants breached the fiduciary duties they

owed to GWG as part of a control group of controlling stockholders.  HCLP and Highland Consolidated aided and abetted or knowingly participated in Heppner's and the BEN Entity Defendants' breaches of their respective fiduciary duties.

719.     HCLP and Highland Consolidated had actual knowledge through their agents—including Banowsky and Wickline—that Heppner and BEN breached fiduciary duties owed to GWG in obtaining funds from GWG that flowed to HCLP and on to Highland Consolidated.

720.     First, HCLP and Highland Consolidated knew that the original incurrence of the BEN-HCLP First Debt and BEN-HCLP Second Debt were not legitimate, arm's-length transactions.

721.     Second, HCLP and Highland Consolidated knew that ████████████████ ████████████████████████████ They likewise knew that ██ ████████████████████████████████████ ████████████ the amended HCLP operating agreement—through which Heppner's entity, BHI, assigned the BEN-HCLP Second Debt to HCLP—had been backdated ████.

722.     Third, HCLP and Highland Consolidated knew that ████████████ ████████████████████████████████ ████████████████████

723.     Fourth, HCLP and Highland Consolidated knew that GWG was told that Heppner would not benefit from payments to HCLP and had no control over HCLP, even though Heppner—via trusts—twice changed HCLP's manager during 2019 (including to Wickline in October 2019), ██████████████████████████ ████████████████████████████



[REDACTED]

[REDACTED]

724.   HCLP and Highland Consolidated substantially assisted and/or knowingly participated in Heppner's breaches of fiduciary duty. [REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

725.   GWG suffered substantial harm as a result of HCLP's and Highland Consolidated's aiding and abetting of, and knowing participation in, Heppner's fiduciary duties. GWG received BEN equity in exchange for making transfers to BEN based on [REDACTED] [REDACTED]. And GWG also engaged in other unfair transactions, the end result of which left GWG solely with BEN equity, that GWG would not have engaged in had the truth surrounding HCLP, Highland Consolidated, and Heppner's self-enrichment scheme involving those entities come to light earlier.   In the aggregate, GWG spent $300 million to complete the various Transactions while receiving—in the end—BEN equity interests.   That BEN equity was and currently is worth a small fraction of the prices GWG paid, and it may be completely worthless by the time of trial.   GWG also suffered harm in the form of other out-of-pocket costs incurred in connection with, or as a result of the Transactions, including, but not limited to, legal costs in the Transactions and in connection with the SEC investigations they played a substantial factor in, as well as over $100 million in professional fees and expenses incurred as a result of GWG's bankruptcy.

**COUNT 6:**        **UNJUST ENRICHMENT (Against HCLP, Highland Consolidated, and Other Defendants to the Extent that They Were Direct or Indirect Subsequent Transferees of Highland Consolidated)**

726.    The Litigation Trust repeats and realleges each and every allegation contained above as if fully set forth herein.

727.    As alleged and for the reasons set forth herein, Heppner breached the fiduciary duty of loyalty he owed to GWG a chairman of GWG's board and as part of a control group of controlling stockholders.

728.    GWG conferred benefits on and enriched HCLP and Highland Consolidated by transferring funds to them indirectly, by transferring funds to BEN with the understanding that BEN would transfer such funds to HCLP and/or Highland Consolidated (and directly to HCLP in one instance).  HCLP knew that the funds it received indirectly via BEN (or directly from GWG) originated from GWG through Heppner, Wickline, Banowsky, and HCLP's other agents.

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████

729.    GWG suffered harm, or impoverishment, as a result of transferring funds directly to HCLP and Highland Consolidated or indirectly to those entities through BEN.  GWG received BEN equity in exchange.  That BEN equity was and currently is worth a small fraction of the prices GWG paid, and it may be completely worthless by the time of trial.  GWG also suffered

harm in the form of other out-of-pocket costs incurred in connection with, or as a result of, the Transactions, including, but not limited to, legal costs in the Transactions and in connection with the SEC investigations they played a substantial factor in.

730.    There is no justification for the siphoning of GWG's funds through HCLP and ultimately Highland Consolidated, and it would be unfair, unjust, and inequitable for HCLP and Highland Consolidated to retain the benefits from the funds they received.  In essence, HCLP and Highland Consolidated were the instruments of Heppner's self-enrichment scheme.

731.    Further Highland Consolidated transferred ████████████████ of the funds it received indirectly from GWG on to other entities, including, without limitation, the Brad Heppner Family Trust, the HBH Trust, and Elmwood Bradley Oaks. These entities were the ultimate beneficiaries of Heppner's self-enrichment scheme. There is no justification for the siphoning of GWG's funds through Highland Consolidated to, among others, the Brad Heppner Family Trust, the HBH Trust, and Elmwood Bradley Oaks, and it would be unfair, unjust, and inequitable for the Brad Heppner Family Trust, the HBH Trust, and Elmwood Bradley Oaks to retain the benefits from the funds they received.

732.    Pleading in the alternative, GWG was—and, in turn, the Litigation Trust is, in stepping into its shoes for purposes of pre-petition claims that became property of the estate— without adequate remedy at law to the extent that all sums received by HCLP and Highland Consolidated, and ultimately, among others, the Brad Heppner Family Trust, the HBH Trust, and Elmwood Bradley Oaks, are not recovered: (a) as a remedy on the aiding and abetting claim against HCLP and Highland Consolidated; (b) from HCLP as an initial transferee of avoidable transfers made by BEN under applicable state fraudulent transfers laws; and/or (c) from Highland Consolidated, the Brad Heppner Family Trust, the HBH Trust, and Elmwood Bradley

Oaks, as a subsequent transferee of funds transferred from HCLP to HCLP Credit to Highland Consolidated. Pleading further in the alternative, the Litigation Trust is also without adequate remedy at law to the extent that it is unable to recover: (a) from HCLP under 11 U.S.C. §§ 550(a)(1) or 550(a)(2); and (b) from Highland Consolidated, the Brad Heppner Family Trust, the HBH Trust, and Elmwood Bradley Oaks, as a subsequent transferee under 11 U.S.C. § 550(a)(2).

**COUNT 7:**     **UNJUST ENRICHMENT (Against Bradley Capital)**

733.   The Litigation Trust repeats and realleges each and every allegation contained above as if fully set forth herein.

734.   In connection with, and as a result of, Heppner's misconduct, Bradley Capital directly or indirectly received ████████████████ from June 2019 onward and was therefore enriched. Bradley Capital would not have received those funds absent GWG's substantial cash transfers in the Transactions. A portion of those funds originated from GWG.

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████

735.   GWG suffered harm, or impoverishment, as a result of transferring funds to BEN. GWG received BEN equity in exchange. That BEN equity was and currently is worth a small fraction of the prices GWG paid, and it may be completely worthless by the time of trial. GWG also suffered harm in the form of other out-of-pocket costs incurred in connection with, or as a

result of, the Transactions, including, but not limited to, legal costs in the Transactions and in connection with the SEC investigations they played a substantial factor in.

736.    The benefit and enrichment that GWG indirectly conferred on Bradley Capital via cash transfers that flowed to BEN, HCLP, and/or Highland Consolidated was directly related to the harm GWG suffered in making those cash transfers.

737.    There was no justification for Heppner's self-enrichment scheme and siphoning vast sums out of GWG (and BEN) for his ultimate benefit, including through Bradley Capital. Bradley Capital was one of the entities he used in that scheme.  It was the entity that Heppner used for private air travel, including for personal reasons.  And Bradley Capital was also part of Heppner's HCLP-related self-enrichment scheme, as it received over ███████ in purported interest payments on the sham HCLP-BEN Second Debt and over ████████████████████ ██████████████████.  In would be unfair, unjust, and inequitable for Bradley Capital to retain the benefits it gained in connection with GWG's transfers.

738.    Pleading in the alternative, GWG was—and, in turn, the Litigation Trust, is, in stepping into its shoes for purposes of pre-petition claims that became property of the estate— without adequate remedy at law to the extent that Bradley Capital received funds or other benefits from BEN that are not recoverable against Bradley Capital as a subsequent transferee under applicable fraudulent conveyance laws in applicable state law.  Pleading further in the alternative, the Litigation Trust is also without adequate remedy at law to the extent that it is unable to recover from Bradley Capital as a subsequent transferee under 11 U.S.C. § 550(a)(2).

**COUNT 8:           UNJUST ENRICHMENT (Against Heppner)**

739.    The Litigation Trust repeats and realleges each and every allegation contained above as if fully set forth herein.

740.     In connection with, and as a result of, Heppner's misconduct, Bradley Capital and Highland Consolidated received ███████████████████ from June 2019 onward.  Bradley Capital and Highland Consolidated expended portions of the funds they received directly or indirectly—through subsequent transferee trusts and entities—in ways that conferred personal benefits on Heppner and enriched him.

741.     The benefits and enrichment that Heppner personally received from the nine figure sums flowing into, and through, Bradley Capital and Highland Consolidated never would have been possible but for GWG's substantial cash transfers in the Transactions. A substantial portion of those funds originated from GWG.  And to the extent BEN made other payments to those entities, ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ Accordingly, GWG conferred a benefit on Heppner in transferring funds to BEN and HCLP.

742.     GWG suffered harm, or impoverishment, as a result of, and related to, the transfers of cash to BEN and HCLP that ultimately benefitted Heppner.  GWG received BEN equity in exchange.  That BEN equity was and currently is worth a small fraction of the prices GWG paid, and it may be completely worthless by the time of trial.  GWG also suffered harm in the form of other out-of-pocket costs incurred in connection with, or as a result of, the Transactions, including, but not limited to, legal costs in the Transactions and in connection with the SEC investigations they played a substantial factor in.

743.     The benefit and enrichment that GWG indirectly conferred on Heppner via cash transfers that flowed to his entities and thereafter benefitted and enriched him was directly related to the harm GWG suffered in making those cash transfers.

744.    There was no justification for Heppner's self-enrichment scheme and siphoning vast sums out of GWG (and BEN) for his ultimate benefit.  It would be unjust, unfair, and inequitable for Heppner to retain the benefits he received.

745.    Pleading in the alternative, GWG was—and, in turn, the Litigation Trust is, in stepping into its shoes for purposes of pre-petition claims that became property of the estate— without adequate remedy at law to the extent that: (a) Heppner received funds or other benefits from BEN that are not recoverable against Heppner as a subsequent transferee under applicable fraudulent conveyance laws in applicable state law; and/or (b) the remedy awarded on the breach of fiduciary duty claims against Heppner does not encompass disgorgement of profits or the benefits Heppner personally received as a result of funds flowing into Bradley Capital and Highland Consolidated. Pleading further in the alternative, the Litigation Trust is also without adequate remedy at law to the extent that it is unable to recover from Heppner as a subsequent transferee under 11 U.S.C. § 550(a)(2).

**COUNT 9:**    **CIVIL CONSPIRACY (Against Heppner, HCLP, and Highland Consolidated)**

746.    The Litigation Trust repeats and realleges each and every allegation contained above as if fully set forth herein.

747.    Heppner, HCLP, and Highland Consolidated engaged in a conspiracy to obtain cash from GWG (primarily through BEN) under false pretenses, through fraud, and through Heppner's breaches of his fiduciary duty.  This conspiracy consisted of a combination of two or more persons or entities: Heppner, HCLP, Highland Consolidated, and HCLP's agents working in conjunction with Heppner and in carrying out the scheme (such as Banowsky, Martens, and Wickline).

748.    Heppner, HCLP, and Highland Consolidated each took one or more overt acts in pursuit of the scheme to obtain cash from GWG under false pretenses, using BEN as an intermediary.

749.    Heppner signed organizational documents in furtherance of the scheme (including back-dated agreements to conceal his relationship with HCLP and Highland Consolidated),
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
███████████████████████████████

750.    HCLP signed ██████████████████████████ backdated loan documents (through Hinkle and Martens), ██████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████

751.    Highland Consolidated ████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
██████████████████████

752.    GWG suffered resulting harm and damages that were proximately caused by, and were a result of, Heppner's, HCLP's, and Highland Consolidated's conspiracy.  GWG advanced substantial sums to BEN ████████████████████████████████████
████████████████████████    The BEN equity that GWG received in exchange for those transfers was and currently is worth a small fraction of the prices GWG paid, and it may be

completely worthless by the time of trial. GWG also suffered harm in the form of other out-of-pocket costs incurred in connection with, or as a result of the conspiracy, including, but not limited to, legal costs incurred in connection with negotiating with HCLP and in connection with SEC investigations related to HCLP, as well as over $100 million in professional fees and expenses incurred as a result of GWG's bankruptcy.

**COUNT 10:**     **AVOIDANCE AND RECOVERY OF THE $ ███████ FRAUDULENT TRANSFER ███████ ██████████ PURSUANT TO TEXAS BUSINESS & COMMERCE CODE ("TUFTA") §§ 24.005(a)(1), 24.008 & 24.009 (Against HCLP, HCLP Credit, Highland Consolidated, Heppner Family Home Trust, and Harmon Trust)**

753. The Litigation Trust repeats and realleges each of the allegations set forth above as if fully set forth herein.

754. ████████████████████████████████████████ ████████████

755. ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ██████████████████████████████

756. ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████

757.    As alleged above, the BEN-HCLP First Debt supposedly incurred on September 1, 2017, was not a legitimate, third-party debt but rather amounted to a shell game as Heppner moved assets and purported liabilities around and refinanced purported related party "loans" that were a decade old and had little payment history.  Indeed, on February 15, 2018, the day before the ███████████████████████ was made, Heppner wrote Martens: "For the first time in over a decade, a principal payment will be made on the note tomorrow.  Just wanted to give you a heads up.  It will be $25 million note pay down of principal to $116 million. . . . Do you need anything more?"  Martens responded by "kidding" about additional payments, and to wish "Happy birthday" to Heppner.  That purported loan was a sham from the start, and to the extent it was ever legally valid and enforceable, it was incurred with actual intent to hinder, delay, or defraud and is voidable for that reason too (as alleged herein).

758.    ██████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████  In January 2018, GWG signed the original Master Exchange Agreement with BEN, pursuant to which GWG would extend debt to BEN under the CLA.

759.    ██████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████

760.    ████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████   Yet Heppner never disclosed to GWG prior to GWG agreeing to sign the Master

Exchange Agreement or prior to GWG closing on the transaction that ██████████████████

██████████████████████████████████████████

761.    ████████████████████████████████████████

██████████████████████████████████████████

762.    ████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

763.    ████████████████████████████████████████

███████████████████████████████████████████████

████

764.    ████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

257

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████

765.    ██████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████

766.    ██████████████████████████████████████████

██████████████████    At all times from January 12, 2018, onward, GWG was a present or future creditor of BCC and BEN as a prospective judgment creditor of BCC and as a creditor of BEN under the CLA.  GWG had state law claims (arising pre-petition) against BCC (and BEN) for: (a) breaching fiduciary duties owed as part of a control group of controlling stockholders; and/or (b) aiding and abetting, or knowing participation in, breaches of fiduciary duty.  The Litigation Trust is likewise a present or future creditor of BEN and BCC, both: (a) stepping into GWG's shoes with respect to state law claims (which are property of the estate) against BEN and BCC; and (b) as a contingent judgment creditor of BEN and BCC with prospective liability under 11 U.S.C. § 550 for transfers that they received as initial transferees or subsequent transferees of the Debtors.

767.    ██████████████████████████████████████████

██████████████████████████████████████████████

768. 

769.

770.

771.

At all times from January 12, 2018 onward, GWG was a present or future creditor of HCLP as a prospective judgment creditor of HCLP because it had state law claims (arising pre-petition) against HCLP for: (a) aiding and abetting, or knowing participation in, breaches of fiduciary duty; (b) civil conspiracy; (c) unjust enrichment; and/or (d) avoidance and recovery of fraudulent transfers that HCLP received from BEN.  The Litigation Trust is likewise a present or future creditor of HCLP, both: (a) stepping into GWG's shoes with respect to state law claims (which are property of the estate) against HCLP; and (b) as a contingent

judgment creditor of HCLP due to HCLP's prospective liability under 11 U.S.C. § 550 for transfers that HCLP received as an initial transferee or subsequent transferee of the Debtors.

772.    Accordingly, the Litigation Trust may avoid the ████████████████████ ███████████████████████████ as transfers that are fraudulent pursuant to Tex. Bus. & Com. Code ("TUFTA") §§ 24.005(a)(1) and 24.008.  The Litigation Trust did not discover the existence of the ████████████████ until April 15, 2024 (upon receipt of Highland Consolidated's bank records), as part of the Litigation Trust's investigation.  Neither GWG nor the Litigation Trust could have reasonably discovered the fraudulent nature of the ██████████ ████████████████████████ prior to the petition date or the effective date of the Plan.

773.    Pursuant to TUFTA §§ 24.008 and 24.009, the Litigation Trust may avoid the ███████████████████████████████████ and obtain the value thereof (to the extent received) from: ███████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

███████████████████

774.    The Litigation Trust pleads the following in the alternative (to the transferee status of HCLP, HCLP Credit, and Highland Consolidated for purposes of this cause of action). Pursuant to TUFTA §§ 24.008 & 24.009(b)(1), the Litigation Trust may also avoid and recover

████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

█████████████████████████████████

**COUNT 11:**      **AVOIDANCE AND RECOVERY OF FRAUDULENT TRANSFERS MADE BY HCLP COMMENCING IN JUNE 2019 AND CONTINUING THEREAFTER PURSUANT TO TUFTA §§ 24.005(a)(1), 24.008 & 24.009 (Against HCLP Credit, Highland Consolidated, and Subsequent Transferees of Highland Consolidated (including, but not limited to, Bradley Capital, Elmwood Bradley Oaks, Brad Heppner Family Trust, and HBH Trust))**

775. The Litigation Trust repeats and realleges each of the allegations set forth above as if fully set forth herein.

776. As alleged and described above, HCLP was an instrumental component of, and active participant in, a self-enrichment scheme orchestrated by Heppner to extract cash from BEN and GWG.

777. Throughout the existence of this scheme, GWG was a present or future creditor of HCLP as a prospective judgment creditor of HCLP because it had state law claims (arising pre-petition) against HCLP for: (a) aiding and abetting, or knowing participation in, breaches of fiduciary duty; (b) civil conspiracy; (c) unjust enrichment; and/or (d) avoidance and recovery of

261

fraudulent transfers that HCLP received from BEN.  The Litigation Trust is likewise a present or future creditor of HCLP, both: (a) stepping into GWG's shoes with respect to state law claims (which are property of the estate) against HCLP; and (b) as a contingent judgment creditor of HCLP due to HCLP's prospective liability under 11 U.S.C. § 550 for transfers that HCLP received as an initial transferee or subsequent transferee of the debtors.

778.    HCLP made numerous transfers of the ill-gotten funds it received in connection with this misconduct t█████████████████████████████████████████████ ███████████. Such transfers—█████████████████████████████████████— commenced on June 4, 2019, and continued through at least May 20, 2022.  The Litigation Trust seeks to avoid transfers HCLP made to HCLP Credit from June 4, 2019 and continuing to present, including, but not limited to, those transfers set forth in Exhibit A, attached hereto and hereby incorporated by reference herein (collectively, along with any transfers made after May 20, 2022, the "HCLP Transfers").

779.    In making the HCLP Transfers, HCLP acted with actual intent to hinder, delay, or defraud any creditor, including GWG (and the Litigation Trust).  HCLP made those transfers in connection with the over-arching wrongful scheme it perpetrated along with Heppner.  ███████



By immediately transferring funds it received and keeping almost nothing, HCLP both furthered the over-arching scheme and thwarted future judgment collection efforts by GWG and the Litigation Trust.

780.    HCLP's actual intent to hinder, delay, or defraud creditors in making the ████████ ████████████████████ is also evident from the confluence of several badges of fraud.

781.    First, each of the HCLP Transfers was made ████████████████████████
████████████████████████████████████████████████████████████████████████
██████████████████████████████████████████.

782.    Second, the existence and fraudulent nature of the HCLP Transfers was concealed.  As alleged above, from 2019 to 2021, Heppner undertook several steps to conceal his relationship with HCLP.  Moreover, ████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
██████████████████████████████████████████.

783.    Third, HCLP did not receive reasonably equivalent value in exchange for the HCLP Transfers.  HCLP did not receive anything in exchange ███████████████████████
████████████████████████████████████████████████████████████████████████.

784.    Fourth, HCLP made the HCLP Transfers immediately after engaging in tortious and/or inequitable conduct that enabled HCLP to procure the funds that were used in those transfers.  Although GWG had not yet threatened HCLP with suit, initiated litigation, or secured a judgment, ████████████████████████████████████████████████████████.

785.    Fifth, and relatedly, HCLP made the HCLP Transfers shortly after it incurred substantial contingent judgment debts to GWG by participating in misconduct that enabled HCLP to obtain the funds in the first place.

786.    Sixth, HCLP was insolvent or became insolvent as a result of making the HCLP Transfers.  HCLP was a mere shell entity.  Its only purported assets were sham loans owed by

BEN, but those purported obligations are voidable.  And HCLP faced substantial litigation contingencies that grew over time as it actively participated in the scheme.

787.    Accordingly, each of the HCLP Transfers was fraudulent as to a present or future creditor of HCLP, including GWG and the Litigation Trust, pursuant to TUFTA § 24.005(a)(1). In turn, pursuant to TUFTA §§ 24.008 and 24.009 the Litigation Trust may avoid the HCLP Transfers and recover and obtain the value thereof from: (a) HCLP Credit as an initial transferee; and (b) Highland Consolidated, which lacked good faith, as a subsequent transferee of the HCLP Transfers.

788.    In addition, pursuant to TUFTA §§ 24.008 and 24.009, the Litigation Trustee may avoid the HCLP Transfers and recover and obtain the value thereof from subsequent transferees of Highland Consolidated to the extent such transferees received portions of the HCLP Transfers. Such entities include Defendants: (a) Bradley Capital, which was a subsequent transferee of Highland Consolidated lacking good faith with respect to at least $███████████  (b) Brad Heppner Family Trust, which was a subsequent transferee of Highland Consolidated lacking good faith with respect to at least $███████████; and (c) Elmwood Bradley Oaks, which was a subsequent transferee of Highland Consolidated lacking good faith with respect to at least ███████████.

789.    In addition, pursuant to TUFTA §§ 24.008 and 24.009, the Litigation Trustee may avoid the HCLP Transfers and recover and obtain the value thereof from subsequent transferees of Bradley Capital (which received funds from Highland Consolidated) to the extent such transferees received portions of the HCLP Transfers.  Such entities include Defendants: (a) Brad Heppner Family Trust, which was a subsequent transferee of Bradley Capital lacking good faith with respect to at least $███████████; (b) HBH Trust, which was a subsequent transferee of

Bradley Capital lacking good faith with respect to at least ██████████; and (c) Elmwood Bradley Oaks, which was a subsequent transferee of Bradley Capital lacking good faith with respect to at least $██████████.

**COUNT 12:**   **AVOIDANCE AND RECOVERY OF FRAUDULENT TRANSFERS MADE BY BEN IN JUNE 2019 AND CONTINUING THEREAFTER PURSUANT TO TUFTA §§ 24.005(A)(1), 24.008 & 24.009 (Against HCLP, HCLP Credit, Highland Consolidated, and Subsequent Transferees of Highland Consolidated (including, but not limited to, Bradley Capital, Elmwood Bradley Oaks, Brad Heppner Family Trust, and HBH Trust)**

790.   The Litigation Trust repeats and realleges each of the allegations set forth above as if fully set forth herein.

791.   In furtherance of, and in connection with, Heppner's scheme to enrich himself and his affiliates through HCLP and Highland Consolidated, Heppner caused BEN LP, BCH, and BCC to make numerous transfers to HCLP that—other than the ██████████ —commenced on June 4, 2019, and continued thereafter.  Those transfers included the following (collectively, along with any such transfers made by BEN LP, BCH, and BCC to HCLP after May 20, 2022, the "BEN-HCLP Transfers"):



| Date | Transferor | Amount |
|------|-----------|--------|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████

792.   ████████████████████████████████████████████████

██████████████████████████████████

793.   In making the BEN-HCLP Transfers and the BEN-Highland Consolidated Transfer, Heppner and the relevant BEN transferor entities acted with actual intent to hinder, delay, or defraud any creditor, including GWG.

794.   Each of the BEN-HCLP Transfers and the BEN-Highland Consolidated Transfer were made as part of, in connection with, and in furtherance of Heppner's scheme to enrich himself and his affiliates through HCLP and Highland Consolidated.  Moreover, Heppner's intent is imputed to BEN LP, BCH, and BCC because Heppner dominated and controlled each of those entities.  BEN Management was the general partner of BEN LP, which was the general partner of BCH, which was the sole member and manager of BCC.  Heppner exercised control over BEN Management and the related BEN entities falling under it as BEN's chairman, founder, and CEO, through his role as chairman on BEN board committees, through his pervasive influence in the board room and relationships with other senior BEN directors such as Hicks and Schnitzer, and through his influence over BEN employees.

795.   BCH's, BEN LP's, and BCC's actual intent to hinder, delay, or defraud creditors in making each of the BEN-HCLP Transfers and the BEN-Highland Consolidated Transfer is also evident from the confluence of several badges of fraud.

796.   First, each of those transfers was made to an affiliate (HCLP) of an insider (Heppner).   ████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████

797.    Second, BEN LP, BCH, and BCC did not receive reasonably equivalent value in exchange for the BEN-HCLP Transfers and the BEN-Highland Consolidated Transfer. ███

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████

798.    Third, BEN LP, BCH, and BCC were insolvent at the time of the transfers and/or as a result of them. ███████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████ the alternative asset portfolio was not owned by BEN or the transferor BEN entities, but rather by various liquid trusts and seller trusts.  The debt that BEN owed to GWG under the CLA ██████████████████████████████████

████████████  Moreover, during the time some of the transfers were made, BEN owed significant debts to third parties, such as Paul Capital and Sabes AV.

799.    Fourth, each of the transfers was made at the same time BEN incurred significant additional contingent judgment debts to GWG by foisting unfair transactions upon it.

800.    Accordingly, the BEN-HCLP Transfers and BEN-Highland Consolidated Transfer were fraudulent as to a present or future creditor of BEN, including GWG, under TUFTA § 24.005(a)(1).

801.     GWG was a present or future creditor of BEN LP, BCH, and BCC as a creditor of BEN under the CLA (specifically BEN LP) and as a prospective judgment creditor of BEN LP, BCH, and BCC.  GWG has state law claims (arising pre-petition) against BCC, BCH, and BEN LP for: (a) breaching fiduciary duties that those BEN entities owed as part of a control group of controlling stockholders; and/or (b) aiding and abetting, or knowing participation in, breaches of fiduciary duty.  The Litigation Trust is likewise a present or future creditor of BEN LP, BCH, and BCC, both: (a) stepping into GWG's shoes with respect to state law claims (which are property of the estate) against BEN and BCC; and (b) as a contingent judgment creditor of BEN and BCC with prospective liability under 11 U.S.C. § 550 for transfers that they received as initial transferees or subsequent transferee of the debtors.

802.     Accordingly, the BEN-HCLP Transfers and BEN-Highland Consolidated Transfer were fraudulent as to creditors of the transferor BEN entities, including GWG and the Litigation Trust, pursuant to TUFTA § 24.005(a)(1).  In turn, pursuant to TUFTA §§ 24.008 and 24.009 the Litigation Trust may avoid the HCLP Transfers and recover and obtain the value thereof from: (a) HCLP as an initial transferee of the BEN-HCLP Transfers; ███████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████.

803.     In addition, pursuant to TUFTA §§ 24.008 and 24.009, the Litigation Trustee may avoid the BEN-HCLP Transfers and the BEN-Highland Consolidated Transfer and recover and obtain the value thereof from subsequent transferees of Highland Consolidated to the extent such transferees received portions of the BEN-HCLP Transfers and/or the BEN-Highland Consolidated Transfer. ██████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

804.     In addition, pursuant to TUFTA §§ 24.008 and 24.009, the Litigation Trustee may avoid the BEN-HCLP Transfers and the BEN-Highland Consolidated Transfer and recover and obtain the value thereof from subsequent transferees of Bradley Capital (which received funds from Highland Consolidated) to the extent such transferees received portions of the BEN-HCLP Transfers and/or the BEN-Highland Consolidated Transfer.   Such entities include Defendants Brad Heppner Family Trust, HBH Trust, and Elmwood Bradley Oaks, all of which were subsequent transferees of Bradley Capital lacking good faith with respect to, collectively, many millions of dollars.

**COUNT 13:          AVOIDANCE OF THE BEN-HCLP FIRST DEBT AND BEN-HCLP SECOND DEBT AS OBLIGATIONS INCURRED WITH ACTUAL INTENT TO HINDER, DELAY, OR DEFRAUD CREDITORS (INCLUDING GWG) PURSUANT TO TUFTA §§ 24.005(A)(1), 24.008, & 24.009 (Against BEN LP, BCC, BCH, BHI, and HCLP)**

805.     The Litigation Trust repeats and realleges each of the allegations set forth above as if fully set forth herein.

806.     As alleged above, the BEN-HCLP First Debt and BEN-HCLP Second Debt were shams.  They were not legitimate third-party obligations, but rather an integral part of Heppner's scheme to extract cash from BEN and GWG through HCLP to Highland Consolidated, and ultimately into Heppner's affiliated trusts and entities.  As instruments of inequitable self-dealing by a fiduciary and fraudulent misconduct, the BEN-HCLP First Debt and BEN-HCLP Second Debt were void and/or voidable as a matter of common law.

807.     Pleading in the alternative, solely to the extent that the BEN-HCLP First Debt and BEN-HCLP Second Debt were legally valid and enforceable obligations at the time of any

payments made to HCLP, the Litigation Trust seeks to avoid any obligations owed in connection with the BEN-HCLP First Debt and BEN-HCLP Second Debt as obligations incurred with the actual intent to hinder, delay, or defraud creditors (including GWG), pursuant to TUFTA §§ 24.005(A)(1) and 24.008.

808.    BCC incurred the purported obligation it owed in connection with the BEN-HCLP First Debt with the actual intent to hinder, delay, or defraud creditors. ██████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████

809.    Moreover, the actual intent to hinder, delay, or defraud BEN's future creditors in connection with the BEN-HCLP First Debt may be inferred from a confluence of several badges of fraud.

810.    First, BEN (and BCC, the original purported borrower/obligor) did not receive reasonably equivalent value in exchange for the purported obligation it incurred to HCLP in connection with the BEN-HCLP First Debt. ██████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████

811.    Second, HCLP was effectively an insider of BEN (and BCC) due to HCLP's ties to Heppner. ███████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

█████████████████████████████████████████████

812.    Third, although the purported obligation itself was disclosed, the surrounding circumstances were concealed from GWG.  As alleged above, ████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████

813.    BCC likewise incurred the purported obligation it owed in connection with the BEN-HCLP Second Debt with the actual intent to hinder, delay, or defraud creditors—in particular, GWG. ████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████

814.    Moreover, the actual intent to hinder, delay, or defraud BEN's future creditors in connection with the BEN-HCLP First Debt may be inferred from a confluence of several badges of fraud.

815.    First, ████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████

816.    Second, the BEN-HCLP Second Debt was an obligation incurred to an insider, BHI.  BCC was a wholly owned subsidiary of BCH, and BHI was BCH's largest equity holder by virtue of its supposed NPC-A account.   Moreover, BHI was Heppner's primary holding vehicle for his equity interest in BEN.

817.    Third, ████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████.  To further distance himself and BHI from the loan, Heppner signed—on or after August 23, 2019—a back-dated version of HCLP's operating agreement that made it appear as if BHI had assigned the BEN-HCLP Second Debt to HCLP as of April 1, 2019.  ████████████████████████████████████████

████████████████████████████████████████████████████████

█████████████████████████████████████

818.    Accordingly, both the BEN-HCLP First Debt and BEN-HCLP Second Debt were fraudulent as to any creditor of BEN and BCC, including GWG.   Neither HCLP nor BHI

provided reasonably equivalent value in connection with either purported obligation, and both lacked good faith (as active participants in Heppner's self-enrichment scheme).

819.   At all times from January 12, 2018, onward, GWG was a present or future creditor of BCC and BEN as a prospective judgment creditor of BCC and as a creditor of BEN under the CLA.  GWG had state law claims (arising pre-petition) against BCC (and BEN) for: (a) breaching fiduciary duties owed as part of a control group of controlling stockholders; and/or (b) aiding and abetting, or knowing participation in, breaches of fiduciary duty.  The Litigation Trust is likewise a present or future creditor of BEN and BCC, both: (a) stepping into GWG's shoes with respect to state law claims (which are property of the estate) against BEN and BCC; and (b) as a contingent judgment creditor of BEN and BCC with prospective liability under 11 U.S.C. § 550 for transfers that they received as initial transferees or subsequent transferees of the debtors.

820.   Neither GWG nor the Litigation Trust discovered nor reasonably could have discovered ██████████████████████████████████████████████████████ ████████████████████ prior to within one-year of the petition date (for GWG) or prior to the effective date of the Plan (for the Litigation Trust).

821.   BEN's financial statements for the period ended December 31, 2018 (provided to GWG in mid-2019) contained a description of the "refinancings" ██████████████████ ██████████████████████████████ Moreover, the financial statement footnotes downplayed Heppner's financial interest in Highland Consolidated as a "class of possible beneficiaries" of trusts that owned limited partnership interests in Highland Consolidated.  ██████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

822.     After those financial statements were provided to GWG's independent directors in mid-2019, GWG and its Special Committees asked questions ████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████

823.     Moreover, even the SEC was not given a straight answer when it asked BEN and GWG about payments to Heppner and his affiliates.  When the SEC specifically asked (on April 30, 2021) about "payments of any kind which Brad Heppner or relatives of Brad Heppner have received either directly or indirectly since January 1, 2018 as a result of Mr. Heppner's ownership of, or affiliation with and/or services provided to" various entities, including HCLP (and "any entities affiliated with" those entities), GWG and BEN refused to identify any specific payments in their answer (transmitted on June 14, 2021).  The response disclosed the existence of "[a] long-standing lending relationship of 25 years between" Highland Consolidated and "entities affiliated with Mr. Heppner" and that Highland Consolidated transferred funds to those entities as "loans," ████████████████████████████████████████

███████████████████████████████████████

824.     In connection with preparing GWG's Form 10-K annual report filed on November 5, 2021 (for fiscal year ended December 31, 2020), BEN finally disclosed to GWG that advances from Highland Consolidated to Heppner's affiliates and entities had been made

"using proceeds from loan repayments made by Beneficient to HCLP . . . with such loan repayments made potentially using cash" originating from GWG.

825.    Ultimately, ███████████████████████████████████████ in connection with the BEN-HCLP First Debt and BEN-HCLP Second Debt was not fully discoverable until Heppner's subsequent uses of the proceeds sent through Highland Consolidated was uncovered.   Those payments—starting with the ████████████████ Transfers—and the surrounding circumstances ████████████████████████████ ████████████████████████████████████████████.   That was not reasonably knowable to GWG pre-petition (and certainly not prior to April 20, 2021).   (The Litigation Trust only discovered this information in April 2024).

826.    Accordingly, any purported obligations owed by BEN in connection with the BEN-HCLP First Debt and BEN-HCLP Second Debt are avoidable and void as obligations incurred with the actual intent to hinder, delay, or defraud creditors (including GWG), pursuant to TUFTA §§ 24.005(A)(1) and 24.008.

**COUNT 14:**          **AVOIDANCE AND RECOVERY OF FRAUDULENT TRANSFERS MADE BY GWG (FROM JULY 2020 – DECEMBER 2020) PURSUANT TO 11 U.S.C. §§ 548(a)(1)(A) & 550 (Against BCH, BCC, BCG (USA), HCLP, HCLP Credit, Highland Consolidated, CT Risk Management, L.L.C., and Other Subsequent Transferees (including, but not limited to, Bradley Capital, Elmwood Bradley Oaks, Brad Heppner Family Trust, and HBH Trust))**

827.    The Litigation Trust repeats and realleges each of the allegations set forth above as if fully set forth herein.

828.    The Debtors made the following transfers of their property, *i.e.,* money, via wire transfer (collectively, the "2020 Transfers"):

276

| Debtor | Date | Amount | Initial Transferee |
|--------|------|--------|--------------------|
| GWG Life | July 16, 2020 | $32,803,085.00 | BCH |
| GWG Life | July 16, 2020 | $28,196,915.00 | HCLP |
| GWG Holdings | September 8, 2020 | $25,000,000.00 | BCH |
| GWG Holdings | October 2, 2020 | $19,200,000.00 | BCH |
| GWG Holdings | December 9, 2020 | $25,000,000.00 | BCH |

829.    The 2020 Transfers were made with the requisite actual intent to hinder, delay, or defraud creditors within the meaning of 11 U.S.C. § 548 because the Debtors were under the control of the BEN/Heppner/Holland Control Group, the BEN/Heppner/Holland Control Group was in a position to—and did—dominate or control the Debtors' dispositions of their property in connection with the 2020 Transfers, and the BEN/Heppner/Holland Control Group acted with the requisite actual intent to hinder, delay, or defraud.

830.    As alleged more fully above: (a) GWG and BEN were affiliated companies (and Heppner was affiliated with HCLP, the initial transferee of $28.2 million in July 2020); (b) the relationships between GWG and BEN (and between GWG, Heppner, and HCLP) were not remotely at arm's-length; (c) BEN and Heppner, as part of the BEN/Heppner/Holland Control Group, controlled GWG's affairs generally and with respect to the transfers of its funds; (d) the 2020 Transfers were initiated and directed by the BEN/Heppner/Holland Control Group, including through their pawn, Evans, who as GWG's CFO acted disloyally to favor BEN's interests; and (e) the 2020 Transfers were either not approved by any GWG Special Committee, or to the extent they were, stemmed from grossly inadequate processes. Accordingly, the knowledge and intent of the BEN/Heppner/Holland Control Group suffices to establish the requisite actual intent to hinder, delay, or defraud creditors under 11 U.S.C. § 548 (without such intent being imputed to GWG for other purposes).

831.    The BEN/Heppner/Holland Control Group possessed actual intent to hinder, delay, or defraud GWG's creditors in connection with the 2020 Transfers. BEN (and HCLP)

extracted cash payments while giving GWG grossly inadequate consideration in exchange in the form of non-unitized Preferred C equity interests in BEN that were almost worthless.  Of the $130.2 million total funds transferred in connection with the 2020 Transfers, $78.2 million immediately flowed (directly, or indirectly through BEN) to HCLP, then to HCLP Credit, and then to Highland Consolidated, and another $5.6 million flowed directly from BEN to Highland Consolidated.  Even for the $32.8 million transferred on July 16, 2020, and the $19.2 million transferred on October 2, 2020, where the funds bounced around various BEN bank accounts, portions of those transfers nevertheless made their way indirectly to Bradley Capital and HCLP. Thus, the 2020 Transfers were part of Heppner's self-enrichment scheme.

832.    Moreover, the BEN/Heppner/Holland Control Group and especially Heppner knew—to a substantial degree of certainty—that GWG's creditors would necessarily be harmed by siphoning funds out of GWG into BEN and to HCLP (and, in turn, Highland Consolidated), with GWG receiving non-unitized, inferior BEN equity in return.  GWG could not afford to transfer large sums to BEN without receiving dollar-for-dollar consideration in exchange, and it was rendered insolvent by transferring large sums to BEN while receiving speculative, non-saleable, and largely worthless BEN equity interests in exchange.  As alleged in more detail herein, GWG was already insolvent or became insolvent as a result of the 2020 Transfers, meaning that GWG's creditors would necessarily be harmed (and hindered and delayed, at minimum).

833.    Accordingly, the Litigation Trust may avoid the 2020 Transfers pursuant to 11 U.S.C. § 548(a)(1)(A) on the basis of the BEN/Heppner/Holland Control Group's actual intent to hinder, delay, or defraud creditors.

834.    Pleading in the alternative, solely to the extent that intent of the BEN/Heppner/Holland Control Group is insufficient (by itself) to establish the requisite intent to hinder, delay, or defraud creditors and avoid the transfers pursuant to 11 U.S.C. § 548(a)(1)(A), the Litigation Trust further alleges that the requisite actual intent to hinder, delay, or defraud GWG as a creditor is established through the confluence of several badges of fraud and that the Litigation Trust may avoid the 2020 Transfers pursuant to 11 U.S.C. § 548(a)(1)(A).

835.    First, the Debtors did not receive reasonably equivalent value in exchange for the 2020 Transfers.  As alleged above, the Preferred C non-unitized equity accounts were largely worthless given that BEN's total equity had minimal, if any, value, due to BEN's disastrous financial condition, historical losses, endless operating cash burn, and highly speculative—and dubious—business plan and projections.  Moreover, the Preferred C equity was inferior to the NPC-A capital accounts higher up in BEN's capital stack.

836.    Second, GWG (more broadly) and the transferring debtors (GWG Holdings and GWG Life) were insolvent at the time of the 2020 Transfers or became insolvent as a result of those transfers, as alleged elsewhere herein.

837.    Third, the 2020 Transfers were made to insiders and affiliates of insiders.  BCH was part of the BEN/Heppner/Holland Control Group, as alleged above.  And HCLP was closely affiliated with Heppner—indeed, it was his instrument to extract cash out of BEN and GWG.

838.    Because the 2020 Transfers are avoidable under 11 U.S.C. § 548(a)(1)(A), the Litigation Trust may recover the transferred funds (or the value thereof) from the initial transferees and subsequent, immediate or mediate, transferees pursuant to 11 U.S.C. § 550.

839.    The Litigation Trust may recover from BCH as an initial transferee the full amount of each of the 2020 Transfers except for the July 16, 2020, transfer of approximately

$28.2 million to HCLP.  The Litigation Trust may recover the $28,196,915 transfer made to HCLP on July 16, 2020, from HCLP as an initial transferee.  And, with respect to that transfer to HCLP on July 16, 2020, the Litigation Trust may recover from BCH as the entity for whose benefit such transfer was made.

840.   The Litigation Trust may recover $15,000,000 from BCC and CT Risk Management, L.L.C. as subsequent transferees of BCH with respect to the July 16, 2020 transfer made by the Debtors to BCH.  Specifically, on July 16, 2020, BCH transferred $15,000,000 it received from the Debtors immediately to BCC, which that same day transferred the $15,000,000 to CT Risk Management, L.L.C., another affiliate of BEN.

841.   The Litigation Trust may recover $5,591,757 from Highland Consolidated as a subsequent transferee of BCH with respect to the July 16, 2020 transfer made by the Debtors to BCH.  On July 16, 2020, BCH transferred $5,591,757 of the money it received from the Debtors directly to Highland Consolidated.

842.   Moreover, the Litigation Trust may recover from BCC, HCLP, HCLP Credit, and Highland Consolidated as subsequent transferees of the 2020 Transfers to the extent each of those Defendants otherwise received proceeds of those transfers, as reflected in Exhibit B, attached hereto and hereby incorporated herein by reference.[27]  In particular, at least $83,788,672 of the 2020 Transfers were received by Highland Consolidated as a subsequent transferee, and the Trustee may recover that amount against Highland Consolidated.

843.   In addition, pursuant to 11 U.S.C. § 550, the Litigation Trust may recover and obtain the value of the 2020 Transfers from subsequent transferees of Highland Consolidated to

---

[27] The amounts listed in the Exhibit B likely do not include all proceeds of the initial transfer that may potentially be traceable to subsequent transferees, and the Litigation Trust reserves the right to seek additional recovery from the identified subsequent transferees, as well as other potential subsequent transferees.

the extent such transferees received portions of the BEN-HCLP Transfers and/or the BEN-Highland Consolidated Transfer. Such entities include Defendants Bradley Capital, Brad Heppner Family Trust, and Elmwood Bradley Oaks, all of which were subsequent transferees of Highland Consolidated lacking good faith with respect to, collectively, tens of millions of dollars.

844.   In addition, pursuant to 11 U.S.C. § 550, the Litigation Trust may recover and obtain the value of the 2020 Transfers from subsequent transferees of Bradley Capital (which received funds from Highland Consolidated) to the extent such transferees received portions of the 2020 Transfers. Such entities include Defendants Brad Heppner Family Trust, the HBH Trust, and Elmwood Bradley Oaks, all of which were subsequent transferees of Bradley Capital lacking good faith with respect to, collectively, many millions of dollars. The Litigation Trust may also recover from such entities to the extent that they were subsequent transferees of Bradley Capital with respect to funds that Bradley Capital received in connection with the 2020 Transfers through intermediaries other than Highland Consolidated.

**COUNT 15:**   **AVOIDANCE AND RECOVERY OF THE $65 MILLION LOAN PURSUANT TO APPLICABLE STATE LAW AND 11 U.S.C. §§ 544(b) & 550 (Against LiquidTrust Management, L.L.C., the Liquid Trusts, the Collective Collateral Trusts, Funding Trust Management, L.L.C., BCC, HCLP, HCLP Credit, Highland Consolidated, Bradley Capital, and Research Ranch Operating Company)**

845.   The Litigation Trust repeats and realleges each of the allegations set forth above as if fully set forth herein.

846.   The $65 Million Loan resulted in transfers of interests in the property of a debtor (GWG Life)—specifically, $65 million—to LiquidTrust Management, L.L.C. for the benefit of the Liquid Trusts. GWG Life funded the $65 Million Loan in batches of transfers (collectively,

the "2019 Loan Transfers") consisting of: (1) an aggregate $50 million transferred on June 3, 2019; and (2) an aggregate $15 million transferred on November 22, 2019.

847.    At the time (or after) GWG Life made the 2019 Loan Transfers, GWG Life, both directly and indirectly as a wholly owned and controlled subsidiary of GWG Holdings had one or more creditors who could have sought to avoid the 2019 Loan Transfers under applicable state law, including, but not limited to, TUFTA §§ 24.005, 24.006, 24.008 & 24.009.

848.    GWG Life did not receive reasonably equivalent value in exchange for the 2019 Loan Transfers.  Although it received a promissory note in the amount of $65 million from the Liquid Trusts dated May 31, 2019 (the "May 2019 Note"), the fair market value of that note and the Liquid Trusts' promise to pay was substantially less valuable than the $65 million transferred. Indeed, no third-party purchaser from GWG in an arm's-length transaction in the marketplace would have paid even a small fraction of the face value of the May 2019 Note given the combination of the following four circumstances, amongst others alleged above.

849.    First, the borrowers were recently-formed Liquid Trusts that had no operational history.  Moreover, their own means of repaying the May 2019 Note was to generate cash flow from the underlying alternative assets they held.  But those assets were highly *illiquid*, old and stale interests dating back many years, and whether those alternative assets—which their prior owners were all eager to unload—could ever repay the note was highly doubtful.

850.    Second, and relatedly, the borrower Liquid Trusts were not required to keep the proceeds, but instead planned to transfer the proceeds through various intermediaries upstream to BEN.  Indeed, the purpose of the loan was ███████████████████████████████████ ███████████████████████, and the loan was structured—to go first to the Liquid Trusts and then around to BEN—specifically in order to prevent BEN's other creditors (like Paul Capital)

from sweeping the proceeds. In other words, the loan proceeds were not used in a way that would help the borrower Liquid Trust repay the loan, but were instead transferred into the financial black hole that was BEN's highly distressed business. (For similar reasons, and because BEN was part of the control group of GWG's controlling stockholders, the loan was made to an insider and was a related party transaction from the get-go).

851. Third, the May 2019 Note was unsecured. Moreover, it was subordinated to the purported HCLP-BEN First Debt and HCLP-BEN Second Debt. (Although those debts were shams and void or voidable, a third-party arm's-length purchaser of the May 2019 Note from GWG would not have realized that at the time and would have assigned significant risk to the presence of senior creditors).

852. Fourth, the maturity date was not until four years later, and no interest was due until maturity. Moreover, the interest rate on the May 2019 Note was only 7.0%. Thus, time value of money would further warrant a discount to face value, especially given the gross inadequacy of a 7% interest rate to compensate a lender for the high risk of non-payment.

853. At the time it made the 2019 Loan Transfers, GWG Life and the Debtors more broadly were undercapitalized. In addition, they reasonably should have believed that GWG Life and GWG would incur debts beyond their ability to repay as they became due. In essence, the Debtors bet the company on BEN's business; GWG and GWG Life would not be able to repay creditors (such as holders of L Bonds) if BEN tanked. GWG Life and GWG reasonably should have known that BEN was, or would become, worthless, *i.e.,* that investing in BEN was throwing good money after bad, that BEN was financially distressed, that BEN's projections were based on statistical simulations untethered to reality and included significant errors, that

BEN was unprofitable and burned cash, and that its business plan was both speculative and inconsistent with basic economics.

854.    GWG Life both directly and indirectly as a wholly owned subsidiary of insolvent GWG Holdings, was also insolvent at the time or became insolvent as a result of the 2019 Loan Transfers. GWG Holdings was insolvent because the amount of its liabilities exceeded the fair value of its assets (including the assets of its subsidiaries). Specifically, because GWG's investment in BEN was effectively worthless, its principal assets were its cash on hand and the fair value of the life insurance policies. But the fair value of these and other non-BEN-related assets was materially less than the amount of GWG's total liabilities. Even including the fair value of the CLA receivable, GWG was still insolvent. Because GWG as a whole was insolvent, and thus lacked the assets to cover pay its debt obligations, GWG Life also was insolvent.

855.    GWG Life guaranteed the obligations under the L Bonds and Seller Trust L Bonds; this guaranty was an "unconditional" guaranty in which GWG Life, among things, waived any right to require the holders of the bonds to proceed first against GWG Holdings. GWG Life further granted a security interest in substantially all its assets to serve as collateral security for obligations under the L Bonds and Seller Trust L Bonds. Because all liabilities associated with the L Bonds and Seller Trust L Bonds were liabilities of GWG Life but some assets (namely, cash) were held solely by GWG Holdings, GWG Life was insolvent at the time. Further, even if GWG Life had rights against GWG Holdings as issuer of the L Bonds and Seller Trust L Bonds, any right of GWG Life to recover for any payment on the guaranties was worthless because GWG Holdings also was insolvent.

856.    Accordingly, a creditor of GWG Life could have avoided the 2019 Loan Transfers as fraudulent transfers pursuant to TUFTA §§ 24.005, 24.006, and 24.008.  GWG Life had one or

more creditors with allowable unsecured claims as of the petition date (*e.g.,* claims asserted by holders of L Bonds, tax claims by the IRS and state tax authorities, trade creditor claims, unsecured litigation claims) that could have avoided the 2019 Loan Transfers and, in turn, the Litigation Trust can step into the shoes of such creditors and avoid the 2019 Loan Transfers pursuant to 11 U.S.C. § 544(b).

857.    Because the 2019 Loan Transfers are avoidable pursuant to 11 U.S.C. § 544(b), the Litigation Trust may recover the transfers or the values thereof from the initial transferees and subsequent transferees (*i.e.,* mediate and intermediate transferees) pursuant to 11 U.S.C. § 550.

858.    The Debtors initially made the Loan Transfers to LiquidTrust Management, L.L.C. in a series of wire transfers made for the benefit of various Liquid Trusts, as follows:

| Date | Amount | For Benefit Of |
| --- | --- | --- |
| June 3, 2019 | $8,335,000 | LT-1 Liquid Trust |
| June 3, 2019 | $8,335,000 | LT-7 Liquid Trust |
| June 3, 2019 | $8,335,000 | LT-5 Liquid Trust |
| June 3, 2019 | $8,335,000 | LT-2 Liquid Trust |
| June 3, 2019 | $8,330,000 | LT-9 Liquid Trust |
| June 3, 2019 | $8,330,000 | LT-8 Liquid Trust |
| November 22, 2019 | $2,500,500 | LT-7 Liquid Trust |
| November 22, 2019 | $2,500,500 | LT-1 Liquid Trust |
| November 22, 2019 | $2,500,500 | LT-5 Liquid Trust |
| November 22, 2019 | $2,500,500 | LT-2 Liquid Trust |
| November 22, 2019 | $2,499,000 | LT-9 Liquid Trust |
| November 22, 2019 | $2,499,000 | LT-8 Liquid Trust |

Pursuant to 11 U.S.C. § 550, the Litigation Trust may recover: (a) from LiquidTrust Management, L.L.C., as an initial transferee, the aggregate $65 million; and (b) from each of the aforementioned Liquid Trusts, as the entities for whose benefit the transfers were made, the respective amount allocated to each.

859.    After receiving the 2019 Loan Transfers from GWG Life, LiquidTrust Management, L.L.C. then made a series of smaller transfers to the Collective Collateral Trusts. Accordingly, the Litigation Trust may recover from the Collective Collateral Trusts as subsequent transferees pursuant to 11 U.S.C. § 550.

860.    From there, the Collective Collateral Trusts transferred funds to Funding Trust Management, L.LC., which in turn transferred funds received in connection with the 2019 Transfers to BCC.  Finally, from BCC, the proceeds of the 2019 Transfers were disbursed for a variety of purposes, including transfers to Heppner-affiliates, including, but not limited to, HCLP (and on up the chain through HCLP Credit to Highland Consolidated), Bradley Capital, Research Ranch Operating Company, as set forth in the attached Exhibit C, hereby incorporated herein by reference.[28]

861.    Pursuant to 11 U.S.C. § 550, the Litigation Trust may recover the full amount of the 2019 Transfers—to the extent of funds received—from, among other entities, the following as subsequent transferees: (a) Funding Trust Management, L.L.C.; (b) BCC; (c) Bradley Capital; (d) HCLP; (e) HCLP Credit; (f) Highland Consolidated; and (g) Research Ranch Operating Company.  None of these subsequent transferees, all of which are affiliated with and/or controlled by BEN or Heppner, acted in good faith.

**COUNT 16:**          **AVOIDANCE OF TERMINATION OF THE 2019 NOTE AS A FRAUDULENT TRANSFER AND RECOVERY OF THE VALUE THEREOF PURSUANT TO 11 U.S.C. §§ 548(a)(1)(A) & 550 (Against the Liquid Trusts)**

862.    The Litigation Trust repeats and realleges each of the allegations set forth above as if fully set forth herein.

---

[28] The amounts listed in the Exhibit C likely do not include all proceeds of the initial transfer that may potentially be traceable to subsequent transferees, and the Litigation Trust reserves the right to seek additional recovery from the identified subsequent transferees, as well as other potential subsequent transferees.

863.     In connection with an "Agreement for Repayment" and related "Payoff Letter" dated September 30, 2020 (but not executed until November 2020), GWG Life (and GWG) agreed to "terminate" the 2019 Note (the "$65 Million Loan Termination").

864.     Pleading in the alternative, to the extent that (a) the Litigation Trust is not awarded $65 million in rescissory damages related to the $65 Million Loan, and/or (b) the Litigation Trust is unable to obtain an aggregate recovery of $65 million on the 2019 Loan Transfers pursuant to §§ 544(b) & 550, the Litigation Trust seeks to avoid the $65 Million Loan Termination as a fraudulent transfer pursuant to 11 U.S.C. § 548(a)(1)(A).

865.     The $65 Million Loan Termination constituted a transfer of the interest of debtor in property within the meaning of 11 U.S.C. §§ 101(54) and 548 because terminating and extinguishing the 2019 Note involved disposing of or parting with an interest in property, *i.e.,* an interest in a note receivable.

866.     The $65 Million Loan Termination was made with the requisite actual intent to hinder, delay, or defraud creditors within the meaning of 11 U.S.C. § 548 because the Debtors were under the control of the BEN/Heppner/Holland Control Group, the BEN/Heppner/Holland Control Group was in a position to—and did—dominate or control the Debtors in connection with the $65 Million Loan Termination, and the BEN/Heppner/Holland Control Group acted with the requisite actual intent to hinder, delay, or defraud.

867.     As alleged more fully above: (a) GWG and BEN were affiliated companies; (b) the relationships between GWG and BEN was not at arm's-length; (c) BEN, as part of the BEN/Heppner/Holland Control Group, controlled GWG with respect to its affairs; (d) the $65 Million Loan Termination was initiated and directed by the BEN/Heppner/Holland Control Group, including through Evans, who as GWG's CFO acted disloyally acted to favor BEN's

interests; and (e) the $65 Million Loan Termination was not the product of a well-functioning GWG Special Committee. Accordingly, the knowledge and intent of the BEN/Heppner/Holland Control Group suffices to establish the requisite actual intent to hinder, delay, or defraud creditors under 11 U.S.C. § 548 (without such intent being imputed to GWG for other purposes).

868.    The BEN/Heppner/Holland Control Group possess actual intent to hinder, delay, or defraud GWG's creditors in connection with the $65 Million Loan Termination.  Pleading in the alternative, solely to the extent that the 2019 Note had any value, GWG and GWG Life did not receive reasonably equivalent value in exchange for the $65 Million Loan Termination. GWG received Preferred C non-unitized equity in BEN that had little to no value in the marketplace at the time for all the reasons alleged above.  Moreover, GWG and GWG Life were insolvent or undercapitalized at the time of the $65 Million Loan Termination, as alleged herein. Finally, the $65 Million Loan Termination was made to an affiliate of an insider.

869.    Accordingly, the Litigation Trust may avoid the $65 Million Loan Termination pursuant to 11 U.S.C. § 548(a)(1)(A).  In turn, pursuant to 11 U.S.C. § 550, the Litigation Trust may recover the value thereof from the Liquid Trusts, the borrowers on the $65 Million Loan who benefitted from the $65 Million Loan Termination and received the extinguishment of debt they otherwise would have owed.

**COUNT 17:       AVOIDANCE OF FRAUDULENT TRANSFERS MADE IN THE NOVEMBER 2021 DECOUPLING TRANSACTION AND RECOVERY OF THE VALUE THEREOF PURSUANT TO 11 U.S.C. §§ 548(a)(1)(A) & 550 (Against BEN LP, BEN Management, BCC, BCH, Heppner, Hicks, Schnitzer, Cangany, Holland, Evans, and Chavenson)**

870.    The Litigation Trust repeats and realleges each of the allegations set forth above as if fully set forth herein.

871.    The Decoupling transaction between GWG and BEN was effective on or around November 29, 2021.

872.    As part of, or in connection with, the Decoupling, on November 26, 2019, the Debtors, GWG and GWG Life, signed documents parting with or disposing of several of their interests in property, each of which constituted a "transfer" within the meaning of 11 U.S.C. §§ 101(54) & 548, including the following: (a) GWG Life agreed to terminate, discharge, and otherwise release BEN LP from the outstanding $208,096,073 amount due under the CLA (the "CLA Termination Transfer") (in exchange for BEN equity interests); and (b) conversion of the NPC-A preferred equity account (with a stated amount of $319 million) that GWG had obtained in December 2019 into inferior, Preferred B capital account (the "Preferred Equity Conversion Transfer").  The CLA Termination Transfers and the Preferred Equity Conversion Transfer were made with actual intent to hinder, delay, or defraud creditors and are avoidable pursuant to 11 U.S.C. § 548.

873.    Around the same time, and in connection with the Decoupling, GWG and GWG Life executed a "Termination and Release Agreement," dated and purportedly effective as of November 15, 2021, which contained a purported release (the "November 2021 Release Transfer") of all potential claims—expressly including breach of fiduciary duty claims—held by GWG and GWG Life against BEN LP, BEN Management, BCC, BCH, BHI, and GWG's "present or former directors, officers, members, or managers" and "present or former directors [and] officers…who also serve or served as directors, members or managers of" BEN LP, BCC, BCH, and BEN Management.  The November 2021 Release Transfer was void or voidable under common law for the reasons set forth herein.  Pleading in the alternative, solely to the extent that the November 2021 Release Transfer was valid and enforceable by any of the Defendants, the

November 2021 Release Transfer involved a transfer of an interest of property of the Debtors—giving up litigation claims—that was made with the requisite actual intent to hinder, delay, or defraud creditors and is avoidable pursuant to 11 U.S.C. § 548(a)(1)(A).

874.   The CLA Termination Transfer, the Preferred Equity Conversion Transfer, and the November 2021 Release Transfer were made with the requisite actual intent to hinder, delay, or defraud creditors within the meaning of 11 U.S.C. § 548 because the Debtors were under the control of the BEN/Heppner/Holland Control Group, the BEN/Heppner/Holland Control Group was in a position to—and did—dominate or control the Debtors in connection with the Decoupling and those transfers, and the BEN/Heppner/Holland Control Group acted with the requisite actual intent to hinder, delay, or defraud.

875.   As alleged more fully above, GWG and BEN were affiliated companies, the relationships between GWG and BEN were not arm's-length, and the BEN/Heppner/Holland Control Group exercised control over GWG, generally.  Although GWG's board was reduced in size following resignations of Defendants Heppner, Hicks, Schnitzer, and others in June 2021, GWG's board continued to act in favor of BEN's and Heppner's interests, not GWG's.   In November 2021, GWG's board consisted of: (1) Holland (a former BEN director who was part of the BEN/Holland/Heppner Control Group); (2) Evans (a former BEN officer who served as Heppner's and BEN's pawn within GWG); (3) Cangany (a dual-director of BEN and GWG who was previously Heppner's plant on the Special Committee in 2020); (4) Chavenson (who had a demonstrated track record of favoring BEN's interests over GWG's); and (5) de Weese (a dual-director of BEN and GWG).  (The majority of those directors were self-interested in procuring releases for themselves given their current or prior affiliations with BEN).  Those BEN-loyalists,

in particular Evans, Holland, and Cangany worked with BEN and Heppner to initiate and push through the Decoupling.

876.    The BEN/Heppner/Holland Control Group (along with Evans and Cangany) possessed the requisite actual intent to hinder, delay, or defraud GWG's creditors in pushing through the Decoupling, and the CLA Termination Transfer, the Preferred Equity Conversion Transfer, and the November 2021 Release Transfer.  Those transactions were not pursued to benefit GWG, but rather to try to insulate insiders such as themselves, Heppner, and BEN from liability for prior egregious misconduct, while at the same time further benefitting Heppner and BEN by removing GWG debt and improving Heppner's (and Hicks' and Schnitzer's) position in the BEN capital stack.

877.    Moreover, Holland, Evans, and their fellow BEN-loyal directors pushed through the Decoupling while knowing to a substantial certainty that GWG's creditors would necessarily be harmed by the Decoupling, and that GWG was on the cusp of bankruptcy (and would be forced to file, in part, due to potential adverse regulatory consequences of the Decoupling itself). GWG was already insolvent and undercapitalized at the time of the Decoupling and became more so as a result of it, and in particular, because of the CLA Termination Transfer.  The net effect of the Decoupling was that GWG"s creditor body and bankruptcy estate would be hindered and delayed in investigating litigation claims and/or recouping any value from BEN by enforcing potential defaults under the CLA, all while the minimal prospects of GWG and its constituents every recovery from an equity position in BEN were made even more remote.

878.    GWG did not receive reasonably equivalent value in exchange for the CLA Termination Transfer, Preferred Equity Conversion Transfer, and the November 2021 Release Transfer, either collectively as a whole as part of the overall Decoupling, or individually in each

component apart.  In exchange for giving up a more than $200 million note receivable from BEN at the top of the capital stack and an NPC-A account that would have shared in a liquidation of BEN, GWG received then (and now) nearly worthless equity interests below large NPC-A accounts (held by Heppner, Hicks, and Schnitzer).  All GWG received in exchange for the purported release of nine-figure litigation claims against BEN and Defendants was a mutual release from BEN, but BEN has no valuable claims against GWG.  And the terms of the overall transactions were so lop-sided that GWG's financial advisor refused to provide a fairness opinion to defend it.

879.    Accordingly, the Litigation Trust may avoid the CLA Termination Transfer, Preferred Equity Conversion Transfer, and the November 2021 Release Transfer pursuant to 11 U.S.C. § 548(a)(1)(A).

880.    The Litigation Trust may also recover the value of the CLA Termination Transfer from BEN LP pursuant to 11 U.S.C. § 550.  The CLA Termination Transfer is avoidable pursuant to § 548.  And BEN LP was the initial transferee of the CLA Termination Transfer as the borrower and obligor under the CLA, whose payment obligation to the debtors was effectively released and extinguished through that transfer.

**COUNT 18:         AVOIDANCE OF ANY PURPORTED RELEASES GIVEN TO DEFENDANTS AS FRAUDULENT TRANSFERS PURSUANT TO 11 U.S.C. §§ 544(b), 548 & 550 (Against all Defendants)**

881.    The Litigation Trust repeats and realleges each of the allegations set forth above as if fully set forth herein.

882.    Pleading in the alternative, solely to the extent that the November 2021 Release Transfer is deemed otherwise valid and not deemed to have been made in connection with, or as part of, the broader Decoupling, the November 2021 Release Transfer is avoidable as a

constructively fraudulent transfer pursuant to: (a) 11 U.S.C. § 548(a)(1)(B); and/or (b) 11 U.S.C. § 544(b) and applicable other law, including, but not limited to, TUFTA §§ 24.005, 24.006, 24.008, and 24.009.

883.    As alleged above, GWG (and/or GWG Life) did not receive reasonably equivalent value in exchange for the November 2021 Release.  GWG and GWG Life purported to release litigation claims worth hundreds of millions of dollars and received a mutual release from BEN. But BEN did not have viable, let alone valuable, claims against GWG and GWG Life.  As alleged above, GWG and GWG Life were insolvent and undercapitalized at the time of the purported November 15, 2021, effective date for the November 2021 Release.  Both GWG and GWG Life have creditors as of the petition date who could have avoided the November 2021 Release pursuant to TUFTA §§ 24.005, 24.006 and 24.008.

884.    Accordingly, the Litigation Trust may avoid the November 2021 Release pursuant to (a) 11 U.S.C. § 548(a)(1)(B); and/or (b) 11 U.S.C. § 544(b) and applicable other law.

885.    Pleading in the alternative, solely to the extent that Defendants contend GWG or GWG Life otherwise purportedly released any claims against any Defendants at some point in time in connection with or after any of the Transactions, the Litigation Trust likewise seeks to avoid such releases as constructively fraudulent transfers.

**COUNT 19:    RESCISSORY, DECLARATORY, OR OTHER RELIEF ESTABLISHING THAT ANY PURPORTED RELEASES ARE VOID IN EQUITY OR AT COMMON LAW.**

886.    The Litigation Trust repeats and realleges each and every allegation contained above as if fully set forth herein.

887.    Pleading in the alternative, solely to the extent that any releases purportedly given through any of the Transactions to any Defendant, including but not limited to the releases

purportedly given in the Termination and Release Agreement related to the Decoupling, are otherwise valid and enforceable, any such releases should be deemed void and ineffective.

888.   Entire fairness is the applicable standard of review for the Transactions because each of the Transactions was a controller transaction involving the BEN/Heppner/Holland Control Group, and none of the Transactions was: (a) submitted to a majority of the minority stockholder vote; and/or (b) approved by a well-functioning Special Committee (or by any Special Committee at all, in some instances).

889.   Entire fairness is also the applicable standard of review for the Transactions because at the time of each of the transactions, GWG did not have a board majority of independent, disinterested, sufficiently informed, individuals who acted in good faith and in GWG's best interests in connection with the Transactions.

890.   The Termination and Release Agreement, entered into between and among GWGH, GWG Life, BCG, BCH, BCC, BEN Management, and BHI, included purported mutual releases purporting to waive certain claims between and among the parties and each of their current or former directors, officers, members, and managers.

891.   At the time GWG entered into the Termination and Release Agreement, GWG's directors were Holland, Evans, Cangany, de Weese, and Chavenson. As directors of GWG, these individuals owed fiduciary duties, including the duty of loyalty (and the duty of good faith).

892.   Two of GWG's five board members (Cangany and de Weese) were dual-directors of both BEN and GWG, and the remaining three GWG directors (Holland, Evans, and Chavenson) were not independent of BEN and acted disloyally by favoring BEN's interests over GWG's interests throughout the Transactions at issue, as detailed above in Counts 1 and 2. Moreover, Holland was a former director of BEN and Evans was a former BEN officer, and thus

Holland and Evans were self-interested in the purported release as well. And to the extent the release purported to release GWG claims against its own directors, Chavenson suffered was also self-interested.

893. Because the GWG board was conflicted, the Termination and Release Agreement is subject to entire fairness review. However, the Termination and Release Agreement was grossly unfair to GWG, to the extent that it caused GWG to release valuable claims against its own directors and officers and BEN and its current and former directors, officers, members, and managers in exchange for nothing more than a mirror release of BEN's nonexistent claims against GWG and its current and former directors, officers, members, and managers. GWG received grossly inadequate and unfair consideration for entering into the Termination and Release Agreement.

894. GWG's directors breached their fiduciary duties of loyalty by causing GWG to enter into the Termination and Release Agreement, by acting self-interestedly and/or by otherwise disloyally favoring BEN's and Heppner's interests over GWG's. Prior to causing GWG to enter into the Termination and Release Agreement, the GWG directors had acknowledged they needed an exit strategy to mitigate their liability if the company failed

895. To the extent the Court finds the release provision to be effective and not otherwise avoidable under Chapter 5 of the Bankruptcy, there would be no adequate remedy at law available to the Litigation Trust to restore its rights. Therefore, to the extent the Court finds that the Termination and Release Agreement waived GWG's claims against BEN or its current or former directors, officers, members, and managers, the Litigation Trust seeks rescission to restore the status quo *ante*, declaring the release invalid and restoring GWG's ability to bring claims against BEN and its directors arising from the Transactions.

896.    In addition, to the extent that Defendants claim that any other agreements entered into in connection with any of the Transactions purport to release claims against any of the Defendants, those should also be found void and of no effect.

897.    None of the Transactions were entirely fair to GWG for the reasons summarized in section D.5 and F.7 and for all the other reasons alleged above.   In each instance, the consideration GWG received was grossly inadequate and unfair.   And each of the Transactions was the product of grossly unfair dealing.

898.    Further, each of the Transactions was a breach of the fiduciary duty of loyalty of the BEN/Heppner/Holland Control Group and the Director Defendants who were interested in those Transactions, as described in Count 1 and Count 2 above.

899.    Because each of the Transactions was: (a) grossly inadequate and unfair and the product of grossly unfair dealing, and (b) a product of breaches of fiduciary duty, and GWG is entitled to rescission of agreements that effectuated the Transactions, including any related agreements that any Defendant(s) contend contain purported releases of BEN, BEN's current or former directors, officers, members, and managers, or any other Defendant.

900.    For the foregoing reasons, the Litigation Trust is entitled to a judgment by the Court rescinding the Termination and Release Agreement and declaring the Termination and Release Agreement, as well as any other agreements related to the Transactions that Defendants contend purport to waive claims against BEN, BEN's current or former directors, officers, members, and managers, or any other Defendant, void and of no effect. The Litigation Trust also requests a declaratory judgment that the Termination and Release Agreement, as well as any other agreements stemming from the Transactions that purport to release claims against BEN or BEN directors, are void and unenforceable.

**COUNT 20:**          **DISALLOWANCE OF CLAIMS PURSUANT TO 11 U.S.C. § 502(d)**

901. The Litigation Trust repeats and realleges each of the allegations set forth above as if fully set forth herein.

902. BHI filed proof of claim number 3671 (GWG Holdings) and number 3672 (GWG Life). BCC filed proof of claim number 3673 (GWG Holdings) and number 3674 (GWG Life). BEN Management filed proof of claim number 3675 (GWG Holdings) and number 3676 (GWG Life). BCH filed proofs of claim number 3677 (GWG Holdings), number 3678 (GWG Life USA), and number 3679 (GWG Life). BEN LP filed proof of claim number 3680 (GWG Holdings), number 3681 (GWG Life USA), and number 3682 (GWG Life). BCG (USA) filed proof of claim number 3683 (GWG Holdings), number 3684 (GWG Life USA), and number 3685 (GWG Life) (collectively, the "BEN Claims").

903. Each of the BEN Claims was filed on July 28, 2022. All of the claims are duplicates, and all assert a purported claim amount of "not less than $15,501,131.40."

904. Section 502(d) of the Bankruptcy Code provides that the claim of any entity or transferee receiving a payment that is avoidable under §§ 544, 547 or 548 of the Bankruptcy Code shall be disallowed unless the entity or transferee turns over the payment or value of the payment. Further, the Plan states: "All Claims or Interests held by Entities from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code or that the Debtors, the Wind Down Trust, or the Litigation Trust, as applicable, allege is a transferee of a transfer avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code." (ECF No. 1678.)

905.     BHI, BCC, BEN Management, BEN LP, BCH, and BCG (USA) are transferees of avoidable transfers, as described herein.

906.     BHI, BCC, BEN Management, BEN LP, BCH, and BCG (USA) have not paid or surrendered the avoidable transfers or the value of the avoidable transfers to the Litigation Trust.

907.     The Litigation Trust thus objects to any and all claims of BHI, BCC, BEN Management, BEN LP, BCH, and BCG (USA) including, without limitation, all pre-petition and post-petition claims, under § 502(d) of the Bankruptcy Code.

908.     Accordingly, the Litigation Trust is entitled to judgment against BHI, BCC, BEN Management, BEN LP, BCH, and BCG (USA) disallowing all claims of these Defendants unless and until they return all amounts due to the Litigation Trust, and any other separately filed objections to such claims are resolved as provided by § 502(d) of the Bankruptcy Code.

909.     The Litigation Trust reserves all other rights with respect to the BEN Claims and intends to object these claims in accordance with the deadline and procedures for claims objections.

## **PRAYER FOR RELIEF**

WHEREFORE, the Litigation Trust prays for relief and judgment as follows:

a.     Entering judgment in favor of the Litigation Trust against all Defendants;

b.     Awarding rescissory damages in equity, jointly and severally, in an amount to be determined at trial against all Defendants who breached fiduciary duties of loyalty or aided and abetted/knowingly participated in breaches of fiduciary duty (Defendants Heppner, Holland, Evans, Hicks, Schnitzer, Cangany, Chavenson, BEN Management, BEN LP, BCH, BCC, HCLP, and Highland Consolidated);

c.     Awarding compensatory damages, jointly and severally, in an amount to be determined at trial against Defendants Heppner, Holland, Evans, Hicks, Schnitzer, Cangany, Chavenson, BEN Management, BEN LP, BCH, BCC, HCLP, and Highland Consolidated;

d.     Disgorging all profits Heppner, Holland, BEN LP, BCH, Hicks, Schnitzer, Cangany, Chavenson, Evans and/or BCC received, directly or indirectly, as a result of breaches of the fiduciary duty of loyalty;

e.      Ordering and imposing a constructive trust over all property that any Defendant created or acquired with proceeds traceable to any breaches of fiduciary duty;

f.      Ordering restitutionary relief or other appropriate relief in equity to the extent that Heppner, Highland Consolidated, Brad Heppner Family Trust, Bradley Capital, Elmwood Bradley Oaks, and/or the HBH Trust were unjustly enriched;

g.      Ordering Heppner, HCLP, Highland Consolidated, Brad Heppner Family Trust, Bradley Capital, Elmwood Bradley Oaks, and the HBH Trust to provide an accounting;

h.      Avoiding the ███████████████ and the ███████████ ██████ and awarding recovery (or other appropriate relief) in the amount of those transfers, to the extent received, against HCLP, HCLP Credit, Highland Consolidated, Heppner Family Home Trust, and Harmon Trust (pursuant to TUFTA §§ 24.005(a)(1), 24.008, & 24.009 or other applicable fraudulent conveyance laws);

i.      Avoiding the HCLP Transfers and awarding monetary recovery in the amount of such transfers, to the extent received (whether directly or indirectly), against HCLP Credit, Highland Consolidated, and subsequent transferees of Highland Consolidated (including, but not limited to, Bradley Capital, Elmwood Bradley Oaks, Brad Heppner Family Trust, and HBH Trust) (pursuant to TUFTA §§ 24.005(a)(1), 24.008, & 24.009 or other applicable fraudulent conveyance laws);

j.      Avoiding the BEN-HCLP Transfers and the BEN-Highland Consolidated Transfer and awarding monetary recovery in the amount of such transfers, to the extent received (whether directly or indirectly), against HCLP, HCLP Credit, Highland Consolidated, and subsequent transferees of Highland Consolidated (including, but not limited to, Bradley Capital, Elmwood Bradley Oaks, Brad Heppner Family Trust, and HBH Trust)) (pursuant to TUFTA §§ 24.005(a)(1), 24.008, & 24.009 or other applicable fraudulent conveyance laws);

k.      Avoiding the BEN-HCLP First Debt and the BEN-HCLP Second Debt as fraudulently incurred obligations (pursuant to TUFTA §§ 24.005(a)(1), 24.008, & 24.009 or other applicable fraudulent conveyance laws);

l.      Avoiding the 2020 Transfers pursuant to 11 § U.S.C. § 548(a)(1)(A), and awarding monetary recovery pursuant to 11 U.S.C. § 550 against BCC, BCH, BCG (USA), HCLP, HCLP Credit, Highland Consolidated, CT Risk Management, L.L.C., Bradley Capital, Elmwood Bradley Oaks, Brad Heppner Family Trust, and HBH Trust to the extent that each Defendant was an initial transferee, an entity for whose benefit such transfers were made, or a subsequent transferee;

m.      Avoidance of the 2019 Loan Transfers pursuant to 11 U.S.C. § 544(b) and applicable other law, and awarding monetary recovery pursuant to 11 U.S.C. § 550 against LiquidTrust Management, L.L.C., the Liquid Trusts, the Collective Collateral Trusts, Funding Trust Management, L.L.C., BCC, HCLP, HCLP Credit, Highland Consolidated, Bradley Capital, and Research Ranch Operating Company, to the extent that each Defendant was an initial transferee or a subsequent transferee;

n.      Avoidance of the $65 Million Loan Termination pursuant to 11 U.S.C. § 548(a)(1)(A) and awarding monetary recovery pursuant to 11 U.S.C. § 550 against the Liquid Trusts in an amount reflecting the value of the debts that were extinguished;

o.      Avoidance of the CLA Termination Transfer pursuant to 11 U.S.C. § 548(a)(1)(A) and awarding monetary recovery pursuant to 11 U.S.C. § 550 against BEN LP in an amount reflecting the value of the debt that was extinguished;

p.      Avoiding the Preferred Equity Conversion Transfer pursuant to 11 U.S.C. § 548(a)(1)(A);

q.      Avoiding the November 2021 Release Transfer (and any other releases purportedly given by the Debtors to any Defendants) pursuant to 11 U.S.C. § 548(a)(1)(A) and/or 11 U.S.C. § 544(b) and other applicable law;

r.      Declaring or ordering appropriate equitable or other relief establishing that the November 2021 Release Transfer and any other releases purportedly given by the Debtors to any of the Defendants are null and void, voidable, subject to rescission, and otherwise unenforceable in equity or under common law;

s.      Ordering injunctive relief pursuant to TUFTA § 24.008(a)(3)(A) and/or other applicable law enjoining HCLP, Highland Consolidated, Heppner, Bradley Capital, Brad Heppner Family Trust, HBH Trust, Heppner Family Home Trust, Elmwood Bradley Oaks from transferring, encumbering, or disposing of property;

t.      Ordering an attachment or other professional remedy, pursuant to TUFTA § 24.008(a)(2), against the property of initial or subsequent transferees of the ██████████ ████████████, the ████████████████████, the HCLP Transfers, the BEN-HCLP Transfers, and the BEN-Highland Consolidated Transfer;

u.      Awarding reasonable attorney's fees and expenses, together with all costs of court, in connection with this action pursuant to TUFTA § 24.013 or other applicable law;

v.      Disallowing the BEN Claims pursuant to 11 U.S.C. § 502(d);

w.      Awarding pre-judgment and post-judgment interest at the maximum rate permitted by law or equity; and

x.      Awarding such other and further relief as the Court deems just.

**Dated:** April 19, 2024

**REID COLLINS & TSAI LLP**

By: */s/ William T. Reid, IV*
William T. Reid, IV
Tex. Bar No. 00788817
S.D. Tex. Bar No. 17074
Nathaniel J. Palmer (admitted *pro hac vice*)
Tex. Bar No. 24065864
Michael J. Yoder (admitted *pro hac vice*)
Tex. Bar No. 24056572
Joshua J. Bruckerhoff
Tex. Bar. No. 24059504
S.D. Tex. Bar No. 1049153
Morgan M. Menchaca
Tex. Bar No. 24103877
S.D. Tex. Bar No. 3697565
Dylan Jones (admitted *pro hac vice*)
Tex. Bar No. 24126834
Emma G. Culotta
Tex. Bar No. 24132034
S.D. Tex. Bar No. 3862661
Taylor A. Lewis
Tex. Bar No. 24138317 (*pro hac vice* forthcoming)
1301 S. Capital of Texas Hwy
Building C, Suite 300
Austin, Texas 78746
(512) 647-6100
wreid@reidcollins.com
npalmer@reidcollins.com
myoder@reidcollins.com
jbruckerhoff@reidcollins.com
mmenchaca@reidcollins.com
djones@reidcollins.com
eculotta@reidcollins.com
tlewis@reidcollins.com

Tarek F.M. Saad (admitted *pro hac vice*)
Tex. Bar No. 00784892
420 Lexington Avenue, Suite 2731
New York, NY 10170
(212) 344-5203
tsaad@reidcollins.com

*Counsel for the GWG Litigation Trustee*

301

**Exhibit A**

**Count 11: AVOIDANCE AND RECOVERY OF FRAUDULENT
TRANSFERS MADE BY HCLP COMMENCING IN JUNE 2019 AND
CONTINUING THEREAFTER PURSUANT TO TUFTA
§§ 24.005(a)(1), 24.008, & 24.009**



**Exhibit B**
**Count 14: AVOIDANCE AND RECOVERY OF FRAUDULENT TRANSFERS**
**MADE BY GWG (FROM JULY 2020 – DECEMBER 2020)**
**PURSUANT TO 11 U.S.C. §§ 548(a)(1)(A) & 550**
**($ in Millions)**



Exhibit C
**Count 15: AVOIDANCE AND RECOVERY OF THE $65 MILLION LOAN**
**PURSUANT TO APPLICABLE STATE LAW AND 11 U.S.C. §§ 544  (b) & 550**
**($ in Millions)**

